## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Angelica Castañon, | ) | |
| 1105 Park Rd. N.W. | ) | |
| Washington, D.C. 20010 | ) | |
| | ) | |
| Gabriela Mossi, | ) | |
| 2853 Ontario Rd. N.W. | ) | **AMENDED COMPLAINT** |
| Washington, D.C. 20009 | ) | |
| | ) | Case No. 1:18-cv-02545-TSC |
| Alan Alper, | ) | |
| 904 New Hampshire Ave N.W. | ) | |
| Washington, D.C. 20037 | ) | |
| | ) | |
| Deborah Shore, | ) | |
| 3408 Patterson St. N.W. | ) | |
| Washington, D.C. 20015 | ) | |
| | ) | |
| Laurie Davis, | ) | |
| 2331 Porter St., N.W. | ) | |
| Washington, D.C. 20008 | ) | |
| | ) | |
| Silvia Martinez, | ) | |
| 1300 Randolph St., N.W. | ) | |
| Washington, D.C. 20011 | ) | |
| | ) | |
| Vanessa Francis, | ) | |
| 4000 10th St. N.W. | ) | |
| Washington, D.C. 20017 | ) | |
| | ) | |
| Abby Loeffler, | ) | |
| 710 4th St. S.E. | ) | |
| Washington, D.C. 20003 | ) | |
| | ) | |
| Susannah Weaver, | ) | |
| 1320 North Carolina Ave N.E. | ) | |
| Washington, D.C. 20002 | ) | |
| | ) | |
| Manda Kelley, | ) | |
| 4210 Benning Rd. N.E. | ) | |
| Washington, D.C. 20019 | ) | |

Absalom Jordan,                                      )
4335 4th St. S.E.                                    )
Washington, D.C. 20032                               )
                                                     )
                        Plaintiffs,                  )
                                                     )
v.                                                   )
                                                     )
                                                     )
The United States of America,                        )
                                                     )
Paul Ryan, in His Official Capacity as               )
Speaker of the House of Representatives              )
The United States Capitol, Room H232                 )
Washington, D.C. 20515                               )
                                                     )
Karen L. Haas, in Her Official Capacity              )
as Clerk of the United States House of               )
Representatives,                                     )
The United States Capitol, Room H154                 )
Washington, D.C. 20515                               )
                                                     )
Paul D. Irving, in His Official Capacity as          )
Sergeant at Arms of the United States                )
House of Representatives                             )
The United States Capitol, Room H124                 )
Washington, D.C. 20515                               )
                                                     )
Orrin G. Hatch, in His Official Capacity             )
as President Pro Tempore of the                      )
United States Senate                                 )
104 Hart Senate Office Building                      )
Washington, D.C. 20510                               )
                                                     )
Julie Adams, in Her Official Capacity as             )
Secretary of the United States Senate                )
232 Hart Senate Office Building                      )
Washington, D.C. 20510                               )
                                                     )
                                                     )
                                                     )
                                                     )

)
Michael Stenger, in His Official Capacity )
as Sergeant at Arms and Doorkeeper of )
the United States Senate )
The United States Capitol, Room S151 )
Washington, D.C. 20510 )
)
Michael R. Pence, in His Official )
Capacity as Vice President of the United )
States, Office of the Vice President )
1600 Pennsylvania Avenue, N.W. )
Washington, D.C. 20500 )
)
Wilbur Ross, in His Official Capacity as )
Secretary of Commerce )
United States Department of Commerce )
1401 Constitution Avenue, N.W. )
Washington, D.C. 20230 )
)
Donald J. Trump, in His Official Capacity )
as President of the United States, )
Office of the President )
1600 Pennsylvania Avenue, N.W. )
Washington, D.C. 20500, )
)
)
　　　　　　　　　　Defendants. )
_____ )

# TABLE OF CONTENTS

Page

I.      NATURE OF THIS ACTION ..................................................................1

II.     JURISDICTION AND VENUE ..............................................................6

III.    PARTIES ...............................................................................................7
        A.    Plaintiffs ....................................................................................7
        B.    Defendants ...............................................................................19

IV.     HISTORY AND FACTS RELEVANT TO THE CLAIMS ......................23
        A.    Residents of the District of Columbia Are Full-Fledged American
              Citizens ....................................................................................23

        B.    The Right to Vote for Legislative Representation Is a Fundamental
              Right ........................................................................................25

        C.    Congress Has the Power to Grant Voting Representation in Congress
              for Citizens Residing in the District ..........................................29

        D.    Congress Has Exercised Its Authority to Grant This Right to Vote to
              Other Citizens Who Are Not Residents of States ........................35

        E.    Congress Has Failed to Exercise Its Authority to Grant Representation
              in Congress to District Residents ..............................................37

        F.    The First Amendment Prohibits Excessive Burdens on Voters' Rights
              to Association ...........................................................................38

        G.    Prior Judicial Decisions Do Not Preclude Plaintiffs' Challenges Here. ..............40

V.      HARM .................................................................................................42
        A.    District Residents Are Harmed by Their Lack of Voting Representation
              in Congress ..............................................................................42

        B.    Defendants' Actions Deprive Citizens Residing in the District of Their
              Right to Voting Representation in Congress ...............................43

VI.     CAUSES OF ACTION .........................................................................43
        A.    Count I (Denial of Equal Protection) ........................................43
        B.    Count II (Denial of Due Process) .............................................44
        C.    Count III (Infringement of the Right to Association and Representation)............44

VII.    PRAYER FOR RELIEF .......................................................................45

VIII.   JURY DEMAND .................................................................................48

i

# I.   NATURE OF THIS ACTION

1.      This action seeks to secure the right to full voting representation in the United States Congress for American citizens living in the District of Columbia, the seat of our national government.  The denial of that right violates the constitutional guarantees of equal protection, due process, and the constitutional right of association.

2.      As the United States Supreme Court explained in 1886, "the political franchise of voting is . . . . a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  The Court also described the right to vote as "fundamental" in establishing the one person, one vote, principle in *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964) (citing *Yick Wo*, 118 U.S. at 370).  The Court reiterated that this right to full voting representation is "fundamental" in striking down State poll taxes in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Yick Wo*, 118 U.S. at 370) (quoting *Reynolds*, 377 U.S. at 561–562).  As the Court explained in *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964): "Other rights, even the most basic, are illusory if the right to vote is undermined."  In short, "the fundamental right to vote . . . is at the heart of this country's democracy." *Burson v. Freeman*, 504 U.S. 191, 191 (1992).

3.      Nevertheless, the right to voting representation in Congress has been wrongfully denied to the Americans who live in the District of Columbia, the capital of the Free World, since the federal government officially took control of the District as the country's national capital in 1801.  The denial of this fundamental right has continued even though District residents have repeatedly petitioned Congress to grant them that right.  And it has continued, for no just reason, even with the "continuing expansion of the scope of the right of suffrage" throughout the centuries since our country's founding. *Reynolds*, 377 U.S. at 555.

1

4.      Members of Congress have correctly concluded that Congress has the constitutional authority to provide voting representation in Congress to District residents under the "District Clause," Article I, Section 8, Clause 17 of the U.S. Constitution. *See infra,* ¶ 104. Notwithstanding that recognition, Congress continues to deny the hundreds of thousands of Americans of voting age in the District their fundamental voting rights. It does so even though it has granted those same rights to other American citizens who, like District residents, do not live in a State, such as those who once lived in a State but now live overseas. And it continues to do so despite the fact that other American citizens who live on federal enclaves exercise their right to vote because Congress has taken action that requires States to permit them to vote even though they live on federal land. This disparate treatment violates the equal protection guaranteed to District residents by the Constitution.

5.       Because the right to vote is fundamental under our Constitution, and because the reasons that right is fundamental apply foursquare to District residents, the continuing denial of that right to District residents also violates their constitutional right to due process, for reasons explained by the Supreme Court in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

6.      The continued denial of voting representation in our national legislature also violates the constitutional right of District residents to band together to further their political beliefs. Because District residents may not band together and ask their voting representatives to take action consistent with their goals, they are denied the core protection guaranteed by the First Amendment right of association. *See generally Gill v. Whitford*, 138 S. Ct. 1916 (2018).

7.      The denial of voting representation thus infringes the equal protection, due process, and association rights of Plaintiffs and the other Americans living in the District. These Plaintiffs, who are subject to all the responsibilities of citizenship—paying the taxes, obeying the

laws, and fighting in the wars authorized by Congress—are entitled to vote for representation in the Congress that sets those taxes, passes those laws, and authorizes those wars. Otherwise, Plaintiffs will continue to be deprived of the fundamental principle upon which our national government was founded—the consent of the governed.

8.      Plaintiffs therefore seek declaratory and, if necessary, injunctive relief to secure the right to full Congressional voting representation for themselves and other District residents, and thus to eliminate this affront to our Nation's ideals and to District residents' fundamental rights.

9.      Plaintiffs' constitutional challenges here are distinct from those raised nearly two decades ago in *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000), *aff'd* 531 U.S. 941 (2000). That decision does not preclude the constitutional challenges in this amended complaint because Plaintiffs here make three constitutional challenges that were not advanced by the *Adams* plaintiffs, were not decided by the *Adams* court, and are based on subsequent legal developments.

10.     *First*, unlike the equal protection challenge in *Adams*, Plaintiffs' claims here are *not* dependent on District residents being characterized as citizens of a "State" for purposes of Article I, Section 2 of the Constitution. Instead, it is based on *Congress*'s refusal to exercise its authority to protect the voting rights of District residents in the face of its recognition, post-*Adams*, that it has the power to do so.

