**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

Angelica CASTAÑON, et al.,

     Plaintiffs,

     v.

The UNITED STATES OF AMERICA, et al.,

     Defendants.

Case No. 1:18-cv-2545
(RDM, RLW, TNM)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT AND
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STANDARD OF REVIEW.......................................................................................6

ARGUMENT ...........................................................................................................7

I. CONGRESS'S FAILURE TO EXERCISE ITS AUTHORITY *UNDER THE DISTRICT CLAUSE* TO EXTEND VOTING REPRESENTATION TO DISTRICT RESIDENTS VIOLATES EQUAL PROTECTION PRINCIPLES...................................7

   A. The Argument that Congress has the Necessary Authority Under the District Clause Regardless of Whether the District Is a "State" Was Neither Advanced nor Addressed in *Adams* ................................................................................7

   B. Congress has Confirmed its Authority to Give District Residents Voting Rights.........................................................................................................9

   C. Congress Correctly Concluded that there Is no Evidence that the Founders Intended to Permanently Disenfranchise District Residents ........................12

   D. Congress has Acted to Provide Voting Representation to Similarly-Situated Citizens ...................................................................................................17

      1. Congress provided voting rights to citizens living in many of the territories ............................................................................................17

      2. Congress has acted to permit residents of federal enclaves to vote.....................18

      3. Congress adopted the Overseas Voting Act, which guarantees voting representation in Congress to citizens living abroad ...........................................21

   E. Voting Representation Is a Fundamental Right, and Therefore its Denial Triggers Strict Scrutiny ...............................................................................23

II. VOTING REPRESENTATION IN CONGRESS IS A FUNDAMENTAL RIGHT OF CITIZENS OF THE UNITED STATES TO WHICH DISTRICT RESIDENTS ARE ENTITLED UNDER THE DUE PROCESS CLAUSE.............................................29

III. DENYING DISTRICT RESIDENTS VOTING REPRESENTATION IN CONGRESS VIOLATES THEIR FIRST AMENDMENT RIGHTS TO ASSOCIATION AND REPRESENTATION ..................................................................32

IV. DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT .....................................34

    A. The Supreme Court's Summary Affirmance in *Adams v. Clinton* Constitutes
       Binding Precedent that Plaintiffs' Claims Are Properly Before this Panel.................34

    B. Even if the *Adams* Court's Determination Were Not Binding, Plaintiffs'
       Claims Are Plainly Justiciable ...................................................................................36

       1. Plaintiffs have standing under Supreme Court precedent and the panel
          decision in *Adams* ...............................................................................................36

       2. Granting the relief sought by Plaintiffs would not impinge congressional
          speech or debate in any way ................................................................................39

       3. Defendants' separation of powers argument is another restatement of
          their redressability claim and should also be rejected..........................................42

       4. Defendants recognize that *Adams* rejected their political question
          argument, and that ruling was correct ..................................................................42

CONCLUSION...........................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Clinton*, 90 F. Supp. 2d 27 (D.D.C. 2000) ...................................................38

*Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000) ...........................................*passim*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................6

*Benisek v. Lamone*, 348 F. Supp. 3d 493 (D. Md. 2018), *probable jurisdiction noted*, Sup. Ct.
   No. 18-726 (argued Mar. 26, 2019) .............................................................. 5, 32–33

*Bigwood v. Defense Intelligence Agency*, 699 F. Supp. 2d 114 (D.D.C. 2010) ...........................6

*Burson v. Freeman*, 504 U.S. 191 (1992) ................................................................24

*Dunn v. Blumstein*, 405 U.S. 330 (1972)..................................................................27

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)...........................................40

*Evans v. Cornman*, 398 U.S. 419 (1970)................................................. 3, 19–20, 26

*Farley v. Farley*, 481 F.2d 1009 (3d Cir. 1973) ........................................................7

*Franchise Tax Board of California. v. Hyatt*, 139 S. Ct. 1485 (2019) .......................................31

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)........................................... 36–38, 42

*Fusari v. Steinberg*, 419 U.S. 379 (1975) ................................................................6

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ........................................................ 5, 32–33

*Gravel v. United States*, 408 U.S. 606 (1972) ........................................................39–40

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)........................... 1, 24, 27–30

*Harrell v. Florida Bar*, 608 F.3d 1241 (11th Cir. 2010)...............................................38

*Igartúa v. Obama*, 842 F.3d 149 (1st Cir. 2016) ...................................................34–35

*Igartúa v. United States*, 626 F.3d 592 (1st Cir. 2010)...............................................37

*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) .....................34

*IMS Health Corp. v. Schneider*, 901 F. Supp. 2d 172 (D. Me. 2012)...........................................7

*Loving v. Virginia,* 388 U.S. 1 (1967) ...................................................................31

*Mueller v. Allen*, 514 F. Supp. 998 (D. Minn. 1981) ..............................................7

*National Mutual Insurance. Co. v. Tidewater Transfer Co.*, 337 U.S. 582 (1949) .....................12

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).......................................... 4, 24, 29–30

*O'Donoghue v. United States*, 289 U.S. 516 (1933) ...............................................22

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) .....................................14

*Reynolds v. Sims*, 377 U.S. 533 (1964) ........................................................ 24, 26–28

*Saenz v. Roe*, 526 U.S. 489 (1999) .........................................................................31

*San Diego Unified Port District v. Gianturco*, 651 F.2d 1306 (9th Cir. 1981).............................7

*Smiley v. Holm*, 285 U.S. 355 (1932)......................................................................27

*Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366 (3d Cir. 1991) ...........................7

*Timbs v. Indiana*, 139 S. Ct. 683 (2019) ..........................................................30–31

*Turner v. Safley,* 482 U.S. 78 (1987) ...............................................................24, 31

*United States v. Guest,* 383 U.S. 745 (1966).........................................................31

*United States v. United Mine Workers*, 330 U.S. 258 (1947) ...............................14

*United States v. Wise*, 370 U.S. 405 (1962) ..........................................................15

*Utah v. Evans*, 536 U.S. 452 (2002) ...............................................................37–38

*Van Ness v. City of Washington*, 29 U.S. 232 (1830) .........................................22–23

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) .................................................................32

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ...............................................................27

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .......................................................24, 27

**Statutes**

An Act Concerning the District of Columbia, 2 Stat. 103 (February 27, 1801)...........................16

An Ordinance for the government of the Territory of the United States northwest
    of the River Ohio, (July 13, 1787) ........................................................................14

District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 777
    (codified at D.C. Official Code § 1-201.01, *et seq.*) ......................................25–26

Indian Citizenship Act, Pub. L. 68-175, 43 Stat. 253
    (codified at 8 U.S.C. § 1401(b)) ...........................................................................25

National Voter Registration Act, Pub. L. 103-31, 107 Stat. 77
    (codified at 52 U.S.C. § 20501–11) ......................................................................28

The Voting Rights Act of 1965, Pub. L. 89-110, 79 Stat. 437
    (codified at 52 U.S.C. §§ 10101, 10103–14, 10501–08, 10701–10702),...............25

Uniformed and Overseas Absentee Voting Act of 1986, Pub. L. No. 99-410, 100 Stat.
    924, (codified at 18 U.S.C. §§ 608–09, 39 U.S.C. § 3406, 52 U.S.C. §§ 20301–10)........*passim*

**United States Constitution**

U.S. Const. art. I, § 6, cl. 1 ...............................................................................39–40

U.S. Const. art. I, § 8, cl. 17 ..............................................................................*passim*

U.S. Const. amend. XIV .....................................................................................25

U.S. Const. amend. XV ......................................................................................25

U.S. Const. amend. XVII ...................................................................................25

U.S. Const. amend. XIX .....................................................................................25

U.S. Const. amend. XXIII ...........................................................................25, 30

U.S. Const. amend. XXIV ..................................................................................30

U.S. Const. amend. XXVI ..................................................................................25

**Rules**

Fed. R. Civ. P. 56(a).............................................................................................6

**Other Authorities**

121 Cong. Rec. 14,734 (1975)...........................................................................22

*Chasing Congress Away*, U.S. House of Representatives, Office of the Historian
(June 1, 2015), https://history.house.gov/Blog/Detail/15032422770 .....................................12

*Common Sense Justice for the Nation's Capital: An Examination of Proposals to
Give D.C. Residents Direct Representation: Hearing Before the House Committee
on Government Reform*, 108th Cong. (2004) ..................................................................10–11

*Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing
Before the Senate Committee on the Judiciary*, 110th Cong. (2007).................................2, 10

Federalist No. 43 (Alexander Hamilton or James Madison).........................................................13

Federal Voting Assistance Program, Never Resided Voters: A Policy Brief
(Spring 2017), https://www.fvap.gov/uploads/FVAP/EO/FVAPNeverResided
PolicyBrief_20170222_FINAL.pdf .........................................................................................23

A Foreign Spectator XIII, *Remarks on the Amendments to the Federal Constitution,
proposed by the Convention of Massachusetts, New Hampshire, New York, Virginia,
South and North-Carolina, with the minorities of Pennsylvania and Maryland*,
New York Daily Gazette, June 17, 1789. ..................................................................................15

Founders Online, *New York Ratifying Convention. First Speech of July 17, [17 July 1788]*,
National Archives (July 17, 1788), https://founders.archives.gov/?q=%22on%
20all%20the%20principles%20of%20free%22&s=1111311111&r=1...................................13

H.R. 1905, District of Columbia House Voting Rights Act, Roll Call Vote No. 231
(Apr. 19, 2007)....................................................................................................... 1–2, 9–10

H.R. Rep. No. 110-52 (2007) ......................................................................................................11

John Kaminski, Gaspare Saladino, Richard Leffler, *Commentaries on the Constitution:
public and private, volume 3, 18 December 1787 to 31 January 1788*, Wisconsin
Historical Society Press (1984), http://digicoll.library.wisc.edu/cgi-bin/History/History-
idx?type=turn&id=History.DHRCv15&entity=History.DHRCv15.p0294&isize=
text&q1=capable%20of%20holding%20two%20millions%20of. .........................................15

Kenneth R. Bowling, *New Light on the Philadelphia Mutiny of 1783: Federal-State
Confrontation at the Close of the War for Independence* Pennsylvania Magazine
of History and Biography 419 (1977) .................................................................................12–13

Library of Congress, Northwest Ordinance, https://www.loc.gov/rr/program/bib/our
docs/northwest.html ................................................................................................................14

