**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGELICA CASTAÑON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>    Defendants. | Case No. 1:18-cv-2545<br>(RDM, RLW, TNM) |

***AMICI CURIAE* BRIEF OF DISTRICT OF COLUMBIA HISTORIANS
IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

STATEMENT OF INTERESTS OF *AMICI CURIAE* ................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 1

ARGUMENT .................................................................................................... 2

I.     THERE IS NO EVIDENCE THAT THE FRAMERS INTENDED TO DENY
FEDERAL REPRESENTATION TO DISTRICT RESIDENTS ..................................... 2

     A.     The Framers' Objective In Creating A Federal "District" Did Not Include
Or Necessitate Denying Residents A Voice In The Federal Government ............... 2

     B.     The Framers Likely Did Not Think It Necessary To Provide Affirmatively
For District Representation At The Time Of Ratification ..................................... 6

II.    THE POST-RATIFICATION HISTORY ALSO DOES NOT ESTABLISH
THAT THE FRAMERS INTENDED TO DISENFRANCHISE DISTRICT
RESIDENTS ..................................................................................................... 9

     A.     An Act Of Congress, Not The Constitution, Deprived District Residents
Of The Vote ................................................................................................. 10

     B.     The Inaction Of Later Congresses Is Not Probative Of The Framers' Intent ........ 14

CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

\* *Adams v. Clinton,*
90 F. Supp. 2d 35 (D.D.C.), *aff'd,* 531 U.S. 941 (2000) ....................... 1, 4, 5, 6, 7, 8, 9, 10, 12

*Bryan v. United States,*
524 U.S. 184 (1998) ................................................................................................................. 8

*National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co.,*
337 U.S. 582 (1949) ............................................................................................................... 13

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,*
377 U.S. 58 (1964) ................................................................................................................. 12

*O'Gilvie v. United States,*
519 U.S. 80 (1996) ................................................................................................................. 13

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
496 U.S. 633 (1990) ............................................................................................................... 14

*Rapanos v. United States,*
547 U.S. 715 (2006) ............................................................................................................... 14

*Schwegmann Bros. v. Calvert Distillers Corp.,*
341 U.S. 384 (1951) ................................................................................................................. 8

*Star Athletica, L.L.C. v. Varsity Brands, Inc.,*
137 S. Ct. 1002 (2017) ........................................................................................................... 14

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 2, cl. 1 ......................................................................................................... 4

U.S. Const. art. I, § 2, cl. 3 ......................................................................................................... 8

U.S. Const. art. I, § 8, cl. 17 .................................................................................................... 4, 5

An Act Concerning the Territory of Columbia and the City of Washington, 1791
Md. Act, ch. 45, *reprinted in* 1 D.C. Code 34 (1991) ........................................................... 10

An Act for the Cession of Ten Miles Square, or any Lesser Quantity of Territory
Within This State, to the United States for the Permanent Seat of the General
Government, 13 Va. Stat. at Large, ch. 32, *reprinted in* 1 D.C. Code 32
(1991). .................................................................................................................................... 10

**Page(s)**

An Act to Cede to Congress a District of Ten Miles Square in This State for the
  Seat of the Government of the United States, 1788 Md. Act, ch. 46, *reprinted
  in* 1 D.C. Code 33 (1991)........................................................................................10

Ordinance of 1787, ch. 8, 1 Stat. 50 (1789)......................................................................8

Organic Act of 1801, An Act Concerning the District of Columbia, 2 Stat. 103,
  *reprinted in* 1 D.C. Code 46 (1991)......................................................................12

Residence Act, 1 Stat. 130 (1790) .................................................................................10

## OTHER AUTHORITIES

*Annals of Cong.* 819 (1789) (Joseph Gales, ed., 1834),
  http://memory.loc.gov/ammem/ amlaw/lwac.htm ..................................9, 11, 12, 13

Kenneth R. Bowling, *The Creation of Washington, D.C.: The Idea and Location
  of the American Capital* (1991) .....................................................................1, 4, 6

H.P. Caemmerer, *The National Capital*, S. Doc. No. 332 (1932) ..................................9

*The Debates In The Several State Conventions On The Adoption Of The Federal
  Constitution, As Recommended By The General Convention At Philadelphia
  In 1787* (Jonathan Elliot ed., 2d ed. 1836),
  http://memory.loc.gov/ammem/amlaw/lwed.html............................................4, 6, 8

William C. diGiacomantonio, *"To Make Hay while the Sun Shines"*: D.C.
  *Governance as an Episode in the Revolution of 1800, in Establishing
  Congress: The Removal to Washington, D.C., and the Election of 1800*
  (Kenneth R. Bowling & Donald R. Kennon eds., 2005) ........................................11

