# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGELICA CASTAÑON, *et al.*,

               Plaintiffs,

    v.

THE UNITED STATES OF AMERICA, *et al.*,

               Defendants.

Case No. 1:18-cv-2545
(RDM, RLW, TNM)

## MEMORANDUM OF LAW OF *AMICI CURIAE*
## CONSTITUTIONAL LAW SCHOLARS IN SUPPORT OF PLAINTIFFS

## TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ................................................................................1

SUMMARY OF ARGUMENT ....................................................................................1

ARGUMENT ...............................................................................................................2

I.      Congress has the power under the District Clause to grant District of Columbia residents the right to vote for Congressional representation..................................................2

     A.      District residents had, then were deprived of, the right to vote for Congress......................................................................................................3

     B.      Congress has the power to restore to District residents the right to vote for Congress.....................................................................................................6

II.      Nothing in the Constitution precludes Congress from granting District residents the right to vote for Congress.....................................................................10

CONCLUSION..........................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000), *aff'd*, 531 U.S. 941 (2000) ........................2

*Attorney Gen. of the Territory of Guam v. United States*,
    738 F.2d 1017 (9th Cir. 1984) ...........................................................................................12

*Baker v. Carr,* 369 U.S. 186 (1962)...................................................................................8, 11

*Evans v. Cornman*, 398 U.S. 419 (1970)* ...............................................................................7

*Igartua De La Rosa v. United States*, 32 F.3d 8 (1st Cir. 1994)...................................................12

*Igartúa-De La Rosa v. United States*, 417 F.3d 145 (1st Cir. 2005) (en banc) ............................12

*Kramer v. Union Free School District No. 15*, 395 U.S. 621 (1969) .............................................9

*Marbury v. Madison*, 5 U.S. 137 (1803).......................................................................................14

*National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co.*,
    337 U.S. 582 (1949)*......................................................................................................6

*Reynolds v. Sims,* 377 U.S. 533 (1964)........................................................................................9

*Richardson v. Ramirez,* 418 U.S. 24 (1974) ...............................................................................11

*Romeu v. Cohen*, 265 F.3d 118 (2d Cir. 2001) ............................................................................12

*Segovia v. United States*, 880 F.3d 384 (7th Cir. 2018)...............................................................12

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 17 (the "District Clause")............................................................ *passim*

U.S. Const. art. I, § 2, cl. 1........................................................................................................10

U.S. Const. art. I, § 3, cl. 1........................................................................................................10

U.S. Const. art. I............................................................................................................ *passim*

U.S. Const. art. II, § 1, cl. 2 ......................................................................................................10

U.S. Const. art. II .....................................................................................................................12

U.S. Const. art. III.......................................................................................................................6

\* Authorities principally relied on are marked with an asterisk (*).

U.S. Const. amend. XIV* ................................................................................................11

U.S. Const. amend. XV ....................................................................................................11

U.S. Const. amend. XVII .................................................................................................10

U.S. Const. amend. XIX ..................................................................................................11

U.S. Const. amend. XXIII ..........................................................................................12, 13

U.S. Const. amend. XXVI ...............................................................................................11

**Statutes and Rules**

An Act Concerning the District of Columbia, 2 Stat. 103 (1801) (the "District of
    Columbia Organic Act")* ..........................................................................................5

An Act Concerning the Territory of Columbia and the City of Washington, 1791
    Md. Act, ch. 45, *reprinted in* 1 D.C. Code 34 (1991) ...............................................4

An act for establishing the temporary and permanent seat of the Government of
    the United States, 1 Stat. 130 (1790) (the "Residence Act") ....................................3

An Act for the Cession of Ten Miles Square, or any Lesser Quanitty of Territory
    Within This State, to the United States for the Permanent Seat of the General
    Government, 13 Va. Stat. at Large, ch. 32, *reprinted in* D.C. Code 32 (1991) ........3

An Act to Cede to Congress a District of Ten Miles Square in This State for the
    Seat of the Government of the United States, 1788 Md. Act, ch. 46, *reprinted
    in* 1 D.C. Code 33 (1991) ..........................................................................................3

An Act to retrocede the County of Alexandria, in the District of Columbia, to the
    State of Virginia, 9 Stat. 35 (1846) ...........................................................................6

D.D.C. LCvR 7(o) .............................................................................................................1

