**EXHIBIT 4**



**DC APPLESEED**

Solving DC Problems

1111 Fourteenth Street, NW
Suite 510
Washington, DC 20005

*Phone* 202.289.8007
*Fax* 202.289.8009
www.dcappleseed.org

WALTER SMITH
*Executive Director*

BOARD OF DIRECTORS

CHAIR: GARY M. EPSTEIN
*Latham & Watkins LLP*
*(retired partner)*

VICE-CHAIR: PATRICIA A. BRANNAN
*Hogan & Hartson LLP*

VICE-CHAIR: DEBORAH M. ROYSTER
*Pepco Holdings, Inc.*

SECRETARY: JON BOUKER
*Arent Fox LLP*

TREASURER: JAMES H. HAMMOND
*Deloitte & Touche LLP*

PAST-CHAIR: RICHARD HERZOG
*Harkins Cunningham LLP*

PAST-CHAIR: NICHOLAS W. FELS
*Covington & Burling LLP*

KATHERINE S. BRODERICK
*University of the District of*
*Columbia - David A. Clarke*
*School of Law*

PATRICK S. CAMPBELL
*Paul, Weiss, Rifkind, Wharton*
*& Garrison LLP*

DEBORAH J. CHOLLET
*Mathematica Policy Research, Inc.*

SHELDON S. COHEN
*Farr, Miller & Washington LLC*

ANNEMARGARET CONNOLLY
*Weil, Gotshal & Manges LLP*

MARC EFRON
*Crowell & Moring LLP*

CURTIS ETHERLY
*Coca-Cola Enterprises*
*Bottling Companies*

FRED GOLDBERG
*Skadden*

JANIE JEFFERS
*Jeffers & Associates LLC*

BOB LEVEY
*Journalist*

LORIE MASTERS
*Jenner & Block LLP*

JACQUE D. PATTERSON
*Federal City Council*

JAMES P. RATHVON
*DLA Piper US LLP*

GARY RATNER
*Citizens for Effective Schools, Inc.*

AMY P. RIFKIND
*Arnold & Porter LLP*

LOIS J. SCHIFFER
*Attorney*

MARGARET SINGLETON
*DC Chamber of Commerce*

STANLEY M. SPRACKER
*Levine School of Music*

TED TRABUE
*District Economic Employment*

RODERIC L. WOODSON
*Holland & Knight LLP*

MATTHEW YEO
*Steptoe & Johnson LLP*

September 5, 2008

Councilmember Phil Mendelson
1350 Pennsylvania Avenue, NW
Suite 402
Washington, DC 20004

Re:    Attorney General of the District of Columbia Clarification Act of
2007

In December 2007, you introduced the Attorney General of the District of
Columbia Clarification Act of 2007, B17-0548 ("Mendelson bill"), which
would modify the method of selecting and removing the District's
Attorney General. In January 2008, you held a hearing on the bill and
invited the DC Appleseed Center for Law and Justice ("DC Appleseed")
to testify, based on findings and recommendations that DC Appleseed
made in a report issued in December 2000.[1]  Because DC Appleseed had
not studied the specific issues raised by the bill, DC Appleseed submitted
only a short letter at the time, but it indicated that it would be interested in
further studying the issues your bill raised.

This letter presents the findings and recommendations from that further
study by DC Appleseed, with the assistance of Latham & Watkins LLP
and Ross Dixon & Bell, LLP. We hope that you and the other
Councilmembers find this letter helpful in moving forward on the
legislation. Please let us know if there is any way we can provide further
assistance in connection with this effort.

---

[1] DC Appleseed Center, *DC Office of the Corporation Counsel: Core Remedies for
Lasting Reform* (Dec. 2000), *available at*
http://www.dcappleseed.org/projects/projects.cfm?project_id=15.

*Affiliations listed only for purposes of identification*

## I.   BACKGROUND

### A.   The 2000 DC Appleseed Report

DC Appleseed's 2000 Report examined how the Office of Corporation Counsel (now, the Office of the Attorney General) was functioning and made specific recommendations aimed at strengthening legal services provided by the District government. Most of the recommendations concerned possible administrative changes, but the Report also noted the need for a strong, independent Attorney General:

> The Corporation Counsel's responsibilities extend not only to the Mayor
> and to other District officials, but to *all the citizens of the District* as well.
> In fulfilling the duties of the Office, the Corporation Counsel "*owes a duty
> of care to the public in general* and to potentially-affected individuals."[2]

The Report did not elaborate on the meaning of an independent Attorney General, or on the content of the Attorney General's duty to the public.

### B.   The Mendelson Bill

Linda Singer resigned from her position as the District's Attorney General in December 2007.[3] Media accounts noted that Ms. Singer's resignation was thought to be motivated at least in part by tension between her and then-general counsel to the Mayor, Peter Nickles.[4] Shortly thereafter, you introduced the Mendelson bill and described, in a written statement, what you hoped it would achieve:

> The recent resignation of the attorney general has highlighted concerns
> over the independence and integrity of the position. . . . This legislation
> will address the need for a strong role for the attorney general and
> providing protections against certain outside influences. The position of
> Attorney General is critical to the well-being and safety of the residents of
> the District of Columbia. . . . Among states, the District is in the minority
> when it comes to structural protections for the position of Attorney
> General. . . . It's about time that this position is elevated.[5]

The original version of the Mendelson bill would have made four major changes to the method by which the District's Attorney General is selected and removed. First, it required the Mayor to submit names of candidates for Attorney General to a committee

---

[2] *Id.* at 1 (citing *Shifrin v. Wilson*, 412 F. Supp 1282, 1302 n.32 (D.D.C. 1976)) (emphases added); *see also Pennsylvania v. Mid-Atlantic Toyota Distribs., Inc.*, 704 F.2d 125, 129 n.7, 130–31 (4th Cir. 1984).

[3] Linda Singer had formerly been the Executive Director of National Appleseed. She was not directly involved in the activities of DC Appleseed.

[4] David Nakamura & Carol D. Leonnig, *Attorney General Quits; Clash With Fenty Aide Cited*, WASH. POST, Dec. 18, 2007, at B1.

[5] *See* David Nakamura & Yolanda Woodlee, *Mendelson Moves to Redefine Attorney General's Role*, WASH. POST, Dec. 20, 2007, at DZ1.

- 2 -

that would rate each candidate and report back to the Mayor.[6]  Second, the Attorney General would be appointed by the Mayor for a six-year term.[7]  Third, the Attorney General could be removed only by a "super-majority" vote of the D.C. Council.[8]  And fourth, the bill provided minimum qualifications for future Attorneys General, including having been a member of the District of Columbia Bar for at least seven years.[9]

In conversations with DC Appleseed, you and your staff have suggested that you intend to introduce another bill with slightly different provisions, based on further thinking and the testimony at the hearing.  The vetting committee provision will likely be removed, and the provision providing for removal by the Council will be replaced by a requirement that the Attorney General may be removed only "for cause" by the Mayor. The new bill may also take steps towards making the Attorney General an elected office.

### C.    The Hearing on the Mendelson Bill

At the January 2008 hearing on the Mendelson bill, the Committee on Public Safety and the Judiciary heard testimony from former Attorney General Robert Spagnoletti; Kathy Patterson, formerly the chair of the same Committee; James Tierney, Director of the National State Attorneys General Program at Columbia Law School and former Maine Attorney General; George Clark, President of the Federation of Civic Associations of the District of Columbia; and current Interim Attorney General Peter Nickles.  As Committee Chair, you and Committee Members Mary Cheh, David Catania, and Yvette Alexander, along with Councilmember Tommy Wells, were present and asked questions of the witnesses.

All of the witnesses acknowledged the importance of a strong, independent Attorney General, but they differed on how to reach that goal.  Mr. Nickles testified that the provisions in the Mendelson Bill violate the District's Charter and principles of separation of powers; he also submitted two letters emphasizing this view.

### D.    DC Appleseed's Research

To research and evaluate the potential need for a stronger, more independent Attorney General and possible ways to achieve that objective, DC Appleseed recruited a project team of attorneys from Latham & Watkins LLP and Ross Dixon & Bell, LLP, who agreed to assist DC Appleseed *pro bono*.  The research addressed two goals: (1) to determine the practical implications of the issue in the District; and (2) to understand how other jurisdictions have addressed similar issues, in order to help identify potential best practices that might appropriately be applied in the District.

Our *pro bono* attorneys devoted over 500 hours to researching statutes and case law in the District, in other States and territories, and at the federal level to determine

---

[6] Mendelson Bill, § 2(a)(2).
[7] *Id.* § 2(a)(3)(A).
[8] *Id.* § 2(a)(3)(C).
[9] *Id.* § 2(b).

what authority attorneys general have in those jurisdictions, how attorneys general are selected and removed, and whether there are provisions elsewhere that ensure their "independence." As part of their research into the history of the powers of attorneys general, the Latham and Ross Dixon teams also looked into the history, policy issues, and current trends surrounding the election of attorneys general. This research provided a good understanding of the evolution of the power and independence of attorneys general.

Additionally, the project team interviewed key players in the recent history of the District's Office of the Attorney General to determine whether the problems that the Mendelson bill attempts to solve have been present in the past. We spoke with Attorney General Peter Nickles, as well as Attorneys General spanning the last ten years: Linda Singer, Robert Spagnoletti, Arabella Teal, Judge Robert Rigsby, and Judge John Ferren. And we discussed the history of the Office of the Attorney General with Wayne Witkowski, who has been in the office 30 years and has published an important analysis of the powers and duties of attorneys general and municipal attorneys. We also interviewed two previous Mayor's Counsel, in addition to Mr. Nickles: Len Becker and Grace Lopes. Our team also spoke with Alan Morrison, who had been special counsel to Linda Singer, and, as you know, we interviewed you to gain a better understanding of the issues you are seeking to address through this legislation.[10]

E.   **Summary of Findings and Recommendations**

Based on the research and investigation described above, we conclude that:

1. The District should not take steps to disengage the Attorney General from the Mayor's office.[11] The Attorney General is a part of the executive branch, and the Mayor should ordinarily guide the policies of the Office of the Attorney General.

2. However, the Attorney General should be able to make certain decisions independent of influence from the Mayor. As the pertinent provision of the D.C. Code contains ambiguous language that appears to have been adopted without serious consideration from a "police regulation" existing before Home Rule,[12] we recommend that the D.C. Code be revised to indicate that, while the Attorney General is "under the direction of the Mayor" generally, the Attorney General has an obligation and common-law authority to represent the public interest, even if that interest may be, in some situations, inconsistent with the course of action chosen by the Mayor after consultation with the Attorney General.

---

[10] A summary of these interviews without attribution to specific individuals is attached to this letter as Appendix A. We have treated the content of the interview with Mr. Nickles as confidential, at his request, and have not reflected it here or in Appendix A.

[11] This conclusion assumes that the current governmental structure remains in place. If the people of the District decide to elect the Attorney General, as discussed in recommendations 7 and 8 below, there will of course be more separation from the Mayor's office.

[12] The term "police regulation" refers to an enactment by the Commissioners, appointed through a federal process, to govern the District of Columbia prior to Home Rule. *See* Congressional Joint Resolution of February 26, 1892, 27 Stat. 394 (vesting Commissioners with local legislative power as respects "reasonable and usual police regulations").

3. The minimum qualifications for the Attorney General outlined in the Mendelson bill are sensible, and we believe the Council has the authority to enact them. We endorse provisions that would require future Attorneys General to be members of the District of Columbia Bar for a minimum period and to live in the District after taking office.

4. Having a set term of office for the Attorney General that corresponds with the Mayor's term would lead to at least two benefits: It would create an expectation that the Attorney General will remain in office for a certain period and would provide a check on the Mayor and Attorney General. However, we are not sure that this requirement will have a significant effect on tenures; an Attorney General who is not satisfied with the position or is not performing well is unlikely to remain in the job longer simply because of a statutory term.

5. Consistent with our first recommendation, we do not support a requirement of either Council approval, or a "for cause" showing, before the Mayor may remove the Attorney General. In our view, and in the view of most of the people with whom we spoke, either kind of removal would provide little protection in the way of increased independence, and in practice would interfere with the prerogative of the Mayor to appoint an Attorney General and could damage the trust and confidence that needs to exist between the Mayor and the Attorney General for both offices to function effectively.

6. There are good arguments for making the Attorney General an elected office. Ultimately, however, we do not think this is a necessary step to ensure a minimum level of independence and stability for the Attorney General. There are also downsides to election, which must be considered before moves in this direction are made.

7. The decision whether to have an elected or appointed Attorney General should rest with the citizens of the District of Columbia. In the past, Congress has vested a jurisdiction subject to federal statute with the power to decide for themselves whether to elect their attorney general. We support efforts to petition Congress to vest the citizens of the District with similar authority to make this decision.

