# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANGELICA CASTAÑON et al.,

                *Plaintiffs*,

     v.

THE UNITED STATES OF AMERICA et al.,

                *Defendants*.

Case No. 1:18-cv-2545
(RDM, RLW, TNM)

---

## BRIEF OF THE UNITED STATES HOUSE OF REPRESENTATIVES AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

DOUGLAS N. LETTER (D.C. Bar No. 2533492)
   *General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
   *Associate General Counsel*
JOSEPHINE MORSE (D.C. Bar No. 1531317)
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Amicus Curiae the United States House of Representatives*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* AND INTRODUCTION ........................................................ 1

ARGUMENT ...................................................................................................................... 3

    THE CONSTITUTION AUTHORIZES CONGRESS TO ENACT LEGISLATION TO
    PROVIDE DISTRICT RESIDENTS WITH THE FUNDAMENTAL RIGHT OF VOTING
    REPRESENTATION IN CONGRESS ................................................................................... 3

    A.  Voting Is a Fundamental Right "Preservative of All Rights" ....................................... 3

    B.  The Lack of Congressional Voting Representation for District Residents
        Contravenes the Basic Constitutional Principle of Self-Governance .......................... 4

    C.  The District Clause, as Evidenced by Its History, Grants Congress Plenary
        Legislative Power Over the District of Columbia ......................................................... 8

    D.  Legal Precedent Supports Congress's Provision of Voting Rights to the District ..... 12

CONCLUSION ................................................................................................................... 14

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Clinton*,
   90 F. Supp. 2d 35 (D.D.C. 2000) ..................................................................................13, 14

*Burson v. Freeman*,
   504 U.S. 191 (1992) ..................................................................................................................3

*D.C. v. Carter*,
   409 U.S. 418 (1973) ................................................................................................................12

*Downes v. Bidwell*,
   182 U.S. 244 (1901) ................................................................................................................11

*Grether v. Wright*,
   75 F. 742 (6th Cir. 1896) ........................................................................................................10

*Harper v. Virginia State Bd. of Elections*,
   383 U.S. 663 (1966) ..................................................................................................................3

*Loughran v. Loughran*,
   292 U.S. 216 (1934) ................................................................................................................12

*M'Culloch v. Maryland*,
   17 U.S. 316 (1819) ....................................................................................................................8

*Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*,
   337 U.S. 582 (1949) ..........................................................................................................12, 13

*Neild v. D.C.*,
   110 F.2d 246 (D.C. Cir. 1940) ..................................................................................................8

*O'Donoghue v. United States*,
   289 U.S. 516 (1933) ..................................................................................................9, 10, 11, 12

*Palmore v. United States*,
   411 U.S. 389 (1973) ..................................................................................................................9

*Powell v. McCormack*
   395 U.S. 486 (1969) ..................................................................................................................3

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..................................................................................................................3

*Stoutenburgh v. Hennick*,
    129 U.S. 141 (1889) ....................................................................................9, 12

*United States v. Cohen*,
    733 F.2d 128 (D.C. Cir. 1984) ...............................................................8

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) ....................................................................................2, 3

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ...............................................................................3

## Constitution & Statutes

U.S. Const. art. I, § 2, cl. 1 .........................................................................9

U.S. Const. art. I, §§ 2-3 .............................................................................9

U.S. Const. art. I, § 3, cl. 1 .........................................................................9

U.S. Const. art. I, § 8, cl. 17 ............................................................. *passim*

U.S. Const. art. III, § 2, cl. 1 .....................................................................13

U.S. Const. art. IV, § 1 ..............................................................................12

42 U.S.C. § 1983 ........................................................................................12

52 U.S.C. § 20302(a)(1) ...............................................................................5

An Act for Establishing the Temporary and Permanent Seat of the Government of the
    United States, 1 Stat. 130 (1790) .........................................................11

District of Columbia Organic Act of 1801, 2 Stat. 103 ...............................11

## Legislative Authorities

District of Columbia House Voting Rights Act of 2007, H.R. 1905, 110th Cong. ........................7

District of Columbia House Voting Rights Act of 2009, S. 160, 111th Cong. ..............................7

H. Rep. No. 111-22 (2009) ......................................................................5, 7

H.R. 51, 116th Cong. (2019) ......................................................................7