11.     Congress clearly has the power to protect the constitutional rights of District residents. The District Clause gives Congress authority to grant voting congressional representation to Americans who do not live in a "State." Members of Congress confirmed—by overwhelming votes—their belief in Congress's power to grant voting rights to residents of the

3

District of Columbia in hearings held and legislation considered in 2007 and 2009.  In 2007, the House of Representatives adopted the 2007 District of Columbia House Voting Rights Act, a bill designed to right this historical wrong.  After it failed to act on the 2007 Act, the Senate took up the matter in the next Congress and adopted the 2009 District of Columbia House Voting Rights Act.  Both the 2007 and 2009 bills provided that "the District of Columbia shall be considered a Congressional district for purposes of representation in the House of Representatives."  H.R. 1905, 110th Cong. § 2(a) (2007); S.160, 111th Cong. § 2(a) (2009).

12.     Congress acted decades ago to protect the fundamental voting rights of Americans living overseas who, like citizens living in the District, are not residents of any "State," by enacting the Uniformed and Overseas Citizens Absentee Voting Act of 1986, Pub. L. No. 99-410.  Congress also used its "exclusive authority" over a federal enclave under Article I, Section 8, Clause 17 of the Constitution in a way that allowed residents of that enclave—the National Institutes of Health—to have voting representation in the State where that enclave was located—Maryland.  As the Supreme Court held in *Evans v. Cornman*, 398 U.S. 419 (1970), once Congress used its "exclusive authority" to permit enclave residents to be subject to taxes and laws of the State comprising the enclave, equal protection principles compelled the conclusion that those residents must be permitted to vote in State and federal elections.

13.     Congress's authority over federal enclaves is set forth in the same constitutional provision that contains the District Clause, using essentially the same language.  Indeed, the District *is in effect* a federal enclave whose establishment, unlike many military bases and other properties purchased by the federal government, was foreseen when the Constitution was adopted.  Yet even though Congress has comparable authority over enclaves and the District, Congress has refused to exercise that authority to afford voting representation to both.  And as

4

noted, Congress took action to bring voting representation to citizens living overseas, but again, not to District residents.  Accordingly, unlike the plaintiffs in *Adams*, Plaintiffs here do not claim they should be treated as residents of a State within the meaning of Article I, Section 2; to the contrary, their claim is that notwithstanding they are not residents of a State, they are nonetheless entitled to voting representation, just as Congress has provided that representation to those living overseas and in federal enclaves.

14.     *Second*, Plaintiffs' due process challenge is distinct from the claims brought in *Adams* in 2000.  Plaintiffs rely on the Supreme Court's recent decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), in which the Court explained that the due process inquiry requires two steps and incorporates equal protection principles.  Under the *Obergefell* analysis, the Court first asks whether a fundamental right is implicated—there, the right to marry; here, the right to voting representation.  The Court *then* asks whether the reasons giving rise to the fundamental right apply to the group in question—there, same-sex couples; here, District residents who are American citizens otherwise eligible to vote.  The *Obergefell* Court also emphasized that fundamental rights are not "defined by who exercised them in the past."  *Id*. at 2602.

15.     Our history, buttressed by many Supreme Court decisions, confirms that the right to voting representation in Congress is a fundamental right.  Application of the analysis set forth in *Obergefell* leads to the conclusion that, as the reasons for that fundamental right apply to District residents, that right can no longer be constitutionally denied them

16.     *Third*, Plaintiffs' claim based on infringement of their First Amendment Association rights is also distinct from the claims advanced in *Adams*.  Recent developments in First Amendment jurisprudence establish that interference with the right to vote necessarily interferes with the right to band together to seek redress of grievances.  *See Vieth v. Jubelirer*,

5

541 U.S. 267, 314 (2004) (Kennedy, J., concurring) ("The First Amendment may be the more relevant constitutional provision in future cases" involving citizens' association rights in the electoral process); *Gill*, 138 S. Ct. at 1938 (Kagan, J., joined by Ginsburg, Breyer, & Sotomayor, JJ., concurring) ("[S]ignificant 'First Amendment concerns arise' when a [s]tate purposely 'subject[s] a group of voters or their party to disfavored treatment.'" (second alteration in original) (quoting *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring))); *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 935 (M.D.N.C. 2018) (finding First Amendment violations "by chilling voters, candidates, and parties' participation in the political process"); *Benisek v. Lamone*, 2018 WL 5816831 (D. Md. Nov. 7, 2018).  While *Vieth*, *Gill*, *Common Cause*, and *Benisek* acknowledged a First Amendment right against the diminution of voting rights, District residents have an even stronger First Amendment claim: their situation is not simply a diminution of voting representation, but a complete denial of that representation.

17. Because of the infringement of their voting rights, District residents lack voting representatives in Congress to whom they may bring their grievances.  That substantial burden on Plaintiffs' rights to association is not justified by any important, offsetting governmental interests, and accordingly violates the First Amendment.  Indeed, there is no principled basis at all for continuing to deny to District residents the fundamental right to vote, a right the Supreme Court has said is essential to the exercise of all other rights under the Constitution.

## II.    JURISDICTION AND VENUE

18. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 § U.S.C. 1346(a), and 5 U.S.C. §§ 701–706, because Plaintiffs' claims arise under the United States Constitution.

19.     A three-judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of congressional districts."  Pursuant to Rule 9.1 of the Rules of the United States District Court for the District of Columbia, Plaintiffs file an Application for a Three-Judge Court contemporaneously with this Amended Complaint.

20.     Venue is proper in this District under 28 U.S.C. §§ 1391 (b)(1)–(2), (e), because all Plaintiffs and Defendants reside in this District and because a substantial part of the events and omissions giving rise to the cause of action have occurred here.

### III.     PARTIES

#### A.     Plaintiffs

21.     The Plaintiffs are United States citizens who reside in the various Wards of the District of Columbia.  Their life experiences and viewpoints are diverse—but Plaintiffs are united in their desire to secure and exercise their fundamental right as citizens of this country: the right to fully participate in the electoral franchise and secure voting representation in Congress. Plaintiffs' names and backgrounds are set forth below.

22.     Plaintiff Angelica Castañon, a resident of Ward 1, was born and raised in Southern California, where she lived until her mid-twenties, when she moved to New York to attend graduate school at Columbia University.  After receiving her degree, she briefly moved to Paris before her career took her to Philadelphia, New York City, and then, in 2013, to the District of Columbia.  Ms. Castañon now owns a home in the Columbia Heights neighborhood of the District.  Since settling in Washington, Ms. Castañon has not been permitted to vote for voting representation in Congress by virtue of her residence in the District of Columbia.

7

23.     Ms. Castañon grew up in poverty.  For some time, she lived with her family in a rented garage and relied on food supplied by food banks and churches.  As a child of color growing up in poverty, she remembers experiencing implicit bias in schools.  In particular, she recalls her mother advocating to keep her in the general education population rather than in remedial classes that Ms. Castañon did not need.  Ms. Castañon recalls her great grandmother's commitment to service, and in particular, her practice of inviting homeless people to eat with the family at their dinner table, no matter how strained the family's resources were.  These memories instilled a duty of service in Ms. Castañon.

24.     Ms. Castañon is currently employed as a Senior Policy Analyst for the National Education Association and serves as an Advisory Neighborhood Commissioner ("ANC") in the District of Columbia.  She has won several community service awards, and in addition to her regular ANC duties, she takes on additional acts of service such as community walks to identify youth suffering from homelessness and addiction.

25.     Ms. Castañon believes it is unfair that residents of the District of Columbia cannot elect voting representatives in the House of Representatives and Senate, despite paying federal taxes and despite the fact that the District's population is larger than that of other States.  Ms. Castañon is concerned that District residents' lack of voting representation in Congress means that they miss out on influencing decisions that affect them, such as the Elementary and Secondary Education Act.  Ms. Castañon is also concerned about individuals who come to the District to work for nonprofit organizations, and are silenced by their lack of voting representation as a result of their move.  Ms. Castañon seeks the right to voting representation in Congress because voting makes her feel included by her country.  Ms. Castañon feels that her lack of voting representation in Congress is hurtful.

26.     Plaintiff Gabriela Mossi, a resident of Ward 1, is a native-born resident of the District of Columbia who spent part of her childhood living in Honduras.  She moved back to the District as a young adult and has been politically active since her return.  Despite her impressive civic involvement, she is not permitted to vote for voting representation in Congress by virtue of her residence in the District of Columbia.

27.     Ms. Mossi regularly votes in District of Columbia elections, including for the position of the non-voting Delegate from the District of Columbia to the House of Representatives.  She served three two-year terms as an Advisory Neighborhood Commissioner for the Adams Morgan neighborhood of the District.  Ms. Mossi also serves on the boards of several not-for-profit organizations: the DC Latino Caucus, the Latino Economic Development Center, and the United Planning Organization.  Ms. Mossi is a homeowner and a member of the Ontario Co-operative Association in Adams Morgan, a Ward 1 neighborhood.

28.     Ms. Mossi is currently employed as the Executive Director of the Washington English Center, a community-based organization that offers English and literacy training to low-income adult immigrants in the greater Washington, D.C. area using volunteer tutors. Previously, Ms. Mossi worked as the Director of Program and Resource Development at the Greater Washington Hispanic Chamber of Commerce Foundation, where she designed and managed technical assistance and commercial revitalization programs for minority small business owners.  Ms. Mossi's community service was publicly recognized in 2017 when she was included on the 2017 El Tiempo Latino/Washington Post Power 100 List.  She also received the Community Service Leader of the Year Award from the Greater Washington Hispanic Washington Chamber of Commerce.

9

29.     As someone who has dedicated her life to strengthening communities and has spent her career working with people who are investing time and money into strengthening their English skills, getting better trained for the changing workforce, and developing small businesses, Ms. Mossi feels strongly that District residents should have the opportunity to vote for voting Congressional representatives who are equal to their peers in Congress and responsive to their constituents.