National Constitution Center Staff, *How Philadelphia Lost the Nation's Capital to Washington,* Constitution Daily (July 16, 2018), https://constitutioncenter.org/blog/how-philadelphia-lost-the-nations-capital ............................................................. 12

Orrin G. Hatch, *'No Right is More Precious in a Free Country': Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 Harvard Journal on Legislation 287 (Summer 2008) ............................................................ 10

Richard L. Forstall, U.S. Census Bureau, Population of States and Counties of the United States: 1790-1990 (March 1996), https://www.census.gov/population/www/censusdata/PopulationofStatesandCountiesoftheUnitedStates1790-1990.pdf ......................... 16

S. 160, District of Columbia House Voting Rights Act, 111th Cong. .......................................... 10

S. 160, District of Columbia House Voting Rights Act, Roll Call Vote No. 73 (Feb. 26, 2009). ......................................................................................................... 2, 9

S. Rep. No. 110-123, (2007) ......................................................................................... 11–12

Stanley L. Engerman & Kenneth L. Sokoloff, *The Evolution of Suffrage Institutions in the New World*, Journal of Economic History, Feb. 2005 ....................................... 25

The Papers of Alexander Hamilton, vol. 5, (Harold C. Syrett & Jacob E. Cooke eds., 1962) ..................................................................................................................... 14

U.S. Census Bureau, 1970 Census: Return of the Whole Number of Persons within the Several Districts of the United States (1973), https://www2.census.gov/library/publications/decennial/1790/number_of_persons/1790a-02.pdf?# .......................................... 14

*Voting by U.S. Citizens Abroad: Hearing on S. 2101 and S.2384 Before the Subcomm. on Privileges and Elections of the Senate Committee On Rules and Administration*, 93rd Cong. (1973) ................................................................................................. 21–22

## INTRODUCTION

The denial of voting representation in Congress to the residents of our Nation's capital is contrary to the core principles on which the United States was founded.  As the three-judge district court stated in *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C 2000), *aff'd* 531 U.S. 941 (2000), there is a "contradiction" between our "democratic ideals" and reality: The District of Columbia is ruled by Congress without the consent of the governed, and District residents are subjected to taxation without representation.  The Department of Justice ("DOJ") acknowledges in its Motion to Dismiss ("MTD") the "'inequity of the situation plaintiffs seek to change'" and that "[v]oting has long been recognized as a vital right."  MTD 1, 37.  Indeed, the Supreme Court has emphatically held voting to be a fundamental right—indeed, the *most* fundamental right, because it is preservative of all other rights.  *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).  Plaintiffs here seek to correct the undisputed injustice of denying the most fundamental of all rights to hundreds of thousands of District residents.

Recent jurisprudential developments compel the conclusion that the Court should declare that the Equal Protection Clause, the Due Process Clause, and the First Amendment entitle District residents to voting representation in Congress.  DOJ's Motion to Dismiss should therefore be denied and Plaintiffs' Motion for Summary Judgment should be granted.

**Equal Protection.**  Both Houses of Congress have passed bills premised on Congress's authority to provide voting representation to District residents under the "District Clause," art. I, § 8, cl. 17, which gives Congress the power to "exercise exclusive Legislation in all Cases whatsoever" involving the District.  A 2007 bill passed by the House of Representatives would have provided voting representation to District residents.  A 2009 Senate bill did the same.  *See* H.R. 1905, District of Columbia House Voting Rights Act, Roll Call Vote No. 231 (Apr. 19,

2007); S. 160, District of Columbia House Voting Rights Act, Roll Call Vote No. 73 (Feb. 26, 2009).

Congress's conclusion that it has this power under the District Clause was supported by a broad array of experts, including former D.C. Circuit Judges Kenneth Starr and Patricia Wald. The essence of their argument, as Judge Wald put it, is that in light of the broad language of the District Clause and because "[t]here certainly is no evidence in the text or history of the Constitution signifying the Framers wanted to deny the District the franchise forever," Congress may provide "D.C. residents the most basic right of all democratic societies, the right to vote for one's leaders." *Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing Before the Senate Comm. on the Judiciary*, 110th Cong. 255–60 (2007).

The argument that Congress has the power to grant voting representation to District residents under the District Clause was neither presented to nor considered by the *Adams* court. And although that argument was emphasized in Plaintiffs' Amended Complaint, DOJ's Motion to Dismiss does not dispute that Congress has this power.

Because Congress *has* the power to provide voting representation to District residents but has *not* done so, Plaintiffs' equal protection argument is straightforward: Congress cannot lawfully extend voting representation in Congress to some taxpaying citizens of the United States subject to the federal laws that Congress enacts, while denying such representation to District residents.

Because voting representation is a fundamental right, this disparate treatment is permissible only if it advances a compelling government interest. But there is not even a rational basis for denying voting representation in Congress to District residents. The District was created because the Founders did not want Congress to depend on State authorities for protection.

Providing voting representation to District residents would not interfere with Congress's ability to protect itself.  In short, Congress's failure to exercise its power to provide voting representation to District residents violates those citizens' equal protection rights.

The inequity of this situation is shown by Congress's decision to grant statehood, and hence voting representation rights, to residents of fourteen former territories that were approximately the same size as the District or smaller when the territory became a state.  It was exacerbated by Congress's adoption of the Uniformed and Overseas Absentee Voting Act of 1986, Pub. L. No. 99-410, 100 Stat. 924, (codified at 18 U.S.C. §§ 608–09, 39 U.S.C. § 3406, 52 U.S.C. §§ 20301–10) ("Overseas Voting Act"), which requires States to allow American citizens living overseas to vote for representatives and senators in the State where they previously lived, even if the State does not consider them to be State residents.  There is no sufficient justification for permitting, for example, a person who moves from Bethesda to Mumbai to continue to vote in Maryland, while rescinding that person's voting representation in Congress if she moves to the District.

The inequity is further shown by the treatment of citizens living on federal "enclaves," such as military bases.  In *Evans v. Cornman*, 398 U.S. 419, 423 (1970), the Court held that even if a State does not consider residents of a federal enclave within the State's boundaries to be State residents, equal protection principles require enclave residents to be permitted to vote for senators and members of Congress.  Thus, enclave residents and American citizens living overseas are constitutionally entitled to voting representation in Congress, even though they are not residing on State land.  The fact that District residents are not State residents therefore does not provide a sound basis for denying voting representation to District residents.

**Due Process.**   A two-step analysis applies to determining which rights are fundamental. *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  The first step is whether, in light of our nation's history and tradition, the right at issue is *generally* considered to be fundamental.  *Id*. at 2598, 2602.  A right can be fundamental even if it was denied to a particular group in the past, because "[i]f rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied."  *Id.* at 2602.  The first step is thus to consider whether there is a long-standing right to voting representation in Congress for American citizens, *not* whether there is a long-standing right for voting representation in Congress for District residents.  Under this analysis, there is no question that the right to voting representation is fundamental because the right has been recognized as vital for decades and, in recognition of its critical role in our democracy, it has been substantially expanded over the last 230 years.

The second step in the due process inquiry asks whether the reasons the right is considered fundamental apply to the group seeking to exercise the right, and if so, whether a substantial government interest justifies denial of the right to that group.  Here, it is clear that the reasons the right to vote is fundamental apply foursquare to District residents.  It is also clear that the only justification offered by DOJ for denying them that right lacks merit because granting District residents the right to vote would in no way impair the government's security.

**First Amendment Rights.**  Recent gerrymandering cases establish that denying voting representation to District residents violates Plaintiffs' First Amendment rights of association and representation.  Indeed, Plaintiffs have a stronger case than the plaintiffs in the recent gerrymandering cases because Plaintiffs' rights are not merely diminished, but are denied altogether.  The gist of the gerrymandering argument is that, by drawing district boundaries in

4

order to favor candidates of one party and disfavor candidates of the other party, the *association* rights of members of the disfavored party are burdened, because they have less reason to band together to support a candidate if congressional district boundary lines have been drawn in order to make it highly unlikely that a candidate from the disfavored party can win. *Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring) (explaining the "burden" placed on members of the "disfavored party"). In addition, the *representation* rights of members of the disfavored party are burdened because a representative from the favored party may be less likely to take action requested by constituents who are members of the disfavored party. *See Benisek v. Lamone*, 348 F. Supp. 3d 493, 517 (D. Md. 2018) (finding that the plaintiffs' "representational rights have been impermissibly burdened" by partisan gerrymandering), *probable jurisdiction noted*, 139 S. Ct. 783 (argued Mar. 26, 2019).

The corresponding rights of District residents are not merely burdened, but are practically eradicated. As to District residents' association rights, there is much less reason for anyone in the District to band together to support a candidate for District Delegate than there would be if the Delegate's vote were counted in the House of Representatives, and the Senate does not recognize the District's "shadow senators" at all. Districts residents' representation rights are practically eradicated because they are not represented by anyone whose votes are counted and who therefore can use their voting power to influence Members of the House of Representatives or Senators.

**DOJ's Threshold Arguments.** There is no merit to DOJ's threshold arguments. As an initial matter, the opinion of the three-judge *Adams* court, like any other district court decision, is not binding precedent. The Supreme Court's summary affirmance *is* binding precedent, but only with respect to what was necessarily decided. It is clear that the Court decided that it had

jurisdiction, because it affirmed the judgment below rather than granting the government's motion to dismiss for lack of jurisdiction.

In addition, Plaintiffs have standing and surmount the various other procedural hurdles DOJ seeks to erect for the same reason the *Adams* plaintiffs had standing: because a declaratory ruling that they are constitutionally entitled to voting representation in Congress will significantly increase the likelihood that Plaintiffs will obtain that relief.

## STANDARD OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction, a plaintiff need only establish "by a preponderance of the evidence that the court has subject matter jurisdiction." *Bigwood v. Def. Intelligence Agency*, 699 F. Supp. 2d 114, 116 (D.D.C. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

As to a motion to dismiss for failure to state a claim, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To prevail on a motion for summary judgment, a plaintiff must establish that there is no genuine dispute as to any material fact and the judgment is warranted as a matter of law. Fed. R. Civ. P. 56(a).

Regarding the decision of the three-judge court in *Adams,* three points are relevant for this case. First, because that decision was summarily affirmed by the Supreme Court, it is binding here only with respect to what the Court necessarily decided in order to affirm. *See e.g.*, *Fusari v. Steinberg*, 419 U.S. 379, 391–92 (1975) (Burger, C.J., concurring) ("When we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not

necessarily the reasoning by which it was reached.").  This affirmance directly addresses the jurisprudential issues raised by DOJ.