William C. diGiacomantonio, *"To Sell Their Birthright for a Mess of Potage":
  The Origins of D.C. Governance and the Organic Act of 1801*, 12 Wash.
  History 30 (2000)................................................................................11, 12, 13, 14

*Documentary History of the Ratification of the Constitution* (1976),
  http://digital.library.wisc.edu/1711.dl/History.Constitution .............................3, 4, 8

The Federalist No. 43 (E.H. Scott ed., 1898)........................................................4, 6, 13

Richard L. Forstall, U.S. Bureau of the Census, Dep't of Commerce, *Population
  of the States and Counties of the United States: 1790 to 1990* (1996),
  http://www.census.gov/population/www/censusdata/PopulationofStatesandCo
  untiesoftheUnitedStates1790-1990.pdf..........................................................13, 14

*Fourth Annual Address* (Nov. 22, 1800), *in A Compilation of the Messages and
  Papers of the Presidents, 1789–1897* (James D. Richardson ed., 2004)................11

**Page(s)**

Roy F. Franchino, *The Constitutionality of Home Rule and National Representation for the District of Columbia*, 46 Geo. L.J. 207 (1957) ...................................6

*The Papers of Alexander Hamilton* (Harold C. Syrett & Jacob E. Cooke eds., 1962) ...........................................................................................................7

Peter Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. 167 (1975) ...............................................................10, 11, 13

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911), https://memory.loc.gov/ammem/amlaw/lwfr.html .................................................3, 5

U.S. Bureau of the Census, Dep't of Commerce, *Population of the 24 [Largest] Urban Places: 1790* (June 15, 1998), https://www.census.gov/population/www/documentation/twps0027/tab02.txt .......................9

U.S. Bureau of the Census, Dep't of Commerce, *QuickFacts: District of Columbia*, https://www.census.gov/quickfacts/dc (last visited June 5, 2019).........................15

## STATEMENT OF INTERESTS OF *AMICI CURIAE*[1]

*Amici* are professors and scholars of American history who focus their research and writings on the history of the District of Columbia.  As historians deeply familiar with the events precipitating the District Clause, the debates of the Constitutional Convention, the state ratification debates, and later legislative efforts with respect to our Nation's Capital, they are authoritative sources regarding the historical questions that bear on the legal issues before this Court.  Indeed, the work of one *amicus* was cited repeatedly by the majority and the dissent in *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C.) (per curiam), *aff'd*, 531 U.S. 941 (2000).  *See id.* at 50 n.25, 51 n.27, 58 n.39 (citing Kenneth R. Bowling, *The Creation of Washington, D.C.: The Idea and Location of the American Capital* (1991)); *id.* at 76-78 nn.8-10, 12, 14, 16-17 (Oberdorfer, J., dissenting in part and concurring in part) (same).  *Amici* submit this brief to clarify important aspects of the historical record, most importantly the absence of any evidence that the Framers intended to deny representation to residents of the future District of Columbia.

The scholars joining this brief include[2]:

- Kenneth R. Bowling, Professor Emeritus of History, The George Washington University.

- William C. diGiacomantonio, Chief Historian, U.S. Capitol Historical Society.

- George Derek Musgrove, Associate Professor of History, University of Maryland, Baltimore County.

## SUMMARY OF ARGUMENT

Defendants argue that "plentiful historical evidence shows" the Founders "understood and anticipated" that the Constitution would deny residents of the future District of Columbia voting

---

[1]    No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.  *See* Fed. R. App. P. 29(a)(4)(E); D.D.C. LCvR 7(o).

[2]    All signatories speak for themselves only and not on behalf of their respective institutions. Institutional affiliations are listed for identification purposes.

representation in Congress.  Mem. in Supp. of Executive and Senate Defs.' Mot. to Dismiss the Am. Compl. 5 ("Defs. Mem.").  This suggestion that the District's current disenfranchisement results from a "considered calculation" by the Constitution's authors, *id.* at 24, is profoundly ahistorical.  Nothing in the record of the Constitutional Convention or in the ratification debates suggests that the Framers intended to deny those who reside in the federal "Seat of Government" a voice in selecting that body.  To the contrary, the available evidence suggests that the Framers anticipated that the new federal district would one day warrant representation, but understandably did not see a need to resolve the issue while the district itself remained a theoretical construct.

Defendants further argue that aspects of post-ratification history, including the passage of the Organic Act, support their position.  Defs. Mem. 5-6, 24.  But that history too suggests otherwise.  Residents of the District of Columbia maintained the vote for a decade after ratification and were disenfranchised by an *Act of Congress*, not by anything in the Constitution.  Indeed, the Organic Act confirms Congress's vast authority to legislate regarding the District.  And the political context of the Act's passage suggests that the Act failed to provide for District residents' representation not because of any doubt about Congress's authority to afford them the vote, but because the issue continued to lack urgency at the time.