District of Columbia Self-Government and Government Reorganization Act,
    Pub. L. 93-198, 87 Stat. 774 (1973), 1 D.C. Code § 1-201.01 *et seq* .....................13

Fed. R. App. P. 29(a)(4)(E) ..............................................................................................1

Overseas Citizens Voting Rights Act, Pub. L. 94-203, and Uniformed and
    Overseas Citizens Absentee Voting Act, Pub. L. 99-410, codified at 52 U.S.C.
    §§ 20301–10* ..........................................................................................................6, 7

**Legislative and Administrative Proceedings**

10 Annals of Cong. 996 (1801) .........................................................................................5

106 Cong. Rec. 1 (1960) ..................................................................................................13

Cong. Globe App'x, 29th Cong., 1st Sess. 894 (1846)....................................................5

District of Columbia House Voting Rights Act of 2007, H.R. 1905,
   110th Cong. (as passed by House, Apr. 19, 2007)...................................................8

District of Columbia House Voting Rights Act of 2009, S. 160,
   111th Cong. (as passed by Senate, Feb. 26, 2009) .................................................8

Staff of H. Comm. on the District of Columbia, 93d Cong., Home Rule for the
   District of Columbia 1973–1974 (Comm. Print 1974) .........................................13

Staff of S. Comm. on the District of Columbia, 93d Cong., Legislative History of
   District of Columbia Self-Government and Governmental Reorganization Act,
   S. 1435 (Public Law 93-198), Part 2 (Comm. Print 1974) ...................................13

Staff of S. Comm. on the Judiciary, Subcomm. on the Constitution, 99th Cong.,
   Amendments to the Constitution: A Brief Legislative History (Comm. Print
   1985) ......................................................................................................................13

**Periodical Materials**

Alan B. Morrison, *The Sounds of Silence: The Irrelevance of Congressional
   Inaction in Separation of Powers Litigation*, 81 Geo. Wash. L. Rev. 1211
   (2013) ..................................................................................................................9, 13

Mark Richards, *The Debates over the Retrocession of the District of Columbia,
   1801–2004*, 16 Wash. History 54 (2004)..............................................................5, 6

Roy F. Franchino, *The Constitutionality of Home Rule and National
   Representation for the District of Columbia*, 46 Geo. L. J. 207, 214 (1957) ..........4

**Other/Miscellaneous**

*A History of Democracy Denied*, DC Vote, https://www.dcvote.org/fight-
   equality/washington-dc-historical-timeline-nations-capital (last visited June 2,
   2019) .......................................................................................................................12

*D.C. Home Rule*, Council of the District of Columbia, https://dccouncil.us/dc-
   home-rule/ (last visited June 2, 2019)....................................................................12

Douglas Evelyn & Paul Dickson, *On This Spot: Pinpointing the Past in
   Washington D.C.* (3d ed. 2008) ..............................................................................4

Federal Voting Assistance Program, Never Resided Voters: A Policy Brief
   (Spring 2017),
   https://www.fvap.gov/uploads/FVAP/EO/FVAPNeverResidedPolicyBrief_20
   170222_FINAL.pdf ...............................................................................................................7


George Washington, *Proclamation of March 30, 1791*, The Avalon Project at
   Yale Law School, *available at*
   http://avalon.law.yale.edu/18th_century/gwproc06.asp ............................................................4

U.S. Nat'l Archives and Records Admin., *The District of Columbia (Washington,
   DC)*, https://www.archives.gov/research/district-of-columbia (last updated
   Apr. 17, 2018) ......................................................................................................................4

## INTEREST OF *AMICI CURIAE*

The *amici curiae* are scholars of constitutional law: Peter B. Edelman at Georgetown University Law Center; Lawrence Lessig at Harvard Law School; Alan B. Morrison at The George Washington University Law School; Peter M. Shane at The Ohio State University Moritz College of Law; Peter J. Smith at The George Washington University Law School; and Kathleen M. Sullivan at Quinn Emanuel Urquhart & Sullivan, LLP, and formerly at Stanford Law School.[1] *Amici* Edelman and Morrison are residents of the District of Columbia who would be entitled to vote for Congress if Plaintiffs prevail.