8. Finally, the Council should consider a provision that would allow for appointment of special counsel in those rare situations where the Attorney General determines that his or her duty to the public interest in a particular matter may prevent him or her from adequately representing the government, an agency, or an official. We propose that the Attorney General should determine when special counsel is needed, and the Mayor should generally select the person to serve as special counsel.

## II.    DISCUSSION

### A.    Overview: History and Background of the State Offices of Attorney General

The position of attorney general is anchored in over 700 years of Anglo-American tradition.[13] Although the position has evolved substantially over time, there are several ways in which an attorney general's powers and responsibilities have remained stable. Most important, perhaps, is that it has been firmly established since at least the 18th century that, aside from any duty to the government itself, an attorney general has a common-law obligation to represent and defend the legal interests of the public—though States can abrogate that common-law power by constitutional change or, in some instances, by statute.[14]

When the States of the Union first adopted the position of attorney general, they incorporated many features of the English common law—including the duty to represent the public interest. In fact, as some courts have observed, an attorney general's duty to the people is even stronger in America because "under the democratic form of government now prevailing the people are the king," and thus the attorney general owes allegiance "to that sovereign rather than to the machinery of government."[15] Hence, the first state attorneys general recognized their dual role in serving both the state government and its citizens.[16]

Today, all States and territories provide for an attorney general, but the exact contours of that office vary. Most commonly, the attorney general is delegated a broad range of responsibilities such as providing legal advice to government agencies and officials, representing the government in litigation, and enforcing civil and criminal law.[17] To gain a better understanding of the different approaches among the States, we examined three factors that directly affect the powers and duties of an attorney general: governmental structure, common-law powers, and the approach to ensuring independence. Each of these factors should be carefully explored when deciding whether to make any changes to the position of Attorney General in the District of Columbia.

### 1.    Governmental Structure

There are several ways in which governmental structure can influence the powers and responsibilities of an attorney general. At the most basic level, some States employ a model, much like the federal government, in which the chief executive operates as the only head of the executive branch. Other States have adopted a model that relies on

---

[13] *See generally* Nat'l Ass'n of Attorneys General, *State Attorneys General: Powers and Responsibilities,* Emily Myers & Lynne Ross, eds., 2007 (2d ed.), at 1, 43 ("NAAG 2007").

[14] *See id.; Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 270 (5th Cir. 1976); *People ex rel. Salazar v. Davidson,* 79 P.3d 1221, 1229 (Colo. 2003).

[15] *Commonwealth ex rel. Hancock v. Paxton,* 516 S.W.2d 865, 867 (Ky. 1974); *see also Martin v. Thornburg,* 359 S.E.2d 472, 479 (N.C. 1987); NAAG 2007, *supra* note 13, at 44.

[16] *See* NAAG 2007, *supra* note 13, at 7–8.

[17] Scott M. Matheson, Jr., *Constitutional Status and Role of the State Attorney General,* 6 U. Fla. J.L. & Pub. Pol'y 1, 3 (1993); *see also* NAAG 2007, *supra* note 13, at 83.

multiple centers of power, one of which is the attorney general. Although the question of whether there is one ultimate executive or several does not, by itself, answer the question of what authority that executive has, an attorney general operating as one member of a plural executive system would be expected to exercise broader authority over a structurally distinct sphere of executive power.

The method of selecting an attorney general is another structural feature to consider. Initially, all but one of the founding States selected the attorney general through appointment—either by the legislature or the governor.[18] Today, however, the attorney general is popularly elected in 43 States and Guam.[19] Each method of selection carries its own specific problems associated with political influence. Appointed attorneys general may be subject to political pressures from the chief executive, whereas elected attorneys general may need to answer to interest groups and are burdened with campaigning for election and reelection. Although some commentators have argued that "independent election . . . greatly increases the [state attorney general's] discretion to oppose other state officers,"[20] there does not appear to be any direct correlation between the selection process and the scope of an attorney general's powers. In fact, States that appoint their attorneys general nevertheless seem to afford a level of independence and common-law powers on par with elected attorneys general.[21]

The process for removal has also been regularly cited as a factor that significantly affects the independence of the office of attorney general.[22] In electing States and territories, attorneys general are traditionally subject to removal only by failing to secure reelection or by impeachment, providing attorneys general some insulation from the decisionmaking authority of the chief executive. The relative handful of States that appoint their attorneys general are somewhat divided in how they approach the removal authority of the chief executive. Looking to the five states where the attorney general is appointed by the Governor, for instance: In New Jersey, the governor may remove the attorney general only "for cause" after notice and a public hearing, and the removal order is subject to de novo court review.[23] In New Hampshire, where the governor and the executive council are involved in the appointment, the governor may remove the attorney "for reasonable cause" under certain conditions.[24] In Hawaii, the removal of the attorney general is subject to the advice and consent of the senate.[25] In Alaska and Wyoming (as in the District of Columbia), the attorney general serves at the pleasure of the chief

---

[18] NAAG 2007, *supra* note 13, at 18; William P. Marshall, *Break Up The Presidency? Governors, State Attorneys General, and Lessons from the Divided Executive*, 115 Yale L.J. 2446, 2451 (2006).

[19] NAAG 2007, *supra* note 13, at 17.

[20] Timothy Meyer, *Federalism and Accountability: State Attorneys General, Regulatory Litigation, and the New Federalism*, 95 Cal. L. Rev. 885, 895 (2007). Indeed, two jurisdictions—Guam and Pennsylvania— switched from appointment to election within the last thirty years, citing independence as one significant reason for the change. *See A.B. Won Pat Guam Int'l Airport Auth. v. Moylan*, 2005 Guam 5, 39–41 & n.5 (Guam Sup. Ct. 2005); Pa. History of House Bills, House Bill 962, at 2042–43, 2435, 2437 (1980).

[21] *See, e.g.*, NAAG 2007, *supra* note 13, at 19.

[22] Meyer, *supra* note 20, at 892–93; *see also* Marshall, *supra* note 18, at 2471.

[23] *See* N.J. Stat. Ann. § 52:14–17.2; *see also Russo v. Governor*, 123 A.2d 482, 484, 489–90 (N.J. 1956).

[24] *See* N.H. Const. pt. II, art. 73.

[25] *See* Haw. Const. art. V, § 6.

executive, and so removal of the attorney general is left to the chief executive's discretion.[26]

### 2.   Common-Law Powers

It is settled law in most jurisdictions that an attorney general possesses some level of common-law authority to represent and protect the interests of the public.[27]  At the same time, most States and territories generally agree that those common-law powers are subject to abrogation by constitution or, in some instances, by statute, and many States have in fact placed limits on this common-law authority.[28]

Although the full extent of an attorney general's common-law powers is unclear, it is generally accepted that these powers enable the Attorney General to represent the public's interest in litigation and reflect a concomitant responsibility to do so.  "Under the common law, an attorney general is empowered to bring any action which he thinks necessary to protect the public interest, and he possesses the corollary power to make any disposition of the state's litigation which he thinks best. . . .  This discretionary control over the legal business of the state, both civil and criminal, includes the initiation, prosecution and disposition of cases."[29]

It is important to note that the "public interest" is a collective term.  It does not connote an obligation to any one particular member of the public.  And it includes not only the majority on any particular issue, but also the minority, and the common interest they share in procedures that are fair to all.  Indeed, the attorney general "is the attorney and legal guardian of the people, or of the crown, according to the form of government. His duties pertain to the Executive Department of the State, and it is his duty to use means most effectual to the enforcement of the laws, and the protection of the people, whenever directed by the proper authority, or when occasion arises."[30]

Predating the concept of separation of powers, the powers endowed by common law are a unique and essential feature of the office of attorney general.  Through these powers, an attorney general's duty to the public interest is not coterminous with that of an executive officer.  Instead, the position of attorney general is a "public trust"—a responsibility that sometimes may require disagreement with the executive officer.[31]  In matters of public concern, attorneys general have "a large discretion" that neither the chief executive nor the courts may control.[32]  As noted, the precise nature and degree of an attorney general's common-law powers vary depending on the jurisdiction.  However,

---

[26] *See* Alaska Const. art. III, § 25; Wyo. Stat. Ann. §§ 9-1-601(a), 9-1-202(a); D.C. Code § 1-301.111.

[27] NAAG 2007, *supra* note 13, at 40; *see also id.* at 38, 47.

[28] *Id.* at 38–42.

[29] *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950 (Alaska 1975); *see also* NAAG 2007, *supra* note 13, at 42–48.

[30] *Shevin*, 526 F.2d at 270.

[31] NAAG 2007, *supra* note 13, at 11, 55–57; *Shevin*, 526 F.2d at 270.

[32] *Shevin*, 526 F.2d at 270.

the scope of an attorney general's common-law powers does *not* appear to turn on whether the attorney general is selected by appointment or election.[33]

### 3.   Approach To Ensuring Independence

Virtually every State acknowledges that its attorney general possesses some level of "independence," but the precise meaning of that concept is unclear. Independence can be viewed as an assessment of autonomy from executive or judicial interference, or it can refer to objectivity—*i.e.*, impartiality in forming legal opinions or rendering advice. Independence can follow either as a formal matter from governmental structure and common-law power, or it can be secured as a functional matter based on the practice and custom of the office. Because independence is an often-cited topic in connection with the overall debate on whether to make changes to the rights and responsibilities of the Attorney General in the District of Columbia, it may be helpful to expand briefly on the concept and its significance.

One formulation of independence suggests that an attorney general should not look to the executive's interests—or, for that matter, the interests of the public—in formulating positions or opinions on legal matters. Under that view, an attorney general must separate any advocacy role from certain decisionmaking functions and adopt a quasi-judicial role instead.[34] We do not endorse that approach because it would effectively collapse judicial and executive decisionmaking and would diminish the ability of an attorney general zealously to represent the "client's" interests, whether that refers to the government itself or to the public. Although attorneys general in all States are expected to adhere to professional ethical obligations, which incorporate an element of legal objectivity, "independence" is better understood as a measure of autonomy from other parts of the executive branch, rather than objectivity in some abstract sense.

With this understanding in mind, the source of an attorney general's independence lies both in the *formal* structure of the government in which the attorney general operates and in the *functional* attributes of the office. In the formal structural sense, independence can result from a sharp institutional division of responsibilities between an attorney general and the chief executive. In the functional sense, independence can be considered a consequence of an attorney general's day-to-day operations, in which independence exists as a product of the customs, duties, and responsibilities of an attorney general's office.

The level of an attorney general's independence varies by jurisdiction. Some States positively identify the attorney general as an independent executive officer with authority to take positions directly contrary to those held by the chief executive. By insulating the office of attorney general from direct influence of the chief executive, attorneys general in these States are free to exercise the powers of the office, to reach independent legal conclusions on behalf of the jurisdiction, to initiate enforcement

---

[33] *See* NAAG 2007, *supra* note 13, at 38 & n.22.

[34] *See, e.g.*, Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 Cardozo L. Rev. 437, 441-42 (1993) (discussing an opinion letter written by U.S. Attorney General Caleb Cushing to the President in 1854, 6 Op. Att'y Gen. 326, 333–34 (1854)); *People v. Shearer*, 30 Cal. 645, 652 (1866).

actions against private parties, and, in some cases, to sue the chief executive of the jurisdiction.[35] Other States, by contrast, offer attorneys general very little formal separation from other offices of the executive branch—though such attorneys general necessarily retain a functional sphere of independence to conduct ordinary operations without direct influence from the chief executive. In States with little structural independence, an attorney general's decisionmaking will undoubtedly be shaped by the policy directions, goals, and objectives of the chief executive, but he or she nonetheless maintains some degree of functional autonomy and discretion in performing the duties of the office.

### B.    The D.C. Attorney General's Unique Position

#### 1.    The Responsibilities of the Office

The District of Columbia's Attorney General is a unique position in a unique jurisdiction. In many ways, the job responsibilities are exceptionally broad. Like a State's attorney general, the D.C. Attorney General serves in a cabinet-level role to an executive and has broad responsibility for the jurisdiction's legal functions. Similar to a district attorney or State's attorney, the D.C. Attorney General is also in charge of some criminal prosecution, although the U.S. Attorney for the District prosecutes felonies. And like a city or county solicitor, the D.C. Attorney General handles civil litigation on behalf of a locality. This unique set of roles reflects the fact that the structure of the District possesses elements similar to city, county, and state governments.