Rule II.8(b), Rules of the U.S. House of Representatives (116th Cong.)........................................1

**Other Authorities**

2 Debates on the Federal Constitution 257 (Jonathan Elliot ed., 1876) ..........................................3

Associated Press, *Tax Day 2017: Which State Sends Most Taxes to D.C.?* (Apr. 16, 2017) ..........5

Common Sense Justice for the Nation's Capital: An Examination of Proposals to Give D.C.
    Residents Direct Representation: Hearing Before the H. Comm. on Gov't Reform,
    108th Cong. 75 (2004) (statement of Judge Kenneth J. Starr)................................................2, 6

DC Vote, *Fact Sheet on Full Voting Representation*........................................................................5

District of Columbia House Voting Rights Act of 2009: Hearing on H.R. 157 Before the
    Subcomm. on the Constitution, Civil Rights & Civil Liberties of the H. Comm. on the
    Judiciary, 111th Cong. 178 (2009)(statement of Professor Viet D. Dinh,
    Georgetown University Law Center Professor)............................................................7, 10, 12

Ending Taxation Without Representation: The Constitutionality of S. 157:
    Hearing Before the S. Comm. on the Judiciary, 110th Cong. 20 (2007)
    (statement of Chief Judge Patricia Wald) ................................................................6, 7, 11, 13

Jamie B. Raskin, *Is This America? The District of Columbia and the Right to Vote*,
    34 Harv. C.R.-C.L.L. Rev. 39 (1999) ................................................................................ 10-11

Lawrence M. Frankel, Comment, *National Representation for the District of Columbia:*
    *A Legislative Solution*, 139 U. Pa. L. Rev. 1659 (1991)...........................................................10

Peter Raven–Hansen, *Congressional Representation for the District of Columbia:*
    *A Constitutional Analysis*, 12 Harv. J. on Legis. 167 (1975)................................................9, 10

Press Release, House Committee on Oversight and Reform, *Cummings Commends Norton on*
    *D.C. Statehood Bill and Announces Upcoming Hearing* (May 30, 2019)................................7

Roy P. Franchino, *The Constitutionality of Home Rule and National Representation for*
    *the District of Columbia*, 46 Geo. L.J. 207 (1957-58) .........................................................4, 11

Senator Orrin G. Hatch, *"No Right Is More Precious in A Free Country":Allowing Americans in*
    *the District of Columbia to Participate in National Self-Government*,
    45 Harv. J. on Legis. 287 (2008) ...............................................................................................4, 10

*The Federalist No. 39* (James Madison) (Jacob E. Cooke ed., 1961)..............................................4

*The Federalist No. 43* (James Madison) (Jacob E. Cooke ed., 1961)........................................4, 10

U.S. Census Bureau, *Quick Facts District of Columbia*.................................................................4

## INTEREST OF *AMICUS CURIAE* AND INTRODUCTION[1]

*Amicus curiae*, the U.S. House of Representatives (House),[2] respectfully submits this brief in support of plaintiffs Angelica Castañon, Gabriela Mossi, Alan Alper, Deborah Shore, Laurie Davis, Silvia Martinez, Vanessa Francis, Abby Loeffler, Susannah Weaver, Manda Kelley, and Absalom Jordan (collectively, Ms. Castañon). The House has a compelling interest in defending the foundational principle of our Republic that the people have a right to choose their legislators—a right that is currently denied to the more than 700,000 residents of the District of Columbia (District) who lack voting representation in Congress. This case also directly implicates Congress's authority under the District Clause of the U.S. Constitution, *see* U.S. Const. art. I, § 8, cl. 17, which vests Congress with plenary power and legislative control over the District, the seat of our national government.

The House has a unique interest in the proper interpretation of the District Clause as well as other constitutional provisions that play a critical role in guaranteeing that democratic self-governance is respected for all Americans. To that end, the House has undertaken legislative efforts aimed at ensuring that the District's residents receive the full complement of voting rights and representation consistent with the Constitution. Given these strong institutional concerns,

---

[1] Pursuant to D.D.C. Local Rule 7(o)(5), counsel for *amicus* certifies that no person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] The Bipartisan Legal Advisory Group (BLAG) of the United States House of Representatives has authorized the filing of an amicus brief in this matter, and Ms. Castañon agreed to dismiss the House defendants. *See* Notice of Voluntary Dismissal of Certain Defendants, ECF No. 20 (Mar. 27, 2019). The BLAG comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip, and "speaks for, and articulates the institutional position of, the House in all litigation matters." Rule II.8(b), Rules of the U.S. House of Representatives (116th Cong.), https://tinyurl.com/HouseRules116thCong. The Republican Leader and Republican Whip dissented.

the House submits this brief in support of Ms. Castañon and urges the Court to recognize the important constitutional interests at stake in enfranchising District residents, who should have a full and equal voice in the federal legislature.