30.     Plaintiff Alan Alper, a resident of Ward 2, was born in Hamilton County, Tennessee and grew up with his family in Chevy Chase, Maryland.  Mr. Alper lived briefly in Ohio, California, and Pennsylvania before settling in Washington, D.C. in 1998.  Mr. Alper and his wife own a home in the Ward 2 Foggy Bottom neighborhood.  He is well-acquainted with his neighbors and is involved in the Foggy Bottom Association and his local Advisory Neighborhood Commission.  From the time when he was first able to register at the age of 18, Mr. Alper has made a point of exercising his right to vote.  While living in Ohio, California, and Pennsylvania, Mr. Alper was able to vote for voting representatives in the House of Representatives and Senate.  As a District resident, Mr. Alper is no longer able to vote for voting representatives in Congress.

31.     Mr. Alper is a lifelong fan of the Washington Senators and Washington Nationals professional baseball teams.  He was quoted in *The Washington Post* and on the Washington Nationals history website *National Pastime*, and had a dog named "Hondo" after Frank Howard of the Washington Senators.  He is a 1979 graduate of the University of Maryland and earned his Athletic Trainer's Certification in 1980 from the National Athletic Trainers' Association.  Mr. Alper has worked as an athletic trainer at District of Columbia area schools, including Georgetown University and Bethesda-Chevy Chase High School, and as a licensed massage

10

therapist at the Center for Integrative Medicine at George Washington University Hospital.  He also taught massage at the George Washington University Exercise Science Department, and owned his own massage practice in the District.  Currently, he is semi-retired.

32.     Mr. Alper thinks it is unfair that residents of the District of Columbia cannot elect voting representatives in the House of Representatives and Senate.  He believes the United States is founded on the principle that all citizens have a voice and a vote.  Mr. Alper wants to vote for voting representatives in Congress, just as he did before moving to the District, because he believes it is his right as the same person who voted in Ohio, California, and Pennsylvania.

33.     Plaintiff Deborah Shore, a resident of Ward 3, grew up in Pittsburgh, Pennsylvania.  She attended Antioch College in Yellow Springs, Ohio and came to the District of Columbia in 1971 during her junior year of college, as part of her school's cooperative education program.  In 1974, she founded a not-for-profit organization currently known as Sasha Bruce Youthwork, which draws on volunteer support to counsel homeless youth and out-of-town runaway children.  As a District resident, Ms. Shore is no longer able to vote for voting representatives in Congress.

34.     Ms. Shore volunteers on several boards, including the DC Alliance of Youth Advocates, the Public Defender Service for the District of Columbia, and the National Network for Youth.  She has received several awards for her leadership in the not-for-profit sector.  Most recently, she was awarded a Lifetime Achievement Award by the National Network for Youth.  Ms. Shore was also named "Washingtonian of the Year" in 2016 and has been named as a White House Champion of Change.

35.     Ms. Shore has been a regular voter throughout her adult life.  She seeks to exercise her right to vote for voting congressional representatives for the District who support

programs and budgets that meet the needs of the youth and young adults she serves.  Ms. Shore
also thinks it is imperative that young adults of voting age in the District be allowed to exercise
the same right to vote as young adults of voting age in any State.  She believes that
disenfranchising young adults who are of voting age exacerbates their feelings of disconnection,
which contributes to a host of other challenges.

36.     Plaintiff Laurie Davis, a resident of Ward 3, was born in Michigan and moved to
the District to attend law school in 1976.  Ms. Davis spent two years working as a *pro se* law
clerk for the United States Court of Appeals for the Second Circuit in New York City from 1980
to 1982, and has lived in the District of Columbia since then.  Ms. Davis settled in the District
with her boyfriend, now husband, and got a job she loved with the Public Defender Service for
the District of Columbia.  She had clients all over the District, so she got to know it well.  Ms.
Davis likes the District for its size, livability, beauty, and people, and has raised two children
here.  However, as a District resident, she is no longer able to vote for voting representatives in
Congress.

37.     Ms. Davis is on the boards of the Public Defender Service for the District of
Columbia, from which she retired, and the Washington Legal Clinic for the Homeless, which she
helped found.  She is a volunteer teacher at the Washington English Center, and volunteers on
refugee support projects at Adas Israel Congregation.  All four of Ms. Davis's grandparents were
immigrants—two having immigrated from a country which was not a democracy at the time—
and all became citizens of the United States.  They believed very firmly in civic responsibilities,
which included reading the newspaper, educating oneself, voting, and serving on juries when
called.  Ms. Davis was always taken along when her parents went to vote, to see what they
believed was the most important thing one could do as a citizen.  This emphasis from her

12

upbringing was reinforced by what she witnessed as a public defender working with mentally ill clients and as general counsel to the D.C. Department of Mental Health ("DMH").  Part of Ms. Davis's job at DMH, such as when enacting the Mental Health Civil Commitment Act of 2002, was working to ensure that Congress would not overturn the law once the District passed it.  She saw the need for change, and the unique limits on the people of the District of Columbia in seeking to make change.

38.     Ms. Davis thinks it is unfair that residents of the District have no way of making their views known through the ballot box, and no input into those who will enforce and interpret federal laws.  She gladly pays federal taxes, but has no say in how that money is used.  Ms. Davis wants to vote for voting representatives in Congress because she wants people to be elected to office who reflect values she holds dear, who will appoint people with integrity, and who will protect the environment.  She thinks that residents of the District of Columbia suffer the ultimate disenfranchisement.

39.     Plaintiff Silvia Martinez, a resident of Ward 4, was born in Germany and grew up spending the first thirteen years of her life moving wherever her Vietnam-War-veteran father was deployed.  From the ages of thirteen to twenty-six, Ms. Martinez lived in Puerto Rico.  She has voted consistently since becoming eligible to vote at eighteen years old.  Ms. Martinez moved to Washington, D.C. in 1994 from Boston, Massachusetts.  As a District resident, she is no longer able to vote for voting representatives in Congress.

40.     Ms. Martinez believes strongly that it is important for people to give back to their communities, especially to the most vulnerable members of those communities. She began volunteering at fifteen years old.  She serves on the board of VIDA senior centers, is Chair of the D.C. Latino Caucus, and is involved in a variety of political causes.  Ms. Martinez is an associate

professor and director of the graduate program in the Department of Communication Sciences and Disorders at Howard University, is an Expert Consultant to the American Speech-Language and Hearing Association and Pan-American Health Organization Project, and is a frequently published researcher in her field.  She has received many professional recognitions—most recently, she received the 2018 Excellence in Diversity Award from the Council of Academic Programs in Communication Sciences and Disorders.

41.     Ms. Martinez thinks it is unfair that District residents cannot vote for voting representation in Congress, because what we conceive of as democracy in the United States is everyone having a voice through their vote and access to their representatives.  She thinks that lack of representation at the federal level results in District residents being second-tier citizens.  Ms. Martinez wants to vote for voting Congressional representatives for the District because she wants her voice to be heard.  When bills come up before Congress, especially about education and health, she thinks she should be able to be heard by her representatives, instead of other people and their representatives making decisions for her.

42.     Plaintiff Vanessa Francis, a resident of Ward 5, grew up in Southbury, Connecticut.  She completed her undergraduate degree at the University of Houston, where she graduated *summa cum laude*.  She moved to the District of Columbia in 2009.  Ms. Francis completed her Master of Arts in Conflict Resolution at Georgetown University in 2011, and has lived in the District since 2015.  Although she voted for voting representation in the House of Representatives and Senate when living in Connecticut and Texas, Ms. Francis is not currently permitted to vote for voting representation in Congress because she is a resident of the District of Columbia.

43.     Ms. Francis has volunteered with the United Service Organizations, Inc. at
Arlington and with the Capitol Area Food Bank.  Her interest in veterans' affairs is related to her
brother's service as a military psychologist.  Ms. Francis works as an instructional designer and
is a co-owner of the District of Columbia landscaping business District Green.  She is a
homeowner in the Brookland neighborhood of Ward 5.

44.     As a student of conflict resolution, Ms. Francis is passionate about fairness and
equal opportunities to be heard.  Ms. Francis believes the District of Columbia's lack of voting
representation in Congress is antithetical to those ideals.  Ms. Francis is also disturbed by the
District's disenfranchisement in light of its complicated racial history.

45.     Plaintiff Abby Loeffler, a resident of Ward 6, was born in Harriman, Tennessee,
and grew up in Rockwood, Tennessee.  She moved to the District of Columbia in 2007 and
began applying for graduate school.  Ms. Loeffler graduated from Catholic University in 2011
with a dual Master of Architecture and City and Master of Regional Planning degree.  Ms.
Loeffler voted for voting representation in Congress as a resident of Tennessee, but is not now
permitted to vote for voting representation in Congress because of her residence in the District.

46.     Ms. Loeffler was raised in a small town by a single mother.  This experience
impressed upon her a belief that women can do more than what their traditional roles suggest.
She also believes it is important for families to be able to use government assistance when
needed.

47.     Ms. Loeffler is now an associate architect at "//3877," a boutique design firm. She
has taught at the Catholic University of America and the George Washington University
Corcoran School of the Arts & Design.  Ms. Loeffler has also volunteered with the National
Building Museum Design Apprenticeship Program, the DC Rollergirls roller derby league, and

15

Batalá Washington, an all-female percussion band.  She is a mentor to District of Columbia high school students who aspire to be architects and planners.