 Second, beyond the issues necessarily addressed by the summary affirmance, *Adams* is not binding here but has only the weight of any other district court case.  *See Farley v. Farley*, 481 F.2d 1009, 1012 (3d Cir. 1973) ("The decision of a three-judge court is entitled to no more weight than any other district court decision."); *see also Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371, n.7 (3d Cir. 1991) ("[E]ven a three judge decision of the district court is not necessarily binding on any other district court."); *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1315, n.24 (9th Cir. 1981) ("When a district court is convened as a statutory three-judge panel, it still is sitting as a district court for purposes of stare decisis."); *IMS Health Corp. v. Schneider*, 901 F. Supp. 2d 172, 185, 185, n.6 (D. Me. 2012) (referring to a three-judge panel decision as "instructive" but "not binding"); *Mueller v. Allen*, 514 F. Supp. 998, 1001 (D. Minn. 1981) ("[A] court's decision is not binding upon courts of equal rank.  Moreover, a specially convened three-judge district court is still a district court."), *aff'd*, 676 F.2d 1195 (8th Cir. 1982), *aff'd*, 463 U.S. 388 (1983).

 Third, on the merits, as is explained in this memorandum, *Adams* did not address the arguments raised by plaintiffs in this case.

## ARGUMENT

I.   **CONGRESS'S FAILURE TO EXERCISE ITS AUTHORITY *UNDER THE DISTRICT CLAUSE* TO RESTORE VOTING REPRESENTATION TO DISTRICT RESIDENTS VIOLATES EQUAL PROTECTION PRINCIPLES.**

 A.  **The Argument that Congress has the Necessary Authority Under the District Clause Regardless of Whether the District Is a "State" Was Neither Advanced nor Addressed in *Adams*.**

 Plaintiffs' equal protection argument is simple: Congress has the power under the District Clause to provide voting representation to District residents.  Given that it has authority to

7

provide such representation, Congress may not confer it on some groups but withhold it from District residents without a compelling governmental interest.  There is no compelling justification here, nor even a rational basis.

Defendants cite *Adams* for the conclusory claim that "[t]he Constitution reserves representation in the House and Senate to residents of a state," MTD 20, and further maintain that because "the Constitution dictates the lack of representation for residents of the District, then all of Plaintiffs' claims must fail."  *Id.* at 25.  But Plaintiffs fundamentally disagree with Defendants' premise that the Constitution "dictates" a lack of representation here.  Plaintiffs maintain that the Constitution does *not* "reserve[] representation in the House and Senate to residents of a state" when those residents live in the District, because—as both Houses of Congress have correctly concluded, *see infra* at 9–12—the District Clause grants Congress the authority necessary to extend the franchise to District residents.  Plaintiffs further argue that Congress's failure to exercise its authority to extend the franchise here—as it *has* done on behalf of other groups that were not residents of States —violates Equal Protection principles.

The argument that Congress has the authority under the District Clause to grant voting rights to District residents was neither made nor addressed in *Adams*.  To the contrary, the plaintiffs there expressly conceded that they "do not dispute that to succeed they must be able to characterize themselves as citizens of a 'state.'"  90 F. Supp. 2d at 46 (citations omitted).  The Plaintiffs here make no such concession—they argue that while the Constitution explicitly *requires* citizens of States to have voting representation in Congress, it *also* gives Congress the authority under the District Clause, art. I, § 8, cl. 17, to authorize voting representation in Congress for District residents.  Thus, while the *Adams* plaintiffs argued that the Constitution should be construed such that "State" includes the District in the relevant provisions, the Plaintiffs

here complain that Congress has failed to use its authority under the District Clause to provide voting representation to District residents.

In its Motion to Dismiss, DOJ does not dispute that Congress has that authority under the District Clause, but instead contends that what matters is that the *Adams* court was "aware that political remedies existed," such as making the District a State.  MTD 29.  That does not address Plaintiffs' argument: Plaintiffs maintain that that there is no need for additional "political remedies," because Congress already *has* the necessary authority under the District Clause, and the Equal Protection Clause requires Congress to *use* it to provide equal protection under the law.

### B.  Congress has Confirmed its Authority to Give District Residents Voting Rights.

Congress's own determinations confirm Plaintiffs' view that Congress has authority to extend voting rights to District residents under the District Clause.  Both houses of Congress, after hearing extensive testimony from leading legal authorities, reached that conclusion.

In April 2007, the House of Representatives passed the District of Columbia House Voting Rights Act (H.R. 1905).  The Act would have created a congressional district consisting of the District of Columbia and given an additional Representative to Utah, and thus would have increased the number of Members in the House of Representatives from 435 to 437.  H.R. 1905 passed the House with bipartisan support by a vote of 241 to 177.  *See* H.R. 1905, District of Columbia House Voting Rights Act, Roll Call Vote No. 231 (Apr. 19, 2007).  The Senate, however, did not pass the bill in that Congress.

But in February 2009, the Senate passed Senate Bill 160, the District of Columbia House Voting Rights Act, on a bipartisan basis and by a wide margin of 61 to 37.  *See* S. 160, Roll Call Vote No. 73 (Feb. 26, 2009).  Like H.R. 1905 in 2007, Senate Bill 160 would have made the District of Columbia a congressional district, given an additional Representative to Utah, and

increased the number of Members in the House of Representatives from 435 to 437.  S. 160, 111th Cong. § 3.  The House did not pass Senate Bill 160 in that Congress.

During hearings on the House and Senate bills, bipartisan panels of lawmakers and constitutional experts testified that Congress has the power under the District Clause to grant District residents voting representation in Congress.  The legal experts who testified included former D.C. Circuit Judge and Solicitor General Kenneth Starr, former Chief Judge of the D.C. Circuit Patricia Wald, and Senator Orrin Hatch.

Senator Hatch supported the proposed legislation because "[the] principle of popular sovereignty is so fundamental to our Constitution, the existence of the franchise so central, that it ought to govern absent actual evidence that America's founders intended that it be withheld from one group of citizens."  Orrin G. Hatch, *'No Right is More Precious in a Free Country': Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 Harv. J. on Legis. 287, 298–99 (Summer 2008).

Judge Wald agreed:

> There certainly is no evidence in the text or history of the Constitution signifying the Framers wanted to deny the District the franchise forever . . . . [And] the courts have acceded to Congress' unique power to legislate for the District when it exercises that power to put the District on a par with States . . . . Congress is justified in concluding the balance tilts in favor of recognizing for D.C. residents the most basic right of all democratic societies, the right to vote for one's leaders.

*Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing Before the Senate Comm. on the Judiciary*, 110th Cong. 255–60 (2007) (statement of Patricia M. Wald, former Chief Judge, U.S. Court of Appeals for the D.C. Circuit).

Judge Starr testified that the broad language of the District Clause (and the comparable authority granted by the Enclave Clause) gives Congress the power to extend voting rights to District residents and residents of federal enclaves.  *See Common Sense Justice for the Nation's*

*Capital: An Examination of Proposals to Give D.C. Residents Direct Representation: Hearing*

*Before the House Comm. on Government Reform*, 108th Cong. 83–84 (2004) (statement of the

Hon. Kenneth W. Starr, former Solicitor General of the United States; former Judge, U.S. Court

of Appeals for the D.C. Circuit) ("Starr Statement").  Judge Starr explained that the Constitution's

explicit grant of voting representation to "State" residents in Article I, Section 2, Clause 1 did not

preclude Congress from extending the right to other citizens.  Judge Starr offered this

commonsense analysis:

> Absent any persuasive evidence that the Framers' intent . . . was to deny the inhabitants of the District the right to vote for voting representation in the House of Representatives, a consideration of fundamental democratic principles further supports the conclusion that the use of [the] term ["State", in Article I, Section 2 of the Constitution] does not necessitate that result.

Starr Statement at 83–84.

Congress's authority under the District Clause is further reinforced by the House and

Senate Committee Reports.  The 2007 House Judiciary Committee Report states that "[w]hile

there [was] no evidence that the Framers intended to deny voting representation for District

residents, the Framers did provide the Congress with absolute authority over the District to rectify

such a problem."  H.R. Rep. No. 110-52, pt. 2, at 2 (2007).  The 2007 House Oversight and

Government Reform Committee Report noted that "[s]cholars spanning the political and legal

spectrum have concluded that Congress has authority through this legislation to provide voting

representation in Congress for local residents. . . . What was done by statute in 1790, and then

undone by statute in 1800, can be redone by statute today."  H.R. Rep. No. 110-52, pt. 1, at 29

(2007).  And the 2007 Senate Homeland Security and Governmental Affairs Committee Report

affirmed that "[t]wo centuries of political and judicial precedent support Congress's authority to

legislatively extend House representation to the District under the District Clause" and that "[t]he

Committee believe[d] this authority, which the Supreme Court described as 'plenary in every

11

respect,' allows Congress to live up to the principles this nation was founded upon, and provide representation in the U.S. House of Representatives to the District of Columbia." S. Rep. No. 110-123, at 4 (2007) (quoting *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 592 (1949) (Jackson, J., opinion)).

The Senate thus endorsed Justice Jackson's conclusion that the District Clause grants Congress power that is "plenary in every respect," including the power to treat residents of the District like residents of the States for purposes of invoking diversity jurisdiction. *Nat'l Mut. Ins. Co.*, 337 U.S. at 592   Justice Jackson also stated that "[i]n no matter should we pay more deference to the opinions of Congress than in its choice of instrumentalities to perform a function that is within its power." *Id.* at 603.

### C. Congress Correctly Concluded that There is No Evidence that the Founders Intended to Permanently Disenfranchise District Residents.

The testimony and committee reports relating to the D.C. voting rights bills correctly concluded that there is no evidence in either the text or history of the Constitution suggesting any intent to forever deny voting representation to District residents.  In fact, as DOJ recognizes, MTD 24–25, the District was created for reasons having nothing to do with voting representation. On June 20, 1783, while the Continental Congress was meeting at Independence Hall in Philadelphia, several hundred disgruntled Pennsylvania State militiamen blocked the doors and demanded back pay for Revolutionary War service.  Congress asked Pennsylvania to send other State militiamen for their protection, but Pennsylvania refused to do so.  Congress disbanded in disarray and fled to Princeton to resume deliberations.  *See* Nat'l Constitution Ctr. Staff, *How Philadelphia Lost the Nation's Capital to Washington,* Constitution Daily (July 16, 2018), https://constitutioncenter.org/blog/how-philadelphia-lost-the-nations-capital-to-washington; *Chasing Congress Away*, U.S. House of Representatives, Office of the Historian (June 1, 2015),

https://history.house.gov/Blog/Detail/15032422770; Kenneth R. Bowling, *New Light on the Philadelphia Mutiny of 1783: Federal-State Confrontation at the Close of the War for Independence*, 101 Pa. Mag. Hist. and Biography 419 (1977).