In sum, there is no historical support for the argument that the Framers of our republic intended to deny participation in that democracy to those living in the Nation's Capital.  The current injustice is not a purposeful or inevitable result of the constitutional design.

## ARGUMENT

### I. THERE IS NO EVIDENCE THAT THE FRAMERS INTENDED TO DENY FEDERAL REPRESENTATION TO DISTRICT RESIDENTS

#### A. The Framers' Objective In Creating A Federal "District" Did Not Include Or Necessitate Denying Residents A Voice In The Federal Government

Defendants' insistence that the Constitution's authors intended to forever disenfranchise

District of Columbia residents is starkly at odds with the Framers' overriding commitment to the core principle that spurred the Revolution: "no taxation without representation." Myriad statements during the debates over the draft Constitution demonstrate how fundamental that principle was to the founding generation. As James Madison explained during the Constitutional Convention, "the right of suffrage is certainly one of the fundamental articles of republican Government," and "[a] gradual abridgement of this right has been the mode in which Aristocracies have been built on the ruins of popular forms."[3] At the Pennsylvania ratifying convention, delegate Benjamin Rush pronounced that "there is no security but in a pure and adequate representation; the checks and all the other desiderata of government are nothing but political error without it, and with it, liberty can never be endangered."[4] And at the New York convention, Alexander Hamilton likewise maintained that "Taxation and represent[ation] go together,"[5] and that "this Gov[ernment] [is] built—on all the principles of free Gov[ernment]," namely "representation."[6]

The Framers also recognized that the People would surely demand this right if it were denied. Oliver Ellsworth, a Connecticut delegate to the Constitutional Convention, cautioned that "[t]he people will not readily subscribe to the Nat[ional] Constitution, if it should subject them to be disenfranchised."[7] And Pierce Butler, a South Carolina delegate, similarly emphasized that "[t]here is no right of which the people are more jealous than that of suffrage" and that limiting the right would risk revolution.[8]

Against this backdrop, any suggestion that the Framers *affirmatively intended* to deny

---

[3]  2 *The Records of the Federal Convention of 1787* at 203 (Max Farrand ed., 1911), https://memory.loc.gov/ammem/amlaw/lwfr.html ("*Records of the Federal Convention*").
[4]  2 *Documentary History of the Ratification of the Constitution* 433 (1976), http://digital.library.wisc.edu/1711.dl/History.Constitution ("DHRC").
[5]  22 DHRC 1734-35 (2008) (notes of Hamilton's speech on June 20, 1788).
[6]  23 DHRC 2193 (2009) (notes of Hamilton's speech on July 17, 1788).
[7]  2 *Records of the Federal Convention* 201.
[8]  2 *Records of the Federal Convention* 202.

federal representation to citizens who happen to reside in the Seat of Government must carry a heavy burden of proof.  Yet the historical record regarding the drafting and adoption of both the District Clause, U.S. Const. art. I, § 8, cl. 17, and the House Composition Clause, *id.* art. I, § 2, cl. 1, provides no support at all for that highly counterintuitive claim.

The District Clause was born from the Framers' determination that the federal government should not be beholden to the State in which it would be located.  This sentiment arose from a June 1783 meeting of the Confederation Congress in Philadelphia.  According to the conventional retelling of the "Mutiny" of 1783,[9] a group of Continental Army soldiers, angry over their lack of pay, confronted the Congress at the Pennsylvania State House; Pennsylvania refused to provide assistance to repel the mob; and the Congress was forced to reconvene elsewhere.  In actuality, the soldiers gathered at the State House to demand pay from the *State* Executive Council, and the Congress attempted to assemble on site (passing through the soldiers to do so) only after the members were called to an emergency session in response.[10]  In any case, the event convinced the Framers that the federal government's security should not be left in the hands of any one State.  As Madison warned in "Federalist 43," without a federal district, "the public authority might be insulted, and its proceedings be interrupted with impunity," and the State's control over the physical site would threaten the federal government's "necessary independence."[11]

It was this widespread feeling[12] that spurred the Framers to provide for a "District"—"not

---

[9]  *See, e.g., Adams*, 90 F. Supp. 2d at 50 n.25.

[10]  Bowling, *supra*, at 30-34.

[11]  The Federalist No. 43, at 239 (E.H. Scott ed., 1898).