Proposed *amici* are scholars of, teach, research, write, and litigate in the subject area of constitutional law. The participation of proposed *amici* in this case will aid the Court because, in their capacity as constitutional law scholars, they will provide a perspective informed by their extensive research and experience in relevant constitutional law. Specifically, they submit this memorandum of law to clarify the power the District Clause gives to Congress to grant District of Columbia residents the right to vote for voting representation in Congress, and to demonstrate that nothing in the text or structure of the Constitution precludes Congress from exercising that power.[2]

## SUMMARY OF ARGUMENT

For the first ten years after Congress designated the area that now constitutes the District of Columbia as the Seat of Government, its white male adult residents were entitled to vote for Congress either in Maryland or Virginia. When Congress assumed control over the District in 1801, it eliminated that right of District residents, which it never restored even though the

---

1. All amici speak for themselves only and not on behalf of their respective institutions. Institutional affiliations are listed only for identification purposes.
2. No counsel for any party authored this brief in whole or in part, and no person or entity other than the *amici* or its counsel made a monetary contribution intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E); D.D.C. LCvR 7(o).

franchise in this country has been vastly expanded since then.  As we show below, the District

Clause empowers Congress to give back to District residents the right to vote for Congress, just

as Congress has allowed overseas citizens and others to vote for Congress even though they do

not reside in any state.  As Plaintiffs demonstrate, the Constitution does not permit this

discrimination with regard to the fundamental right to vote when there is not even a rational basis

for it, let alone a compelling justification.

Contrary to Defendants' claim that the Constitution "reserves" the right to vote for

members of Congress to residents of states, the Constitution does not preclude District residents

from voting for Congress.  The provisions in Article I and relevant amendments on voting for

Congress only assure who may vote—*i.e.*, eligible residents of states—but say nothing that

prevents Congress from granting other citizens the same right.

Nor is this case foreclosed by *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000), *aff'd*,

531 U.S. 941 (2000).  The court there rejected District residents' claim that the Constitution

requires that the District be treated as a state for purposes of Congressional representation.  *Id.* at

47.  Plaintiffs in this case make entirely different claims.

## <u>ARGUMENT</u>

**I.** **Congress has the power under the District Clause to grant District of Columbia residents the right to vote for Congressional representation.**

Plaintiffs' claim in this case is based on what is known as the District Clause, which is

the basis on which the federal government created the District and also other federal enclaves.  It

is set forth in Article I, section 8, clause 17 as one of Congress' enumerated powers:

> To exercise exclusive Legislation in all Cases whatsoever, over such District (not
> exceeding ten Miles square) as may, by Cession of particular States, and the
> acceptance of Congress, become the Seat of the Government of the United States,
> and to exercise like Authority over all Places purchased by the Consent of the
> Legislature of the State in which the Same shall be, for the Erection of Forts,
> Magazines, Arsenals, dock-Yards, and other needful Buildings[.]

**A.      District residents had, then were deprived of, the right to vote for Congress.**

On the basis of this clause, Congress on July 16, 1790 enacted the Residence Act—

officially titled "An act for establishing the temporary and permanent seat of the Government of

the United States." 1 Stat. 130 (1790). It directed that a site on the Potomac River be selected as

the permanent capital for the United States government. The Act designated Philadelphia to

serve as the temporary capital of the United States until the first Monday of December 1800,

when the Seat of Government would be transferred to the new location on the Potomac.

The Residence Act authorized the President to create a commission to survey the land

and build suitable buildings for the federal government. The Act did not, however, transfer to

Congress immediate authority over the newly-created district. It instead provided that "the

operation of the laws of the state within such district shall not be affected . . . until the time fixed

for the removal of the government thereto, and until Congress shall otherwise by law provide."

*Id.* Accordingly, Maryland and Virginia continued to govern, and their state laws remained in

effect in, their respective portions of the ceded land.

Eager to host the capital of the newborn republic, Maryland and Virginia passed acts to

cede land to the federal government even before Congress decided on the location of the new

Seat of Government. On December 23, 1788, the Maryland General Assembly passed an act that

authorized its representative in the House of Representatives to "cede to the Congress of the

United States any district in this State, not exceeding ten miles square, which the Congress may

fix upon and accept for the seat of Government of the United States." 1788 Md. Act, ch. 46,

*reprinted in* 1 D.C. Code 33, 34 (1991). On December 3, 1789, the Virginia General Assembly

"forever ceded" a "tract of the country" on its side of the Potomac River "to the Congress and

Government of the United States, in full and absolute right." 13 Va. Stat. at Large, ch. 32,