The D.C. Attorney General's office also consolidates the legal staff serving other executive agencies, requiring the Attorney General to manage one of the largest state or local governmental legal offices in the nation. This legal staff provides representation and/or guidance not only to District agencies that answer to the Mayor, but to some that do not—including independent agencies that may hire their own counsel for advice but that still must be represented by the Attorney General in litigation. It is important to note that the D.C. Attorney General serves a distinct role from the Mayor's general counsel, who advises the Mayor on legal affairs. The issues of independence that we have evaluated in this paper do not pertain to the general counsel, who as a practical matter should be viewed as a direct extension of the Mayor.

The job of Attorney General requires a complex mix of skills. In interviews conducted for this research, former Attorneys General suggested that the person must be an excellent lawyer and a quick study in response to the various issues that the Office handles, as well as a talented manager in order to understand the needs of such a large office. Interviewees further emphasized that the Attorney General should have enough political clout to obtain resources and support, and must be able to navigate the District's political relationships. However, a number of former officeholders argued that the quality of the working relationship between the Mayor and the Attorney General is the determining factor in whether a person will be successful in the role.

---

[35] *See Marshall, supra* note 18, at 2453–61.

In general, the Attorney General/Corporation Counsel's office has attracted talented lawyers, but it has also been subject to high turnover. The people with whom the project group spoke almost universally praised the skill and stature of those who have taken the position. A number of those who have held the position, such as the late Charles Ruff, are regarded as extraordinarily talented and dedicated public servants. However, the average tenure of a D.C. Attorney General has been approximately 18 months. James Tierney, an expert on attorneys general who spoke before the Committee on Public Safety and the Judiciary, described this as the shortest tenure in the country. Counting Interim Corporation Counsel and Attorneys General, 23 individuals have held the position since the District was granted Home Rule in 1973.

The people we interviewed offered a number of potential reasons, many interrelated, why tenures in this office tend to be short. Some noted that many of the most respected people to hold the office left to take other prestigious positions; others believed that the position lacked sufficient stature within the government to attract individuals who would stay for long tenures; others attributed turnover to the limited resources available to the Office; and many described the relationships between the Attorneys General and the respective Mayors as a factor influencing how long individuals remained in office.

### 2.    The Statutory Scheme and the Powers of the Office

Understanding the actual role of the Attorney General requires examining both the law and the custom and practice of the District.

### a.    Law

The Charter states that the Mayor "shall, through the heads of administrative boards, offices, and agencies, supervise and direct the activities of such boards, offices, and agencies."[36] The statute creating the Office of Corporation Counsel, now called the Attorney General, provides as follows:

> The Corporation Counsel shall be under the direction of the Mayor, and have charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof. He shall furnish opinions in writing to the Mayor, whenever requested to do so. All requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor. He shall perform such other professional duties as may be required of him by the Mayor.[37]

One problem with interpreting and applying this provision is that, although it uses the word "Mayor," it was apparently not written with a "Mayor" in mind at all. This basic provision — with the difference that it refers to "Commissioner" instead of "Mayor"—appears in Reorganization Order No. 50 of the Board of Commissioners (June

---

[36] D.C. Code § 1-204.22(4).
[37] D.C. Code § 1-301.111.

26, 1953). Our research indicates that the language in the Reorganization Order may, itself, have been unchanged going back to the creation of the Office of the Attorney General in 1877.[38] We were unable to locate any legislative history to identify the initial source of the language or to amplify on its original intent.

As explained in more detail in Appendix C, the precise meaning of this provision is not entirely clear. For example, it is possible to reach diametrically different conclusions about whether and how the phrase "under the direction of the Mayor" modifies the rest of the first sentence. One way of reading the sentence is to say that everything the Attorney General does is "under the direction of the Mayor"—including not only "the charge and conduct of all law business," but also "all suits instituted by and against the government thereof." At the other extreme, another way of reading this sentence is that the phrase "under the direction of the Mayor," does not modify *any* of the remainder of the sentence: in other words, the Attorney General is under the direction of the Mayor, "*and*" (in addition and separate) has "charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof." (Emphasis added.) Neither of these seems to capture the actual dynamic. As detailed in Appendix C, the best reading of the statute is that the Attorney General is under the *general* direction of the Mayor, but that the language was not intended to abrogate historic common-law authority that the Attorney General retained from Maryland common law, which was imported upon the formation of the District. Under this common-law authority, the Attorney General is generally answerable to the Mayor but still retains an independent obligation to the public interest. This view appears consistent with the pertinent case law and with custom and practice.

### b.    Custom and Practice

Although our interviews uncovered many different views about the Attorney General position, our interviewees agreed that there is, at least, some level of authority that the Attorney General exercises—or should exercise—independent of the Mayor. The most obvious examples would be the decision whether to prosecute a particular juvenile offender, or how to make particular arguments in a civil lawsuit. Indeed, the *Position Description for the Attorney General for the District of Columbia*, Executive Office of the Mayor Document DX-905-E5, explains that the Attorney General works "under the general direction of the Mayor of the District of Columbia, who provides policy guidance and makes assignments in terms of general objectives and priorities in consultation with the [Attorney General]," but that "[w]ithin the latitude of policies established by the Mayor," the Attorney General "functions with independence in accomplishing broad assignments and special projects."[39]

---

[38] As mentioned above, the language emerges from a "police regulation" that congressionally-appointed Commissioners had adopted for the District of Columbia before Home Rule. *See* Congressional Joint Resolution of February 26, 1892, 27 Stat. 394.
[39] *Position Description for the Attorney General for the District of Columbia*, Executive Office of the Mayor Document DX-905-E5 at 1.

### C.   The Mendelson Bill

As discussed in the introduction, you introduced a bill in December 2007 that would change the way in which the District's Attorney General is selected and removed. In subsequent conversations, you and your staff have suggested that you intend to introduce another bill with some different provisions. This section focuses on the specific provisions that we understand may be included in the revised bill. It compares the proposals for the District's Attorney General with other States' practices. Finally, it sets forth DC Appleseed's recommendations with regard to each proposal, and the bases for those recommendations.

### 1.   Summary of Provisions

DC Appleseed understands that the revised Attorney General bill proposes several changes to the District of Columbia Attorney General position, all with the goals of increasing the officeholder's independence and longevity in office, and the stability of the office itself. As we understand these goals, independence relates to the concerns expressed above that the Attorney General maintain a fealty to the public interest. Longevity and stability are both ends in themselves (in that they are associated with continuity of policies, preservation of institutional knowledge, and lower staff turnover), and means to the end of investing the position with the authority needed to make the Attorney General effective. The revised bill would: (1) create minimum qualifications for the Attorney General; (2) create a four-year term of office; and (3) place a "for cause" requirement on the Mayor's power to remove the Attorney General.

### 2.   Comparison to Other Jurisdictions

The practices in other States and United States territories concerning qualifications, term of office and removal vary and, in some instances, the choice of practice may be affected by whether the attorney general is elected or appointed. However, most jurisdictions (regardless of whether they elect or appoint their attorneys general), apply some combination of qualifications, terms limits and restrictions on removal powers. These practices are summarized below and in the chart from the National Association of Attorneys General, provided as Appendix B.[40]

### 3.   Minimum Qualifications

Every jurisdiction, with the exception of Delaware, Kansas, and Tennessee, has at least some minimum qualification for its Attorney General.[41] The most common types of qualifications are discussed below.

---

[40] The National Association of Attorneys General has given its permission for DC Appleseed to reproduce the chart, reproduced from NAAG 2007 at 20–23, as an attachment to this letter.

[41] *See* Council of State Governments, *The Book of the States*, Keon Chi, ed. (2007), at 217; NAAG 2007, *supra* note 13, at 20–25, 30, for a discussion of the various States' minimum qualifications identified in this section.

**Minimum Age.** Thirty-two out of the 57 jurisdictions surveyed by NAAG have minimum age requirements. The most common minimum age is 25.

**Bar membership.** Thirty-one jurisdictions expressly, and 11 implicitly, require that the Attorney General be a member of the bar. Eleven of these States or territories provide a minimum number of years that an attorney must be admitted to the bar before the attorney can be eligible to serve as attorney general, ranging from 5 years (Wyoming) to 10 years (Connecticut).

**Residency and citizenship.** Most jurisdictions, including 26 States, impose a requirement of state residency. The requirements for length of residency range from 6 months in Michigan to 10 years in Maryland. Thirty jurisdictions also expressly require United States citizenship. In another 11 jurisdictions, U.S. citizenship can be inferred from the requirement that the attorney general be a "qualified elector."

**Single office-holders.** Several jurisdictions prohibit sitting attorneys general from holding other offices.

**No private practice of law.** Forty-nine States forbid the private practice of law by the attorney general, whether by law (in 33 States) or by less formal methods.

### 4.      Term of Office

Currently, 46 States have four-year terms for their attorneys general, two States have two-year terms, and one State has an eight-year term. Alaska's attorney general serves at the pleasure of the governor. Among those States with four-year terms, 16 limit the attorney general to two terms.[42]

### 5.      Removal

In the 43 States that elect their attorneys general, the attorney general is ordinarily subject to removal only by impeachment or failure to secure reelection. Of the seven States that do not elect their attorney general, two of them have branches of government besides the executive making the selection, and accordingly do not invest the executive with at will powers of removal.[43] Of the remaining five states, two—Alaska and Wyoming—permit removal of the attorney general at will, and the remaining three (New Jersey, New Hampshire, and Hawaii) restrict removal either by a "for cause" standard or by requiring some form of legislative involvement or approval.[44]

### D.      Analysis and Recommendations

This section sets forth DC Appleseed's analysis and specific recommendations regarding each of the three current proposals regarding the office of the Attorney General

---

[42] NAAG 2007, *supra* note 13, at 26–27.
[43] In Maine, the State Senate and Representatives select the Attorney General by secret ballot. Me. Const. art. IX, § 11. In Tennessee, the judges of the State Supreme Court select the Attorney General. Tenn. Const. art. VI, § V.
[44] *Id.* at 27–29.

that we understand may be included in the revised legislation. Our recommendations reflect consideration of other States' practices, DC Appleseed's discussions with former Attorneys General and general counsel, DC Appleseed's evaluation of the potential legality of the various provisions, and our assessment of what would best serve sound government and the administration of justice.

### 1.    Impose Minimum Qualifications

DC Appleseed recommends that the Council adopt minimum bar membership, bar tenure and residency qualifications for the Attorney General. Although some government attorneys (for example, in the federal government) are authorized to practice before the courts of the District of Columbia without becoming members of the District of Columbia Bar, having the chief lawyer who represents the District be a member of the District's bar is important both symbolically and practically. The Attorney General should be able to function within and to gain respect among the District's legal community, and it is a source of strength that a number of prior Attorneys General/Corporation Counsel have also served as President of the District of Columbia Bar. Requiring a minimum period of tenure as a member of the bar guarantees at least some historic connection with the District's legal system, which is a plus given the unique nature of our city and its laws.

For similar reasons, DC Appleseed supports a residency requirement. It is logical to require an officer serving in one of the top executive posts in the District of Columbia to live in the city. Recognizing that, at any one time, a substantial number of the District's lawyers reside outside the city, the requirements should not be for prior residency at the time of appointment. Instead, it should be required that the Attorney General live in the District or move into the District within a reasonable specified time after assuming the office.

As explained in Appendix D, so long as the requirements are reasonable and applied prospectively to future Attorneys General, it is likely within the power of the Council to set minimum qualifications for the position without congressional approval or a change to the District's Charter.

### 2.    Create a Term of Office

DC Appleseed supports a four-year term of office for the Attorney General that is co-extensive with the Mayor's term. A term of office promotes the dual goals of increased stability and increased independence. As explained below, however, although we support a term of office, we do not support limiting the Mayor's power of removal. Therefore, although the Attorney General would be appointed for a four-year term, the term would not operate as a tenure.

There are two significant potential benefits from specifying a term. First, the presence of a fixed term creates an aspirational timeframe for individuals serving as Attorney General. Although there is no evidence that having a specified term of office would have resulted in previous Attorneys General or Corporation Counsel staying in the

position longer, the specification of a four-year period could bolster stability in the future. Without a term, it is difficult to create a custom of serving in the position for a number of years. If that custom developed, we would expect there would be additional significance attributed to either the Attorney General's decision to resign or the Mayor's decision to remove the Attorney General. This process would, we expect, properly subject those decisions to greater scrutiny. The likely effect would be increased stability and independence of the Attorney General.

Second, specifying a term serves as a potential check upon both the Mayor and the Attorney General. Under the current system, an Attorney General, once appointed, serves indefinitely, and the ability of the Council to remove an Attorney General is limited. This does not appear to have meaningfully affected the actual tenure of prior Attorneys General and Corporation Counsel. None has served as long as four years, nor (apart from a limited hold-over period) has any individual confirmed in the post continued to serve beyond the end of a Mayoral term. (In some instances, a Mayor's term has ended with an "acting" Attorney General or Corporation Counsel in place who has remained in the position for some time afterwards.) However, the District's experience is limited, and the fact that a situation has not arisen during the past 35 years does not necessarily mean it will not arise in the future. Revisiting the selection of the Attorney General, requiring reappointment, and inviting reexamination by the Council after a specified period is a logical practice because it reinforces the expectation that the conduct of the office will receive careful scrutiny.