The right to vote is universally recognized as a fundamental right essential to our Nation's core democratic values and constitutional principles.  Indeed, the Supreme Court has long emphasized that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws."  *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). Notwithstanding the importance of the right to vote, the residents of the District of Columbia have no voting representation in Congress.  This anomaly is particularly stark because the Constitution provides Congress with complete legislative authority over all of the District's affairs.  And leaving District residents without the right to voting representation in Congress serves no legitimate governmental interest.

Ms. Castañon is correct that the Constitution authorizes Congress to grant District residents voting representation in Congress:  The District Clause grants Congress broad authority to "exercise exclusive Legislation in all Cases whatsoever" over the District that would "become the Seat of Government."  U.S. Const., art. 1, § 8, cl. 17.  Under this Clause, as various former judges, scholars, and legal historians have testified, "Congress does enjoy authority to create a seat in the House of Representatives, [a] fully voting seat."[3]  Thus, voting representation in Congress for District residents is both consistent with our Nation's foundational principle of self-governance and authorized by the Constitution.

---

[3] Common Sense Justice for the Nation's Capital: An Examination of Proposals to Give D.C. Residents Direct Representation: Hearing Before the H. Comm. on Gov't Reform, 108th Cong. 75 (2004) (statement of Judge Kenneth J. Starr).

## ARGUMENT

**THE CONSTITUTION AUTHORIZES CONGRESS TO ENACT LEGISLATION TO PROVIDE DISTRICT RESIDENTS WITH THE FUNDAMENTAL RIGHT OF VOTING REPRESENTATION IN CONGRESS**

### A.  Voting Is a Fundamental Right "Preservative of All Rights"

The Supreme Court has made clear that "the political franchise of voting" is "a fundamental political right, because [voting rights are] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also, e.g.*, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966) (same).  Indeed, the Department of Justice correctly notes in its motion to dismiss Ms. Castañon's complaint that "[v]oting has long been recognized as a vital right." MTD Mem. (Apr. 1, 2019), ECF No. 21-1, at 37.

"Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).   This is true because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights," and "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *Id*. at 562.  The Supreme Court has thus instructed:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.  Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964); *see also, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (same).  This concept is not new; at the creation of our republic, Alexander "Hamilton emphasized: '[T]he true principle of a republic is, that the people should choose whom they please to govern them.'"  *Powell v. McCormack*, 395 U.S. 486, 540-41 (1969) (quoting 2 Debates on the Federal Constitution 257 (Jonathan Elliot ed., 1876)).

The right of the people to vote is particularly important to the House of Representatives, which, from the time of the founding, has been "elected immediately by the great body of the people." *The Federalist No. 39*, at 252 (James Madison) (Jacob E. Cooke ed., 1961). And, as James Madison explained in 1788, it was understood that the creation of the District would continue to provide "for the rights, and the consent of the citizens inhabiting it . . . as they will have had their voice in the election of the Government which is to exercise authority over them." *The Federalist No. 43*, at 289.

**B. The Lack of Congressional Voting Representation for District Residents Contravenes the Basic Constitutional Principle of Self-Governance**

There are approximately 700,000 residents of the District of Columbia.[4] "Yet, unlike American citizens living in the fifty states or even outside the United States altogether, Americans living in the District of Columbia . . . cannot exercise this most precious right with respect to their national government." Senator Orrin G. Hatch, *"No Right Is More Precious in A Free Country": Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 Harv. J. on Legis. 287 (2008). Contrary to our Nation's basic principle of self-governance, residents of the District of Columbia lack direct voting representation in Congress: D.C. residents are "Americanized for the purpose of national and local taxation and arms-bearing, but not for the purpose of voting." *Id.* (quoting Roy P. Franchino, *The Constitutionality of Home Rule and National Representation for the District of Columbia*, 46 Geo. L.J. 207, 207 (1957-58)). This absence of representational rights serves no legitimate governmental interest: granting U.S. citizens in the District the same right as all other citizens—to have voting

---

[4] *See* U.S. Census Bureau, *Quick Facts District of Columbia*, https://www.census.gov/quickfacts/fact/table/DC/PST045218.

representation in Congress—significantly advances the rights of District residents at no cost to others.