48.    Ms. Loeffler believes it is unfair that District voters cannot elect voting representatives in the House of Representatives and Senate.  District residents are subject to federal laws and pay federal taxes, but do not have the same ability as other citizens to elect a voting representative to help determine what laws are passed and how federal taxes are spent.  She believes her voting rights should not depend on where she lives.  Ms. Loeffler seeks to elect voting representatives in the House of Representatives and Senate because the District has a unique culture and needs to be represented based on the beliefs of its own residents.  Ms. Loeffler believes this is especially true because Congress continues to have oversight of the District's local government activities.

49.    Plaintiff Susannah Weaver, a resident of Ward 6, was born and raised in Pennsylvania.  Ms. Weaver attended college in Massachusetts, and worked in Italy and Massachusetts before moving to the District for graduate school in 2001.  After a semester of graduate school, she left for an opportunity to work for the House of Representatives Committee on Science from 2002 through 2006.  In 2006, Ms. Weaver realized that she would be remaining in the District for the long term.  She is not now permitted to vote for voting representation in Congress due to her status as a District resident.

50.    Ms. Weaver has volunteered with College Bound, her local elementary school, and Hill Havurah, a Jewish community in Capitol Hill, in addition to serving as a member of the Board of Visitors of Georgetown University Law Center.  She loves the Capitol Hill neighborhood, and her husband (whom she met while in law school in the District) also loves the neighborhood and volunteers regularly.  Ms. Weaver has also had unique career opportunities in

16

Washington, D.C., not only in the House of Representatives, but also the U.S. Environmental Protection Agency, U.S. Department of Justice, the federal district court for the District of Columbia, and the Supreme Court of the United States.  Despite this, she is sometimes tempted to move because she cannot vote for representation in Congress.  Ms. Weaver volunteers in what elections she can, and tells her parents and in-laws how frustrating it is to be unable to vote for her own federal representatives, but that isn't enough.

51.     Ms. Weaver thinks it is unfair that District residents are citizens and residents of the United States, and pay both federal and local taxes, but don't have voting representation in the federal government.  When she has an opinion about something going on in Congress or thinks that Congress needs to take action, she doesn't have a representative to weigh in with who is charged with representing her.  When there is a vote, there is no one she can seek to influence who is supposed to have her (and her neighbors') best interests in mind.  In particular, as a lawyer, Ms. Weaver has strong views on who she thinks is qualified to be a federal judge or Justice and yet her opinion carries no weight when the Senate votes to confirm a judge or Justice.  Ms. Weaver does not believe there is any principled basis on which she is denied voting representation in the federal government.

52.     Plaintiff Manda Kelley, a resident of Ward 7, was born in Illinois, and moved to the District of Columbia as a young adult.  Ms. Kelley loves the District because it is a big city with a small-town feel.  Ms. Kelley voted for the first time as a resident of Illinois.  Since then, she has not been permitted to elect voting representation in the House of Representatives or Senate because she is a resident of the District.

53.     Ms. Kelley was an active member of Moms on the Hill, as well as an instrumental member of a parents' group that founded the highly rated Two Rivers Public Charter School in

the Ward 6 Capitol Hill neighborhood.  She went back to school to earn a bachelor of arts in teaching, graduated *summa cum laude*, and is now a teacher at the school she helped found.  Ms. Kelley made room for these community commitments in her life as a single mother to a busy student athlete who was enrolled in Advanced Placement International Baccalaureate classes and who graduated in the top of her high school class.  She feels lucky to have had support from friends and family, particularly because she has rheumatoid arthritis and her daughter has Type I diabetes, which are both expensive to treat.  For personal reasons like these, Ms. Kelley believes it is imperative that District voters have voting representation in the House of Representatives and Senate.

54.     Plaintiff Absalom Jordan, a resident of Ward 8, is a native Washingtonian born in May, 1941.  Mr. Jordan attended District of Columbia public schools and Federal City College (now known as the University of the District of Columbia).  Because he has lived his entire life in the District, he has never been permitted to elect voting representatives in Congress.

55.     Mr. Jordan is a veteran who served four years in the United States Air Force.  He was a civil rights activist and was active in local District issues.  He served with the Far Southeast Community Organization, the D.C. Statehood Assembly, the Bethlehem Baptist Church, the Anacostia Coordinating Council, Ward 8 Education Council, and his Advisory Neighborhood Commission.

56.     Mr. Jordan worked for the International Business Machines Corporation ("IBM") after his service in the Air Force, and then became a legislative aide to a member of the Council of the District of Columbia.  Later, he worked in the District of Columbia Department of Employment Services.  He is currently retired, but continues his community involvement.

57.     Mr. Jordan has never had the ability to elect voting representatives in Congress, even while serving in the Air Force.  He believes that it is a violation of fundamental rights to disenfranchise the District of Columbia in this way.  Mr. Jordan seeks to vote for voting members of the House of Representatives and Senate to exercise one of his fundamental rights as an American citizen.

58.     All of the Plaintiffs are citizens of the United States and are registered to vote in the District of Columbia.

**B.     Defendants**

59.     Defendant Paul Ryan in his official capacity as Speaker of the United States House of Representatives is charged (among other responsibilities) with presiding over proceedings on the House floor.  On information and belief, Defendant Ryan would not rule in favor of permitting a vote cast by an elected representative of the District of Columbia to count among the votes counted on that issue in the House of Representatives.  Defendant Ryan maintains his office at, and conducts his official duties from, the United States Capitol Building in Washington, D.C.

60.     Defendant Karen L. Haas, in her official capacity as Clerk of the United States House of Representatives, is charged with the duty (among other duties) of keeping a roll of all Representatives and Representatives-Elect, comprised of those persons, and those persons only, who are elected in accordance with the laws of the United States.  Defendant Haas is also charged to call the Members-Elect to order at the commencement of each Congress and to call the roll of Members-Elect; to note all questions of order and decisions thereon; to oversee the recording of votes on legislation presented for a vote; and to certify the passage by the House of all bills and joint resolutions.  Defendant Haas, as Clerk of the House of Representatives, has not

19

certified the Delegate of the District of Columbia as a voting member of the House of

Representatives and has failed to include and record the vote of the District of Columbia

Delegate on legislation, bills, and resolutions presented for a vote on the floor of the House, in

violation of the fundamental right of District residents to full voting representation in the

Congress of the United States.  Defendant Haas maintains her office at, and conducts her official

duties from, the United States Capitol Building in Washington, D.C.

61.    Defendant Paul D. Irving, in his official capacity as Sergeant at Arms of the

House of Representatives, is the chief law enforcement and protocol officer of the House.  It is

the Sergeant at Arms' duty (among other duties) to help maintain protocol and order in the

House Chamber.  Defendant Irving, as Sergeant at Arms of the House of Representatives, is

charged to regulate admittance to the House Floor for Representatives (and certain other staff

and assistants) and to bar all other persons from admission during the sessions of the House.

Defendant Irving, as Sergeant at Arms of the House of Representatives, has not given effect to

votes cast by citizens of the District of Columbia in determining the prevailing voting Member

entitled to enter the floor of the House on behalf of the District.  Defendant Irving maintains his

office at, and conducts his official duties from, the United States Capitol Building in

Washington, D.C.

62.    Defendant Orrin G. Hatch in his official capacity as President Pro Tempore of the

United States Senate is empowered (among other things), in the absence of the President of the

Senate, to preside over proceedings on the Senate floor.  On information and belief, Defendant

Hatch would not favor permitting individuals elected by the citizens of the District of Columbia

to be seated in the United States Senate.  Defendant Hatch maintains his office at, and conducts

his official duties from, the United States Senate Hart Office Building in Washington, D.C.

20

63.     Defendant Julie Adams, in her official capacity as Secretary of the United States Senate, serves as an administrative and financial officer of the Senate and, in that role (among other duties), oversees the maintenance of all records of the Senate, and oversees the Senate Parliamentarian.  Defendant Adams, as Secretary of the United States Senate, would not give effect to votes cast by citizens of the District in determining the prevailing candidate entitled to be sworn in as a Senator.  Defendant Adams also has not sent a Recommended Form for Certificate of Election to an official of the District of Columbia certifying an upcoming election in the Senate, as she does to the secretary of state and the governor of each of the fifty States where there is an upcoming election for the Senate.  Defendant Adams maintains her office at, and conducts her official duties from, the United States Senate Hart Office Building in Washington, D.C.

64.     Defendant Michael Stenger, in his official capacity as Sergeant at Arms and Doorkeeper of the United States Senate, is the chief law enforcement officer of the Senate and is therefore responsible (among other things) for determining who can enter the Chamber of the United States Senate.  In his official capacity as the executive officer of the Senate, the Sergeant at Arms enforces all rules of the Senate: its Standing Rules, Standing Orders, Rules for the Regulation of the Senate Wing, and Rules for Impeachment Trials.  Defendant Stenger, as Sergeant at Arms and Doorkeeper of the United States Senate, would not give effect to votes cast by citizens of the District in determining the prevailing candidate entitled to enter the floor of the Senate as a Senator from the District of Columbia.  Defendant Stenger maintains his office at, and conducts his official duties from, the United States Capitol Building in Washington, D.C.

65.     Defendant Michael Pence, in his official capacity as Vice President of the United States, is empowered (among other things), as President of the Senate, to preside over

21

proceedings on the Senate floor.  On information and belief, Defendant Pence would not favor permitting individuals elected by the citizens of the District of Columbia to be seated in the United States Senate.  Defendant Pence maintains his office at, and conducts his official duties from, The White House in Washington, D.C.

66.      Defendant Wilbur Ross in his official capacity as Secretary of the United States Department of Commerce is charged with responsibility (among other responsibilities) for conducting the decennial census required by Article I, Section 2 of the United States Constitution and for reporting census data to the President of the United States to enable fair apportionment of seats in the United States House of Representatives.  On information and belief, Defendant Ross would not include a separate entry for the District of Columbia in his decennial census report to the President of the United States for purposes of apportioning voting representation in the United States House of Representatives to the District of Columbia.  Defendant Ross maintains his office at, and conducts his official duties from, the Department of Commerce in Washington, D.C.