In 1787, many of the same Founders returned to Philadelphia to draft the Constitution. They were resolved that the safety and dignity of the federal government should never again rely on a State's willingness to offer protection. *See, e.g.*, Federalist No. 43 (Alexander Hamilton or James Madison):

> The indispensable necessity of complete authority at the seat of government, carries its own evidence with it . . . Without it, not only the public authority might be insulted and its proceedings interrupted with impunity; but a dependence of the members of the general government on the State comprehending the seat of the government, for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonorable to the government and dissatisfactory to the other members of the Confederacy.

For that reason, they decided to separate the seat of federal power from State-controlled land. Nothing about that decision is inconsistent with providing voting rights to District residents. Congress can prevent its proceedings from being "interrupted with impunity" whether or not District residents have voting representation.

In addition, it is noteworthy that none of the Founders argued that residents of the District should *not* have voting representation in Congress. To the contrary, some argued that "[t]his gov[ernment] [is] built on all the principles of free gov[ernment] [r]epresentation etc." Founders Online, *New York Ratifying Convention. First Speech of July 17, [17 July 1788]*, National Archives, (July 17, 1788), https://founders.archives.gov/?q=%22on%20all%20the%20princip les%20of%20free%22&s=1111311111&r=1. Furthermore, prominent cities competed to be the nation's capital. It is unlikely that they would have done so had their leaders thought they would lose voting representation in Congress as a consequence.

Rather than resulting from a determination that residents of the District should be permanently disenfranchised, it is likely that District residents lost their voting rights as a consequence of their small number when the capital moved to the District in 1801. In 1787, the Confederation Congress adopted the Northwest Ordinance, which created the Northwest Territory and established precedent for organized territories in the United States. Library of Congress, Northwest Ordinance, https://www.loc.gov/rr/program/bib/ourdocs/northwest.html (last visited June 2, 2019). The Ordinance provided that "whenever any of the said States shall have sixty thousand free inhabitants therein, such State shall be admitted . . . into the Congress of the United States." An Ordinance for the government of the Territory of the United States northwest of the River Ohio, § 14, art. 5 (July 13, 1787). That 60,000 free inhabitants' threshold was comparable to the then-current size of Delaware, the smallest of the States at the time. U.S. Census Bureau, 1970 Census: Return of the Whole Number of Persons within the Several Districts of the United States 3 (1973), https://www2.census.gov/library/publications/decennial/1790/number_of_persons/1790a-02.pdf?#.

In 1788, Alexander Hamilton proposed an amendment to the New York ratifying convention providing that "When the Number of Persons in the District or Territory to be laid out for the Seat of the Government of the United States . . . amount to [an unspecified number] . . . Provision shall be made by Congress for having a District representative in that Body." The Papers of Alexander Hamilton, vol. 5, 189–190 (Harold C. Syrett & Jacob E. Cooke eds., 1962). That amendment was not adopted, but without explanation. It is, of course, well settled that "unsuccessful attempts at legislation are not the best of guides to legislative intent." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969) (citing *Fogarty v. United States*, 340 U.S. 8, 13–14 (1950)); *see also United States v. United Mine Workers*, 330 U.S. 258, 281–282 (1947).

14

That is because, "[l]ogically, several equally tenable inferences could be drawn from the failure of the Congress to adopt an amendment in the light of the interpretation placed upon the existing law by some of its members, including the inference that the existing legislation already incorporated the offered change." *United States v. Wise*, 370 U.S. 405, 411 (1962). Here, the draft Constitution already included the District Clause, which gave Congress the broad authority over the District necessary to extend voting representation to its residents.

Hamilton was not the only member of the founding generation to think that District residents should ultimately have voting representation, and who tied the issue to the population of the District. Samuel Osgood of Massachusetts stated in 1788 that a District "Ten Miles Square" is "capable of holding two Millions of People." He urged that "the People settled there . . . when numerous enough be represented in the lower House." John Kaminski, Gaspare Saladino, Richard Leffler, *Commentaries on the Constitution: public and private, volume 3, 18 December 1787 to 31 January 1788*, Wisconsin Historical Society Press at 266-67 (1984), http://digicoll.library.wisc.edu/cgi-bin/History/History-idx?type=turn&id=History.DHR Cv15&entity=History.DHRCv15.p0294&isize=text&q1=capable%20of%20holding%20two%20 millions%20of. The next year, while the First Federal Congress was considering the amendments that became the Bill of Rights, a newspaper article asked, "shall they have no vote, even when their number may be 40 or 50,000?" A Foreign Spectator XIII, *Remarks on the Amendments to the Federal Constitution, proposed by the Convention of Massachusetts, New Hampshire, New York, Virginia, South and North-Carolina, with the minorities of Pennsylvania and Maryland*, New York Daily Gazette, June 17, 1789.

This history suggests that the Founders were willing to accept a lack of representation in Congress until the District reached a minimum size. As shown in Appendix A, the area that

became the District had a population of about 14,000 residents, including slaves, as of 1800.
Thus, the number of "free inhabitants" was a small fraction of the 60,000 threshold established by
the Northwest Ordinance.  It is, therefore, unsurprising that the Founders did not protest *en masse*
when District residents were not provided with voting representation in Congress in 1801, when
the capital moved to the District.  It was simply far too small to be treated as a State.

DOJ incorrectly suggests that the 1801 "Organic Act" *intentionally* stripped District
residents of voting representation.  MTD 4.  The Act itself did not address voting rights—it was
largely concerned with the establishment of courts in the District.  Indeed, the final provision of
the Act, Section 16, explicitly states that "nothing in this act" affects "any other body corporate or
politic, within the said district, except insofar as it relates to . . . judicial powers . . . ."  An Act
Concerning the District of Columbia, 2 Stat. 103, at 108 (February 27, 1801).  The establishment
of the nation's capital in the District resulted in the loss of voting rights for those living in the
District—but that was because the District Clause removed the seat of the government from the
control of any State, not because of any affirmative intent by Congress to deny the vote to those
residing in the District.

The District did not reach the 60,000 threshold for about seven decades after its creation.
The District's population increased sharply, from about 75,000 in 1860, including slaves, to about
130,000 in 1870—certainly enough to warrant voting representation under the terms of the
Northwest Ordinance.  Indeed, as shown in Appendix A, the District was larger than each of the
fifteen States admitted to the union since 1864, except Oklahoma, according to the census
immediately prior to the State's admission.  Richard L. Forstall, U.S. Census Bureau, Population
of States and Counties of the United States: 1790-1990, at 2–4, 28 (March 1996),
https://www.census.gov/population/www/censusdata/PopulationofStatesandCounties

oftheUnitedStates1790-1990.pdf.  When Alaska and Hawaii were admitted in 1959, the next

year's census indicated that they had about 200,000 and 600,000 residents, respectively, while the

District was home to more than 750,000 residents.  *Id.* at 2.  The Founders almost certainly would

have expected District residents to be provided with voting representation sometime during this

period, and probably closer to 1864 than 1959.  However, once the District reached what the

Founders would have considered an appropriate size, Congress failed to exercise its District

Clause authority to provide voting rights—and apparently did not expressly recognize it had that

authority until the twenty-first century.

   In short, there is no evidence that the Founders intended to permanently disenfranchise

District residents.  Nor is there any rational justification—much less a compelling one—why

District residents continue to lack voting representation.

### D. Congress has Acted to Provide Voting Representation to Similarly-Situated Citizens.

#### 1. Congress provided voting rights to citizens living in many of the territories.

   As noted above, *see supra* at 12–17, the most logical conclusion concerning the intent of

the Founders is that they thought District residents should be given voting representation in

Congress when the District's population reached a suitable size.  Accordingly, there was no

reason to deny voting representation to District residents while admitting territories smaller than

the District as States—which, of course, provided voting representation to the residents of those

territories.  And as shown in Appendix A, the District was larger than fourteen of the fifteen

territories admitted as States since 1864 in the census immediately preceding their admission.

   District residents are taxpaying citizens who are comparable to the residents of the

territories that became States in all significant respects.  Indeed, unlike the territories, the District

was formed from land that was part of the original thirteen States.  It is, therefore, all the more

unfair that Congress has failed to provide voting representation to District residents while providing voting representation to smaller territories that were acquired later.

There is no merit to DOJ's argument that "Plaintiffs' logic would equally call into question the status of all U.S. territories, whose residents, like District residents, do not elect congressional representatives because they are not residents of states." MTD 35. Indeed, DOJ imaginatively contends that Plaintiffs' logic extends to residents of "wetlands." *Id.* But the Court's judgment need extend no farther than the District. Unlike residents of the District, residents of current United States territories do not pay federal income taxes. And, unlike the District and many enclaves, the current U.S. territories were not carved out of land that used to belong to a State. And, none of their residents ever had voting representation in Congress, while District residents did until Congress adopted the 1801 Organic Act without providing for continued voting representation in Congress.

In short, there is no justifiable basis for Congress to provide voting representation to, for example, residents of Alaska but not to District residents. Moreover, as next described, Congress *has* provided voting representation to others who are not residents of states.

### 2. Congress has acted to permit residents of federal enclaves to vote.

Under the District Clause, Congress has authority to "exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States . . . ." U.S. Const. art. I, § 8, cl. 17. Similarly, pursuant to the Enclave Clause, which is the second half of the sentence that begins with the District Clause, Congress possesses "like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be" as it does over the District itself—that is to say, absolute authority. *Id.* Based on

essentially this same constitutional authority as provided in the District Clause, Congress has created numerous federal enclaves. Indeed, the District is in substance a federal enclave, whose establishment, unlike that of many military bases, national parks, and other properties purchased by the federal government, was foreseen when the Constitution was adopted. However, Congress has used its near-identical authority over enclaves and the District differently, effectively conferring voting rights on the former while denying those rights to the latter.