[12]  *See, e.g.,* 10 DHRC 1318 (remarks of James Madison at Virginia convention) ("How could the General Government be guarded from the undue influence of particular States, or from insults, without such exclusive power?"); 4 *The Debates In The Several State Conventions On The Adoption Of The Federal Constitution, As Recommended By The General Convention At Philadelphia In 1787*, at 219-20 (Jonathan Elliot ed., 2d ed. 1836), http://memory.loc.gov/ammem/amlaw/lwed.html ("*Debates In The Several State Conventions*")

exceeding ten Miles square"—to house the new "Seat of the Government," and to empower Congress to adopt "exclusive Legislation, in all Cases whatsoever," over that area.  U.S. Const. art. 1, § 8, cl. 17.  But to be clear, there is no evidence that *anyone* suggested—at the Constitutional Convention, at any state ratifying convention, or in the hundreds of contemporary articles in the press—that realizing this objective necessitated relegating district residents to second-class citizenry without representation in Congress.  As the *Adams* court rightly recognized, the "rationale for the District Clause ... would not by itself require the exclusion of District residents from the congressional franchise."  90 F. Supp. 2d at 50.

In addition, nothing in the history of the drafting and adoption of the House Composition Clause—which clarified that "the People of the several States" would choose members of the House of Representatives—suggests that it was intended as a prohibition against voting by the residents of the "District" mentioned in Article I, section 8, clause 17.  As with the District Clause, there is no evidence that the Framers ever adverted to the voting rights of the district's residents when crafting that language.  Instead, the Framers' choice of the word "States" in this provision reflected two compromises.  First, there was a debate over whether the House should be elected by the "People of the several States" or instead by state legislatures[13]—which was resolved in favor of direct election by individuals.  Second, there was debate over whether voting qualifications should be set at the federal or instead at the state level—which was resolved by letting States decide.[14]  But at no point during either of those debates did anyone suggest that all residents of the planned federal district would lack representation in the House.

---

(remarks of James Iredell at North Carolina convention) ("What would be the consequence if the seat of the government of the United States, with all the archives of America, was in the power of any one particular state?  Would not this be most unsafe and humiliating?").

[13]   *See, e.g.*, 1 *Records of the Federal Convention* 48-60.

[14]   *See, e.g.*, 2 *Records of the Federal Convention* 201-06.

There is thus absent from the historical record any indication that the Framers, profoundly committed to voting representation, had a specific intent to disenfranchise the residents of the future Seat of Government.  Even Defendants acknowledge that the Framers' supposed decision to deny representation to district residents represents an "oddity."  Defs. Mem. 5.  Defendants insist that this denial was nonetheless a conscious choice, *see id.*, but there is no evidence supporting such a characterization.

### B.      The Framers Likely Did Not Think It Necessary To Provide Affirmatively For District Representation At The Time Of Ratification

The *Adams* court recognized that the voting rights of district residents were not specifically considered during the Constitution's drafting.  *See* 90 F. Supp. 2d at 50.  Yet the court understood portions of the state ratifying debates to reflect "a contemporary understanding that residents of the District would not have a vote in the national Congress."  *Id.* at 51.  Those debates do not conclusively establish such a shared understanding.  Indeed, the limited available evidence indicates that the Framers and other supporters of the Constitution assumed that district residents would continue to vote with their former State for at least some period of time.[15]  The evidence

---

[15]   Many statements in support of the draft Constitution reflect a belief that the ceding State would protect the rights of its residents living within the ceded land.  *See* Bowling, *supra*, at 84 ("Federalists denied that the liberties of the residents of the federal city would be infringed.").  For example, Madison explained that the land ceded for the Seat of Government "is to be appropriated to this use, with the consent of the State ceding it," and stressed that "the State will no doubt provide in the compact for the rights, and the consent of the citizens inhabiting it."  The Federalist No. 43, at 239.  At the North Carolina convention, delegate James Iredell also explained that the ceding State would be able to "stipulate the conditions of the cession," and that "such state [would] take care of the liberties of its own people."  4 *Debates In The Several State Conventions* 219.  George Nicholas likewise insisted at the Virginia convention "that as the state, within which the ten miles square might be, could prescribe the terms on which Congress should hold it, no danger could arise, as no state would consent to injure itself."  3 *Debates In The Several State Conventions* 434.  It is thus plausible that ratification of the District Clause was based on the assumption that the State ceding territory for the federal district would protect the fundamental liberties of its citizens, of which the right to vote was paramount.  *See* Roy F. Franchino, *The Constitutionality of Home Rule and National Representation for the District of Columbia*, 46 Geo. L.J. 207, 214

also suggests that the Framers anticipated that the district residents would eventually require representation as a body, but did not see a need to resolve the issue at that early juncture.