*reprinted in* 1 D.C. Code 32, 33 (1991).[3]  On March 30, 1791, President Washington proclaimed the then-boundaries of the Seat of Government, a specified ten square miles lying on both sides of the Potomac.[4]

From 1791 through 1801, therefore, the territory that comprised the District had been ceded to the federal government and was, in fact, subject to federal jurisdiction.  But during this interim period, Congress had vested governing authority in Maryland and Virginia, and the residents of the District had both local and federal suffrage as if they were state residents.[5]  As a result, eligible residents of the portion of the District ceded by Maryland voted for Maryland Representatives and Senators, while eligible residents of the portion ceded by Virginia voted for Virginia Representatives and Senators.

Stretching from Georgetown to the Anacostia River, and later including Alexandria, the new federal territory was officially named the District of Columbia in 1796.[6]  President Adams ordered the executive branch of the federal government to relocate to the District in May 1800, and Congress held its first session in the District in November 1800.[7]  Shortly thereafter, in

---

3.  On December 19, 1791, the Maryland legislature passed an act to direct "[t]hat all that part of the said territory, called Columbia, which lies within the limits of this state, shall be and the same is hereby acknowledged to be for ever ceded and relinquished to the congress and government of the United States, in full and absolute right, and exclusive jurisdiction."  An Act Concerning the Territory of Columbia and the City of Washington, 1791 Md. Act, ch. 45, § 2, *reprinted in* 1 D.C. Code 34, 35 (1991).  The Virginia legislature did not pass a separate act to confirm its cession after Congress passed the Residence Act in 1790.

4.  George Washington, *Proclamation of March 30, 1791*, THE AVALON PROJECT AT YALE LAW SCHOOL, *available at* http://avalon.law.yale.edu/18th_century/gwproc06.asp.

5.  *See* Roy F. Franchino, *The Constitutionality of Home Rule and National Representation for the District of Columbia*, 46 GEO. L. J. 207, 214 (1957).

6.  U.S. NAT'L ARCHIVES AND RECORDS ADMIN., *The District of Columbia (Washington, DC)*, https://www.archives.gov/research/district-of-columbia (last updated Apr. 17, 2018).

7.  DOUGLAS EVELYN & PAUL DICKSON, ON THIS SPOT: PINPOINTING THE PAST IN WASHINGTON D.C. 8 (3d ed. 2008).

February 1801, Congress enacted the District of Columbia Organic Act, 2 Stat. 103 (1801), and began exercising its exclusive executive and legislative control over the District.

In passing the Organic Act, Congress recognized that, under the District Clause, there was no choice—the capital had to be established in the District immediately and the federal government had to control the territory. *See* 10 Annals of Cong. 996 (1801). In the Organic Act, Congress kept in effect the substantive laws of Maryland and Virginia in their respective former sections, but made no provision for residents of the new federal District to continue to vote for Congress (and it gave no reason for denying them the vote). Following the election of 1800, power in the federal government was shifting for the first time, and the Federalists' principal goal in passing the Organic Act was to have Congress exercise its full authority over the District before they lost their majority to the Jeffersonian Republicans. In addition, only about 14,000 people lived in the District in 1800, with just a small percentage eligible to vote. *See* Plaintiffs' Memorandum ("Pltfs.' Mem.") at 15–16; *Amici Curiae* Brief of D.C. Historians ("Historians' Br.") at 13.

Two decades later, a grassroots retrocession movement started in Alexandria to return the Virginia-ceded portion of the District to Virginia.[8] In 1840, the residents of Alexandria voted in favor of returning the Virginia portion of the District back to the Commonwealth, and successfully lobbied the Virginia State Assembly to endorse retrocession, which it did in 1846.[9] In the Congressional debate on a bill of retrocession in June 1846, Representative Robert M.T. Hunter of Virginia argued passionately in favor of the retrocession, citing the restoration of voting rights as a principal reason. Cong. Globe App'x, 29th Cong., 1st Sess. 894 (1846).

---

8. Mark Richards, *The Debates over the Retrocession of the District of Columbia, 1801–2004*, 16 WASH. HISTORY 54, 60 (2004).
9. *Id.* at 67.