DC Appleseed considered whether there would be any benefit to staggering the Attorney General's term so that it would not run coterminously with the Mayor's. As a practical matter, unless the Mayor's removal power is restricted, such a change could have limited effect, as a new Mayor could always require the Attorney General's resignation. Moreover, the downside of having such a significant appointee from one administration staying in office into another would outweigh its potential advantages. It may be very difficult for a holdover from a previous administration to gain the confidence and trust of a new Mayor, and dividing authority in this way risks dividing responsibility and impeding the ability of a new Mayor to fashion a new administration.

As discussed in Appendix D, DC Appleseed believes that the creation of a term of office for the Attorney General that does not otherwise restrict the Mayor's removal power would not violate any inherent separation of powers principles under the District Charter and may be implemented by the Council acting alone.

### 3. Do Not Limit the Mayor's Power of Removal Under the Current Structure

There are arguments to be made in favor of limiting the Mayor's power of removal. However, within the current appointment structure, imposing a limitation on removal is likely to prove counterproductive, on balance. Accordingly, DC Appleseed does not recommend a "for cause" removal provision.

The goal of a "for cause" removal provision would be to protect the Attorney General's independence by insulating his or her decisionmaking from politically motivated reprisals. The theory is that an Attorney General who cannot be removed merely for opposing the Mayor on a particular issue could have more freedom to make decisions and to take action independently. The approach in other jurisdictions is mixed on this point: as we have noted above, in the five states in which the chief executive appoints the attorney general, three have some restriction on the executive's power of removal, while two (Alaska and Wyoming) do not.

Our interviews have suggested that in the District, a "for cause" removal provision would be unlikely to achieve the result of insulating the Attorney General's decisionmaking. With or without a "for cause" removal requirement, Attorneys General will likely resign when asked to do so by the Mayor that appointed them. On the flip side, with or without a "for cause" removal provision, Mayors will likely be cautious about firing an Attorney General (both generally and especially for weak or political reasons), given the publicity that likely would follow.

If, however, the Attorney General refused to resign when asked by the Mayor to do so, the result would more likely be negative than positive for the District. Our interviewees have overwhelmingly suggested that the Attorney General has gained respect and influence not by publicly disagreeing with the Mayor, but rather by gaining the Mayor's trust. Some interviewees indicated that, in practice, the Mayor's removal authority has actually been a source of strength for the Attorney General, because the Attorney General can say to the Mayor, "if you do not like the job I am doing, fire me." If a Mayor is forced to retain an Attorney General in which he or she has lost confidence, the most likely result is not an enhancement of the Attorney General's power, but a situation in which the Mayor limits communications with the Attorney General and seeks out other advisors. Conversely, it is unlikely that the District would benefit from forcing a Mayor who disagrees with an Attorney General to air publicly perceived "causes" for removal, or to have its chief legal officer put in the position of suing the District to challenge the "cause" for his or her own removal.

But, even if a dispute would not come to this point, there is also a risk of diffusing responsibility and accountability. Currently, the Mayor is responsible for the conduct of the executive branch, and is ultimately responsible and answerable to the electorate, whatever position an Attorney General may take. Unless the Attorney General is also elected, the Attorney General is not answerable in any similar way.

For similar reasons, DC Appleseed does not support vesting the Council with the power to remove the Attorney General. Our view is that, as a practical matter, whether vested in the Mayor or the Council, a "for cause" removal power will not effectively advance the role of the Attorney General.

As we discuss in Appendix D, creating a "for cause" or Council removal provision may also conflict with separation of powers principles in the District, and could require congressional action or a Charter change in order to effectuate it. However, because DC Appleseed does not recommend limiting the Mayor's power of removal, we

outline only briefly the complex legal question presented by the possibility of such a change.

### E.   Other Recommended Changes

In addition to the changes proposed by the Mendelson bill, DC Appleseed examined whether other changes might assist in strengthening the Office of the Attorney General. In particular, DC Appleseed analyzed whether the following actions would be beneficial to the position: (1) clarifying the laws enumerating the Attorney General's powers and responsibilities; (2) selecting the Attorney General by election rather than appointment; and (3) permitting the appointment of special counsel in instances where the Attorney General determines that his or her duty to the public interest in a particular matter may prevent him or her from adequately representing the government, an agency, or an official. These options are briefly examined below.

### 1.   Clarify District Law

As discussed above, D.C. Code § 1-301.111 is somewhat ambiguous and potentially subject to divergent interpretations. As explained in Appendix C, we conclude that the better reading of the statute incorporates this concept of independence, and in order to eliminate any potential confusion on that score, we recommend that the Council clarify the statute to make plain how the Attorney General is intended to function in the current system. We therefore propose the following revisions:

(a) The ~~Corporation Counsel~~ Attorney General shall be under the general direction of the Mayor~~,~~ ~~and~~ The Attorney General shall have charge and conduct of all law business of the said District~~,~~ and all suits instituted by and against the government thereof, and shall possess all powers afforded the Attorney General by the common and statutory law of the District and shall be responsible for upholding the public interest. He or she shall have the power to control litigation and appeals, as well as the power to intervene in legal proceedings on behalf of this public interest. ~~He~~ The Attorney General shall furnish opinions in writing to the Mayor, whenever requested to do so. All requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor. ~~He~~ The Attorney General shall perform such other professional duties as may be required of him or her by the Mayor.

(b) In the event the Attorney General determines that his or her duty to represent the public interest in a particular matter may prevent him or her from adequately representing the government, an agency, or an official, he or she shall notify the Mayor of this circumstance and the Mayor shall appoint special counsel to represent the government, an agency, or an official for the matter, *provided, however,* that if the Mayor is expected to be adverse to the special counsel, the Attorney General shall notify the

<u>Chief Judge of the District of Columbia Court of Appeals, who shall
appoint the special counsel for the matter.</u>

<u>(c) The authority given under this section shall not be construed to deny or
limit the duty and authority of the Attorney General as heretofore
authorized, either by statute or under the common law.</u>

This language adapts authority from several different sources.  The phrase "by the
common and statutory law of the District," is drawn from New Jersey Stat. Ann.
§ 52:17A-4.  New Jersey's system, like the District's, involves the appointment of an
Attorney General who, in turn, is under the general direction of the executive (there, the
Governor).

The phrase "shall be responsible for upholding the public interest," would
statutorily affirm the Attorney General's duty to represent the public interest.  In the vast
majority of circumstances, the Attorney General and the Mayor will be aligned on what
the public interest requires.  Nevertheless, the Attorney General's duty to represent the
public interest may, in some rare circumstances, require the Attorney General to endorse
a view that is not completely shared by the Mayor.  While this common law public
interest authority should be used sparingly, merely acknowledging its existence by statute
will further ensure its effectiveness.  The citizens of the District will accordingly benefit
from the instances in which the Attorney General opposes a position of the Mayor, and
also from the check and balance that results from the far more common process of
internal discussion, debate, and resolution of any differences that the Mayor and the
Attorney General might have.

The sentence "He or she shall have the power to control litigation and appeals, as
well as the power to intervene in legal proceedings on behalf of the public interest," is an
adaptation from case law that has interpreted the common-law powers found in various
States.[45]

The sentence "The authority given under this section shall not be construed to
deny or limit the duty and authority of the Attorney General as heretofore authorized,
either by statute or under the common law," is from Maine Rev. Stat. Ann. Tit. 5 § 199.
As noted above, in Maine, the Attorney General is also appointed—although, in an
unique method, Maine's Senate and Representatives select the Attorney General by secret
ballot.[46]  This savings clause is important as there are currently approximately 300
statutes in the District of Columbia that refer to authority of the Attorney General that
should be preserved, and this provision aims to effectuate that.

The premise of acting under the "general" direction of the Mayor, is a concept
currently reflected in the Position Description of the Attorney General for the District.
This Position Description provides that "[t]he Attorney General for the District of
Columbia has full responsibility for providing all legal services to the Government of the
District of Columbia, and for coordinating, planning, directing and managing the Office

---

[45] *See* NAAG 2007, *supra* note 13, at 44–48.
[46] Me. Const. art. IX, § 11.

of the Attorney General for the District of Columbia . . . .”[47]  The Attorney General
“[w]orks under the general direction of the Mayor of the District of Columbia, who
provides policy guidance and makes assignments in terms of general objectives and
priorities in consultation with the [Attorney General].  Within the latitude of policies
established by the Mayor, [the Attorney General] functions with independence in
accomplishing broad assignments and special projects.”[48]  And, “[t]he Attorney General
functions solely on [his] own initiative and responsibility with respect to the duties of the
Office,” and “[t]he relationship of the Attorney General to the Mayor, directors or
departments and agencies of the District of Columbia Government, and the [C]ouncil of
the District of Columbia, is that of attorney and client.”[49]  The Position Description
further states that “[i]n providing these legal services, the Attorney General functions
independently of the Mayor or any other officer of the District of Columbia Government.
The solution of problems or achievement of results is solely the [Attorney General’s]
responsibility.”[50]

      The Attorney General’s Position Description confirms that a system of functional
independence is envisioned in the workings of the executive.  The relationship between
the Mayor and Attorney General affords the Attorney General functional independence
within the confines of broader policy objectives and direction established by the Mayor.
Hence, while the Mayor exercises authority over matters of policy, the implementation of
these policies through the Attorney General’s functions is left to the discretion of the
Attorney General.  Accordingly, some conflicts that might otherwise arise between the
Attorney General and Mayor could be avoided by consulting the delineation of power
and responsibility set forth in the Position Description.

      As explained in Part II.E.3 below, the provision for a special counsel reflects an
approach taken in many States and territories to deal with the circumstances described.

## 2.    Enable the District to Determine Whether to Elect the Attorney General

      Some have proposed that the District change the method of selection from
appointment to election as a way to strengthen the independence of the Office of the
Attorney General.  Our examination of this issue revealed numerous factors counseling
alternatively in favor of, and against, such action.  To assist the discussion on this topic,
we discuss the factors weighing in favor of and against electing the Attorney General
briefly below.

      The most common arguments counseling in favor of electing the Attorney
General seem to be: (1) an elected Attorney General would be structurally independent of
the Mayor and would therefore be generally free from the Mayor’s political agenda;
(2) an elected Attorney General could increase the stability of the office by serving a

---

[47] *Position Description for the Attorney General for the District of Columbia*, Executive Office of the
Mayor Document DX-905-E5 at 1.
[48] *Id.*
[49] *Id.* at 1–2.
[50] *Id.* at 2.

longer term in the position; (3) an elected Attorney General would be more directly accountable to District voters, and, therefore, to the public interest; (4) an elected Attorney General would have greater political clout and the ability to secure adequate funding for the Office of the Attorney General; (5) an elected Attorney General would bolster the "gravitas" of the position; (6) an elected Attorney General would provide an additional voice and "power center" in the District's government; and (7) an elected Attorney General would provide the residents of the District the opportunity to vote for an additional public official and thus afford residents a greater say in selecting and participating in their government. Many of our interviewees discussed these as significant goals.

The most common arguments counseling against electing the Attorney General appear to be: (1) an elected Attorney General might be less politically independent than an appointed Attorney General because of the political necessities associated with fund-raising and running for office; (2) switching to an elected system might deter the most objectively qualified candidates from seeking the position given that many of the outstanding individuals that previously held the office likely would not have sought the position if it were elected; (3) an elected Attorney General might be less protective of the rights of the minority in cases requiring the Attorney General to uphold the rule of law in the face of strong countervailing popular opinion; (4) the Mayor might be less likely to seek advice and counsel from an independently elected Attorney General; and (5) the additional power center represented by an elected Attorney General could potentially trigger greater disagreements and tension between the Attorney General and the Mayor, which could be detrimental to a jurisdiction the size of the District and one that is under the authority of Congress. These significant concerns, too, were raised by our interviewees.