The lack of voting representation for District residents is particularly striking because Congress "has ultimate authority over all aspects of the city's legislative, executive, and judicial functions." H. Rep. No. 111-22, at 3 (2009). Under the current system of representation in Congress, the citizens of the States have a vote in the laws that govern the District, but residents of the District itself have no such vote. And despite their lack of voting representation in Congress, District residents "pay billions of dollars in Federal taxes each year." *Id.* at 4.[5] "They must also register for selective service, serve on Federal juries, and assume other responsibilities of U.S. citizenship." *Id.* Moreover, many District residents are Federal government employees and members of our Nation's armed forces. *Id.*[6] It is particularly troubling that U.S. citizen members of the military who reside in the district bear arms to protect the democratically elected government of the United States (and can even be drafted into the armed forces to do so) but are assertedly barred by the Constitution from having voting representation in Congress.

Congress has granted Americans living abroad the right to vote in Federal elections. The Uniformed and Overseas Absentee Voting Act of 1986 provides "absent uniformed services voters and overseas voters" the right to vote "in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). As Patricia Wald, the former Chief Judge of the

---

[5] The District reportedly pays more in federal taxes than many States. *See* DC Vote, *Fact Sheet on Full Voting Representation*, https://tinyurl.com/DCVote-FactSheet; *see also* Associated Press, *Tax Day 2017: Which State Sends Most Taxes to D.C.?*, https://tinyurl.com/fortune-most-tax-dollars (Apr. 16, 2017) (reporting that the District "sends the most tax dollars per person to the U.S. government").

[6] "District residents have fought and died in every war since the War for Independence." DC Vote, *Fact Sheet on Full Voting Representation*, https://tinyurl.com/DCVote-FactSheet.

U.S. Court of Appeals for the D.C. Circuit, has testified:  "Ironically, the effect of that has been that if a Massachusetts resident moves permanently to Zimbabwe, she can continue to vote, but if she moves to the District she can't vote."[7]

Recognizing the importance of the right to vote for District residents, numerous legal scholars and senior government officials have testified in favor of voting representation for the District.  For example, as discussed in more detail below, Kenneth W. Starr, former Solicitor General of the United States and a former Judge on the U.S. Court of Appeals for the D.C. Circuit, testified that "Congress does enjoy authority to create a seat in the House of Representatives, [a] fully voting seat."[8]  Judge Starr located "the source of [that] authority" in the District Clause, Art. 1, § 8, cl. 17.[9]  Relying on the "very broad" and "majestic" scope of the Clause, the language of the provision, and its location in the Constitution—before the "grand necessary and proper clause"—Judge Starr also urged that Congress has the power to enfranchise District residents.[10]  Similarly, Chief Judge Wald has testified that although granting voting representation to the District is "a close, and . . . somewhat novel, constitutional issue," Congress has the power under the "plenary grant" of authority in the District Clause to grant such rights to District residents.[11]  And, given "the absence of any clear impediment to Congress exercising

---

[7] Ending Taxation Without Representation: The Constitutionality of S. 157: Hearing Before the S. Comm. on the Judiciary, 110th Cong.  20 (2007) (statement of Chief Judge Patricia Wald).

[8] Statement of Judge Kenneth J. Starr at 75.

[9] *Id.*; *see also id.* at 78-79 (written statement of Judge Kenneth J. Starr).

[10] *Id.* at 75.