67.      Defendant Donald Trump, in his official capacity as President of the United States, is charged with the responsibility, among other responsibilities, to transmit to Congress the results of each decennial census of the population of the United States, specifying the number of representatives in the United States House of Representatives to be apportioned to each State. Defendant Trump, as President of the United States, would not calculate, account for, and include the population of the District of Columbia for the purpose of apportioning representatives in the United States House of Representatives to the District of Columbia. Defendant Trump maintains his office at, and conducts his official duties from, The White House in Washington, D.C.

### IV.   HISTORY AND FACTS RELEVANT TO THE CLAIMS

### A.   Residents of the District of Columbia Are Full-Fledged American Citizens.

68.   The individual Plaintiffs are representative of the more than 690,000 United States citizens who are also residents in the District of Columbia.  *See QuickFacts District of Columbia*, U.S. Census Bureau (July 1, 2017), www.census.gov/quickfacts/DC.  Of these, approximately 520,000 are of voting age, of which approximately 470,000 were registered to vote as of April 30, 2018.  *See Monthly Report of Voter Registration Statistics*, D.C. Bd. of Elections (April 30, 2018), https://dcboe.org/CMSPages/GetFile.aspx?guid=faa2652c-b93c-4426-aacd-19460cf69adc.

69.   Citizens in a representative democracy have rights and responsibilities that attach to their citizenship.

70.   Among the key responsibilities of United States citizenship are paying taxes; serving, when called upon to do so, in the Nation's defense in time of conflict; serving on juries; supporting and defending the Constitution; and participating in the Nation's political processes through the exercise of the franchise.  Another responsibility of United States citizenship is to obey the laws duly adopted by the legislative bodies elected by the body politic.

71.   Like other citizens of the United States, Americans living in the District of Columbia have long fulfilled and continue to fulfill their responsibilities of citizenship, and they have supported and continue to support their national government.

72.   District residents fully meet their obligation to pay taxes to the federal government.  In FY 2017, individuals living in the District paid approximately $26 billion in federal taxes.  *See* Internal Revenue Service Data Book, 2017, 11, *Table 5. Gross Collections, by Type and State, Fiscal Year 2017*, https://www.irs.gov/pub/irs-soi/17databk.pdf.  This amount is

23

greater than the total federal income taxes paid by individuals in twenty-three States. *Id.* On a

per capita basis, Americans living in the District pay more federal taxes than those living in all

fifty States. *See id.* at 11–13; *Annual Estimates of Resident Population*, U.S. Census Bureau

(July 1, 2017), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src

=bkmk.

73.     District residents have also discharged faithfully their obligations to serve the

Nation in time of conflict, serving in every major armed conflict over the past century—from

World War I, World War II, the Korean War, and the Vietnam War, to the Persian Gulf War and

the wars in Afghanistan and Iraq.  As of 2015, more than 28,000 veterans of the Country's

Armed Services live within the District.  *District of Columbia*, U.S. Dept. of Veterans Affairs, 1

(2016), https://www.va.gov/vetdata/docs/SpecialReports/State_Summaries_District

_of_Columbia.pdf

74.     Another obligation of citizenship is to participate in the election of government

officials.  Despite not being able to vote for Members with full voting rights in the United States

Congress, District residents discharge this obligation in greater percentages than do the citizens

of the Nation as a whole.  In 2016, 82.1% of eligible District residents were registered to vote, a

higher percentage than that in all fifty States of the Union.  In that year, 74.3% of eligible

District residents voted, a greater percentage than that in all fifty States. *See Voting and*

*Registration in the Election of November 2016*, U.S. Census Bureau, Table 4a (rel. May 2017),

https://www.census.

gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

75.     Thus, while the right to vote is a fundamental right of citizenship, to the extent

that achieving the right is related to fulfillment of the major responsibilities of United States

citizenship, District residents are as entitled as any group of Americans to voting representation in Congress, not least because of their impressive discharge of the obligations of United States citizenship.

**B.    The Right to Vote for Legislative Representation Is a Fundamental Right.**

76.    Since its birth, the United States has stood for a "self-evident" democratic ideal: governments "deriv[e] their just Powers from the consent of the Governed."  The Declaration of Independence para. 2 (U.S. 1776).  This fundamental tenet—American citizens' right to participate in the political franchise—is the cornerstone of the Nation's guarantee of a republican form of government.

77.    Over the past 230 years, our country has acted time and again to expand rights of suffrage and thus has more fully embraced the concept of government by the consent of all of the governed.  Historical recognition of the need to perfect the right of suffrage is reflected by action by every branch of the federal government—and especially Congress and the judiciary—to continue to extend and expand the exercise of suffrage rights.

78.    When the Constitution was ratified in 1789, suffrage was narrowly constrained. The Constitution provided (and provides, subject to Amendments) that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . ."  U.S. Const. art. I Section 4, cl. 1.  Most States in 1789 permitted only landholders to vote and further constrained the right to vote to free, white male citizens who paid taxes and satisfied durational residency requirements.

79.    Yet even in those early days of the republic, the Framers recognized that "[t]he definition of the right of suffrage is very justly regarded as a fundamental article of republican

25

government." The Federalist No. 52 (Alexander Hamilton or James Madison). The Supreme Court in 1886 affirmed the political franchise as "a fundamental political right, because preservative of all rights." *Yick Wo,* 118 U.S. at 370.

80.   While ownership of property as a requirement to vote was gradually eliminated in the late 1700s and early 1800s, the right to vote remained confined for the most part to free, taxpaying, white adult males. Those dynamics began to shift in the period following the Civil War, when the States ratified the Fourteenth and Fifteenth Amendments to the Constitution. The Fourteenth Amendment prohibited the States from depriving citizens—"[a]ll persons born or naturalized in the United States"—from the "privileges or immunities" of citizenship, U.S. Const. amend. XIV, Section 1, while the Fifteenth Amendment guaranteed that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, Section 1.

81.   Race-based restrictions on the franchise nonetheless surfaced after ratification of the Civil Rights Amendments and survived in the guise of poll taxes, literacy tests, and sometimes, campaigns of rank intimidation or terror. Against this backdrop, in 1932 the Supreme Court recognized the "numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right" to vote. *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

82.   The Constitution originally provided for the election of Senators by State legislatures, not by direct election. U.S. Const. art. I, Section 3, cl. 1. Congress passed the Seventeenth Amendment to the Constitution to provide for direct election of Senators by citizens of each State, in the early 20th century. That amendment was ratified in 1913.

26

83.     The women's suffrage movement gained momentum during the same period (notwithstanding an 1874 Supreme Court ruling that the Constitution did not grant women the right to vote.  *See generally Minor v. Happersett*, 88 U.S. 162 (1874)).  After decades of struggle, those efforts culminated in 1920 in the passage and ratification of the Nineteenth Amendment, guaranteeing that the right to vote shall not be denied or abridged on account of sex.

84.     Four years later, the Indian Citizenship Act extended citizenship to all Native Americans born in the United States.  Act of June 2, 1924, Pub. L. No. 68-175, 43 Stat. 253. While the privileges of citizenship technically included the right to suffrage, in practice States continued to deny Native Americans the right to vote from 1924 until at least 1957, when President Eisenhower signed the Civil Rights Act of 1957 into law, with the objective of ensuring all eligible voters' right to vote.  Pub. L. No. 85-315, 71 Stat. 634.

85.     Eliminating an injustice of more than 150 years, the Twenty-Third Amendment in 1961 restored the right of Americans living in the District, which "constitut[es] the seat of Government of the United States," to vote in presidential elections, another right lost when the federal Government took control of the District in 1801.  U.S. Const. amend. XXIII Section 1.

86.     The Supreme Court issued a series of decisions from 1964 to 1972 that maintained the trend of treating suffrage as a fundamental right that must be protected from infringement.  As the Court affirmed in 1964:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. *Other rights, even the most basic, are illusory if the right to vote is undermined*. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Wesberry*, 376 U.S. at 17–18 (emphasis added).  That same year, the Court declared:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and
> democratic society. Especially since the right to exercise the franchise in
> a free and unimpaired manner is preservative of other basic civil and
> political rights, any alleged infringement of the right of citizens to vote
> must be carefully and meticulously scrutinized.

*Reynolds,* 377 U.S. at 561–62.

87.     Two years later, the Court struck down poll taxes as an unconstitutional barrier to

the franchise, declaring that "wealth or fee paying has, in our view, no relation to voting

qualifications; the right to vote is too precious, too fundamental to be so burdened or

conditioned." *Harper*, 383 U.S. at 670. The Court similarly struck down durational residency

requirements in 1972. *Dunn v. Blumstein*, 405 U.S. 330, 332–33 (1972). In 1970, the Supreme

Court ruled that, by virtue of Congressional action, residents of federal enclaves are entitled to

vote in State elections. *Evans*, 398 U.S. at 419–20.

88.     In 1971—during the Vietnam War—the Twenty-Sixth Amendment lowered the

minimum voting age from 21 to 18, based in part on the rationale that citizens who serve our

Nation in times of armed conflicts are entitled to participate in electing its leaders. U.S. Const.

amend. XXVI, Section 1.

89.     After years of legislative impasse in Congress, Congress passed the District of

Columbia "Home Rule Act," and President Richard M. Nixon, a longtime proponent of greater

rights for the District, signed the act into law on December 24, 1973. District of Columbia Home

Rule Act, Pub. L. No. 93-198, 87 Stat. 777 (from 1973 to 1997 known as the District of

Columbia Self-Government and Governmental Recognition Act). In the Home Rule Act,

Congress restored the right of District residents to have a voice in their own local government

through election of a local legislature (the District Council), a right that Congress, exercising its

constitutional powers over the District, had eliminated in 1874 during Reconstruction.