In 1970, the Supreme Court held in *Evans v. Cornman*, 398 U.S. at 420, that the Equal Protection Clause requires that residents of the National Institutes of Health ("NIH"), a federal enclave in Maryland, be permitted to vote in federal and State elections, including for United States Senators and Representatives, in the State from which the enclave was carved. The Court so held even though Maryland did not consider NIH residents to be Maryland residents. This result was required, the Court held, because even though Congress could have barred the exercise of State power in the enclave given its own exclusive jurisdiction, Congress instead acted to permit Maryland "to extend important aspects of state powers over federal areas." *Id.* at 423. For example, Congress subjected NIH residents to Maryland "state criminal laws, state income tax, state sales tax, state unemployment laws, state laws related to driving, state family law, and state schools." MTD 30. And once Congress chose to extend State authority to enclaves, the Court held, Congress could not deny the right to vote because as "the citizen's link to his laws and government, [it] is protective of all fundamental rights and privileges." *Evans*, 398 U.S. at 422.

District residents are subject to D.C. Code provisions governing criminal laws, D.C. income tax, and D.C. sales tax. They go to the D.C. Department of Motor Vehicles for a District driver's license, go to D.C. Superior Court to resolve family law disputes, and send their children to the District of Columbia public school system. It is therefore perplexing that DOJ would

contend that "it is impossible for the federal government to reduce its control over the District the way it did over the federal enclave at issue in *Evans*, because there is no other obvious source of law in the District to collect taxes, regulate driving, or mediate family dispute." MTD 32. Congress has already reduced its control over the District, as it has done over federal enclaves, and has permitted the District to self-regulate in many areas—including those considered to be critical by the *Evans* court. Likewise, the Council of the District of Columbia serves as the District's elected legislative body—contrary to DOJ's claim that "[t]he District . . . lacks any . . . state legislative apparatus." *Id.* at 21.

Thus, District residents are comparable to NIH residents in every way considered significant by the *Evans* court—yet NIH residents have voting representation in Congress, and District residents do not. The reason this is so is merely "because of distinctions between the manner in which Congress has exercised its authority over the enclaves and the District . . . ." *Adams*, 90 F. Supp. 2d at 68.

DOJ's apparent ignorance of the extent to which Congress has devolved authority to the District government blinds it to the obviousness of the appropriate remedy. Congress has devolved authority over enclave residents to the States in which those residents live and, accordingly, enclave residents vote for the legislators who make those laws and who represent state residents in Congress. District residents are not subject to laws passed by any State legislators. Therefore, it is more appropriate for District residents, who vote for District legislators, to be represented in Congress by legislators who represent the District rather than a State.

### 3.   Congress adopted the Overseas Voting Act, which guarantees voting representation in Congress to citizens living abroad.

Defendants claim that "[n]othing about the [Uniformed and Overseas Citizens Absentee Voting Act of 1986] changes the distinctions drawn by the Constitution between the District and the States."  MTD 31.  But more to the point, nothing about the distinction between the District and the States changes Congress's plenary authority under the District Clause.  Congress has acted by legislation to ensure that Americans who reside entirely outside of the United States— and who therefore do not live within a State at all—can exercise their right to vote for representation in Congress.  Congress can do the same for District residents.

The Overseas Voting Act allows otherwise disenfranchised American citizens residing in foreign countries to vote by absentee ballot for United States Senators and Representatives in "the last place in which the person was domiciled before leaving the United States."  52 U.S.C. § 20310 (5)(C).  The Americans covered by the Act do not actually reside in the State in which they vote, they need not be considered residents of the State in which they vote, nor need they even intend to one day return to that State.

Prior to its enactment, overseas Americans' right to vote depended on the governing laws of their prior State of residence.  Unhappy with this uneven extension of the franchise, congressional representatives noted the importance of voting, even for those Americans who do not live in any one of our States:

> Americans abroad not only lack opportunity to participate-they are excluded from representation . . . It is time Congress provided a clear and responsible response by enfranchising these citizens. The need for *federal* legislation is overwhelming. How can one justify a system which allows a former resident of Michigan now living in Paris to vote in the 1972 Presidential election but denies his fellow citizen and neighbor that fundamental privilege of citizenship merely because Rhode Island or West Virginia was his last state of residence before moving to France?

*Voting by U.S. Citizens Abroad: Hearing on S. 2101 and S.2384 Before the Subcomm. On Privileges and Elections of the Senate Comm. on Rules and Admin.* 93rd Cong. 70 (1973) (statement of Sargent Shriver, Chairman, Ambassadors Committee for Voting by Americans Overseas).

> Americans outside the United States possess both the necessary interest and the requisite information to participate in the selection of Senators and Congressmen back home. . . . the citizen outside of the United States also has his congressional interests. . . . It is apparent, moreover, that the local citizen and the oversea citizen share a number of common national interests, such as Federal taxation, defense expenditures (for example, U.S. troops stationed overseas), inflation, and the integrity of and competence of our National Government.

121 Cong. Rec. 14,734 (1975) (statement of Sen. Byrd).

> Citizens, wherever situated have an inherent constitutional right to vote, and that such a right should not be denied simply because those citizens cannot claim a residence in any State.

*Voting by U.S. Citizens Abroad: Hearing on S. 2101 and S.2384 Before the Subcomm. on Privileges and Elections of the Senate Comm. On Rules and Admin.* 93rd Cong. 2 (1973) (statement of Sen. Pell).

These arguments apply with equal, if not greater, force to District residents' right to vote. They too, wherever situated, have an inherent right to vote that should not be abridged merely because they are not residents of any State. They too share common national interests with residents of the fifty States. And they too regard themselves as citizens of these United States—not merely as citizens of the District of Columbia. "The District is not an 'ephemeral' subdivision of the 'outlying dominion of the United States,' but the capital—the very heart—of the Union itself . . . . The power conferred by [the District Clause] is plenary; but it does not . . . authorize a denial to the inhabitants of any constitutional guaranty not plainly inapplicable." *O'Donoghue v. United States*, 289 U.S. 516, 539 (1933). And while "[t]he constitution of the United States declares that [C]ongress shall have *exclusive legislation* [over the District]; . . . it does not require

that the power shall be *despotic* or *unlimited*."  *Van Ness v. City of Washington*, 29 U.S. 232, 265 (1830) (emphases in original).

United States citizens who vote while living overseas can do so, not inherently "because of their status as citizens of a state," MTD 31, but because of Congressional action specifically *requiring* States to permit overseas citizens to vote.  DOJ attempts to justify the inclusion of overseas residents in the franchise by pointing out that those residents used to live in a State—but not all of them did.  And, of course, some who live in the District once lived in a State.  The Overseas Voting Act even enables overseas American citizens have *never* resided in the United States, such as children born abroad, to vote in congressional elections in the State in which that person's parents reside or last resided.  Federal Voting Assistance Program, Never Resided Voters: A Policy Brief 2 (Spring 2017), https://www.fvap.gov/uploads/FVAP/EO/FVAPNever ResidedPolicyBrief_20170222_FINAL.pdf.  There is no reason why Americans living overseas and who have never lived in this country should have representation in Congress while Americans living within walking distance of this Court should be denied that right.  There is also no reason why those who once lived in a State and now live overseas should be afforded the vote, but those who once lived in a State but now live in the Nation's Capital are denied that vote.

**E.  Voting Representation Is a Fundamental Right, and Therefore its Denial Triggers Strict Scrutiny.**

DOJ acknowledges that rational basis review applies only where a classification does not "target a suspect class *or impinge on a fundamental right*," and further acknowledges that "[v]oting has long been recognized *as a vital right*."  MTD 32, 37 (emphases added).  DOJ nevertheless argues that "a rational basis . . . is all that is required" because "[r]esidents of the District are not a suspect class."  *Id.* at 32.  It appears that DOJ believes there is a difference between a fundamental right and a vital right.

But it is well-established both that voting representation is a fundamental right and that impingement of voting rights—like impingement of any fundamental right—triggers strict scrutiny.  More than 130 years ago, the Supreme Court declared that "the political franchise of voting is . . . a fundamental political right, because preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  The Court has repeatedly made similar declarations.  *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964) (quoting *Yick Wo*, 118 U.S. at 370); *Harper*, 383 U.S. at 667 (quoting *Yick Wo*, 118 U.S. at 370); *Burson v. Freeman*, 504 U.S. 191, 191 (1992).

In *Obergefell*, 135 S. Ct. at 2598, the Court held that in determining which rights are fundamental, "[h]istory and tradition guide . . . the inquiry but do not set its outer boundaries."  The Court emphasized that fundamental rights are not defined by who practiced them in the past, because, "[i]f rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied."  *Id.* at 2602.  In *Obergefell*, the Court reviewed the expansion of the right to marry to include interracial couples, fathers behind in making child-care payments, and prison inmates, and concluded that the right to marry is a fundamental right.  135 S. Ct. at 1598–2605 (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978); *Turner v. Safley*, 482 U.S. 78, 95 (1987)).

The expansion of voting rights over the last 230 years is even more extensive.  From today's perspective, the Founders had an extremely restrictive view concerning who should exercise the right to vote.  Voting rights were initially limited to white male property owners, but have been substantially expanded so that all adult citizens subject to federal income taxes are now

24

eligible to vote, except District residents and some felons. This expansion has occurred by constitutional amendments, legislation, and judicial decisions.

One important expansion, accomplished by changes in State law in the late 1700s and early 1800s, was the elimination of property ownership as a precondition for being permitted to vote. Stanley L. Engerman & Kenneth L. Sokoloff, *The Evolution of Suffrage Institutions in the New World*, J. Econ. Hist. Feb. 2005, at 1, 7, 11, 15–16. But the right to vote remained confined for the most part to free, taxpaying, white adult males until the Civil War.

Some subsequent expansions of the right to vote were accomplished by amending the Constitution. The Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." The Seventeenth Amendment provides that Senators shall be "elected by the people" rather than appointed by State legislatures. The Nineteenth Amendment prohibits denial of the right to vote "on account of sex." The Twenty-Third Amendment restored the right of Americans living in the District to vote in presidential elections. The Twenty-Fourth Amendment prohibits poll taxes, but only in federal elections. And the Twenty-Sixth Amendment expanded the right to vote to citizens who are "eighteen years of age or older."

Other expansions of the right to vote have been enacted by statute. In 1924, Congress enacted the Indian Citizenship Act, Pub. L. 68-175, 43 Stat. 253 (codified at 8 U.S.C. § 1401(b)), which had the effect of giving the right to vote to approximately 125,000 Indians who had not previously been considered citizens of the United States. The Voting Rights Act of 1965, Pub. L. 89-110, 79 Stat. 437 (codified at 52 U.S.C. §§ 10101, 10103–14, 10501–08, 10701–10702), prohibits racial discrimination in voting and has been amended five times to expand protection of

voting rights.  In 1973, Congress restored the right of District residents to have a voice in their own local government through election of a local legislature (the District Council), a right that Congress had eliminated in 1874.  District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 777 (codified at D.C. Official Code § 1-201.01, *et seq.*).  And in 1986, Congress enacted the Overseas Voting Act, which authorizes American citizens living overseas to vote in federal elections in the State in which they previously lived, even if that State does not consider them to be residents.