Those two understandings—that residents of the land ceded for the district would retain the franchise, and that the district itself would eventually have representation—are reflected in a proposed constitutional amendment offered by Hamilton at the New York convention. That amendment (which did not pass) presumed that residents could continue voting with the State from which the district was carved, but would have given them the right to cast votes *as district residents* once the district's population reached the size necessary for a voting representative under the apportionment rules.[16]

The *Adams* court and Defendants have interpreted the failure of Hamilton's proposal as reflecting a shared recognition that, absent a constitutional amendment, district residents would lack representation. 90 F. Supp. 2d at 51; Defs. Mem. 5. But Hamilton's proposal—the *only* proffered amendment at any of the state conventions specifically concerning the voting rights of district residents—does not bear that out. At most, the failed amendment reveals a disinclination, at that particular time, to provide *automatically* for representation of the district *qua district* as a matter of constitutional mandate. In other words, Hamilton's amendment would have taken the matter out of future Congresses' hands—a course of action that his fellow New York ratifying

---

(1957) (arguing that "[t]he ceding states could have prevented" the District of Columbia's later disenfranchisement "by reserving that the rights of their citizens should not be impaired").

[16]   The proposed amendment provided:

> When the Number of Persons in the District of Territory to be laid out for the Seat of the Government of the United States, shall according to the Rule for the Apportionment of Representatives and direct Taxes Amount to ____ [an unspecified number] such District shall cease to be parcel of the State granting the Same, and Provision shall be made by Congress for their having a District Representation in that Body.

5 *The Papers of Alexander Hamilton* 189 (Harold C. Syrett & Jacob E. Cooke eds., 1962).

voters might have found premature or unwise for any number of reasons.[17]

When they ratified the District Clause, the Framers resolved only its maximum geographic limits.[18]  They did not yet know even the location of the new district, let alone its population; it was not until the later passage of the Residence Act in 1790, *see infra* at 10, that the First Federal Congress (not the Framers) ultimately selected the location that in 1791 became the District of Columbia.  It seemed almost certain, moreover, that the district would have far fewer than 60,000 residents—the minimum then needed to automatically qualify for statehood under the terms of the Northwest Ordinance[19]—and likely that it would have less even than the 30,000 population-to-Representative ratio the Framers established for the House.[20]

The First Federal Congress, for example, split its time between Philadelphia (population

---

[17]  The *Adams* court also noted a statement that Thomas Tredwell supposedly made at the New York convention.  90 F. Supp. 2d at 51 (quoting Tredwell as arguing that "[t]he plan of the federal city ... subject[s] the inhabitants of that district to the exclusive legislation of Congress, in whose appointment they have no share or vote" (first alteration in original) (emphasis omitted)).  This statement actually comes from a speech that was later printed in the Albany Register (an Antifederalist newspaper), which the paper attributed to an unnamed delegate on an unknown date.  *See* 23 DHRC 2549 (suggesting the speech's publication "could have been a ploy to publish an Antifederal essay").  Regardless, it is clear the speaker was an opponent of the Constitution.  *See id.* at 2549-58.  And characterizations of the Constitution by those who sought to defeat it should carry little weight in divining its meaning.  *Cf. Bryan v. United States*, 524 U.S. 184, 196 (1998) ("'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation.'" (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394 (1951))); *see also infra* n.38.

[18]  As Madison explained at the Virginia ratifying convention, it was possible that the district "may not be more than one mile."  3 *Debates In The Several State Conventions* 432; *see also id.* (describing the district contemplated in the Constitution as "very circumscribed").

[19]  The Northwest Ordinance was passed by the Continental Congress in 1787.  The First Federal Congress then adopted it as federal law.  Ordinance of 1787, ch. 8, § 2, 1 Stat. 50, 53 (1789).

[20]  *See* U.S. Const. art. I, § 2, cl. 3.  The specific number was the subject of debate during the Constitutional Convention, and the delegates settled on 30,000 as the lowest ratio they could use without producing a very large and chaotic House.

28,522) and New York City (population 33,131).[21]  And at the time many different localities were engaged in lobbying efforts to become the Nation's capital.  As Rep. Samuel Livermore remarked to his fellow members in 1789, "[m]any parts of the country appear extremely anxious to have Congress with them.  There is Trenton, Germantown, Carlisle, Lancaster, Yorktown, and Reading, [which] have sent us abundance of petitions, setting forth their various advantages."[22]  While Rep. Livermore did not mention every locality ever considered, it is telling that none of his listed cities had a population of more than 2,500.[23]  Moreover, it seems implausible that States would have been fiercely competing to house the new federal district if the price of winning was expected to be their residents' disenfranchisement.[24]

## II.  THE POST-RATIFICATION HISTORY ALSO DOES NOT ESTABLISH THAT THE FRAMERS INTENDED TO DISENFRANCHISE DISTRICT RESIDENTS

The events in the decades following ratification likewise provide little support for the proposition that the Framers understood the Constitution to deprive residents of the federal district of the right to vote.  Even after Maryland and Virginia ceded land for the District of Columbia to the federal government, residents in that territory continued to vote with their former States for a decade after ratification while those States maintained jurisdiction over the ceded land.  It was only when the Sixth Congress formally relocated to the District and passed the Organic Act that

---

[21]  U.S. Bureau of the Census, Dep't of Commerce, *Population of the 24 [Largest] Urban Places: 1790* (June 15, 1998), https://www.census.gov/population/www/documentation/twps0027/tab02.txt ("*1790 Census: Population Urban Places*").