Congress approved the retrocession in 1846, 9 Stat. 35 (1846), and the Virginia General
Assembly subsequently accepted it.[10]  District residents in the former-Virginia portion of the
capital region thus regained their voting rights, by Act of Congress, but those who continued to
reside in the District continued to be denied the vote for Congress.

### B.     Congress has the power to restore to District residents the right to vote for Congress.

It is the plenary power to create and govern the District on which Plaintiffs rely to
establish the power of Congress to authorize residents of the District to vote for members of
Congress.  The most significant example of legislation in which Congress elevated the District to
the status of a state was enacted with respect to a provision of the Constitution that applies only
to "states": the federal statute that grants citizens of the District the same status as citizens of a
state under Article III.  In *National Mutual Insurance Co. of District of Columbia v. Tidewater
Transfer Co*., 337 U.S. 582 (1949), the Supreme Court upheld a 1940 statute that treats citizens
of the District of Columbia, along with certain unincorporated territories, as citizens of states,
which makes them eligible to sue and be sued under the grant of diversity jurisdiction in Article
III of the Constitution.  A three-judge plurality ruled that the District Clause gave Congress the
power to give District citizens the same rights as state citizens, *id.* at 600, while two concurring
justices concluded that the District should be considered a "state" for purposes of the Article III
diversity clause, without the need for Congressional action, *id.* at 619, 624–25.

In addition, in 1975, Congress enacted the Overseas Citizens Voting Rights Act
("OCVRA"), Pub. L. 94-203, and in 1986 the Uniformed and Overseas Citizens Absentee
Voting Act ("UOCAVA"), Pub. L. 99-410, codified at 52 U.S.C. §§ 20301–10.  Under OCVRA
and UOCAVA, U.S. citizens who live outside the United States and U.S. citizens who are in the

---

10. *Id.* at 72.

military stationed abroad are entitled to cast absentee ballots in federal elections, including for

Congress, in the last state in which they resided before leaving the United States.  Most

significantly, this right extends even to U.S. citizens who have no intention of ever returning to

the United States.  52 U.S.C. § 20310(5).  Congress thus granted to certain U.S. citizens who do

not—and may never again—reside in any "state" the right to vote for members of Congress.

Indeed, a majority of states allow foreign-born U.S.-citizen children of such expatriate U.S.

citizens to vote for Congress in the state where their parents vote.[11]  Thus, even some U.S.

citizens who never did and may never reside in any state are permitted to vote for Congress

without constitutional objection.

Similarly redressing the disenfranchisement of voters for Congress, the Supreme Court

held in *Evans v. Cornman*, 398 U.S. 419, 426 (1970), that Maryland could not deny the right to

vote to residents of federal enclaves, there the National Institutes of Health ("NIH").  Because

Congress had granted Maryland the right to exercise governing authority in a federal enclave,

and Maryland did so, Congress in effect granted voting rights to the enclave residents.  Like the

District, NIH residents had the vote and then lost it.  The government had established the NIH in

the 1930s, but it did not become a "federal reservation" until 1953.  *Id.* at 420–21.  Before 1953,

the area was considered part of Maryland and residents voted as citizens of the state.  Thereafter,

residents continued to register and vote in Maryland until 1963, when the Maryland Court of

Appeals held that residents of the NIH grounds were not residents of Maryland under the state

constitution and thus could not vote in Maryland, giving rise to the case.  *Id.* at 421.  This is

---

11. FEDERAL VOTING ASSISTANCE PROGRAM, NEVER RESIDED VOTERS:  A POLICY BRIEF 6–7
    (Spring 2017),
    https://www.fvap.gov/uploads/FVAP/EO/FVAPNeverResidedPolicyBrief_20170222_FINA
    L.pdf.

another example of U.S. citizens having the right to vote for federal offices even when they currently reside in locations that do not fall within the traditional notions of a state's boundaries.

In 2007 and 2009, both houses of Congress considered bills that would have given the District a voting member of the House of Representatives.  In 2007, the House passed such a bill, but the Senate attempt was ended by a filibuster.  *See* District of Columbia House Voting Rights Act of 2007, H.R. 1905, 110th Cong. (as passed by House, Apr. 19, 2007).  In 2009, the Senate passed the bill, but the House did not. *See* District of Columbia House Voting Rights Act of 2009, S. 160, 111th Cong. (as passed by Senate, Feb. 26, 2009).  Both Houses of Congress thus respectively concluded, with the support of testimony by numerous judges and academics, that Congress has the power under the District Clause to grant the District voting representation in Congress, and its residents the right to vote for those representatives.