Because we conclude the District can provide the minimum level of independence necessary for the Attorney General without making the office an elected position, we do not take a position on the merits of the arguments for and against election. However, DC Appleseed firmly supports providing District residents the right to decide for themselves whether the Attorney General should be elected or appointed. Permitting the District's residents the opportunity to decide the method for selecting their Attorney General would inherently augment the District's legitimacy, arguably advance its sovereignty, and make the government a more accurate representation of the type of government preferred by the electorate. Accordingly, DC Appleseed encourages the Council to seek to amend the Home Rule Act to allow the people of the District to voice their decision on this important political issue. Indeed, given that Congress afforded Guam the opportunity to decide the method for selecting its Attorney General, Congress should certainly provide the District with the opportunity to do so as well.[51]

[51] Like the District of Columbia's Home Rule Act, Guam's Organic statute is an enactment of Congress. *See* 48 U.S.C. §§ 1421, *et seq.* (the "Organic Act" of Guam). As originally enacted, the Organic Act provided that the governor would appoint the attorney general with the advice and consent of the legislature for a four-year term, and could remove the attorney general "for cause." *See* H.R. Rep. No. 105-742, 105th Cong., 2d Sess., at 2 (1998), *available* at 1998 WL 658802, *2. After the residents of Guam overwhelmingly indicated their support for election of the attorney general, the Guam legislature passed a

### 3.    Allow for Appointment of Special Counsel

Lastly, the Council might want to consider whether the Attorney General should be permitted to appoint special counsel in cases where the Attorney General determines that his or her duty to the public interest in a particular matter may prevent him or her from adequately representing the government (whether generally or through representation of a particular agency or official).  As explained below, we expect that it is very rare that a conflict will develop between the Attorney General's dual responsibilities to represent the government and to represent the interest of the public as a whole.  Nonetheless, the fact that the Attorney General has these dual responsibilities makes such a conflict possible, and having a mechanism in place to accommodate the potential for such a conflict may have benefit.

State practices vary concerning the authority of attorneys general to take positions in court that are contrary to the views of other executive agencies—and, in some States, court decisions have found that the attorney general's authority is quite broad.  For example, some states allow an attorney general to serve the "dual role" of representing the executive and "vindicating wrongs against the collective citizens of the State," by bringing an action against the executive "when there is a possibility [that the executive] is acting illegally."[52]  Similarly, some states permit the attorney general, in the event of a conflict between government agencies, to choose to defend one agency and to have the other agency hire private counsel.[53]

Even without such broad authority, however, an attorney general could be asked to defend a position the attorney general does not believe, in the public interest, should be defended.  And many States have adopted provisions permitting the appointment of special counsel in such circumstances.  In some jurisdictions, the practice is addressed by statute.  In some states, the government client selects special counsel upon approval by the attorney general.  In others, the governor appoints special counsel.  Several States that do not elect their attorneys general require the approval of both the governor and the attorney general before special counsel may be appointed.[54]

---

resolution calling upon Congress to amend the Organic Act to permit the Guam legislature to choose whether to elect or appoint the attorney general.  *See generally A.B. Won Pat Guam Int'l Airport Auth. v. Moylan*, 2005 Guam 5 (Guam 2005) (discussing procedural history).  In 1998, Congress amended the Guam Organic Act as requested.  *See* 48 U.S.C. § 4821g(d)(2).  Guam has since passed legislation setting forth the details of the office, including selection by election, minimum qualifications, and restrictions on outside employment.  *See* Guam Pub. L. No. 25-44 (codified at 5 Guam Code Ann. §§ 30101, 30109(h), 30114, 30116, 30118).

[52] *State  ex rel. Condon v. Hodges*, 562 S.E.2d 623, 627 (S.C. 2002) (citations omitted) (upholding power of South Carolina's Attorney General to sue the governor to argue that an action violated separation of powers, with the Governor defended by his Chief Legal Counsel); *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610 (Ky. 1992) (Lawsuit by Attorney General of Kentucky challenging Governor's authority to appoint himself to be a trustee of the University of Kentucky).

[53] *See, e.g., D'Amico v. Board of Medical Examiners*, 520 P.2d 10, 17 n.5 (Cal. 1974) (California Attorney General noting a conflict and representing the state's Medical Board, while the state's Osteopathy Board retained private counsel).

[54] *See, e.g., State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 775 (Tenn. Ct. App. 2001) (quoting Tenn. Code Ann. § 8-6-106 (providing for such a procedure "[i]n all cases

We expect that the circumstances in which such a special counsel might be appropriate in the District of Columbia would be limited. For example, special counsel is not necessary to deal with a personal conflict (e.g., a financial interest in a case) that may prevent the Attorney General from being the advocate for a position. Such situations can be handled by personal recusal and delegation to others who do not have such a conflict.[55] Nor in our view should the special counsel be used a means of dealing with situations in which agencies disagree with each other. In those situations, the Attorney General can serve the interest of the public as a whole by ensuring that the Government speaks with one voice.

We would expect that the circumstances in which the government would even initially take a position that the Attorney General might find to be contrary to the interest of the public as a whole, would be rare. And it would be rarer still that the Attorney General would be unable, through a process of advice and internal discussion, to harmonize the government's position with the public interest.

In this rare circumstance, however, a serious question can be raised about what system best serves the public interest. Under the current statutory framework, an Attorney General, upon concluding that a course of action would violate the public interest, can remonstrate with those taking the course of action, and, if that fails, either agree to defend the action or, instead, resign. A special counsel provision would afford the Attorney General a third option: the Attorney General could refuse to defend the particular position, but without violating his or her ethical responsibilities to the government client. Such an option could bolster the independence and tenure of Attorneys General, by permitting the Attorney General to protect the public interest and not merely to resign.[56]

In light of the wide range of approaches to this issue, there are many workable arrangements that the District might adopt. Nevertheless, because the District's Attorney General is appointed by the Mayor, we propose that the preferred arrangement for selecting special counsel would be one that allows the Attorney General to decide whether special counsel is necessary, and leaves the selection of a particular individual for that position to the Mayor, unless the Mayor is directly implicated, in which case

---

where the interest of the state requires")); *State Health Planning and Coordinating Council v. Hyland*, 391 A.2d 1247, 1250 (N.J. Super. Ct. App. Div. 1978) (noting that both the Attorney General and the Governor must approve of the appointment of special counsel) (quoting N.J.S.A. 52:17A-13); *Chun v. Board of Trs. of Employees' Ret. Sys.*, 952 P.2d 1215, 1232 (Haw. 1998) (A department may employ or retain an outside attorney if the Attorney General declines to represent it and the Governor waives the legal provision otherwise barring departments from retaining special counsel) (quoting Haw. Rev. Stat. § 28-8.3)

[55] *See also* NAAG 2007, *supra* note 13, at 61 (noting that an attorney general may be disqualified from dual representation when he is an actual party to the dispute, for example when he has intervened to protect the public interest); *Attorney Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d 16, 31 (Mich. Ct. App. 2000) (noting that when the Attorney General is a party to the litigation, "independent counsel should be appointed for the state agency in order to remedy the ethical impediment to the legal action brought by the Attorney General").

[56] We do not seek to address the situation, which the Council might also wish to consider, of when the Attorney General may be called upon to investigate or prosecute an executive-branch official with whom the Attorney General feels too closely connected to investigate or prosecute effectively. In these situations, as well, a special counsel provision (more akin to an independent counsel provision) may be advisable.

court involvement would be sought.  This approach would comport with the model of government employed by the District and would furnish the Attorney General with an important tool to resolve potential difficulties that might arise from his or her duties to both the government and the public interest.  Our suggested paragraph (b) of an amended D.C. Code §1-301.111, which is provided in Section II.E.1 above, reflects our preferred approach.

## III.    CONCLUSION

We share your view that protecting the independence, stability, and credibility of the District's Office of the Attorney General is an important goal.  The noted provisions of this bill, along with the additional provisions we have suggested, would help to advance that purpose.  We are happy to help in this undertaking in any way we can and to address any questions you have about the material we have presented here.

Sincerely,

Walter Smith
Executive Director

cc: Mayor Adrian Fenty
    Peter Nickles, Acting Attorney General
    Vincent C. Gray, Council Chair
    Jack Evans, Chair Pro Tempore/Ward Two
    Carol Schwartz, At-Large Councilmember
    David Catania, At-Large Councilmember
    Kwame R. Brown, At-Large Councilmember
    Jim Graham, Ward One Councilmember
    Mary M. Cheh, Ward Three Councilmember
    Muriel Bowser, Ward Four Councilmember
    Harry Thomas Jr., Ward Five Councilmember
    Tommy Wells, Ward Six Councilmember
    Yvette Alexander, Ward Seven Councilmember
    Marion Barry, Ward Eight Councilmember

**APPENDIX A:**

## SUMMARY OF INTERVIEWS

The Project Team interviewed current Interim Attorney General Peter Nickles and five former Attorneys General spanning the last ten years: Linda Singer, Robert Spagnoletti, Arabella Teal, Judge Robert Rigsby, and Judge John Ferren. We discussed the workings of the Office of the Attorney General with two top deputies: Wayne Witkowski, who has been in the office 30 years and has published an important analysis of the powers and duties of attorneys general and municipal attorneys; and Alan Morrison, who was special counsel to Linda Singer. We also interviewed two former general counsels to the Mayor in addition to Mr. Nickles: Len Becker, and Grace Lopes. This appendix summarizes these interviewees' responses to the following questions: Is there a need for the Office of the Attorney General to be more independent of the Mayor? Have there been instances when the Mayor has influenced an Attorney General in a way that was improper or that prevented the Attorney General from doing his or her job well? Are the provisions in the Mendelson Bill appropriate? Would the Attorney General benefit from being an elected position, rather than being appointed by the Mayor? In order to protect the confidentiality of the interviewees, we do not attribute views to particular people but, instead, summarize the overall content of the interviews as a whole.[1]

### The Office of Attorney General

Interviewees agreed that the job of Attorney General requires a complex mix of skills. Former Attorneys General suggested that the person must not only be an excellent lawyer and a quick study in response to the various issues that the Office handles, but the person also needs to be a talented manager in order to understand the needs of such a large office. Interviewees further emphasized that the Attorney General should have enough political clout to obtain resources and support by being able to navigate the District's political relationships. The people with whom the project group spoke almost universally praised the skill and stature of those who have taken the position. However, a number of former officeholders argued that the quality of the working relationship between the Mayor and the Attorney General is the determining factor in whether a person would be successful in the role.

### Independence

One interviewee felt that, to function most effectively, the Attorney General should have the power to make decisions about the functioning of the office—including decisions about the budget, personnel, and litigation strategy—without any interference from the Mayor. No other interviewee went this far, but there was general agreement among the interviewees that the Attorney General should have independence in some areas, while the Mayor should give general direction to the office.

---

[1] We have treated the content of the interview with Mr. Nickles as confidential, at his request, and have not reflected it here or in our letter.

Although our interviews have uncovered many different views about the Attorney General position, our interviewees agreed that there is, at least, some level of authority that the Attorney General exercises—or should exercise—independent of the Mayor. The most obvious examples would be the decision whether or not to prosecute a particular juvenile offender, or how to make particular arguments in a civil lawsuit.

Thus, all interviewees agreed that the Mayor should not interfere with litigation decisions—especially in criminal prosecutions. But most interviewees felt that the Attorney General should defer to the Mayor on most policy decisions, and some of the interviewees pointed out that historically, in the District, the Mayor has generally served as the ultimate arbiter of the public will concerning policy. At the same time, the interviewees agreed that the line between decisions that are strictly litigation-related and those that implicate only policy was not clear. One interviewee suggested that the Attorney General should always be implementing the Mayor's policies, even when taking legal positions in court; this interviewee did agree, however, that the Mayor should never have the power to block criminal prosecutions. Another interviewee suggested that the Attorney General should have the ability to take positions on important legal policy issues when the Mayor did not agree and when the Attorney General felt it was in the best interest of the District to take a particular position; the interviewee did not feel this was possible under the current system. Several interviewees felt that the line between what the Mayor can and cannot influence should be more clearly defined—either by statute or through some more informal means, such as a memorandum of understanding.

Most interviewees felt that the ability of an Attorney General to remain independent of the Mayor's office was a function of having a strong enough personality to work within the system. One interviewee felt that this was the proper way to ensure independence; another interviewee felt that the Attorney General should not have to engage in this type of push back against the Mayor's office. Several interviewees noted that the ethical rules the Attorney General must follow as a lawyer create a measure of independence because there are some actions an Attorney General is barred from taking.

**Instances of Interference from the Mayor's Office**

For the most part, the interviewees were obliged to keep specific circumstances and cases confidential, but several of the interviewees described actual or possible examples of interference from the Mayor's office. None of the interviewees reported mayoral interference in a criminal investigation or prosecution. And most interviewees agreed that recent reported instances where the Mayor's counsel attempted to appear in court on behalf of the District and advanced a position contrary to that of the Office of the Attorney General counsel of record in the lawsuit were at least improper. But for the most part, perceived "interference" from the Mayor came on policy disagreements, and most interviewees agreed that the Mayor generally should have the final decision over policy decisions.