[11] Statement of Chief Judge Patricia Wald at 19, 22.

that power," she urged Congress to "tilt the constitutional balance in favor of the legislation" that would do so.[12]

In 2007, the House passed a bill that would have provided voting representation to District residents by granting the District a voting seat in the House. *See* District of Columbia House Voting Rights Act of 2007, H.R. 1905, 110th Cong. The bill provided that the District "shall be considered a Congressional district for purposes of representation in the House of Representatives," *id.* § 2(a), and would have permanently increased the number of representatives to "437 Members, including any Members representing the District of Columbia," *id.* § 3(a). As a House Judiciary Committee report later explained, the source of authority for this provision was the District Clause. H. Rep. No. 111-22, at 5. And the Committee correctly observed that "[t]here is no sound explanation as to why District residents have been disenfranchised since the District was formally established." *Id.* "[T]he Framers did provide the Congress with absolute authority over the District, broad enough to rectify such a problem." *Id.*[13] Although the Senate did not pass the bill in 2007, two years later, during the 111th Congress, it passed a substantially similar bill. *See* District of Columbia House Voting Rights Act of 2009, S. 160, 111th Cong.

The House has continued to be actively involved on the issue of rights for District residents, including voting representation.[14]

---

[12] *Id.* at 22.

[13] Citing District of Columbia House Voting Rights Act of 2009: Hearing on H.R. 157 Before the Subcomm. on the Constitution, Civil Rights & Civil Liberties of the H. Comm. on the Judiciary, 111th Cong. 178-200 (2009) (statement of Professor Viet D. Dinh, Georgetown University Law Center Professor).

[14] *See* H.R. 51, 116th Cong. (2019) (providing Statehood for the District); Press Release, House Committee on Oversight and Reform, *Cummings Commends Norton on D.C. Statehood Bill and Announces Upcoming Hearing* (May 30, 2019), https://tinyurl.com/PressReleaseHR51.

**C.  The District Clause, as Evidenced by Its History, Grants Congress Plenary Legislative Power Over the District of Columbia**

As argued below, Congress is authorized by the U.S. Constitution to enact legislation that would enfranchise residents of the District.  The Constitution embodies the fundamental principle that our government is "emphatically and truly, a government of the people." *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819).  Most significantly, the District Clause, recognized by the Framers as an essential element of the constitutional order, grants Congress "plenary" power over the District and its affairs.  In its breadth, the Clause therefore provides Congress with authority to give Congressional voting representation to District residents.

Congress's authority over the District is conferred by Art. I, § 8, cl. 17 of the Constitution, which provides:

> The Congress shall have Power To… exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States[.]

U.S. Const. art. I, § 8, cl. 17.  With this sweeping language, the Framers gave Congress "extraordinary and plenary power," *United States v. Cohen*, 733 F.2d 128, 140 (D.C. Cir. 1984), to "legislate within the District for every proper purpose of government," *Neild v. D.C.*, 110 F.2d 246, 249 (D.C. Cir. 1940) ("Congress possesses full and unlimited jurisdiction to provide for the general welfare of citizens within the District of Columbia by any and every act of legislation which it may deem conducive to that end.").

While acknowledging the exceptional scope of Congress's authority over the District, Opp'n at 24 n.17, the Department of Justice asserts that the Constitution nonetheless "reserves representation in the House and Senate to residents of a state—a group that does not include residents of the District," by virtue of *other* constitutional provisions that concern the

composition of Congress. *Id.* at 20-21, 24 n.17 (citing U.S. Const. art. I, §§ 2-3); *see* U.S. Const. art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States."); *id.* art. I, § 3, cl. 1 ("The Senate shall be composed of two Senators from each State, chosen by the Legislature thereof."). This is incorrect, as demonstrated by the text, history, and precedent interpreting the District Clause.

The Supreme Court has long emphasized the extraordinary breadth of Congress's District Clause powers: "Over this District Congress possesses 'the combined powers of a general and of a state government *in all cases* where legislation is possible.'" *O'Donoghue v. United States*, 289 U.S. 516, 539 (1933) (emphasis added) (quoting *Stoutenburgh v. Hennick*, 129 U.S. 141, 147 (1889)). As a result, Congress not only may "exercise all the police and regulatory powers which a state legislature or municipal government would have" over the District, but it may also apply laws of "otherwise nationwide application" to the District. *Palmore v. United States*, 411 U.S. 389, 397 (1973) ("The power is plenary.").