28

90.     In 1986, President Ronald Reagan signed the Uniformed and Overseas Citizens Absentee Voting Act into law.  The law uniformly ensures that United States citizens living overseas, including citizens who have no intention of returning to the United States, can vote for representatives in Congress.  The law does not, however, allow District of Columbia residents to vote.  Uniformed and Overseas Citizens Absentee Voting Act of 1986, Pub. L. No. 99-410 (codified at 18 U.S.C. §§ 608–09, 39 U.S.C § 3406, 52 U.S.C. §§ 20301–10).

91.     In 1993, in passing the National Voter Registration Act, Congress declared the following: "[t]he Congress finds that . . . (1) the right of citizens of the United States to vote is a fundamental right; [and] (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right . . ." 52 U.S.C. § 20501(a)(1)-(2).

**C.     Congress Has the Power to Grant Voting Representation in Congress for Citizens Residing in the District.**

92.     Article I, Section 8, Clause 17 of the Constitution authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States."  This provision, referred to as the "District Clause," confers on Congress comprehensive power over the governance of the District (and likewise, as explained above, over other federal enclaves).

93.     Nothing in the District Clause prohibits Congress from granting United States citizens who reside in the District the rights of national citizenship, including the right to voting representation in Congress.  The Framers of the Constitution adopted the District Clause because they wanted our Nation's capital to be free from control by any one State.  They did not intend thereby to deprive District residents of their fundamental voting rights, especially after fighting a

29

revolution to win just such a right.  If they had intended a deprivation of so fundamental a right, they would have stated so explicitly.  Nowhere in the District Clause nor the Constitution did the Framers require or contemplate such a fundamental deprivation.  And as the Court stated in *Adams*, no District Clause interest is served by denying voting representation to residents of the District.  90 F. Supp. 2d at 66.

94.     In 1788 and 1789, respectively, Maryland and Virginia ceded the territory now comprising the District to the United States.  *See* Act of July 16, 1790, ch. 28, 1 Stat. 130.  The second session of the First Congress passed the Residence Act of 1790, and President George Washington signed it into law on July 16, 1790.  That Act provided that the national capital and permanent seat of our national government be established on a site on the Potomac River, and set a deadline of December 1800 for the capital to be ready.  *Id.* § 6.  The United States accepted the ceded land in 1790.  Congress formally assumed full control and jurisdiction over the District on February 27, 1801, in the District of Columbia Organic Act of 1801.  (In 1846, Congress retroceded the land given by Virginia.  H.R. 259, 29th Cong. (1st Sess.)).

95.     Between 1790 and 1800, before the federal government took control of the territory ceded by Maryland and Virginia, Americans who had been citizens of Maryland and Virginia prior to the cession continued to exercise their right to vote for representation in both houses of Congress.  In 1793 and 1794, in fact, District resident Uriah Forrest served in Congress with full voting rights.  When the United States assumed jurisdiction over the District, District residents lost voting representation in Congress as a result of Congress's failure to take action.  It was *congressional* action (or inaction), in the Residence Act of 1790 and the Organic Act of 1801—not action by the Framers—that effectively deprived District residents of their right to vote for full voting representation in Congress.  Although Congress has acknowledged its power

under the District Clause to grant back to the District residents the right to full voting

representation, Congress has failed to act, and that power has lain dormant since 1800.  In recent

years, bipartisan majorities of both houses of Congress have separately confirmed, by wide

margins, that Congress has such authority under the District Clause.  Yet Congress has failed to

guarantee this fundamental right to District residents.

96.     In April 2007, in the 110th Congress, the House of Representatives passed the

District of Columbia House Voting Rights Act (H.R. 1905), which would have created a

Congressional district consisting of the District of Columbia, given an additional Representative

to Utah, and thus increased the number of Members in the House of Representatives from 435 to

437.  H.R. 1905 passed the House with bipartisan support by a vote of 241 to 177, including

"yes" votes from then-Representative (now Vice President) Mike Pence of Indiana, and then-

Representative (now Speaker of the House) Paul Ryan of Wisconsin.  *See* H.R. 1905, Roll Call

Vote No. 231 (April 19, 2007).  The Senate, however, failed to pass the bill in that Congress.

97.     In February 2009, the Senate passed Senate Bill 160, the District of Columbia

House Voting Rights Act, also on a bipartisan basis and by a wide margin of 61 to 37.  *See* S.

160, Roll Call Vote No. 73 (Feb. 26, 2009).  Like H.R. 1905 in 2007, Senate Bill 160 would

have created a congressional district consisting of the District of Columbia, given an additional

Representative to Utah, and increased the number of Members in the House of Representatives

from 435 to 437.  S. 160, 111th Cong. § 3.  The House failed to pass Senate Bill 160 in the 111th

Congress.

98.     During hearings on the House and Senate bills, bipartisan panels of lawmakers

and constitutional experts testified in support of Congress's power to grant voting rights to

31

District residents in the national legislature, specifically concluding that Congress has the inherent power to grant District residents the right to vote in Congress.

99.     The legal experts who testified included former D.C. Circuit Judge and Solicitor General Kenneth Starr, former Chief Judge of the D.C. Circuit Patricia Wald, and Senator Orrin Hatch.  All concluded that Congress has the power to grant District residents Congressional representation under the District Clause.  Senator Hatch, a staunch supporter of the proposed legislation, "believe[d] that [the] principle of popular sovereignty is so fundamental to our Constitution, the existence of the franchise so central, that it ought to govern absent actual evidence that America's founders intended that it be withheld from one group of citizens."  Orrin G. Hatch, *'No Right is More Precious in a Free Country': Allowing Americans in the District of Columbia to Participate in National Self-Government,* 45 Harv. J. on Legis. 287, 298–99 (Summer 2008).  In her testimony, Judge Wald agreed:

> There certainly is no evidence in the text or history of the Constitution signifying the Framers wanted to deny the District the franchise forever for any legitimate reason. . . . There are many other instances in which the courts have acceded to Congress' unique power to legislate for the District when it exercises that power to put the District on a par with States in critical constitutionally-related areas . . . . Congress is justified in concluding the balance tilts in favor of recognizing for D.C. residents the most basic right of all democratic societies, the right to vote for one's leaders.

*Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 255–60 (2007) (statement of Patricia M. Wald, former Chief Judge, U.S. Court of Appeals for the D.C. Circuit).

100.    Article I, Section 2, Clause 1 of the Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States."  The reference to the "people of the several States" was not intended to strip

otherwise qualified voters who reside in the District of their right to vote.  As former United States Solicitor General and D.C. Circuit Judge Kenneth Starr testified, the broad language of the District Clause gives Congress the power to extend voting rights to District residents and residents of federal enclaves—places ceded to the federal government by a State.  *See Common Sense Justice for the Nation's Capital: An Examination of Proposals to Give D.C. Residents Direct Representation: Hearing Before the H. Comm. on Government Reform*, 108th Cong. 2d Sess. 83–84 (2004) (statement of the Hon. Kenneth W. Starr, former Solicitor General of the United States; former Judge, U.S. Court of Appeals for the D.C. Circuit) ("Starr Statement").

101.    As Judge Starr further explained, the Constitution's explicit grant of voting representation to "State" residents in Article I, Section 2, Clause 1 does not preclude Congress from extending the right to other citizens (as explained below) under the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 18 U.S.C. §§ 608–09, 39 U.S.C. § 3406, 52 U.S.C. §§ 20301–10.  Judge Starr also offered a common sense rebuttal to the argument to the contrary: "[a]bsent any persuasive evidence that the Framers' intent . . . was to deny the inhabitants of the District the right to vote for voting representation in the House of Representatives, a consideration of fundamental democratic principles further supports the conclusion that the use of [the] term ["State", in Article I, Section 2 of the Constitution] does not necessitate that result."  Starr Statement at 83–84.

102.    Similarly, although the Seventeenth Amendment speaks of "two Senators from each State, elected by the people thereof …," thus *requiring* the election of two senators from each State, the Amendment does not override Congress's authority under the District Clause to extend representation in the Senate to citizens who do not reside in a State.  As explained below,

33

Congress has exercised its authority to permit citizens living overseas to vote for both Senators and Members of the House of Representatives.

103.     Although both the House and Senate separately passed their respective versions of the District voting rights bill, both houses did not ultimately pass the same bill in the same Congress (in part as a result of failed negotiations over a proposed amendment repealing all firearm safety laws in the District in 2009).  Thus, the voting rights bill supported in both Houses of Congress never became law.  Since then, Congress has not acted to afford District residents voting representation in either House, even though bills establishing voting representation for the District have been introduced in Congress every year since the earlier bill failed in 2009.  This is so even though majorities of both Houses made clear in passing the voting rights bill in 2007 and 2009 that Congress has authority under the District Clause to pass such legislation.

104.     Congress's authority under the District Clause to pass such legislation is also voiced in House and Senate Committee Reports.  The March 20, 2007 House Judiciary Committee Report states that "[w]hile there [was] no evidence that the Framers intended to deny voting representation for District residents, the Framers did provide the Congress with absolute authority over the District to rectify such a problem."  H.R. Rep. No. 110-52, pt. 2, at 2 (2007).  The March 19, 2007 House Oversight & Government Reform Committee Report notes that "[s]cholars spanning the political and legal spectrum have concluded that Congress has authority through this legislation to provide voting representation in Congress for local residents. . . . What was done by statute in 1790, and then undone by statute in 1800, can be redone by statute today."  H.R. Rep. No. 110-52, pt. 1, at 29 (2007).  The June 28, 2007 Senate Homeland Security and Government Affairs Committee Report affirmed that "[t]wo centuries of political and judicial precedent support Congress's authority to legislatively extend House representation to the

34

District under the District Clause" and that "[t]he Committee believe[d] this authority, which the Supreme Court described as 'plenary in every respect,' allows Congress to live up to the principles this nation was founded upon, and provide representation in the U.S. House of Representatives to the District of Columbia." S. Rep. No. 110-123, at 3 (2007) (quoting *Nat'l Mutual Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 592 (1949)).