It bears note that because an expansion was accomplished by constitutional amendment does *not* necessarily mean that it could not have been accomplished by statute.  From the perspective of the group obtaining voting rights, a constitutional amendment may be seen as a superior alternative because it may be changed only by a subsequent amendment, rather than by legislation.  On the other hand, given the difficulty in obtaining a constitutional amendment, where voting rights can be successfully obtained through legislation, that may be the preferred alternative.  For example, although Americans living overseas could have been provided with voting rights by amending the Constitution to require States to count their votes, Congress instead enacted legislation.

Other expansions of the right to vote have been accomplished by judicial decisions.  As noted above, in 1970 the Supreme Court held in *Evans v. Cornman* that the Equal Protection Clause requires that residents of federal enclaves be permitted to vote in federal and State elections in the State from which the enclave was created.  The Court held that, owing to Congress's treatment of those residents under its Enclave Clause authority, residents of federal enclaves have that right even if the State does not consider them to be State residents.

26

Other notable cases expanding voting rights include *Reynolds v. Sims*, 377 U.S. at 565–566 which established the one-person, one-vote rule.  In that case, the Court applied constitutional principles derived from provisions adopted almost one hundred years prior to the decision, but had not previously been interpreted to require one-person, one vote.  In addition, two years later, the Court in *Harper v. Virginia State Board of Elections* struck down poll taxes as an unconstitutional barrier to the franchise in State elections, declaring that "wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned."  383 U.S. at 670.  The Court similarly struck down durational residency requirements in 1972.  *Dunn v. Blumstein*, 405 U.S. 330, 332–33 (1972).

In *Reynolds*, the Court reviewed much of the history described above and spoke of the "continuing expansion of the scope of the right of suffrage in this country."  377 U.S. at 555.  In light of that history of expansion, it is clear that the right to vote is a fundamental right.  As noted above, the Supreme Court described the right to vote as a fundamental right in 1886.  *Yick Wo v. Hopkins*, 118 U.S. at 370 (declaring that "the political franchise of voting is . . . a fundamental political right, because preservative of all rights").  In 1932, the Court recognized the "numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right" to vote.  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  In 1964, in *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964), the Court stated that:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.  Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

That same year, in *Reynolds*, 377 U.S. at 561–62, the Court declared that:

27

Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

In 1993, in passing the National Voter Registration Act, Pub. L. 103-31, 107 Stat. 77 (codified at 52 U.S.C. § 20501–11), Congress also concluded that the right to vote is a fundamental right.  It declared: "The Congress finds that . . . (1) the right of citizens of the United States to vote is a fundamental right; [and] (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right . . . ."  52 U.S.C. § 20501(a)(1)–(2).

It is therefore clear, as the Supreme Court wrote in *Reynolds*, that "*any* alleged infringement of the right of citizens to vote must be *carefully and meticulously scrutinized*."  377 U.S. at 562 (emphasis added).  In *Harper*, which involved a challenge to Virginia's poll tax, the Court similarly emphasized that "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be *closely scrutinized* and carefully confined."  383 U.S. at 670 (emphasis added).  Plainly, District residents' *total* lack of voting representation in Congress, a far greater "infringement" on the fundamental right to vote than either the apportionment problem in *Reynolds* or the fee requirement of *Harper*, is thus subject to heightened scrutiny—which, again, DOJ does not even attempt to satisfy.

In any event, the disfavored treatment of District residents cannot withstand even rational basis scrutiny.  DOJ correctly recognizes that the District was created so that Congress would not need to depend on State and local authorities for protection.  Yet this is the only rationale DOJ offers for denying the vote to District residents.  And it does so even though, as the *Adams* court noted, the protection of the seat of the government cannot justify denying the vote to those who live in the Nation's capital.  90 F. Supp. 2d at 66.

28

It is therefore clear that the continued denial of the vote to District residents is unconstitutional under the Equal Protection Clause.

## II.  VOTING REPRESENTATION IN CONGRESS IS A FUNDAMENTAL RIGHT OF CITIZENS OF THE UNITED STATES TO WHICH DISTRICT RESIDENTS ARE ENTITLED UNDER THE DUE PROCESS CLAUSE.

Analysis under the Due Process Clause also compels the conclusion that the denial of voting representation to District residents can no longer be justified.  As shown above, *supra* at 23–28, it is clear that voting representation is a fundamental right.  Because voting is a fundamental right of American citizens, the only remaining question under the two-step *Obergefell* inquiry is whether the reasons the right is fundamental apply to District residents.  If so, the denial of that right to those residents must advance a substantial governmental interest. And the previous longstanding denial of voting representation to District residents cannot serve as justification for continuing that denial.  135 S. Ct. at 2602.

The *Adams* court correctly concluded that DOJ had "failed to offer a compelling justification for denying District residents the right to vote in Congress."  90 F. Supp. 2d at 66. DOJ has again failed to do so because no substantial government interest is advanced by denying voting representation to District residents.  As explained previously, the District was created to allow Congress to protect itself, and it is clear that voting representation for District residents will not in any way diminish Congress's ability to do so.  *Id.* (noting agreement with dissenting opinion that "denial of the franchise is not necessary for the effective functioning of the seat of government").

DOJ suggests that the two-step *Obergefell* analysis does not apply because this case is more like the Supreme Court case involving physician-assisted suicide than the same-sex marriage case.  MTD 36–37 (citing *Obergefell*, 135 S. Ct. at 2602; *Washington v. Glucksburg*,

521 U.S. 702 (1997)).  But that is plainly not so.  In *Obergefell*, the Court emphasized the expansion of the right to marry to include the right of interracial couples, prisoners, and spouses who fail to pay child support.  As shown above, *supra* at 23–28, there has been an even more extensive record of expansion of voting rights over the last 230 years.  In contrast, there has been no comparable expansion of a right to commit suicide.

DOJ also points to the Twenty-Third Amendment, which provided voting rights to District residents in presidential elections.  MTD 37.  However, the fact that the expansion of voting rights may be achieved by constitutional amendment does not mean that is the only way to expand voting rights.  Indeed, as the history relating to poll taxes shows, the adoption of a constitutional amendment remedying one problem does not mean that a court may not remedy a related problem.  The Twenty-Fourth Amendment, adopted in 1964, bars poll taxes in *federal* elections.  Yet two years later in *Harper* the Court struck down *State* poll taxes.  As that history demonstrates, the fact that a constitutional amendment was adopted to give District residents voting rights in presidential elections does not mean that this Court may not rule that District residents are also entitled to voting representation in Congress.  And, as noted, DOJ does not dispute that Congress has the authority to grant that representation under the District Clause.

Although further confirmation that voting is fundamental is not needed, the Supreme Court's decision in *Timbs v. Indiana*, 139 S. Ct. 683, 689 (2019) (citations omitted), recently reiterated that our "Nation's history and tradition" is relevant to determining whether a right is "fundamental."  In that case, the Court examined to the right to be free of excessive fines, beginning with the Magna Carta and extending to the present—today, all fifty States prohibit the imposition of excessive fines.  *Id.* at 686–91.  The Court concluded that the right to be free from

excessive fines is a fundamental right incorporated by the Fourteenth Amendment's Due Process Clause and hence applicable to the States.  *Id*. at 691.

Justices Thomas and Gorsuch concurred in *Timbs*, preferring to rely on the Fourteenth Amendment's Privileges or Immunities Clause rather than the Due Process Clause.  But just as their examination of our Nation's history and tradition showed that freedom from excessive fines is a Privilege due citizens of the United States, the same is true of the right to voting representation.  Therefore, applying the Privileges or Immunities Clause would lead to the same result in this case as applying the Due Process Clause.

Finally, with respect to due process, it bears emphasis that a right can be constitutionally protected even if it is not explicitly granted by the Constitution.  *See, e.g.*, *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (finding that "[t]he Constitution *implicitly* strips States of any power they once had to refuse each other sovereign immunity" and rejecting as "ahistorical literalism" the argument that the Court "should find no right to sovereign immunity in another State's courts because no constitutional provision explicitly grants that immunity") (emphasis added).  Indeed, most of the "fundamental" rights protected by due process—such as the right to travel and the right to marry—are "unenumerated" rights.  *See, e.g.*, *United States v. Guest,* 383 U.S. 745 (1966) (noting the constitutional right to travel); *Saenz v. Roe*, 526 U.S. 489 (1999) (same); *Loving v. Virginia*, 388 U.S. 1 (1967) (invalidating bans on interracial marriage); *Turner v. Safley*, 482 U.S. 78 (1987) (holding that prisoners cannot be denied the right to marry).  "There are many other constitutional doctrines that are not spelled out in the Constitution but are nevertheless implicit in its structure and supported by historical practice."  *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. at 1498.

The right to vote is enumerated in the Constitution and has been greatly expanded over the last 230 years, as shown *supra* at 23–27.  Indeed, it is the most fundamental right since it is preservative of all other rights.  It should no longer be denied to District residents.

## III.   DENYING DISTRICT RESIDENTS VOTING REPRESENTATION IN CONGRESS VIOLATES THEIR FIRST AMENDMENT RIGHTS TO ASSOCIATION AND REPRESENTATION.

Plaintiffs' First Amendment associational and representational rights are also unconstitutionally infringed by their lack of voting representation in Congress, as shown by recent gerrymandering cases.

With respect to the right to *association*, political gerrymandering diminishes citizens' interest in banding together to elect candidates when the election result has been foreordained by "cracking and packing" district boundaries such that candidates of one party are almost certain to win in some districts.  As Justice Kennedy explained, "Representative democracy . . . is unimaginable without the ability of citizens to band together."  *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).  Justice Kagan elaborated: "Members of the 'disfavored party' . . . deprived of their natural political strength by a partisan gerrymander, may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)."  *Gill v. Whitford*, 138 S. Ct. at 1938 (Kagan, J., concurring) (citation omitted).  Thus, a gerrymander may "burden[] the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects."  *Id*. at 1939.