[22]  1 *Annals of Cong.* 819 (1789) (Joseph Gales, ed., 1834), http://memory.loc.gov/ammem/amlaw/lwac.html ("*Annals of Cong.*").

[23]  *1790 Census: Population Urban Places*, *supra* n.21.

[24]  The *Adams* court found it probative that Pierre L'Enfant's "original plan" for the District of Columbia provided for "a city of 800,000."  90 F. Supp. 2d at 49 n.24.  But L'Enfant did not submit his plan to the Second Congress until December 1791, after ratification and the selection of the Potomac site.  H.P. Caemmerer, *The National Capital*, S. Doc. No. 332, at 29 (1932).  L'Enfant's later vision could not have influenced the Framers' pre-ratification assumptions.

District residents lost the vote.  But Congress's failure to provide for District voting rights in that Act or in subsequent legislation is not probative of the Framers' intent on the issue or Congress's understanding of its own authority, given relevant historical and political circumstances.

### A. An Act Of Congress, Not The Constitution, Deprived District Residents Of The Vote

In 1788 and 1789, Maryland and Virginia ceded land to the United States for the new federal district.[25]  The First Congress accepted that cession by passing the Residence Act of 1790. That Act provided, however, that "the operation of the laws" of Maryland and Virginia would "not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide."[26]  Similarly, the States provided that their jurisdiction would "not cease or determine until Congress ... shall, by law, provide for the government thereof, under their jurisdiction, in the manner provided by" the District Clause.[27]  The Residence Act identified the first Monday in December of 1800 as the date on which "the seat of the government of the United States" would "be transferred to the district."[28]  Importantly, residents of the District of Columbia continued to vote as citizens of Maryland and Virginia until that transfer took place—a full decade after ratification.[29]

---

[25]  *See* An Act to Cede to Congress a District of Ten Miles Square in This State for the Seat of the Government of the United States, 1788 Md. Act, ch. 46, *reprinted in* 1 D.C. Code 33, 34 (1991); An Act for the Cession of Ten Miles Square, or any Lesser Quantity of Territory Within This State, to the United States for the Permanent Seat of the General Government, 13 Va. Stat. at Large, ch. 32, *reprinted in* 1 D.C. Code 32, 33 (1991).

[26]  Residence Act, § 1, 1 Stat. 130 (1790).

[27]  13 Va. Stat. at Large, ch. 32, *reprinted in* 1 D.C. Code at 33; An Act Concerning the Territory of Columbia and the City of Washington, 1791 Md. Act, ch. 45, § 2, *reprinted in* 1 D.C. Code 34, 35 (1991).

[28]  Residence Act, § 6, 1 Stat. 130.

[29]  *See Adams*, 90 F. Supp. 2d at 58; *id.* at 79 & n.20 (Oberdorfer, J., dissenting in part and concurring in part) (cataloguing historical evidence that District residents continued to vote during this period); Peter Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. 167, 174 (1975).

The federal government accordingly relocated to the District in 1800.  In President John Adams' first state of the union address, he reminded the Sixth Congress of its authority to assert plenary power over the District:  "It is with you, gentlemen, to consider whether the local powers over the District of Columbia vested by the Constitution in the Congress ... shall be immediately exercised."[30]  The question of the extent and form of Congress's jurisdiction over the District was referred to a House committee chaired by Henry Lee, and on December 17, 1800, Lee presented a proposed bill to govern the District.[31]  Among other things, the bill provided that—while Maryland and Virginia would no longer enact or administer laws for the District—Congress would borrow the laws of Maryland and Virginia as they existed in December 1800 as the operating law of the District until such time as Congress could "enter on a system of legislation in detail."[32]  Members of Congress recognized that by providing for the governance of the District, the bill would trigger the conditions of the Residence Act and the States' cessions and invest Congress with exclusive jurisdiction.  The force of law over the District would thus "derive solely from Congress."[33]

Yet while Lee's bill, and related Senate bills, precipitated substantial debate, Congress was simultaneously preoccupied with the aftermath of the election of 1800.  For the first time in the young Nation's history, executive authority would transfer into the hands of an opposition party, and the Federalist congressional majority was confronted with their own impending loss of power