*Amici* are aware of no judicial decisions holding that Congress either has or lacks the power to restore the vote for Congress to District residents, which, given that they have been denied the right to vote since 1801, raises the question of why.  It is, however, understandable why there has been no prior case relying on the District Clause as a basis for restoring the vote.

The potential for expanding the franchise using the Equal Protection Clause, on which Plaintiffs principally rely here, to challenge the discriminatory denial of the right to vote, began with *Baker v. Carr,* 369 U.S. 186 (1962).[12]  There the Court concluded that a challenge to a state's failure to re-draw its lines for its legislature for more than sixty years, to eliminate the vast differences in the number of citizens among its legislative districts, was not a political question and would be adjudicated on its merits by the federal courts.  *Id.* at 209.  Soon thereafter, the

---

12. The bases of Plaintiffs' other two claims—Due Process and the First Amendment—arose even later.  *See* Pltfs.' Br. at 29–32 (Due Process), 32–34 (First Amendment).

Court established the principle of one person, one vote, under which both branches of state legislatures had to be based on population. *Reynolds v. Sims,* 377 U.S. 533, 565–66 (1964). Perhaps more significant for this case, the Court expanded its use of the Equal Protection Clause to strike down other state limitations on the right to vote, including the property ownership and similar requirements in *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 630–33 (1969), and later cases. Thus, prior to these decisions—and *Tidewater* in 1978, demonstrating the scope of Congress' power under the District Clause—there was no basis for a challenge such as this.

Moreover, even if a connection had been made between the examples of Congressional power discussed above and its powers under the District Clause, the impact of that connection would have been academic. Congress first gave the District a limited form of home rule in 1973. *See* p. 13, *infra*. But even then, Congress maintained close supervision over virtually everything the District government did—as it does to this day. It was only in the twenty-first century that Congress began to consider its powers under the District Clause and to debate whether and how to use it. *See* pp. 8, *supra*. In any event, the question before the Court is not whether anyone in Congress or in the District believed Congress had the power and duty to restore the vote to District residents, but whether Congress in fact has that power and what the Constitution requires Congress to do.[13]

---

13. For a detailed discussion as to the irrelevance of Congressional silence in deciding whether Congress has a particular power under the Constitution, *see* Alan B. Morrison, *The Sounds of Silence: The Irrelevance of Congressional Inaction in Separation of Powers Litigation*, 81 GEO. WASH. L. REV. 1211 (2013).

## II.      Nothing in the Constitution precludes Congress from granting District residents the right to vote for Congress.

It had been taken as a given by many that the Constitution necessarily limits membership of Congress to representatives of states, and that District residents could gain voting representation in Congress only by becoming a state, or by a constitutional amendment.  This perception, while understandable, is wrong.  Indeed, it is inconceivable that, in debating where to locate the capital, the First Congress, which included many of the Framers, thought that it would be permanently disenfranchising those who would reside at the Seat of Government—their own citizens.  It is also inconceivable that many states would have fought so hard to have the Seat in their own cities if they anticipated that their residents would lose the right to vote.  *See* Historians' Br. at 9 & n.22 (Samuel Livermore speech).

Although the structure of the Constitution makes voting for Congressional representation essential, neither the original Constitution nor the Bill of Rights (which had been adopted quickly by the First Congress) provided for individual voting rights.  The Constitution did not establish federal rules for voting for members of the House, but instead left it to the states, which were required only to utilize "the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  U.S. Const. art. I, § 2, cl. 1.  The Senate was even less voter friendly: under Article I, section 3, clause 1, its members were chosen by the state legislatures, whose members were elected under state law.  It was not until the Seventeenth Amendment was adopted in 1913 that the people in the states became entitled to vote for Senators directly, using the same state-based qualifications applicable to the House.  Even the election of the President, both in 1789 and today, is done by electors that each state "shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress."  *Id*. art. II, § 1, cl. 2.

Thus, it is only by the grace of the state legislatures that Americans can cast a vote for President, although it is hard to imagine any state withdrawing that right today.