At least one interviewee expressed frustration at the Mayor's refusal to allow the Attorney General to pursue particular lawsuits. But the interviewee recognized that it would not have been proper to pursue the suits over the Mayor's objection—even if the Attorney General had the technical authority to do so. Another interviewee expressed a similar frustration at not having the authority to take positions on issues without the Mayor's approval. These were not situations where the interviewees felt that the Mayor had acted improperly or illegally; rather, they were situations analogous to an employee disagreeing with his or her boss. And neither interviewee suggested that these situations indicated a need to make wholesale changes to the functioning of the Office of the Attorney General.

Several interviewees described executive branch employees attempting to pressure the Office of the Attorney General into taking action by claiming that they were "speaking for the Mayor." And two interviewees described situations where the Mayor, or an executive branch official claiming to speak for the Mayor, attempted to influence hiring and firing in the Office of the Attorney General. But in most of these situations, the interviewees refused to make decisions that were not in the best interest of the office. Indeed, the personal interactions between the Attorney General and the Mayor's office were cited by most of the interviewees as the key to avoiding and dealing with interference from the Mayor. Some interviewees also felt that for the most part strong pushback from the Attorney General to the Office of the Mayor was a healthy thing leading to better ultimate decisionmaking and increased confidence between the two offices.

**Mendelson Bill Provisions**

**Tenure**

All interviewees stressed the importance of increasing stability in the Office of the Attorney General, and they agreed that anything that would encourage Attorneys General to remain in the position as it currently exists for a longer period of time would be a positive. The people we interviewed offered a number of potential reasons, many interrelated, why tenures in the office tend to be short. Some noted that many of the most respected people to hold the office—such as Charles Ruff—left to take other prestigious positions; others believed that the position lacked sufficient stature within the government to attract individuals who would stay for long tenures; others attributed turnover to the limitations on resources in the Office; and many described the relationships between the Attorneys General and the respective Mayors as factors influencing how long individuals remained in office.

In addition, all of the people we spoke with felt that Attorneys General that did not want to remain in the position would not stay any longer simply because they had a statutory tenure period. One interviewee felt that a term of office could even be counterproductive if it allowed poorly performing Attorneys General to remain in office.

**Minimum Qualifications**

Nearly all of the interviewees agreed that some minimum qualifications would be appropriate and that the provisions in the Mendelson bill are reasonable. All of those who supported minimum qualifications stressed the importance of getting the strongest lawyers possible in the office. But even those who supported minimum qualifications for the office did not feel qualifications necessarily had to be defined in legislation; most felt the Council could effectively enforce minimum qualifications through the confirmation process. One interviewee worried that minimum qualifications could preclude some good candidates from being nominated.

**Removal Provisions**

Most of the interviewees felt that the Mayor should have the power to remove an Attorney General that he or she cannot work with. A Mayor would be likely to "freeze out" an Attorney General whom he or she no longer supports but who remains in office, and this would make it extremely difficult for the Attorney General to do his or her job.

One interviewee felt that requiring the Mayor to show cause before removing the Attorney General would increase independence of the office. Another interviewee felt that it would make sense to have a "for cause" requirement for removing the litigation head of an office split such that one office handled litigation, while a separate office was responsible for providing advice for agencies and handling transactional work, but not for a combined office. But another interviewee felt that a "for cause" requirement would make it too difficult for the Mayor to remove an ineffective Attorney General because there would be few circumstances that would give the Mayor formal "cause" to remove the Attorney General.

Ultimately, our interviewees largely expressed that a "for cause" removal provision is unlikely to achieve independence for the Attorney General. With or without a "for cause" removal requirement, Attorneys General, when asked to resign by the Mayor that appointed them, will likely do so. On the flip side, with or without a "for cause" removal provision, Mayors will likely be cautious about firing an Attorney General (both generally and especially for weak or politically-motivated reasons), given the publicity that likely would follow.

In addition, our interviewees have overwhelmingly suggested that the Attorney General has gained respect and influence not by publicly disagreeing with the Mayor, but rather by gaining the Mayor's trust. Some interviewees have indicated that, in practice, the Mayor's removal authority has actually been a source of strength for the Attorney General. If a Mayor is forced to retain an Attorney General in which he or she has lost confidence, the most likely result is not an enhancement of the Attorney General's power, but a situation in which the Mayor limits communications with the Attorney General and seeks out other advisors.

**Election**

Only two of the interviewees supported election of the Attorney General in light of the current statutory scheme. One interviewee went so far as to say that election was the only way to achieve the type of independence the Attorney General needs to perform his or her job; this interviewee also stressed the importance of allowing District residents more chances to participate in the democratic process. The other interviewee supportive of an election felt that an elected Attorney General would have additional "political clout" to both increase enforcement of issues in the public interest and bring additional needed resources to the Office of the Attorney General, and the interviewee supported election for these reasons.

One interviewee felt that if the responsibilities of the Office of the Attorney General were split between litigation and advice/transactional sections, it would be reasonable to elect the head of the litigation office. But the interviewee did not support election of an Attorney General with the combined responsibilities that the office has now because election would probably not attract candidates qualified in both areas.

The rest of the interviewees felt that it was either not necessary to elect the Attorney General to achieve more independence or that election would weaken the office. Some worried that if the Attorney General represented a more independent power source, the Mayor would not speak as candidly with the Attorney General, and in turn, the Attorney General would not be able to do his or her job as well as an appointed Attorney General with more support from the Mayor. Many interviewees noted that an elected Attorney General could potentially be beholden to campaign donors and supporters, and running for reelection could distract the Attorney General from his or her work. Thus, election would substitute one possible source of interference (the Mayor who has the power to appoint and remove the Attorney General) with another (political allies, fundraisers, and other constituencies).

Many interviewees who were opposed to election questioned whether an election process would attract candidates best qualified for all aspects of the job; in particular, they worried that an elected Attorney General would politicize the office at the expense of good management. Those who expressed this view noted that some of the best Attorneys General in the District's past would not have run for election. However, one of the supporters of an elected Attorney General suggested that election would open the office to equally qualified lawyers who might not have the political connections to gain an appointment.

**APPENDIX B:**

**STATE ATTORNEYS GENERAL
POWERS AND RESPONSIBILITIES[1]**

---

[1] The National Association of Attorneys General has given its permission for DC Appleseed to reproduce this chart, reproduced from Nat'l Ass'n of Attorneys General, *State Attorneys General: Powers and Responsibilities,* Emily Myers & Lynne Ross, eds., 2007 (2d ed.), at 20–23, as an attachment to this letter.

TABLE 2-1 – QUALIFICATIONS, SELECTION AND TERM OF ATTORNEYS GENERAL

| | QUALIFICATIONS | | | SELECTION AND TERM | | |
|---|---|---|---|---|---|---|
| JURISDICTION | Min. Age | Citizenship & State Residency | Bar Admission Required | Elected | Appointed by; with consent of | Term (yrs), Limit |
| Alabama | 25 | U.S. (7 years), 5 years | No | X | | 4, 2 terms |
| Alaska | – | U.S., 1 year | No | | Governor, Legislature | –[1] |
| American Samoa | – | U.S. | No | | Governor, Legislature | –[2] |
| Arizona | 25 | U.S. (10 years), 5 years | 5 years | X | | 4, 2 consecutive terms |
| Arkansas | 21 | U.S., elector[2], 1 year | No | X | | 4, 2 terms |
| California | – | U.S., state | 5 years | X | | 4, 2 terms |
| Colorado | 25 | U.S., 2 years | Yes | X | | 4, 2 consecutive terms |
| Connecticut | – | Elector[3] | 10 years | X | | 4 |
| Delaware | – | – | No | X | | 4 |
| District of Columbia | – | D.C. | No | | Mayor | –[2] |
| Florida | 30 | U.S., elector[4], 7 years | 5 years | X | | 4, 2 terms |
| Georgia | 25 | U.S. (10 years), 4 years | 7 years | X | | 4 |
| Guam | – | – | No | | Governor, Legislature | –[2] |

TABLE 2-I – QUALIFICATIONS, SELECTION AND TERM OF ATTORNEYS GENERAL

| | QUALIFICATIONS | | | SELECTION AND TERM | | |
| JURISDICTION | Min. Age | Citizenship & State Residency | Bar Admission Required | Elected | Appointed by, with consent of | Term (yrs), Limit |
|---|---|---|---|---|---|---|
| Hawaii | – | U.S., 1 year | Implied | | Governor, Senate | –[3] |
| Idaho | 30 | U.S., 2 years | Yes | X | | 4 |
| Illinois | 25 | U.S., 3 years | Yes | X | | 4 |
| Indiana | 21 | State | Yes | X | | 4 |
| Iowa | – | Elector[3] | No | X | | 4 |
| Kansas | – | – | Yes | X | | 4 |
| Kentucky | 30 | U.S., 2 years | 8 years | X | | 4, 2 consecutive terms |
| Louisiana | 25 | U.S., elector[3], 5 years | 5 years | X | | 4 |
| Maine | – | – | No | Legis-lation | | 2, 4 terms |
| Maryland | – | U.S., 10 years | 10 years | X | | 4 |
| Massachusetts | – | 5 years | Yes | X | | 4, 2 terms |
| Michigan | 21 | Elector[3], 6 months | No | X | | 4, 2 terms |
| Minnesota | 21 | U.S. (3 months), elector | Implied | X | | 4 |
| Mississippi | – | U.S., Elector[3] | 5 years | X | | 4 |
| Missouri | – | U.S., 1 year | No | X | | 4 |
| Montana | 25 | U.S., 2 years | 5 years | X | | 4, 2 terms |
| Nebraska | – | – | No | X | | 4 |
| Nevada | 25 | Elector[3], 2 years | No | X | | 4, 2 terms |
| New Hampshire | – | – | Yes | | Governor, Executive Council | 4 |

TABLE 2-1 – QUALIFICATIONS, SELECTION AND TERM OF ATTORNEYS GENERAL

| JURISDICTION | Min. Age | Citizenship & State Residency | Bar Admission Required | Elected | Appointed by; with consent of | Term (yrs), Limit |
|---|---|---|---|---|---|---|
| New Jersey | – | State | Implied | | Governor, Senate | 4 |
| New Mexico | 30 | U.S., 5 years | Yes | X | | 4, 2 consecutive terms |
| New York | 30 | U.S., 5 years | Implied | X | | 4 |
| North Carolina | 21 | Elector[3] | Yes | X | | 4 |
| North Dakota | 25 | Elector[3], 5 years | Yes | X | | 4[2] |
| N. Mariana Islands | – | – | 5 years | | Governor, Senate | |
| Ohio | 18 | Elector[3] | Implied | X | | 4, 2 successive terms |
| Oklahoma | 31 | U.S., elector[3], 10 years | No | X | | 4 |
| Oregon | 18 | Elector[3] | No | X | | 4 |
| Pennsylvania | 30 | State, 7 years | Yes | S | | 4, 2 terms |
| Puerto Rico[5] | 21 | U.S. | Yes | | Governor, Senate | –[2] |
| Rhode Island | 21 | Elector[3] | Yes | X | | 4, 2 consecutive terms |
| South Carolina | – | U.S., elector[3] | Implied | X | | 4 |
| South Dakota | – | State | Implied | X | | 4, 2 successive terms |
| Tennessee | – | – | Implied | | Supreme Court | 8 |
| Texas | – | – | No | X | | 4 |

TABLE 2-1 – QUALIFICATIONS, SELECTION AND TERM OF ATTORNEYS GENERAL

| | QUALIFICATIONS | | | SELECTION AND TERM | | |
| JURISDICTION | Min. Age | Citizenship & State Residency | Bar Admission Required | Elected | Appointed by, with consent of | Term (yrs), Limit |
|---|---|---|---|---|---|---|
| Utah | 25 | U.S., elector, 5 years | Yes | X | | 4 |
| Vermont | 21 | U.S., elector[3] | Implied | X | | 2 |
| Virginia | 30 | U.S., state, 1 year | 5 years | X | | 4 |
| Virgin Islands | – | U.S. | Yes | | Governor, Senate | –[2] |
| Washington | 21 | Elector[3] | Yes | X | | 4 |
| West Virginia | 25 | U.S. 5 years | Yes | X | | 4 |
| Wisconsin | – | U.S., elector[3] | Implied | X | | 4 |
| Wyoming | 21 | Elector[3] | 4 years | | Governor | –[2] |

1  The term may run for an indefinite number of years.
2  For a definition of "elector," see the constitution of the specific state that has this requirement.
3  The term runs concurrently with that of the state Governor.
4  The term of the Attorney General beginning in 2004 was for 2 years. Thereafter, the term will be 4 years.
5  There are no statutory requirements in Puerto Rico for the office of Attorney General. Historically, qualifications related to U.S. citizenship and admission to the bar are required.