The historical origins of the Clause and its special role in the formation of the Nation's capital reinforce the expansive nature of Congress's power over the District. The Clause was adopted following a near armed mutiny in Philadelphia in 1783, when a crowd of disgruntled Revolutionary War soldiers gathered to demand back pay outside the building in which the Continental Congress had convened. When called upon to help quell the protest, the government of the Commonwealth of Pennsylvania refused, forcing the Continental Congress to adjourn and flee to New Jersey to complete its business. *See, e.g.*, Peter Raven–Hansen, *Congressional Representation for the District of Columbia: A Constitutional Analysis*, 12 Harv. J. on Legis., 167, 169, 171 (1975) (relating Pennsylvania incident); Lawrence M. Frankel, Comment,

*National Representation for the District of Columbia: A Legislative Solution*, 139 U. Pa. L. Rev. 1659, 1683-84 (1991) (same).

The Clause was a deliberate response to this episode—in particular, to the then-widespread belief that the Federal government should not be beholden to any one state in which it happened to be located.  *See, e.g.*, Raven–Hansen at 169-72; Hatch at 289, 291.  As Madison declared in the wake of the incident, there must be "complete authority at the seat of government" lest the Federal government "be insulted and its proceedings be interrupted, with impunity."  *The Federalist No. 43*, at 289.  To achieve this goal, the Framers took pains to formulate a capital for their new government that was "national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation." *O'Donoghue*, 289 U.S. 516, 539-40 (1933) (quoting *Grether v. Wright*, 75 F. 742, 757 (6th Cir. 1896)); *id.* at 539 (explaining that the District Clause is an "unqualified grant of permanent legislative power" over the District).  Thus, "the Framers' purpose in providing for the creation of an independent capital city was to create a Federal District free from any control by an individual state, and the disenfranchisement of District residents was not necessary to accomplish that goal."  Hatch at 291 (quotation marks omitted).

Importantly, there is no indication that in so forming the national capital, the Framers—who also viewed the right to vote as indispensable to the new republican government (*see supra* pp. 2-4)—intended that the residents of the lands ceded to the District would forfeit their right to elect voting representatives in Congress.  *See* Statement of Professor Viet D. Dinh at 178-200.[15]

---

[15] *Id.* at 185 ("There are no indications, textual or otherwise, to suggest that the Framers intended that Congressional authority under the District Clause, extraordinary and plenary in all respects, would not extend also to grant District residents representation in Congress."); Jamie B. Raskin, *Is This America? The District of Columbia and the Right to Vote*, 34 Harv. C.R.-C.L.L.

Quite the opposite appears to be true, as numerous legal scholars have argued and the events surrounding the District's creation illustrate.

After Congress enacted legislation pursuant to its District Clause authority to accept the cessions of land by Maryland and Virginia to form the District, there was a ten-year period before the District was formally deemed the seat of the Federal government.  *See* An Act for Establishing the Temporary and Permanent Seat of the Government of the United States, 1 Stat. 130 (1790); District of Columbia Organic Act of 1801, 2 Stat. 103.  During that decade, which immediately followed the ratification of the Constitution by the States, the District's residents not only retained their constitutional rights to vote but also exercised those rights by casting ballots in Congressional elections in their respective ceding states.  *See, e.g.*, Franchino at 214; *O'Donoghue*, 289 U.S. at 540 (It is "important to bear constantly in mind" that, because the District's original inhabitants "were entitled to all the rights, guaranties, and immunities of the Constitution" as residents of the ceding states, "it is not reasonable to assume that the cession stripped them of these rights."); *Downes v. Bidwell*, 182 U.S. 244, 261 (1901) ("The mere cession of the District of Columbia to the Federal government relinquished the authority of the states, but it did not take it out of the United States or from under the aegis of the Constitution.").

The "critical point" of this history, as one constitutional scholar concluded, is that "District residents were able to vote in Congressional elections in Maryland and Virginia . . .

---

Rev. 39, 77 (1999) ("[T]he historical record is plain that the overriding purpose of the District Clause was to guarantee that Congress would not be forced to depend on a state government that could compromise or obstruct its actions for parochial reasons.  Congress did not intend to disenfranchise citizens within the capital city."); Statement of Chief Judge Wald at 255 ("There certainly is no evidence in the text or history of the Constitution signifying the Framers wanted to deny the District the franchise forever for any legitimate reason.").

[with] voting rights derived from Congressional action under the District Clause," thus "demonstrating the Framers' belief that Congress may authorize by statute representation for the District."  Statement of Prof. Viet D. Dinh at 187-88.