> ### D. Congress Has Exercised Its Authority to Grant This Right to Vote to Other Citizens Who Are Not Residents of States.

105.     Although Congress continues to fail to extend to American citizens residing in the District the right to vote for representation in our national legislature, Congress has acted to allow Americans who are not residents of States to vote in other contexts for United States Senators and Representatives.

106.     Pursuant to the District Clause, Congress possesses "like authority over all places purchased by the consent of the legislature of the State in which the same shall be" as it does over the District itself.

107.     Exercising this same authority, and based on essentially the same constitutional authority, Congress has created numerous federal "enclaves." Indeed, the District *is* in substance a federal enclave, whose establishment, unlike that of many military bases and other properties purchased by the federal government, was foreseen when the Constitution was adopted.

108.     In creating and exercising its jurisdiction over such enclaves, Congress has taken action to preserve the right of Americans living in such enclaves to continue to vote for representatives in Congress, just as District residents did between 1790 and 1800.

109.     Congress has enacted legislation authorizing States to enforce certain State laws on federal enclaves. Americans who reside on federal enclave lands are consequently subject to

the laws of the State in which the enclave is contained.  Congress has, for example, enacted

legislation authorizing State authorities to enforce compliance with State workers' compensation

laws on federal enclave land within the State to the same extent as if the land was under the

exclusive jurisdiction of the State.  *See* 40 U.S.C. § 3172(a).

110.    In 1970, the Supreme Court held that the Equal Protection Clause requires that

residents of federal enclaves, such as the National Institutes of Health ("NIH"), located in

Maryland just outside of the District, be permitted to vote in federal and State elections,

including for United States Senators and Representatives, in the State from which the enclave

was created.  *Evans*, 398 U.S. at 420.  This was required, the Court held, because even though

Congress could have precluded this result by refusing to permit the exercise of State power in the

enclave given its own exclusive jurisdiction, Congress instead took action that "permitted the

States to extend important aspects of State powers over federal areas."  *Id.* at 423.  That action

included subjecting NIH residents to Maryland income taxes.  *Id.*

111.    Congress has also acted by legislation to ensure that Americans who reside

entirely outside of the United States can exercise their right to vote for representation in

Congress.  In 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act,

which allows otherwise disenfranchised American citizens residing in foreign countries to vote

by absentee ballot for United States Senators and Representatives in "the last place in which the

person was domiciled before leaving the United States."  52 U.S.C. § 20310 (5)(C).  The

Americans covered by the Act need not be residents of the State in which they vote, nor need

they even return to that State.

36

**E.      Congress Has Failed to Exercise Its Authority to Grant Representation in Congress to District Residents.**

112.    Since it asserted control of the District pursuant to the Organic Act of 1801, Congress has consistently failed to exercise its authority under the District Clause to grant back Congressional representation to citizens residing in the District.  This is so even though Congress has exercised its authority to protect voting rights for those living overseas and in a manner which results in voting rights for those living in federal enclaves.  Thus, in the case of enclaves, as the Court pointed out in *Adams*, District residents are not entitled to claim the protection of the Supreme Court's decision in *Evans* "because of distinctions between the manner in which Congress has exercised its authority over the enclaves and the District."  90 F. Supp. 2d at 68.

113.    In 1970, Congress authorized the election of a delegate (the "Delegate") for the District of Columbia to the House of Representatives.  2 U.S.C. § 25a.  By statute, the Delegate is empowered with all privileges of Members of the House under the Constitution—except for the power to vote.  *Id.*  Some Congresses (e.g., the 103d Congress (1993–1995) and 110th and 111th Congresses (2007–2011) have allowed the District's Delegate to vote in the Committee of the Whole in the House.  Other Congresses have stripped the District's Delegate of that right or failed to grant it, thus further demonstrating Congress's power to right this wrong.

114.    Congress has not granted District residents the right to vote for representation, in any form, in the Senate.  And even though, as was the case regarding residents of enclaves and those living overseas, Congress could have taken action to afford voting representation to District residents, it has not done so.

F.      **The First Amendment Prohibits Excessive Burdens on Voters' Rights to Association.**

115.    Recent judicial decisions have underscored that interference with a group of voters' right to vote necessarily interferes with their rights of association.  *See supra* at ¶ 16. That principle has deep roots in First Amendment jurisprudence.

116.    As Justice Harlan stated for a unanimous Court in *NAACP v. Alabama (ex rel. Patterson)*, 357 U.S. 449, 460 (1958), "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."

117.    A decade later, the Court explained the interwoven strands of "liberty" affected by restrictions on the right to vote, writing that such burdens implicate both "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  "Both of these rights, of course, rank among our most precious freedoms." *Id.*

118.    Congress's failure to extend to American citizens residing in the District the right to elect voting representatives in our national legislature prevents District residents from casting their votes *effectively*, and guarantees that they will be unable to fully and fairly *advance* their political beliefs in Congress.  Because their participation in elections does not include election of voting representatives in Congress, District residents are denied the right to address and effectively resolve their grievances through the political process.  They are thus denied the right to associate for the advancement of their political beliefs. *See Common Cause*, 318 F. Supp. 3d

38

at 932 (finding impermissible burdens on speech and association from gerrymandering that caused increased "difficulty convincing voters to participate in the political process and vote, attracting strong candidates, raising money to support such candidates, and influencing elected officials").

119.    District residents are also denied their closely-related right to representation.  In *Benisek*, 2018 WL 5816831 at *8, the court held that voters' representational rights and associational rights were both violated by gerrymandering.  The court explained that the gerrymandering reduced some citizens chances "to help elect a candidate of choice," while other citizens were placed in "overpopulated" districts, meaning that a candidate of the citizen's choice likely would have been elected in the absence of gerrymandering, thus contracting the value of their votes.

120.    The law recognizes, of course, that the government must necessarily impose some restrictions on the right to vote:  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).

121.    As a result, the Supreme Court has developed a balancing test for claims of infringement of the right to association in the electoral process.  Specifically, the Court first assesses the "character and magnitude of the asserted injury" to associational and voting rights, and then "identif[ies] and evaluate[s]the precise interests put forward" by the government.  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  It then weighs the burdens imposed against the government's interests, recognizing that "important regulatory interests" can generally "justify reasonable, nondiscriminatory restrictions."  *Id.* at 788.

122.    This case does not involve a mere "restriction" on District residents' ability to participate in the process of electing voting congressional representatives—rather, they are barred from that foundational democratic process entirely.  And Plaintiffs are not aware of *any* government interests—let alone "important" ones—served by this ban.

123.    Therefore, District residents' representational and associational rights have been violated without respect to their political beliefs.  Neither Democrats, Republicans, nor others may join together to elect candidates of their choice to represent them.  Gerrymandering cases have required proof of intent to discriminate against members of a disfavored political party. *See, e.g.*, *Common Cause*, 318 F. Supp. 3d at 929–30 (finding intent to favor Democrats).  Proof of intent to discriminate should not be required when every residents' First Amendment rights are violated.  Nevertheless, if proof of intent to discriminate is required, Plaintiffs will show such intent.

### G.    Prior Judicial Decisions Do Not Preclude Plaintiffs' Challenges Here.

124.    As noted above, a three-judge district court in 2000 rejected due process and equal protection challenges to the long-standing denial of the right to voting representation in Congress to District residents.  *Adams*, 90 F. Supp. 2d at 37.  That decision did not address and therefore does not preclude the challenges set out in this amended complaint for several reasons.  First, the plaintiffs in that case did "not dispute that to succeed they must be able to characterize themselves as citizens of a 'State.'"  *Id.* at 46.  Plaintiffs here make no such concession and unlike the plaintiffs in *Adams,* the present plaintiffs do not rely on Article I, Section 2 for their claims.  Rather, unlike the *Adams* plaintiffs, the plaintiffs here contend that they are constitutionally entitled to voting representation notwithstanding that they are not residents of a State and that legislative and legal developments after *Adams* entitle them to that representation.

40

125.    With respect to the equal protection claim in *Adams*, the plaintiffs did not argue, and the Court did not address, whether Congress has authority under the District Clause to grant voting representation to District residents.  It was not until 2007 and 2009 that Congress demonstrated that that it does have such authority.  Because Congress has that authority and has exercised its authority to afford voting representation to those living overseas, and in a manner which results in voting representation for those who live in enclaves, its refusal to do so for District residents violates equal protection principles.

126.    In addition, without the benefit of *Obergefell* the district court in *Adams* framed the due process issue as being whether "District residents have a right to vote in Congressional elections" and analyzed the issue in terms of whether there is a longstanding tradition of voting representation in Congress for District residents.  *Id.* at 70.  However, the Supreme Court's 2015 decision in *Obergefell* departs from this approach and established instead a two-step analysis: it first concluded that marriage is a fundamental right and then held that the reasons for that right apply to same-sex couples; accordingly, denial of that right violates the Due Process Clause.  Under *Obergefell*'s two-step approach, the Court should first conclude that the right to voting representation in Congress is a fundamental right as shown above and then determine that because the reasons for that right extend to District residents, those residents can no longer be constitutionally denied that right.

127.    The application of the First Amendment right of association to this case was demonstrated in the Supreme Court's 2004 decision in *Vieth* and its 2018 decision in *Gill*; through those decisions five Members of the Court identified a First Amendment right of association claim that is available to these plaintiffs.  Thus, none of the claims advanced here are precluded by *Adams*.