In addition, the First Amendment *representational* rights of members of the disfavored party are also burdened.  A three-judge court recently held that the "representational rights" of Republicans who lived in a district that had been gerrymandered so that it would almost certainly

elect a Democrat were "impermissibly burdened" as a result. *Benisek v. Lamone*, 493 F. Supp. 3d at 517. Members of a disfavored party are plainly less likely to persuade their representative to vote in a manner that accomplishes their policy objectives.

The corresponding rights of District residents are not merely burdened—they have *no* chance of banding together to elect a like-minded voting representative. There would be much more reason for District residents to band together to elect candidates for the House and Senate if the District's Delegate and shadow senators had full voting rights. And Districts residents' representational rights are plainly seriously harmed by the absence of a voting representative or senators to whom District residents may petition to vote to accomplish the residents' policy objectives and to persuade other lawmakers to join them in doing do.

DOJ appears to completely misunderstand the rights articulated in decisions such at *Gill v. Whitford* and *Benisek v. Lamone*. DOJ contends that there is no First Amendment violation here because Plaintiffs may "freely assemble" and "petition existing lawmakers." MTD 38. But no one contended in those gerrymandering cases that they could *not* assemble or petition Congress. They instead contended that gerrymandering *burdened* their ability to elect representatives of their choice and thereby diminished their interest in banding together to seek to do so and to influence action by their representatives.

In *Gill*, for example, the alleged First Amendment injury was not that the ability to assemble and petition lawmakers was eradicated by gerrymandering, but instead that the gerrymander had "burdened" their ability to do so. 138 S. Ct. at 1939 (Kagan, J., concurring). Similarly, the court in *Benisek* "concluded that the plaintiffs' claims state a viable cause of action in alleging that Maryland's 2011 redistricting plan violated the First Amendment by *burdening* their representational and associational rights." 348 F. Supp. 3d at 513 (emphasis added). The

same is true here.  In fact, Plaintiffs' rights are plainly more significantly burdened than in the gerrymandering cases because District residents have *no* ability to band together to elect voting representatives and *no* voting representative from whom to seek assistance.

## IV.   DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT.

DOJ advances several related threshold arguments for dismissal.  But these efforts (1) ignore the binding effect of the Supreme Court's summary affirmance in *Adams v. Clinton*; and (2) both fail to contest the critical facts conferring standing here and misconstrue applicable law.

### A. The Supreme Court's Summary Affirmance in *Adams v. Clinton* Constitutes Binding Precedent that Plaintiffs' Claims Are Properly Before this Panel.

A summary affirmance by the Supreme Court is binding with respect to what was "essential to sustain that judgment."  *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979).  A finding of jurisdiction *was* essential to the Supreme Court's summary affirmance in *Adams* and is accordingly binding on this panel.  This jurisdictional finding included the determination that the plaintiffs in *Adams*, identically situated to the Plaintiffs here, had standing to pursue their claims on the merits.  (Beyond jurisdictional issues, however, neither the Supreme Court's affirmance nor the three-judge district court's opinion is binding because a summary affirmance does not affirm the reasoning of the court below and a three-judge district court decision is not binding precedent.  *See supra* at 7.)

As the First Circuit explained in *Igartúa v. Obama*, 842 F.3d 149, 155 (1st Cir. 2016), the Supreme Court's implicit finding that the three-judge panel had jurisdiction over *Adams*' apportionment claim "cannot be disregarded as a nonprecedential drive-by jurisdictional ruling" (internal quotations and citations omitted).  On direct appeal of the *Adams* decision to the Supreme Court, the parties expressly disputed whether "the failure to apportion members of the

34

House of Representatives to the District" was "properly before a three-judge court" under 28 U.S.C. § 2284(a)—the same provision under which Plaintiffs bring this suit. *Igartúa*, 842 F.3d at 154 (quoting *Adams*, 90 F. Supp. 2d at 38). The "government asked the Court to *dismiss* the [*Adams*] appeal either because the three-judge district court lacked jurisdiction over appellants' claim or because appellants lack[ed] standing to seek the relief that they have requested." *Id.* (internal quotations and citations omitted). But the Court declined to dismiss and instead affirmed, while also noting that Justice Stevens would have dismissed. *Id.* As the *Igartúa* court found: "Given the government's arguments distinguishing between dismissal and affirmance, and Justice Stevens' position that dismissal—rather than affirmance—was appropriate, the Court's decision to affirm appears to signify" that the panel had jurisdiction. *Id.*

Moreover, after the Supreme Court's summary affirmance, the government itself adopted the view that the three-judge court had jurisdiction under Section 2284(a). Specifically, in a brief opposing certiorari later in the *Adams* proceedings, the government wrote:

> Instead of dismissing the appeal for lack of jurisdiction [as the government had requested on direct appeal, the Supreme Court] . . . affirmed the judgment of the three-judge court on the merits. That determination . . . that the three-judge district court was properly convened under Section 2284(a) settles the issue for the parties.

*Id.* at 155 (quoting Br. for President of U.S. in Opp'n at n.2, *Adams v. Bush*, 537 U.S. 812 (2002) (No. 01-1519)) (internal quotations and citations omitted). Simply put, the government "interpreted the Supreme Court's affirmance in *Adams* to mean that the nonapportionment claim was properly before" the panel. *Id.*

In sum, the government argued to the Supreme Court in *Adams* that the federal courts lacked jurisdiction over the same kind of nonapportionment challenge at issue here. The Court disagreed and—as the government recognized in *Adams*—that determination is binding.

35

**B. Even if the *Adams* Court's Determination Were Not Binding, Plaintiffs' Claims Are Plainly Justiciable.**

Even if defendants' threshold arguments were not foreclosed by the *Adams* Court's summary affirmance, they would still be wrong. This Court need not reach these arguments, but it should reject them if it does.

**1. Plaintiffs have standing under Supreme Court precedent and the panel decision in *Adams*.**

Defendants argue that Plaintiffs cannot satisfy either the redressability or causation prongs of standing analysis "[f]or essentially the same reasons." MTD 16. But Supreme Court decisions both before and after *Adams*—as well as the panel's decision in *Adams* itself—plainly indicate that Plaintiffs satisfy both prongs.

 a. *Redressability*: Prior to *Adams,* the Supreme Court addressed redressability in the context of an apportionment challenge in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). There, Massachusetts and two of its voters brought statutory and constitutional challenges to the Secretary of Commerce's decision to allocate federal overseas employees to particular States for reapportionment purposes. In a plurality decision for four justices, Justice O'Connor acknowledged that "the President and other executive and congressional officials" would "not be directly bound by" a decision granting the declaratory relief sought by the plaintiffs. *Id.* at 803. But the plurality still found that "the injury alleged is likely to be redressed by declaratory relief against the Secretary" of Commerce because, "as the Solicitor General has not contended to the contrary, we may assume it is substantially likely" that the relevant government officials "would abide by [a federal court's] authoritative interpretation" of the relevant provisions. *Id.*

The reasoning of *Franklin* applies directly here. Defendants do not dispute Plaintiffs' standing to sue the Secretary of Commerce. Nor do Defendants in any way suggest that either

executive or congressional officials would fail to abide by this Court's authoritative interpretation of the Constitution.  Under *Franklin*, then, Defendants *concede* Plaintiffs' standing in this case.

The judgment in *Utah v. Evans*, 536 U.S. 452 (2002), decided two years after *Adams v. Clinton*, reinforced the redressability standard of the *Franklin* plurality.  There, Utah challenged the Secretary of Commerce's method for applying census data to award a seat in the House of Representatives to North Carolina rather than Utah.  As relief, Utah sought an injunction compelling census officials *not* to rely on the challenged method.  *Id.* at 459.  Addressing redressability, the Court—a majority of six justices this time—found that "the practical consequence" of such a change in approach "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered."  *Id.* at 464.  In *Utah v. Evans*, then, the majority expressly adopted the "significant increase in the likelihood of relief" standard for redressability articulated by the *Franklin* plurality.  *See also Igartúa v. United States*, 626 F.3d 592, 636 (1st Cir. 2010) (Torruella, J., concurring and dissenting) (reaching the same conclusion after analyzing *Franklin* and *Evans*).

*Adams* itself—although it was decided before *Utah v. Evans*—applied the same standard as in *Franklin* and found that it was satisfied:

> The Secretary of Commerce plays the same role here as the Secretary did [in *Franklin*], and is equally amenable to suit.  Here, as in *Franklin,* neither the President nor the House officials have suggested that they would refuse to follow a decision of this court (assuming, of course, that it were upheld on appeal) regarding the apportionment of congressional districts.  Hence, we can conclude that plaintiffs satisfy the redressability prong of the standing inquiry and, as in *Franklin,* can do so without deciding whether the President or the Clerk is subject to suit.

90 F. Supp. 2d at 43–44 (footnotes omitted).  In short, the *Adams* panel found that a federal court decision authoritatively construing the law would likely be obeyed by the relevant government officials—regardless of whether they were technically "bound" by the suit.  The same is true here.

**b.** *Causation*:  Defendants' causation argument primarily relies on Judge Oberdorfer's decision on remand of certain of the claims in *Adams* to the district court.  Specifically, with respect to the *Adams* plaintiffs' suit against the Senate officers, Judge Oberdorfer claimed that the plaintiffs had not "established the necessary causal link between the defendants' [the Secretary of the Senate, the Sergeant of Arms, and the Doorkeeper] actions and their injury."  *Adams v. Clinton*, 90 F. Supp. 2d 27, 32–33 (D.D.C. 2000).  According to Judge Oberdorfer, the "plaintiffs' alleged injury is the denial of their right to vote for a member of the Senate," and that could not happen unless a number of other things occurred: "[A] law would have to be passed authorizing the Board of Elections to conduct an election for Senator, the Board of Elections would have to hold such an election, and the Senate would have to refuse to recognize the individual identified by the District as a Senator."  *Id.* at 33.  "It is by no means certain that all, if any, of these events would ever take place."  *Id.*

While Judge Oberdorfer's decision purported to address causation, it actually addressed redressability—but without applying the Supreme Court's redressability standard set forth in the case law above as well as in *Adams* itself.  The question whether the list of things identified by Judge Oberdorfer would occur *in the future* has little, if anything, to do with what *caused* the lack of representation challenged in *Adams*.