---

[30]   *Fourth Annual Address* (Nov. 22, 1800), *in A Compilation of the Messages and Papers of the Presidents, 1789–1897* (James D. Richardson ed., 2004).
[31]   William C. diGiacomantonio, *"To Sell Their Birthright for a Mess of Potage": The Origins of D.C. Governance and the Organic Act of 1801*, 12 Wash. History 30, 36-37 (2000) (*"To Sell Their Birthright"*).
[32]   10 Annals of Cong. 872 (remarks of Rep. Harper); *see also* Raven-Hansen, *supra*, at 174 (the bill was "to 'freeze' the state laws for the District as they stood in December, 1800").
[33]   William C. diGiacomantonio, *"To Make Hay while the Sun Shines": D.C. Governance as an Episode in the Revolution of 1800*, *in Establishing Congress: The Removal to Washington, D.C., and the Election of 1800* 39, 42 (Kenneth R. Bowling & Donald R. Kennon eds., 2005).

as Jeffersonian Republicans took the House.[34]  Because "Jeffersonian Republican ideology was committed to restraining the power of the central government," the lame-duck Sixth Congress recognized that the incoming members would resist Federalists' efforts to "[a]ssur[e] Congress the full exercise of its authority in the ten miles square."[35]

Against that backdrop, the Sixth Congress pushed through a Senate version of the bill that looked much like Lee's first proposed bill, thus enacting the Organic Act of 1801 and assuming full control of the District. [36]  Among other things, the Act divided the District into Washington county and Alexandria county; established a circuit court to adjudicate criminal and civil cases in the District; and provided for a marshal, a United States attorney, a register of wills, and a judge of the orphans' court.[37]  The Act said nothing about District residents' voting rights.  But by placing the District under its exclusive jurisdiction, Congress by implication stripped District residents of the right to vote as citizens of Virginia and Maryland—and at that point, it was too late for the ceding States to protect their former residents' franchise.  To be clear, however: it was this *Act of Congress*, not the Constitution, that took away District residents' right to vote.[38]

---

[34]  diGiacomantonio, *"To Sell Their Birthright"* 46.

[35]  *Id.*

[36]  Organic Act of 1801, An Act Concerning the District of Columbia, 2 Stat. 103, 105, *reprinted in* 1 D.C. Code 46, 46–49 (1991).

[37]  *Id.* at 46-48.  Like Lee's original bill, the Act borrowed Maryland and Virginia's laws, as they then existed, and enacted them as the governing law of the District through Congress's own legislative power.

[38]  In the course of the debates over the Organic Act, some suggested that this result flowed from the Constitution itself.  However, many of these individuals were opponents of the Organic Act who sought to defeat the bill by raising the specter of disenfranchisement.  *See Adams*, 90 F. Supp. 2d at 52-53 (discussing the views of "some residents of the District," as well as remarks of Rep. Smilie, a staunch Antifederalist); Defs. Mem. 5 & n.5 (citing *Adams*).  Again, the Supreme Court has "often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents," because, "[i]n their zeal to defeat a bill, they understandably tend to overstate its reach."  *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964).  Other statements mentioned the possibility of a constitutional amendment to restore the vote, without stating that such an amendment was the sole solution.  10 Annals of Cong. 998–

Furthermore, just as the Framers' failure to explicitly provide for the voting rights of district residents in the Constitution itself is not probative, *see supra* at 6-9, nothing determinative can be gleaned from the fact that the Sixth Congress did not provide for voting rights in the Organic Act. Whereas 60,000 residents were required to automatically qualify for statehood, *see supra* at 8, only 14,093 residents lived in the District of Columbia in 1800.[39] Unsurprisingly, then, the Sixth Congress had broader and more pressing priorities as supporters rushed the bill to the President's desk. Particularly given the fraught context in which the Organic Act was passed, the Sixth Congress's further deferral of the not-yet-urgent issue demonstrates no affirmative congressional intent to deny voting rights to District residents.[40] And its inaction sheds even less light on the Framers' original intent with regard to those rights.[41] What the Organic Act does confirm is Congress's vast authority to govern the District pursuant to the District Clause.[42]

99 (remarks of Rep. Dennis); *see also* Raven-Hansen, *supra*, at 177. And although Rep. Bird suggested that the "blame" for the District's disenfranchisement lay with "the men who framed the Constitutional provision," that statement—by someone who was not a Framer, more than a decade after ratification—sheds little light on the Framers' intent. 10 Annals of Cong. 996. In contrast with these scattered statements, the Organic Act itself sent a clear message: Congress has broad authority over the District. Nothing in the Organic Act suggests that Congress lacked the power to grant District residents the vote, and the debates leading up to the passage of the Organic Act do not indicate any affirmative desire to disenfranchise District residents.