Ever since *Baker v. Carr*, courts have looked to the Equal Protection Clause of the Fourteenth Amendment as an important means of ensuring that Americans have the right to vote. U.S. Const. amend. XIV.  But that amendment includes language that protects only the voting rights of male citizens over the age of twenty-one, and even excludes those who otherwise qualify if they "participat[ed] in rebellion, or other crime." *Id.* amend. XIV, § 2.  The Fifteenth Amendment, ratified in 1870, is the first mention of a right to vote in the Constitution.  It provides that the right to vote may not be "denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," *id.* amend. XV, § 1, but it did nothing to cut back on the permission the Fourteenth Amendment gave states to continue denying the vote to women, persons under twenty-one, and felons.

In light of these express exclusions in the Fourteenth Amendment, which were left untouched by the Fifteenth Amendment, it was reasonable for those who sought to give women, and later eighteen-year-olds, the right to vote to conclude that doing so would require a constitutional amendment.  *See id.* amend. XIX (the right to vote cannot be "denied or abridged . . . on account of sex"); *id.* amend. XXVI (the right of U.S. citizens "who are eighteen years of age or older, to vote shall not be denied or abridged").  This history also shows why courts have been unwilling to date to overturn laws that impose even permanent denials of the right to vote on convicted felons.  *See, e.g.*, *Richardson v. Ramirez,* 418 U.S. 24, 56 (1974).  By contrast, because the Fourteenth Amendment does not mention the denial of Congressional voting rights for District residents, there is no basis to conclude that a constitutional amendment is necessary to give them the right to vote.

In 1960, Congress adopted the Twenty-Third Amendment, two years before *Baker v. Carr, supra,* was decided.  The amendment gave District residents the right to vote in Presidential elections, but not in Congressional elections.  Defendants argue that the adoption of the Twenty-Third Amendment supports the understanding that only a constitutional amendment can authorize District residents to vote for Congress.  *See* Defs.' Br. at 22.  That argument loses much of its force because the District had no legislature of its own at the time and so lacked the capacity to comply with the specific role for state legislatures regarding electors required by Article II.[14]

This incapacity, combined with the fact that Congress up to that time had been unwilling to give the District the kind of home rule that would be needed to comply with those Article II requirements,[15]  it was entirely reasonable for Congress to have assumed in 1960 that a

---

14. Once Congress passed the Twenty-Third Amendment (and it was ratified by the states), it was inconceivable that Congress would take a different route for Puerto Rico or the other unincorporated territories.  As such, the results of cases challenging the denial of the right to vote in Presidential elections in the unincorporated territories are entirely understandable.  *See, e.g.*, *Igartúa-De La Rosa v. United States*, 417 F.3d 145, 146–48 (1st Cir. 2005) (en banc); *Igartua De La Rosa v. United States*, 32 F.3d 8, 9–11 (1st Cir. 1994); *Attorney Gen. of the Territory of Guam v. United States*, 738 F.2d 1017 (9th Cir. 1984).  And other cases that have relied, in part, on the Twenty-Third Amendment to justify the continued denial of the vote for residents of the unincorporated territories, including voting by absentee ballot in former states of residence, have not even mentioned, let alone addressed the significance of, the District Clause.  *See, e.g.*, *Segovia v. United States*, 880 F.3d 384, 388–90 (7th Cir. 2018); *Romeu v. Cohen*, 265 F.3d 118, 120–21, 124–25 (2d Cir. 2001).  For these reasons, this Court may safely disregard these cases.

15. Before the District was combined into a single territory in 1871, certain municipal subdivisions of the District at various times and for varying periods were permitted local legislatures, but none had the authority to serve the role contemplated for state legislatures by Article II.  After 1871, District residents had a popularly-elected house of delegates, with no significant power, until they lost it in 1874.  *D.C. Home Rule*, COUNCIL OF THE DISTRICT OF COLUMBIA, https://dccouncil.us/dc-home-rule/ (last visited June 2, 2019); *A History of Democracy Denied*, DC VOTE, https://www.dcvote.org/fight-equality/washington-dc-historical-timeline-nations-capital (last visited June 2, 2019).  Not until home rule in 1973 did the District have a "state-wide" legislative body capable of taking on the role of a state legislature under Article II.

constitutional amendment was needed to give District residents the right to vote in Presidential elections. It also is entirely reasonable to infer, given the historical circumstances, that the Congress that passed the Twenty-Third Amendment would not have been willing to give District residents the right to vote for Congress even if it believed it had the power to do so. Accordingly, the decision to utilize a constitutional amendment to enable District residents to vote for President implies nothing about the very different question of whether Congress has the power to restore the right of District residents to vote for Congress. [16]