**APPENDIX C:**

**ANALYSIS OF THE CURRENT D.C. CODE SECTION 1-301.111**

The Charter states that the Mayor "shall, through the heads of administrative boards, offices, and agencies, supervise and direct the activities of such boards, offices, and agencies."[1] The statute creating the Office of Corporation Counsel, now called the Office of the Attorney General, provides as follows:

> The Corporation Counsel shall be under the direction of the Mayor, and have charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof. He shall furnish opinions in writing to the Mayor, whenever requested to do so. All requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor. He shall perform such other professional duties as may be required of him by the Mayor.[2]

On its face, this provision is not clear about whether and how the phrase "under the direction of the Mayor" modifies the rest of the first sentence. One way of reading the sentence is to say that everything the Attorney General does is "under the direction of the Mayor"—including not only "the charge and conduct of all law business," but also "all suits instituted by and against the government thereof." There is arguable support for this view in *District of Columbia v. Pryor*.[3] That case interpreted the pre-Home Rule statute (referencing the "Commissioner," instead of the "Mayor"), and stated that "subservience to the chief executive officer of the District government is the major thesis of this provision."[4]

However, there are reasons for questioning a reading of this statute or *Pryor* that would give the Mayor total control over individual litigation or prosecution decisions. To begin with, the question presented to the court in *Pryor* was *not* whether the Mayor would control individual litigation decisions. The issue in *Pryor* was whether a *Superior Court judge* could instruct the Corporation Counsel to represent a private litigant in a civil commitment proceeding, and the Court of Appeals concluded that the particular "determination is one for the executive," rather than for the courts.[5] *Pryor* did not address whether the Attorney General had common-law authority, or whether the provision would have abrogated it.

Moreover, the position that the Mayor has total control over the Attorney General would lead to an extreme result: It would read the statute to have indirectly abrogated all of the Attorney General's common-law authority and, instead, empower the Mayor (who need not be a lawyer) to direct the "conduct of all law business" and, for example, to

---

[1] D.C. Code § 1-204.22(4).
[2] D.C. Code § 1-301.111.
[3] 366 A.2d 141, 143 (D.C. 1976).
[4] *Id.*
[5] *Id.*

require the Attorney General to dismiss a civil enforcement action or misdemeanor prosecution if the Mayor so "directs." If the statute were intended to achieve that result, it could have said so clearly by deleting the words "be" and "and" to read: "The Corporation Counsel shall ~~be,~~ under the direction of the Mayor, ~~and~~ have charge and conduct . . . ." (Strikeout to reflect changes).

At the other extreme, another way of reading this sentence would be that the phrase "under the direction of the Mayor" does not modify *any* of the remainder of the sentence: in other words, the Attorney General is under the direction of the Mayor, "*and*" (in addition and separate) has "charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof." (Emphasis added.) This reading does ascribe meaning to all the words in this sentence, but it does not entirely make sense. Arguably, if the statute were intended to create such independence, it would not have relied on the word "and," to do that. (A better word would be "but"; and, more likely, it would have been in a separate sentence.) Moreover, the entire rest of the provision discusses actions the Attorney General does at the request or behest of the Mayor. It seems odd to ascribe a separate meaning to half a sentence. Finally, there would seem to be at least some tension between reading the statute as having created complete independence, and the specification in the Charter that the Mayor "shall, through the heads of administrative boards, offices, and agencies, supervise and direct the activities of such boards, offices, and agencies."[6]

We conclude the best interpretation of Section 1-301.111, and of the Mayor's general authority as prescribed in the Charter, is that the Attorney General *does* act under the direction of the Mayor, but that the Mayor's authority is general, and consistent with an understood common-law view of attorney general authority. This reading appears to be consistent both with the law addressing common-law authority of attorneys general and the actual understanding, custom, and practice of those who have been Attorneys General for the District.

**The D.C. Attorney General's Common-Law Powers.** The United States Court of Appeals for the Fourth Circuit has stated that the D.C. Attorney General, like attorneys general "in a vast majority of jurisdictions, possess[es] common law power and duties in addition to those defined expressly by statutory or constitutional provision."[7] As the Court notes, such powers are implicit in provisions, like those in the District, that afford the attorney general "power and authority to represent the jurisdiction and its interests in litigation."[8] As Section II.A.2 of our letter explains, these common-law powers include a measure of independence from the executive necessary to protect the public interest.

---

[6] D.C. Code § 1-204.22(4).

[7] *Pennsylvania v. Mid-Atlantic Toyota Distribs., Inc.*, 704 F.2d 125, 129 n.7 (4th Cir. 1984).

[8] *Id.* at 130 (citing D.C. Code Ann. § 1-361 (1981)). *See also id.* at 130, 131 (noting that the authority has been used to bring "suits in the names of their respective states to enforce causes of action by federal law" and "to pursue litigation that advances or vindicates public interests," and adding that "the notion that these attorneys general may institute actions to remedy invasions of the public interest[, a common law duty,] appears implicit in the statutory and constitutional scheme defining their powers").

Case law and history support the conclusion that the Attorney General of the District of Columbia continues to possess these independent and implied common-law powers. Although District of Columbia Courts have not specifically used the words "common-law duty," they have referenced the D.C. Attorney General's duty to the public (at least in certain roles), which is generally considered the most critical aspect of an attorney general's common-law powers.[9] In addition, many statutes grant the D.C. Attorney General "the authority to pursue causes of action of general public benefit in the name of the District of Columbia."[10]

The common-law powers of the District's Attorney General would appear to derive from Maryland common law. The current District of Columbia comes from land ceded by Maryland in 1801. Under the Organic Act of 1801, which created the District (the "Organic Act"), "the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of the said district."[11] Any law in Maryland that existed in 1801, including the common law, became the law of the District at its inception.[12]

Although the Maryland Attorney General does not currently have common-law powers,[13] in 1801 the Maryland Attorney General did.[14] Accordingly, in 1801 when the

---

[9] See, e.g., Shifrin v. Wilson, 412 F. Supp. 1282, 1302 n.23 (D.D.C. 1976) (concluding "that, in rendering advice to various departments of the District government, the Corporation Counsel [now named the Attorney General] owes a duty of care to the public in general and to potentially affected individuals"); In re Lorazepam & Clorazepate, 205 F.R.D. 369, 386 (D.D.C. 2002) (noting that the District of Columbia has parens patriae powers, a common law duty to act in the best interest of the public, and thus has the authority to settle a class action lawsuit on behalf of its residents against pharmaceutical companies), petition for review denied, 289 F.3d 98 (D.C. Cir. 2002). See also U.S. Parole Comm'n v. Noble, 693 A.2d 1084, 1114 (D.D.C. 1997) (Schwelb, J. dissenting) (referring to the "Corporation Counsel's responsibility to represent the interests of the District and its citizens from a law enforcement perspective").

[10] See Wayne Witkowski, Who is the Client of the Municipal Government Lawyer?, 209 Prac. L. Inst. Crim. 117, 135 (2007) (citing, e.g., D.C. Official Code §§ 28-4506, 28-3909, 8-103.16(e) (2001)).

[11] Organic Act of 1801, 2 Stat. L. 103, Ch. 15 § 1; see also, e.g., Mead v. Phillips, 135 F.2d 819, 824 (D.C. Cir. 1943) (looking in reliance to "the common law existing in Maryland prior to creation of the District of Columbia"); see also History of the D.C. Code, D.C. Code (2001) ("[T]he organic act provided that the law in force in the County of Washington, District of Columbia, which was that portion taken from Maryland, were first the principles and maxims of equity as they existed in England, and in the colonies in the year 1776, the common law of England, and the statutes of the British Parliaments which were in effect in the colonies in 1776, and which were not locally inapplicable.").

[12] Organic Act of 1801, 2 Stat. L. 103, Ch. 15 § 1; see also Faulks v. Shrider, 114 F.2d 587, 591 (D.C. Cir. 1940) ("[M]uch of the statutory and common law of the District is derived from that of Maryland.") (using eighteenth century decisions by Maryland courts to determine the meaning of "adverse possession by actual enclosure" in D.C.); Eisentrager v. Forestal, 174 F.2d 961, 966 n.28 (D.C. Cir. 1949) (stating that the United States District Court for the District of Columbia may issue a writ because it possesses all of the common-law powers initially held by Maryland courts); Mead, 135 F.2d at 824–25 (D.C. Cir. 1943) (noting that the common law of Maryland applies in the District to allow a wife a portion of her husband's estate); Estate of French v. Doyle, 365 A.2d 621, 622 n.2 (D.C. 1976) (addressing a challenge to the constitutionality of a D.C. statute that originated in Maryland and became applicable to the District by the Organic Act of 1801).

[13] See Philip Morris Inc. v. Glendening, 709 A.2d 1230, 1237 (Md. 1998); State v. Burning Tree Club, 481 A.2d 785, 795, 797 (Md. 1984).

[14] Murphy v. Yates, 348 A.2d 837, 840–42 (Md. 1975). According to the court in Murphy, the Maryland Attorney General had common-law powers from 1776 to 1817. Id. at 840–41.

District adopted Maryland's laws, the Maryland Attorney General had common-law powers and thus those powers would also have been adopted by the District.[15]

Common-law powers, once assumed, could be abrogated by statute. But a statute doing so would need to be explicit. Although "the legislature may deprive the attorney general of specific [common-law] powers . . .[,] in the absence of such legislative action, he typically may exercise all such authority as the public interest requires."[16]

Accordingly, we believe that the logical conclusion is that the District of Columbia Attorney General retains the common-law powers generally afforded to attorneys general. Neither the general Charter language, nor D.C. Code § 1-301.111, purports to limit or to list all of the powers and duties of the D.C. Attorney General. Neither expressly deprives the Attorney General of common-law powers. As the United States Court of Appeals for the District of Columbia Circuit noted, "the common law constitutes a fundamental part of the law of the District of Columbia[.]"[17] Moreover, "to the extent that the statutes fail to cover the entire subject, common law is a source for amplification and definition."[18]

---

[15] *See Mead*, 135 F.2d at 819 ("In 1798 the Act was passed which later became, without material alterations, the law of the District of Columbia. . . . This exposition of the law of Maryland was expressly adopted by this court in 1912, as constituting a correct declaration of the law of the District."); *cf. Manchin v. Browning*, 296 S.E.2d 909, 915 (W. Va. 1982) (finding conversely that West Virginia does not recognize common law attorney general powers, because Virginia did *not* recognize them, at the time West Virginia was formed).

[16] *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268–69 (5th Cir. 1976). *Accord Commonwealth v. Kozlowsky*, 131 N.E.2d 207, 212 (Mass. 1921) (finding that the Massachusetts Attorney General could exercise power and authority in the public interest, "in the absence of some express legislative restriction to the contrary"). In *Mid-Atlantic*, the Fourth Circuit noted, "[n]one of the four jurisdictions involved [including the District of Columbia] in this appeal explicitly forbids its attorney general to maintain these actions and '[i]n the absence of express statutory or constitutional restrictions, the common law duties and powers attach themselves to the office as far they are applicable and in harmony with our system of government." *Mid-Atlantic*, 704 F.2d at 129, n.7.

[17] *Mead*, 135 F.2d at 825.

[18] *Id.*

- 4 -

**APPENDIX D:**

## THE AUTHORITY OF THE COUNCIL TO ADOPT PROPOSALS CONSIDERED FOR THE MENDELSON BILL

This appendix sets forth DC Appleseed's opinions regarding the authority of the D.C. Council on its own to adopt various changes concerning the Office of the Attorney General. First, we discuss the separation of powers framework that likely would be applied by a court evaluating the legality of the various proposals. Second, we address specific potential changes to the Office of the Attorney General.

## I.   THE GENERAL SEPARATION OF POWERS IN THE DISTRICT OF COLUMBIA

The District of Columbia Charter creates a three-branch system of government within the District,[1] that generally vests the "executive power of the District . . . in the Mayor,"[2] while the "legislative power granted to the District . . . is vested in and shall be exercised by the Council in accordance with [the Charter]."[3] The Mayor's power generally includes the power of appointment and removal.[4] In addition, the Mayor "shall, through the heads of administrative boards, offices, and agencies, supervise and direct the activities of such boards, offices, and agencies."[5] Currently, the heads of such executive offices serve at the pleasure of the Mayor, unless otherwise provided for by congressional legislation.[6]

The Charter vests the D.C. Council with "authority to create, abolish, or organize any office, agency, department, or instrumentality of the government of the District, and to define the powers, duties and responsibilities of any such office,"[7] and to advise and consent to appointments.[8] Concomitantly, the Council can conduct hearings or investigations to evaluate a nomination when it is made, and oversight hearings as appropriate after appointment.[9]

In analyzing these respective realms of authority, the District of Columbia Court of Appeals has found that federal separation of powers principles apply to the District:

> . . . it is reasonable to infer from [the District's] tripartite structure and the vesting of the respective "power" in each branch that the same general principles should govern the exercise of such power in the District Charter

---

[1] *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992).