### D.   Legal Precedent Supports Congress's Provision of Voting Rights to the District

Consistent with the text and history of the District Clause, courts have long affirmed Congress's expansive authority to legislate under the Clause.  Because the District Clause power includes "in respect of the District, the exercise by Congress of other appropriate powers conferred upon that body by the Constitution," *O'Donoghue*, 289 U.S. at 539, the Supreme Court has repeatedly recognized that Congress may treat the District as a State for various statutory and constitutional purposes.

For example, the Court has held that Congress may regulate commerce across the District's borders, notwithstanding that the Commerce Clause refers only to Commerce "among the several States."  *Stoutenburgh*, 129 U.S. at 149; *see also, e.g.*, *Loughran v. Loughran*, 292 U.S. 216, 228 (1934) (providing that the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, binds courts of the District "equally with courts of the states").  Along the same lines, although "the District of Columbia is not a 'State' within the meaning of the Fourteenth Amendment," the Supreme Court has acknowledged that—in the important context of the civil rights remedies created by Congress in 42 U.S.C. § 1983—"inclusion of the District of Columbia in § 1983 would necessitate a wholly separate exercise of Congress' power to legislate for the District under Art. I, § 8, cl. 17."  *D.C. v. Carter*, 409 U.S. 418, 424 n.8 (1973).

In *National Mutual Insurance Company v. Tidewater Transfer Company*, 337 U.S. 582, 604 (1949), the Supreme Court similarly upheld a federal statute that treated the District as a State for purposes of diversity jurisdiction in federal court, even though Article III, § 2, cl. 1, refers to cases "between Citizens of different States."  In so holding, the *Tidewater* plurality

stressed the "exclusive responsibility of Congress for the welfare of the District," *id*. at 590, and

the "broad terms," *id*. at 589, under which "Congress is empowered 'to exercise exclusive

Legislation in all Cases whatsoever, over such District,'" *id*. (quoting U.S. Const. art. I, § 8, cl.

17).  Importantly, the plurality also emphasized that, where—as would be the case here—

Congress is legislating for the District on a matter "not expressly forbidden by the Constitution,"

then there is "no matter" in which the Court should "pay more deference to the opinions of

Congress than in its choice of instrumentalities to perform a function within its powers."  *Id*. at

603.

  As these cases illustrate, "courts have acceded to Congress's unique power to legislate for

the District when it exercises that power to put the District on a par with States in critical

constitutionally-related areas."  Statement of Chief Judge Wald at 3.  There is every reason to

conclude that Congress's District Clause power extends equally to the critical area of voting

representation for the District.

  Finally, the Department of Justice relies extensively on *Adams v. Clinton*, 90 F. Supp. 2d

35 (D.D.C. 2000) (per curiam), *aff'd*, 531 U.S. 941 (2000).  In *Adams*, a three-judge panel of this

Court determined that the District was not a State for purposes of Article I apportionment of

Congressional representatives.  *Id.* at 50; *id.* at 55-56.  The court in *Adams* did not have occasion

to decide the argument advanced by the House here: that the District Clause authorizes Congress

to enact *legislation* otherwise granting Congressional voting representation to District residents.

The court in *Adams* concluded that it "lack[ed] authority" to hold the denial of voting

representation for District residents unconstitutional and to grant plaintiffs the injunctive relief

they sought.  *Id.* at 72 ("If they are to obtain [relief], [plaintiffs] must plead their cause in other

venues.").  But the court recognized the "contradiction between the democratic ideals upon

which this country was founded and the exclusion of District residents from congressional representation." *Id.* (explaining that the court was "not blind to the inequity of the situation plaintiffs seek to change"). This Court should answer the question not presented in *Adams* and hold that the District Clause authorizes Congress to grant voting representation in Congress to District residents.

## CONCLUSION

For the foregoing reasons, the House urges the Court to hold that the Constitution grants Congress the power to enact legislation to provide District residents with the fundamental right— which is core to our democratic values and constitutional principles—to voting representation in Congress.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 2533492)
   *General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
   *Associate General Counsel*
JOSEPHINE MORSE (D.C. Bar No. 1531317)
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov


*Counsel for Amicus Curiae the United States House*
   *of Representatives*

June 10, 2019

14

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2019, I caused the foregoing document to be filed via the

U.S. District Court for the District of Columbia CM/ECF system, which I understand caused a

copy to be served on all registered parties.


*/s/ Douglas N. Letter*
DOUGLAS N. LETTER