41

## V.    HARM

### A.    District Residents Are Harmed by Their Lack of Voting Representation in Congress.

128.    The Supreme Court has repeatedly held that the right to vote is the most fundamental right because it is "preservative of all rights."   Denial of the right to vote "plainly constitutes an 'injury in fact.'"  *Adams*, 90 F. Supp. 2d at 41.

129.    Other American citizens who pay taxes—including Americans living overseas and in federal enclaves—have voting representation and they can band together to present grievances to a representative and two senators who represent them.  District residents cannot. This denial is contrary to our Nation's most fundamental principles.

130.    In addition, because Congress exercises plenary authority over the District under the District Clause, District residents are deprived of representation not only in legislation on national matters, but also in legislation on purely local issues as well, when Congress acts as the local legislature for District.  Unlike American citizens living in States, Americans living in the District are subject to laws enacted by a Congress in which they have no voting representation— and in addition to national matters, these laws also concern local matters of critical importance that are traditionally committed to State governments in our constitutional framework.

131.    As a result, on issues as wide-ranging as funding of infrastructure and the setting of educational standards and the minimum wage, Congress has overridden the will of Americans in the District, all without any accountability.  To the voters affected by those decisions, these deprivations constitute concrete harm and constitutional injury.

132.    The denial of District residents' voting representation in the political process has also led to District residents' exclusion from corresponding benefits.

42

133.    For example, the District receives a smaller amount of federal funds than many States.  Without voting representation in the House and the Senate, District residents are unable to rely on local champions in Congress arguing for a fairer distribution of federal funds.  This denial constitutes a real and substantial injury.

**B.      Defendants' Actions Deprive Citizens Residing in the District of Their Right to Voting Representation in Congress.**

134.    The actions and omissions of Defendants have caused the individual Plaintiffs to suffer actual injury by depriving them of their fundamental right to voting representation in Congress.  There is a substantial likelihood that these injuries will be redressed by the declaratory and injunctive relief that Plaintiffs seek in this action.  *Adams*, 90 F. Supp. 2d at 41–42 (concluding that plaintiffs satisfied the injury-in-fact, causation, and redressability requirements of standing).

## VI.     CAUSES OF ACTION

**A.      Count I (Denial of Equal Protection)**

135.    Congress has the authority under the District Clause to extend the right to full voting representation in Congress to District residents, just as Congress has used its authority to extend that right to other American citizens not living in States, i.e., those living overseas and in federal enclaves.  Continuing to deny that right to American citizens living in the District results in District citizens being treated unequally—both relative to other Americans required to abide by the same Congressional enactments, and also relative to Congress's treatment of citizens living overseas and in federal enclaves.

136.    This unequal treatment inflicts grave harms on plaintiffs and other American citizens who live in the District, bars them from exercising their fundamental right to participate

43

in the political process, and abridges central precepts of equality, as set forth in the Fourteenth

Amendment to the Constitution and as incorporated in the Fifth Amendment to the Constitution.

### B.    Count II (Denial of Due Process)

137.    The right of citizens of the United States to voting representation in Congress is a

fundamental right of United States citizenship, deeply rooted in our Nation's heritage and

implicit in the concept of ordered liberty.  As such, it is a fundamental right protected by the Due

Process clauses of the Fifth and Fourteenth Amendments to the Constitution.

138.    Each of the reasons showing that the right to vote for legislative representation is

fundamental applies with equal force to American citizens residing in the District, just as each

applies to American citizens living in the 50 States, in federal enclaves, and overseas.

139.    The denial of the right to vote for members of the United States Congress

deprives plaintiffs and other citizens of the District of Columbia of liberty and property without

due process of law, in violation of the Fifth Amendment to the Constitution.  This denial also

constitutes an unjust limitation on the fundamental right to vote in violation of the Due Process

Clauses of the Fifth and Fourteenth Amendments.

### C.    Count III (Infringement of the Right to Association and Representation)

140.    All citizens of the United States have the right, guaranteed by the First

Amendment, to associate in the electoral process for the advancement of their political beliefs.

That right is among the most fundamental of all freedoms guaranteed by the Constitution.

141.     Congress's failure to extend to plaintiffs and other District residents the ability to

elect voting representatives in our national legislature denies them the right to associate for the

advancement of their political beliefs, and leaves them without voting representatives in

Congress to whom they may effectively bring their grievances.

44

142.   Those burdens on Plaintiffs' associational rights are not offset by any important regulatory interests, and accordingly violate the First Amendment.

## VII.   PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs request that the Court grant the following relief:

1.   Issue a DECLARATORY JUDGMENT declaring that individual Plaintiffs, in common with all adult citizens of the District of Columbia, possess a constitutional right to vote in elections for voting members of the United States House of Representatives and the United States Senate; that they have been deprived of this right without warrant or justification; that Defendants have violated this right; that the continuing deprivation of this right violates one of the most precious attributes of United States citizenship; and that 2 U.S.C. § 2a and 13 U.S.C. § 141 are unconstitutional insofar as they require or have been applied to effect the exclusion of citizens of the District of Columbia from the Congressional apportionment process.

2.   Issue a DECLARATORY JUDGMENT declaring that the Delegate to the House of Representatives for the District of Columbia, as the duly elected representative of the United States citizens residing in the District of Columbia, has the full powers and privileges afforded to Members of the House of Representatives, including without limitation the power to vote on all legislation considered by the House.

3.   Defer further relief for a reasonable period of time to provide Congress an opportunity, on the basis of the Court's declaratory judgment, to fashion a

constitutional remedy that will vindicate the constitutional rights of the citizens of the District of Columbia to vote for members of the United States Senate.

4.  To comply with the declaratory judgment, Congress need not exercise its authority under Article IV, Section 3, Clause 1 to make the District a State. However, making the District a State would satisfy the judgment.

5.  Failing appropriate action by the Congress, order INJUNCTIVE RELIEF as necessary to assure vindication of the constitutional rights of District citizens to vote for members of the United States Congress.  Such relief could include:

   (a)  ENJOINING Defendants Ryan, Haas, and Irving, and their successors in office, to give effect to votes cast by the Delegate to the House of Representatives for the District of Columbia;

   (b)  ENJOINING Defendants Hatch, Stenger, and Pence, and their successors in office, to permit individuals elected by the citizens of the District of Columbia to be seated in the United States Senate.

   (c)  ENJOINING Defendant Haas, and her successors in office, to account for citizens of the District of Columbia in transmitting the certificates apportioning the voting members of the House of Representatives;

   (d)  ENJOINING Defendant Adams, and her successors in office, from transmitting to the States forms certifying upcoming elections for United States Senators, unless provision is made for participation by citizens of the District of Columbia in the election of members of the United States Senate;

46

    (e)    ENJOINING Defendants Irving and Stenger, and their successors in office, to give effect to votes cast by citizens of the District of Columbia in determining the prevailing candidates entitled to be seated, to participate in debates, to vote in roll calls, and to receive the salary of a voting member of the House of Representatives or of the Senate;

    (f)    ENJOINING Defendants Ross and Trump, and their successors in office, to include the District of Columbia in calculations for purposes of transmitting to Congress, on the basis of the decennial census, any number of representatives to be apportioned to the District of Columbia.

    (g)    ORDERING the Defendants to present plans setting forth their recommended best means for assuring the right of District of Columbia citizens to participate in the election of voting members of Congress;

    (h)    After full consideration of the parties' proposed plans, ORDERING Defendants to pursue the steps that will most appropriately assure the rights of District of Columbia citizens to participate in the election of voting members of Congress.

6.    AWARD Plaintiffs their reasonable attorney fees and allowable costs of court; and

7.    ORDER such further or different relief as the Court deems just and proper.

## VIII.   JURY DEMAND

143.    Plaintiffs hereby demand a jury trial on all issues so triable.

November 26, 2018                                        Respectfully submitted,

                                                        /s/ Christopher J. Wright
                                                        Christopher J. Wright (D.C. Bar No. 367384)
                                                        Patrick O'Donnell (D.C. Bar No. 459360)
                                                        Timothy J. Simeone (D.C. Bar No. 453700)
                                                        Deepika H. Ravi (D.C. Bar No. 1017076)
                                                        HARRIS, WILTSHIRE & GRANNIS LLP
                                                        1919 M Street NW, 8th Floor
                                                        Washington, D.C. 20036
                                                        Telephone: 202-730-1300
                                                        *cwright@hwglaw.com*
                                                        *podonnell@hwglaw.com*
                                                        *tsimeone@hwglaw.com*
                                                        *dravi@hwglaw.com*

                                                        *Counsel for Plaintiffs*

48

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2018, I served a copy of the foregoing and accompanying materials on the acting United States Attorney General; the United States Attorney for the District of Columbia; Paul Ryan, in his official capacity as Speaker of the United States House of Representatives; Karen L. Haas in her official capacity as Clerk of the United States House of Representatives; Paul D. Irving, in his official capacity as Sergeant at Arms of the United States House of Representatives; Orrin G. Hatch, in his official capacity as President Pro Tempore of the United States Senate; Julie Adams, in her official capacity as Secretary of the United States Senate; Michael Stenger, in his official capacity as Sergeant at Arms and Doorkeeper of the United States Senate; Michael R. Pence, in his official capacity as Vice President of the United States; Wilbur Ross, in his official capacity as Secretary of the United States Department of Commerce; and Donald J. Trump, in his official capacity as President of the United States, by hand and U.S. Certified Mail.

/s/ Christopher J. Wright
Christopher J. Wright (D.C. Bar No. 367384)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*cwright@hwglaw.com*

*Counsel for Plaintiffs*

49