Rather, whether certain things would happen in the future relates to whether a decision in plaintiffs' favor would have provided redress.  And that is precisely the question to which the *Franklin/Evans* standard applies—again, redressability is established when a favorable decision "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered."  *See, e.g.*, *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260, n.7 (11th Cir. 2010); *Utah v. Evans*, 536 U.S. at 464; *see also Franklin*, 505 U.S. at 803.  The *Adams*

panel answered that question correctly: If a court were to declare that the lack of voting representation for District residents violates the Constitution, it would become much more likely that the relevant government actors and entities would take action to redress that unlawful situation. In *Franklin*, *Evans*, and *Adams*, that was so even though the Secretary of Commerce plainly did not singlehandedly "cause" the challenged lack of representation. And there is really no question that if the Court grants Plaintiffs their requested relief, District officials would eagerly take the steps necessary to elect representatives with voting rights in Congress.

Both the Supreme Court and the panel majority in *Adams* assumed that government officials would likely comply with an authoritative construction of the relevant provisions by a competent court. The same is true here.

> **2. Granting the relief sought by Plaintiffs would not impinge congressional speech or debate in any way.**

Given the inconsistency between Defendants' standing arguments and the Supreme Court's precedents discussed above, it is unsurprising that Defendants' non-justiciability arguments open *not* with standing, but with an unmeritorious Speech or Debate Clause argument. This argument is little more than a restatement of the redressability claim. Moreover, Defendants (1) advance virtually no analysis of the provision on which they rely; and (2) ignore the *Adams* panel's effective rejection of this argument.

The Supreme Court has explained that to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *Gravel v. United States*, 408 U.S. 606, 617 (1972), the Constitution provides that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place," U.S. Const. art. I, § 6, cl. 1. "The purpose of the Clause is to insure that the legislative function the Constitution allocates to

Congress may be performed independently." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).

The "heart of the Clause" is thus "speech or debate in either House." *Gravel*, 408 U.S. at 625. The Supreme Court has held that:

> Insofar as the Clause is construed to reach other matters, they must be *an integral part of the deliberative and communicative processes* by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Id.* (emphasis added). Thus, "the courts have extended the privilege to matters beyond pure speech or debate in either House, but only when necessary to prevent indirect impairment *of such deliberations*." *Id.* (emphasis added) (internal quotations and citations omitted).

Defendants do not articulate any way in which a declaration finding the District's lack of voting representation in Congress to be unconstitutional would affect speech or debate in either House. Nor do they maintain that such a declaration would interfere with the "deliberative and communicative processes by which Members participate in committee and House proceedings." *Id.* at 625. Defendants also do not cite *any* case finding a nonapportionment challenge—or anything remotely similar—to be barred by the Speech or Debate Clause.

Instead, Defendants claim that the Speech and Debate Clause bars Plaintiffs' suit because Plaintiffs allegedly challenge "legislative activities—namely, the Senate's constitutionally-mandated duty to judge the election and qualification of its members, U.S. Const. art. I, § 5, cl. 1, and the Senate's ability to control procedures for voting on legislation and speaking and debating in the chamber." MTD 11. But Plaintiffs do no such thing. Again, the Speech or Debate Clause protects the *process* of legislating—but the declaration that Plaintiffs seek here has nothing to do with such *processes*. Indeed, Congress is just as free to *debate* denying voting representation for residents of the District as it is to debate refusing to recognize women or African American

representatives.  Plaintiffs simply argue that congressional action (or inaction) perpetuating the first of these policies is as unconstitutional as actually adopting either of the latter two would be, and that the Speech or Debate Clause does not bar a federal court from so stating.

Defendants ignore the fact that the *Adams* panel rejected a similar Speech or Debate Clause argument.  Defendants there did not claim that the Speech or Debate Clause constituted an outright bar to judicial review, as here, but instead made the subtler argument that the Clause should be understood to negate causation or redressability.  Specifically, "the Clerk of the House contend[ed] that the Speech or Debate Clause" would prevent the court from "enjoining her should she decide not to comply with our declaration of the law," thereby breaking "the chain of causation" such that Plaintiffs purportedly could not "satisfy the requirement of redressability." 90 F. Supp. 2d at 42.  The panel rejected this argument, however, without addressing the propriety of an injunction.  As noted in our redressability discussion, *see supra* at 34–35, the three-judge court found that *declaratory* relief would likely cause "the President and the congressional officials [to] follow the law as the Court articulated it."  *Id.*

As in *Adams,* Defendants' Speech or Debate Clause argument here is merely a repackaging of their redressability argument.  Defendants' objection is not really that granting Plaintiffs the declaratory relief they seek would interfere with speech or debate in Congress—it is that actually mandating specific "legislative activities" would do so.  MTD 11–12.  But Plaintiffs do not ask for that relief any more than the plaintiffs in *Adams* did, and Defendants' Speech and Debate Clause argument should be rejected for the same reasons here.  Indeed, in the end, Defendants' Speech and Debate Clause argument proves way too much: it amounts to a contention that a Court can never declare congressional action unconstitutional, since to do so would interfere with Congress's prerogatives under that Clause.  Plainly, this is not correct.

41

### 3. Defendants' separation of powers argument is another restatement of their redressability claim and should also be rejected.

Defendants also argue that "Plaintiffs' claims raise serious separation-of-powers concerns because Plaintiffs seek to compel Congress to legislate or propose constitutional amendments." MTD 12. But this argument merely restates the redressability concern repeatedly addressed above. Again, as in both *Franklin* and *Adams*, Plaintiffs here seek a declaration of the law by a competent court against the Secretary of Commerce (and others), whom defendants appear to concede is a proper defendant. Such a declaration would not "compel" Congress to do anything—but as Justice O'Connor wrote in *Franklin*, Plaintiffs' injury would "likely" be "redressed by declaratory relief against the Secretary" because, "as [defendants have] not contended to the contrary, we may assume it is substantially likely" that the relevant government officials "would abide by [a federal court's] authoritative interpretation" of the relevant provisions. 505 U.S. at 803.

### 4. Defendants recognize that *Adams* rejected their political question argument, and that ruling was correct.

Defendants claim that Plaintiffs "present a nonjusticiable political question," MTD 19, but acknowledge that "the court in *Adams* concluded otherwise." *Id.* (citing *Adams*, 90 F. Supp. at 40). The *Adams* panel was correct.

As the *Adams* panel pointed out, "[t]he Supreme Court has repeatedly declared that constitutional challenges to apportionment are justiciable." 90 F. Supp. 2d at 40 (internal quotations and citations omitted). The "purely legal issue" of whether "District residents are among those qualified to vote for congressional representatives" under the U.S. Constitution "is one the courts are perfectly capable of resolving." *Id.* This Court should do so here.

**CONCLUSION**

The Court should deny DOJ's Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment.

June 3, 2019                                        Respectfully submitted,

                                                   /s/ Christopher J. Wright
                                                   _____
                                                   Christopher J. Wright (D.C. Bar No. 367384)
                                                   Patrick O'Donnell (D.C. Bar No. 459360)
                                                   Timothy J. Simeone (D.C. Bar No. 453700)
                                                   Deepika H. Ravi (D.C. Bar No. 1017076)
                                                   HARRIS, WILTSHIRE & GRANNIS LLP
                                                   1919 M Street NW, 8th Floor
                                                   Washington, D.C. 20036
                                                   Telephone: 202-730-1300
                                                   *cwright@hwglaw.com*
                                                   *podonnell@hwglaw.com*
                                                   *tsimeone@hwglaw.com*
                                                   *dravi@hwglaw.com*

                                                   *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2019 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher J. Wright
Christopher J. Wright (D.C. Bar No. 367384)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*cwright@hwglaw.com*

*Counsel for Plaintiffs*

# APPENDIX A

## State and District Populations From Census
## Immediately Preceding Statehood

| New State | Year Joined | Census Year | State Population | D.C. Population |
|---|---|---|---|---|
| Vermont | 1791 | 1790 | 85,425 | N/A |
| Kentucky | 1792 | 1790 | 73,677 | N/A |
| Tennessee | 1796 | 1790 | 35,691 | N/A |
| Ohio | 1803 | 1800 | 42,159 | 14,093 |
| Louisiana | 1812 | 1810 | 76,556 | 24,023 |
| Indiana | 1816 | 1810 | 24,520 | 24,023 |
| Mississippi | 1817 | 1810 | 31,306 | 24,023 |
| Illinois | 1818 | 1810 | 12,282 | 24,023 |
| Alabama | 1819 | 1810 | 9,046 | 24,023 |
| Maine | 1820 | 1820 | 298,335 | 33,039 |
| Missouri | 1821 | 1820 | 66,586 | 33,039 |
| Arkansas | 1836 | 1830 | 30,388 | 39,834 |
| Michigan | 1837 | 1830 | 28,004 | 39,834 |
| Florida | 1845 | 1840 | 54,477 | 43,712 |
| Texas | 1845 | 1840 | N/A | 43,712 |
| Iowa | 1846 | 1840 | 43,112 | 43,712 |
| Wisconsin | 1848 | 1840 | 30,945 | 43,712 |
| California | 1850 | 1850 | 92,597 | 51,687 |
| Minnesota | 1858 | 1850 | 6,077 | 51,687 |
| Oregon | 1859 | 1850 | 12,093 | 51,687 |
| Kansas | 1861 | 1860 | 107,206 | 75,080 |
| West Virginia | 1863 | 1860 | 376,688 | 75,080 |
| Nevada | 1864 | 1860 | 6,857 | 75,080 |
| Nebraska | 1867 | 1860 | 28,841 | 75,080 |
| Colorado | 1876 | 1870 | 39,864 | 131,700 |
| North Dakota | 1889 | 1880 | 36,909 | 177,624 |
| South Dakota | 1889 | 1880 | 98,268 | 177,624 |
| Montana | 1889 | 1880 | 39,159 | 177,624 |
| Washington | 1889 | 1880 | 75,116 | 177,624 |
| Idaho | 1890 | 1890 | 88,548 | 230,392 |
| Wyoming | 1890 | 1890 | 62,555 | 230,392 |
| Utah | 1896 | 1890 | 210,779 | 230,392 |
| Oklahoma | 1907 | 1900 | 790,391 | 278,718 |
| New Mexico | 1912 | 1910 | 327,301 | 331,069 |
| Arizona | 1912 | 1910 | 204,354 | 331,069 |
| Alaska | 1959 | 1950 | 128,643 | 802,178 |
| Hawaii | 1959 | 1950 | 499,794 | 802,178 |

Source: U.S. Census Bureau, Population of States and Counties of the United States: 1790-1990, 2-4, 28 (March 1996), https://www.census.gov/population/www/censusdata/PopulationofStatesandCountiesoftheUnitedStates1790-1990.pdf.