[39] Richard L. Forstall, U.S. Bureau of the Census, Dep't of Commerce, *Population of the States and Counties of the United States: 1790 to 1990* at 28 (1996), http://www.census.gov/population/www/censusdata/PopulationofStatesandCountiesoftheUnitedStates1790-1990.pdf.

[40] *See* diGiacomantonio, *"To Sell Their Birthright"* 48 (the Organic Act was a "last-ditch, 11th-hour insurance polic[y] aimed at perpetuating Federalist influence").

[41] *Cf. O'Gilvie v. United States*, 519 U.S. 80, 90 (1996) ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute.").

[42] That vast power is consistent with the Framers' intent to invest Congress with broad authority. *See, e.g.*, The Federalist No. 43, at 239 (referring to the "indispensable necessity of [Congress's] complete authority at the seat of Government"); *cf. Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 592 (1949) ("[C]ongressional power over the District, flowing from Art. I, is plenary in every respect.").

**B.    The Inaction Of Later Congresses Is Not Probative Of The Framers' Intent**

In the ensuing years, Congress did not act to restore District residents' voting rights.  But the absence of such legislative action does not establish that the early Congresses believed they lacked the power to provide District residents the right to vote, for three reasons.

*First*, the population of the District of Columbia continued to remain well below the 60,000-person threshold for statehood for decades following ratification.[43]  It is hardly surprising therefore that no one made any serious effort to secure District residents a voting representative.

*Second*, as a practical matter, the need for federal representation was far weaker than it later became.  When Congress convened in the District for its first full session in 1801, the 137 members of the Seventh Congress alone (not including their families and staff) constituted a considerable portion of the District's entire population.  There was thus a sense that the views of District residents would naturally be taken into account due to their frequent, direct interaction with members of Congress themselves.[44]  That sense likely further diminished the political will to provide District residents with a voting representative.

*Finally*, as the Supreme Court has repeatedly explained, "'[c]ongressional inaction lacks persuasive significance' in most circumstances."[45]  Congress's power over District voting rights should not be discounted merely because Congress has not previously exercised that power.

---

[43]   *Population of the States and Counties of the United States: 1790 to 1990*, *supra,* at 29 (showing a population of 51,687 in 1850).

[44]   *See* diGiacomantonio, *"To Sell Their Birthright"* 43 (some believed that congressmen would represent the interests of their neighbors in the District more effectively than delegates in faraway Annapolis or Richmond).

[45]   *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1015 (2017) (alteration in original) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)); *see also, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality opinion) ("Congress takes no governmental action except by legislation.").

14

**CONCLUSION**

Nothing in the Constitutional Convention or in the ratification debates suggests that the Framers intended to deny federal representation to residents of the "District" they envisioned in Article I, section 8, clause 17. Instead, there is ample evidence that the Framers considered the franchise the most cherished of liberties, and the limited historical record accordingly suggests that the Framers assumed future residents of the "Seat of Government" would have a voice in selecting that body. But, given the many unknowns about the contemplated district at the time of ratification, the Framers did not conclusively resolve the issue.

The post-ratification history is equally devoid of support for the notion that the Framers affirmatively disenfranchised residents of the District of Columbia in the Constitution. Residents of the District maintained the vote for a decade after ratification, and Congress's failure to provide for their voting rights in the Organic Act does not indicate that Congress lacked the *power* to do so. Given the political circumstances and the District's small population at the time, it is no surprise the Act did not make specific provision for residents' voting rights. And later Congresses' failure to remedy the District's lack of representation in the years that followed does not suggest that the Framers intended *forever* to preclude District residents from receiving voting representation—including today when the District's population is over 700,000.[46]

Nothing in our Nation's early history establishes that the Constitution bars the residents of the Nation's Capital from exercising this most fundamental civil right. This Court should deny the Defendants' motion to dismiss and grant the Plaintiffs' motion for summary judgment.

---

[46] U.S. Bureau of the Census, Dep't of Commerce, *QuickFacts: District of Columbia*, https://www.census.gov/quickfacts/dc (last visited June 5, 2019).

Dated: June 10, 2019

Respectfully submitted,

/s/ Richard P. Bress

Richard P. Bress (D.C. Bar No. 457504)
Jamie D. Underwood (D.C. Bar No. 471614)
Margaret A. Upshaw* (D.C. Bar. No. 156456)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
Telephone:    (202) 637-2200
Facsimile:    (202) 637-2201
richard.bress@lw.com
jamie.underwood@lw.com
maggie.upshaw@lw.com

* Application to the United States District Court for the District of Columbia pending.

*Counsel for* Amici Curiae *District of Columbia Historians*