In 1973, Congress passed legislation granting limited home rule for the District. *See* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774 (1973), 1 D.C. Code § 1-201.01 *et seq*. In that Act, Congress granted District residents the right to vote for a mayor and a newly-created District Council to directly govern the District on local matters, subject to Congressional oversight—but not the right to vote for Congress. During the debates on the Home Rule Act, some members of Congress sought to discuss the issue of voting Congressional representatives for the District. It became clear over the course of the debates, however, that it was a fight that would be saved for another day. [17]

---

16. The conclusion regarding Congressional power to restore the vote is not altered by the fact that the Senate had included in the proposed Twenty-Third Amendment a provision that would have given the District voting representation in the House. Senator Kenneth Keating (N.Y.), who introduced this provision, remarked that the "continued massive disqualification of all the residents of the District of Columbia from their right to participate in our electoral process is inexcusable. It is unreasonable. It is undemocratic." 106 CONG. REC. 1, 1759 (1960). The House later stripped this provision from the amendment, STAFF OF S. COMM. ON THE JUDICIARY, SUBCOMM. ON THE CONSTITUTION, 99TH CONG., AMENDMENTS TO THE CONSTITUTION: A BRIEF LEGISLATIVE HISTORY 77 (Comm. Print 1985), which might have been done for at least three possible reasons: (1) a constitutional amendment was unnecessary; (2) voting rights should include the Senate and the House; or (3) Congress wished to continue to discriminate against District residents, even though it had the power to end the unequal treatment. *See also* Morrison, note 12 *supra*.

17. *See, e.g.*, STAFF OF H. COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA 1973–1974  986–87, 990 (Comm. Print 1974); STAFF OF S.

Again, the refusal to end the discrimination does not establish a lack of power to do so. Moreover, even if Congress concluded that it lacked that power, it is the Supreme Court, not Congress, that has the final word on the meaning of the Constitution. *See Marbury v. Madison*, 5 U.S. 137 (1803).

If Defendants are correct that only those citizens who reside in a state may constitutionally vote for Congress, UOCAVA and the many state laws that permit former residents to vote for Congress would be rendered unconstitutional. Yet, there are many individuals who live full time in the District, yet keep their voting status for federal and state elections in the state from which they came, with no reported constitutional objections. Unless the rules regarding physical residence within a state and the right to vote for Congress are a one-way street, the ability to live in the District and vote for Congress elsewhere supports Plaintiffs' position that nothing in the Constitution precludes Congress from affording District residents the right to vote for Congress.

\*\*\*

The right to vote is fundamental. *See* Pltfs.' Br. at 23–24. It is only through the right to elect voting members of Congress that the fundamental right to vote can be exercised meaningfully with respect to the federal government. Unlike other U.S. citizens—including U.S. citizens who do not reside in states—District of Columbia residents do not get to elect a voting member of Congress, even though Congress exercises exclusive and plenary legislative authority over them. As *amici* have shown, Congress has the authority under the District Clause to remedy the discrimination that has lasted for more than 200 years. And as *amici* also have demonstrated,

---

COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., LEGISLATIVE HISTORY OF DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT, S. 1435 (PUBLIC LAW 93-198), PART 2 1197–98 (Comm. Print 1974).

no other clauses of Article I (or any other Article) deny Congress the power to restore the right of citizens residing in the District to vote for Congress.   Its failure to do so violates the Constitution.

## **CONCLUSION**

The relief requested by Plaintiffs should be granted.

Dated: June 10, 2019

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: /s/ William R. Stein

| | |
|---|---|
| Alan B. Morrison (D.C. Bar No. 073114) | William R. Stein (D.C. Bar No. 304048) |
| THE GEORGE WASHINGTON | Eleanor C. Erney (D.C. Bar No. 1048544) |
|   UNIVERSITY LAW SCHOOL | 1775 I Street, N.W. |
| 2000 H Street, N.W. | Washington, D.C.  20006-2401 |
| Washington, D.C. 20052 | (202) 721-4600 |
| (202) 994-7120 | william.stein@hugheshubbard.com |
| abmorrison@law.gwu.edu | eleanor.erney@hugheshubbard.com |

*Counsel for* Amici Curiae *Constitutional Law Scholars*