[2] D.C. Code § 1-204.22.

[3] D.C. Code § 1-204.04.

[4] D.C. Code § 1-204.22(2) (giving Mayor power of appointment); *Myers v. United States*, 272 U.S. 52, 164 (1926) (power of removal is incident to power of appointment).

[5] D.C. Code § 1-204.22(4).

[6] D.C. Code §§ 1-523.01(a), 1-603.01, 1-610.51(b).

[7] D.C. Code. § 1-204.04(b).

[8] D.C. Code § 1-523.01(a).

[9] *See* D.C. Code § 1-204.13(a).

as are applicable to the three branches of government at the federal level. Congress could reasonably intend that absent contrary provision drawn either expressly or by implication from the Self-Government Act or other statutes, its "legislative" power as delegated to the Council would reflect its "legislative" power vis-à-vis the other branches of government at the national level.[10]

Courts have therefore analyzed separation of powers issues in the District by looking to the federal system and constitutional law for guidance.[11] The courts have further noted that the Council has "explicitly declared that it 'recognizes the principle of separation of powers in the structure of the District of Columbia government.'"[12]

However, application of separation of powers principles to the District in general—and to the Office of the Attorney General specifically—is not as clear as the above language from *Wilson* might initially suggest. Whereas separation of powers at the federal level is fundamental to the Constitution, separation of powers in the District is more a rule of interpretation than an innate part of the system. In general, the United States Supreme Court has stated that separation of powers does not apply with equally strong force to the States as to the federal government.[13]

In addition, the United States Constitution expressly delegates to Congress the power to legislate for the District of Columbia.[14] And Congress has the power (and has frequently used it) to structure the District of Columbia's government in ways that would violate constitutional separation of powers principles were they applied to the federal government. For example, following the ruling in *INS v. Chadha*,[15] which invalidated the legislative veto of executive decisions on the federal level, Congress specifically amended the District Charter to authorize the Council to use resolutions to "disapprove actions of a kind historically or traditionally transmitted by the Mayor . . . to the Council pursuant to an act."[16] The District of Columbia Court of Appeals noted that Congress intended the amendment to preserve the existing practices in the District and to "authorize the Council in certain circumstances to do . . . what the Congress itself could not do in its capacity as a national legislature."[17]

---

[10] *Wilson*, 615 A.2d at 231–32 (citations omitted).

[11] *See id.; Hessey v. Burden*, 584 A.2d 1, 4–6 (D.C. 1990) (looking to federal case law on separation of powers to revolve an issue regarding Council's power to create a new administrative office within the District government); *Cropp v. Williams*, No. 03-4569, 2003 WL 21904574 (D.C. Super. Aug. 1, 2003), *vacated as moot*, 841 A.2d 328 (D.C. 2004) (applying federal separation of powers analysis to removal of D.C. executive officials).

[12] *Wilson*, 615 A.2d at 231 (citing D.C. Code § 1-227.1(b) (1992)).

[13] *See Dreyer v. Illinois*, 187 U.S. 71, 84 (1902); *see also Halleck v. Berliner*, 427 F. Supp. 1225, 1233 & n.10 (D.D.C. 1977) ("It is doubtful whether the doctrine of separation of powers applies with the same force to the governmental structure of the District of Columbia as it does to the federal government.") (citations omitted).

[14] U.S. Const. art. I, § 8, cl. 17; *Neild v. District of Columbia*, 110 F.2d 246 (D.C. Cir. 1940).

[15] 462 U.S. 919 (1983).

[16] *Wilson*, 615 A.2d at 232.

[17] *Id. See also, e.g.*, D.C. Code § 1-204.24c (2008) (providing that the Chief Financial Officer may be removed only "for cause" by the Mayor with approval by two-thirds of the Council—a system that might

Moreover, the responsibilities of the District of Columbia's Attorney General are not the same as those of the United States Attorney General. For example, the Office of the Attorney General is counsel to some independent agencies that are not themselves answerable to the Mayor.

Accordingly, it is reasonable to expect that a court testing the legality of any of the proposed changes to the Office of the Attorney General will look for guidance to federal case law analyzing separation of powers. But it is not always clear how those principles apply to the different array of powers that exists in the District.

## II.   HOW THESE PRINCIPLES APPLY TO SPECIFIC PROPOSALS

The proposed changes to the Office of the Attorney General potentially implicate separation of powers principles because they deal with methods and bases for the selection and removal of a significant executive officer. The current division of power between the Mayor and the Council is outlined broadly in DC Appleseed's letter and is the basis for DC Appleseed's recommendations regarding what changes the Council can make without a Charter change and what changes would require congressional action or a change in the District Charter.

### A.   What Changes Can the Council Make on Its Own?

**Impose minimum qualifications.** Although *Cropp v. Williams*[18] was vacated as moot, it nonetheless offers useful analysis of this issue. The court looked closely at amendments to the District's Inspector General position that were enacted by the Council but vetoed by the Mayor. The court did not decide, but did suggest, that changing the qualifications of an executive agency office may be an appropriate power of the Council.[19] However, any changes to the position would have to be applied prospectively, and could not force the ouster of the current office-holder.[20]

**Impose term limits.** Unless otherwise specified, term limits are a "limitation and not [a] grant" on an executive officer-holder. *Parsons v. United States*, 167 U.S. 324, 338 (1897). Term limits only limit the period in which an officer can serve without being re-nominated (and made subject to an additional round of legislative advice and consent), and do not change the executive's removal authority or create a tenure for the office. *See id. Parsons* implicitly permitted a term limit on the President's selection of United States Attorneys. Accordingly, we would expect a court to conclude that the Council could similarly structure the Office of the Attorney General to include a term limit without tenure for the Attorney General. As explained below, however, it is less clear whether the Council could go further to add a "for cause" qualification to the Mayor's removal power.

---

well be unconstitutional were it applied in like manner to a federal officer); D.C. Code § 47-391.01 (vesting executive powers in a Financial Responsibility and Management Assistance Authority whose members are chosen not by the Mayor, but by the President with consultation of Congress).

[18] No. 03-4569, 2003 WL 21904574 (D.C. Super. Aug. 1, 2003).

[19] *Id.* at *3

[20] *Id.* at *4.

**Divide or define the powers of the Office of the Attorney General.** As noted above, the Charter affords the Council's "authority to create, abolish or organize any office, agency, department, or instrumentality of the government of the District and to define the powers, duties, and responsibilities of any such office, agency, department or instrumentality."[21] Under this provision, it is clear that the Council may, should it wish, re-organize the Office of the Attorney General to divide the powers of the Attorney General's office in some way, such as separating the Attorney General's enforcement and prosecutorial function from other roles (such as representing agencies in litigation or assisting government contracting). The Council also could use this power to articulate more clearly the role of the Attorney General.[22] It could also define or limit more clearly the role of the Mayor's general counsel, for example, by preventing the general counsel by law from representing the District in court.[23]

**B.      What Changes Clearly Require Congressional Approval or a Charter Amendment?**

**Empowering the Council to approve removals.** A bill requiring a supermajority of the Council to approve removal of the Attorney General would likely violate the Charter. Both federal and District of Columbia law are clear that the legislature may not vest itself with the power to control the executive's removal of officers, which is an executive function.[24]

**Creating an elected Attorney General position.** Currently, the District Attorney General, as part of the Executive Service, is nominated subject to the advice and consent of the Council and serves at the pleasure of the Mayor.[25] The Charter specifically identifies which positions are subject to election, including the Mayor and the Council,[26] and the Attorney General is not among them. Accordingly, creating an elected Attorney General would require a Charter change or an Act of Congress.

**C.      What Changes Are in a Gray Area?**

**Removing "at the direction of the Mayor" from the Corporation Counsel/Attorney General statute.** D.C. Code §1-301.111 states, "[t]he Corporation

---

[21] D.C. Code § 1-204.04(b).

[22] *Id.; see Francis v. Recycling Solutions, Inc.,* 695 A.2d 63, 73 (D.C. 1997) (noting that "[t]he Council . . . may enact legislation that restricts the actions of the Mayor," and concluding that "the Council deliberately chose to limit the Mayor's and the Corporation Counsel's authority in the procurement area" and thereby restricted their authority to seek judicial review of certain decisions).

[23] *Cf. Recycling Solutions,* 695 A.2d at 71 (agency head had no standing to bring suit in individual capacity; any authority to sue was in her official capacity as agency director, but District agency, as a noncorporate department within a municipal corporation, was not of its own right).

[24] *See Cropp,* 2003 WL 21904574, at *4; *Bowsher v. Synar,* 478 U.S. 714, 723 (1986) ("a direct congressional role in the removal of officers charged with the execution of the laws . . . is inconsistent with separation of powers"); *Myers v. United States,* 272 U.S. 52, 122 (1926) (statute unconstitutionally placed removal of executive officer in power of president with "advice and consent" of Senate).

[25] D.C. Code §§ 1-523.01(a), 1-603.01, 1-610.51(b).

[26] *See* D.C. Code §§ 1-204.01, 1-204.21. *See also Buckley v. Valeo,* 424 U.S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must...be appointed in the manner prescribed by s. 2 cl. 2 of that Article.").

Counsel shall be under the direction of the Mayor, and have charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof."[27]  As this is a statute, not the Charter itself, the Council could change or clarify its terms, so long as the Charter does not require a more restrictive reading of the Attorney General's powers.

As explained in more detail in Appendix C, having analyzed the issue, DC Appleseed believes that the better reading of the Charter and this provision is that the Attorney General has always retained common-law authority to act in the public interest. If this analysis is correct, it should not violate the Charter to recognize the existence of the authority explicitly by statute. If, however, the Charter were understood (contrary to our view) to prevent the Attorney General from exercising common-law powers independent of the Mayor, the Council could not create those powers by amending a statute, and would need either to amend the Charter or to obtain congressional legislation.

**"For Cause" Removal.**  In *Cropp*, the court explained that "[i]n practice . . . [the] nominally strict assignment of removal power to the executive branch is given some necessary flexibility" and "[t]he proper separation of powers inquiry therefore requires examining whether the statue, taken as a whole, 'unduly interfere[es]' with the executive role."[28]  The District of Columbia Court of Appeals has also stated that this is the proper test for analyzing separation of powers issues.[29]  Both *Cropp* and *Hessey* relied at least in part on *Morrison*, wherein the Supreme Court concluded that a "good cause" removal restriction on the independent counsel did not violate the separation of powers.[30]

It is not clear how a court would evaluate a law that imposed a "good cause" or "for cause" removal requirement for the Attorney General.  The District of Columbia Court of Appeals has construed *Morrison* as concluding that a "good cause" removal provision is not impermissibly restrictive when it leaves the executive with "substantial ability to ensure that the laws are 'faithfully executed.'"[31]  In fact, the Council's version of the Inspector General statute at issue in *Cropp* included a "good cause" removal requirement (which was not challenged in that case) before Congress later added additional removal restrictions to the position.[32]  If the District's Attorney General is considered to be like the Inspector General, having some power independent of the Mayor, then a court might find a good cause removal restriction appropriate.

On the other hand, a court could find that the District Attorney General is subordinate to the Mayor and possesses much less independence than the Inspector General, and, on that basis, the Council could no more impose a removal requirement on

---

[27] D.C. Code § 1-301.111.

[28] 2003 WL 21904574, at *3 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

[29] *See Hessey*, 584 A.2d at 6 ("Our task, in this local dispute over separation of powers, is similarly to decide whether the establishment of the [proposed new agency] OPA with the authority to contest the Mayor's tax assessments in court 'impermissibly burdens' or 'unduly interferes with' the Mayor's charter responsibility for tax assessments.").

[30] *Morrison*, 487 U.S. at 692.

[31] *Hessey*, 584 A.2d at 5.

[32] *See Cropp*, 2003 WL 21904574, at *5.

the District Attorney General than Congress could impose such a limitation on the President in choosing the federal Attorney General.[33]

Based on the District of Columbia Court of Appeals' stated endorsement of separation of powers as a principle in the District, it seems likely that a court would strike down a "for cause" removal provision.  However, this conclusion is not free from doubt.

---

[33] *See Proposals Regarding an Independent Attorney General*, 1 Op. Off. Legal Counsel 75, 1977 WL 18024 (1977) (concluding that it would be unconstitutional to impose a "for cause" or malfeasance removal provision on the federal Attorney General).