# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGELICA CASTAÑON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>The UNITED STATES OF AMERICA,<br>    *et al.*,<br><br>    Defendants. | Case No. 1:18-cv-2545<br>(RDM, RLW, TNM) |

## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF EXECUTIVE AND SENATE DEFENDANTS' <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

I.   Threshold Issues Warrant the Dismissal of All Claims. ....................................... 2

    A.   Plaintiffs Repeatedly Seek to Compel Congress to Enact Their Preferred
        Legislation, but That Relief Is Barred for Several Reasons................................... 2

        1.   Plaintiffs Have Not Sued the Appropriate Defendants for the Relief
              They Seek.................................................................................................. 4

        2.   Separation of Powers and the Speech or Debate Clause Prohibit the
              Courts from Requiring Congress to Pass Legislation. ............................... 6

        3.   Plaintiffs' Request Also Heightens Nonjusticiability Concerns. ................ 7

    B.   If Plaintiffs Intend to Request Other Relief, It Is Still Subject to the Same
        Problems. .............................................................................................................. 9

    C.   Plaintiffs Do Not Dispute that the President Should Be Dismissed as a
        Party to this Lawsuit Because There Is No Cause of Action Against the
        President and Plaintiffs Cannot Obtain Equitable Relief Against the
        President................................................................................................................ 11

    D.   Standing Is Lacking as to the President and Secretary of Commerce. ................. 12

II.  Even if the Court Exercised Jurisdiction, Plaintiffs' Claims Fail on the Merits............... 13

    A.   As Recognized in *Adams*, District Residents Do Not Reside in a State, and
        Therefore the Constitution Precludes Their Representation in the House or
        Senate.................................................................................................................. 13

        1.   Plaintiffs' Focus on the District Clause Is Irrelevant............................... 16

        2.   Plaintiffs' Historical Evidence Does Not Indicate a Constitutional
              Problem with the District's Lack of Representation................................... 17

    B.   In Any Event, Plaintiffs' Equal Protection Claim Would Fail Because the
        Classification Plaintiffs Challenge Is Drawn by Article I and District
        Residents Are Not Similarly Situated to Residents of Federal Enclaves or
        Overseas Voters. .................................................................................................. 18

    C.   Plaintiffs' Due Process Claim Would Also Fail Because District Residents
        Do Not Meet the Constitutionally-Mandated Qualifications for Voting
        Representation in the House or Senate. ................................................................ 22

    D.   Plaintiffs Do Not State a Claim Under the First Amendment. ............................ 23

CONCLUSION.............................................................................................................. 25

i

# TABLE OF AUTHORITIES

## CASES

*Adams v. Clinton,*
  90 F. Supp. 2d 35 (D.D.C. 2000), *aff'd*, 531 U.S. 941 (2000)........................................... *passim*

*Adams v. Clinton,*
  90 F. Supp. 2d 27 (D.D.C. 2000) ....................................................................................... 11

*Agostini v. Felton,*
  521 U.S. 203 (1997)............................................................................................................ 22

*Amco Ins. Co. v. Drs Realty Co., Inc.,*
  No. 15-10725, 2016 WL 627889 (E.D. Mich. Feb. 17, 2016).................................................. 5

*Associated Gen. Contractors of Am. v. City of Columbus,*
  172 F.3d 411 (6th Cir. 1999) ............................................................................................... 7

*Attorney Gen. of Territory of Guam v. United States,*
  738 F.2d 1017 (9th Cir. 1984) ............................................................................................. 16

*Benisek v. Lamone,*
  348 F. Supp. 3d 493 (D. Md. 2018), *vacated & remanded sub nom.,*
  *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) .................................................................. 24

*Carliner v. Commissioner,*
  412 F.2d 1090 (D.C. Cir. 1969)........................................................................................... 22

*City of Cincinnati v. Ky. Transportation Cabinet,*
  No. 1:16-CV-488, 2017 WL 4386379 (S.D. Ohio Sept. 29, 2017) ........................................... 5

*Common Cause v. Biden,*
  748 F.3d 1280 (D.C. Cir. 2014)............................................................................................. 4

*Dep't of Commerce v. Montana,*
  503 U.S. 442 (1992).............................................................................................................. 8

*Diamond Shamrock Corp. v. Lumbermens Mut. Cas. Co.,*
  416 F.2d 707 (7th Cir. 1969) ................................................................................................ 5

*Downes v. Bidwell,*
  182 U.S. 244 (1901).............................................................................................................. 8

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975)......................................................................................................... 7, 10

*Evans v. Cornman*,
  398 U.S. 419 (1970)..............................................................................................20

*Frison v. United States*,
  No. 95-5062, 1995 WL 686224 (D.C. Cir. Oct. 4, 1995) ..........................................7

*Gravel v. United States*,
  408 U.S. 606 (1972)..............................................................................................11

*Hearst v. Black*,
  87 F.2d 68 (D.C. Cir. 1936)....................................................................................7

*Igartúa de la Rosa v. United States*,
  842 F. Supp. 607 (D.P.R. 1994), *aff'd*, 32 F.3d 8 (1st Cir. 1994),
  *cert denied*, 514 U.S. 1049 (1995)...........................................................................8

*Igartúa-De La Rosa v. United States*,
  417 F.3d  (1st Cir. 2005)........................................................................................15

*Mass. Delivery Ass'n v. Coakley*,
  671 F.3d 33 (1st Cir. 2012).....................................................................................5

*McChord v. Cincinnati, N.O. & T.P. Ry. Co.*,
  183 U.S. 483 (1902)...............................................................................................7

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)...........................................................................................22

*Phillips v. Payne*,
  92 U.S. 130 (1875).................................................................................................8

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019)................................................................................2, 24, 25

*Spencer v. Eversource Energy Serv. Co.*,
  No. 16-CV-353-JL, 2017 WL 4326481 (D.N.H. Sept. 28, 2017) ..............................5

*State Farm Mut. Auto. Ins. Co. v. Mid-Continent Cas. Co.*,
  518 F.2d 292 (10th Cir. 1975) .................................................................................5

*Timbs v. Indiana*,
  139 S. Ct. 682 (2019).............................................................................................23

*United States v. Johnson*,
  383 U.S. 169 (1966)................................................................................................7

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004)..................................................................................................... 25

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)..................................................................................................... 22

**STATUTES**

2 U.S.C. § 2a ................................................................................................................... 10

13 U.S.C. § 141 ......................................................................................................... 10, 12

D.C. Code § 1-206.02 ..................................................................................................... 15

District of Columbia Self–Government and Governmental Reorganization Act,
   Pub. L. No. 93-198, 87 Stat. 774 (1973)
   (codified as amended at D.C. Code § 1-201.01 *et seq.*)........................................... 15

**U.S. CONSTITUTION**

U.S. Const. art. I, § 2................................................................................................. 12, 14

U.S. Const. art. I, § 5....................................................................................................... 11

U.S. Const. art. I, § 8................................................................................................. 13, 20

U.S. Const. art. IV, § 3..................................................................................................... 20

**OTHER AUTHORITIES**

Federal Voting Assistance Program, Never Resided Voters: A Policy Brief 2 (Spring 2017),
   https://www.fvap.gov/uploads/FVAP/EO/FVAPNeverResidedPolicyBrief_20170222
   _FINAL.pdf ............................................................................................................... 21

Military and Overseas Voter (UOCAVA), District of Columbia Board of Elections,
   https://www.dcboe.org/FAQS/Military-and-Overseas-Voters-(UOCAVA) ............................. 21

**INTRODUCTION**

The Constitution established a system of representative democracy in which House and Senate seats are allocated among the states. This system is, definitionally, constitutional. The instant case is not about the wisdom of the system established by the Constitution. Rather, this case concerns only whether Plaintiffs can compel the United States Congress to enact the legislation of their choice (or whether they can achieve the same legislative outcome through declaratory judgment directed at a handful of officers of the Senate and two Executive Branch officials).[1] They cannot.

On the threshold issues, Plaintiffs embrace *Adams*. Yet *Adams* does not resolve whether the instant case suffers from threshold flaws because Plaintiffs here seek shockingly bold relief, well beyond that sought in *Adams*, including that this Court order Congress to enact legislation.[2] Such relief would clearly violate the separation of powers and Speech or Debate Clause, among other problems. Even if such a claim were theoretically cognizable, Plaintiffs here have utterly failed to bring one because they have sued the wrong parties. They have not sued Congress as an entity, and they have now dismissed all the House defendants, making it impossible—even if a

---

[1] The Defendants in this case are President Donald Trump, Secretary of Commerce Wilbur Ross, President Pro Tempore of the Senate Chuck Grassley, Secretary of the Senate Julie Adams, Sergeant at Arms and Doorkeeper of the Senate Michael Stenger, and Vice President Michael R. Pence (Executive and Senate Defendants). Several individuals affiliated with the House of Representatives—Speaker of the House Nancy Pelosi, Clerk of the House Cheryl Johnson, and Sergeant at Arms of the House Paul Irving—were previously defendants before they were voluntarily dismissed by Plaintiffs. Notice of Voluntary Dismissal of Certain Defendants, ECF No. 20. Despite Plaintiffs' repeated references to the Department of Justice, the Department of Justice itself is not a party to this lawsuit.

[2] And, the decision of the three-judge court in *Adams* has no application to the threshold issues concerning the Senate Defendants, because the claims against the Senate defendants in *Adams* were remanded to Judge Oberdorfer and ultimately dismissed on threshold grounds.

1

court had the power to force legislative action—for any of Plaintiffs' purported injuries to be redressed.

On the merits, Plaintiffs either ignore *Adams*' controlling holding or fail to distinguish it from the nearly identical claims they bring here.  Two of their three claims—equal protection and due process—have already been resolved by the three-judge panel in *Adams* and affirmed by the Supreme Court.  Their third claim, based on an untested First Amendment theory, was flawed at the outset and its viability has been even further undercut by the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2482 (2019).

**I.      Threshold Issues Warrant the Dismissal of All Claims.**

Plaintiffs maintain that since *Adams* was adjudicated on the merits, their case must be too.  Yet, with respect to the threshold issues, this case is different from *Adams* in at least two ways that are fatal to Plaintiffs' case.   First, Plaintiffs appear to be attempting to require Congress to pass legislation, which a court cannot do.  Second, Plaintiffs have dismissed the House defendants from this case.

**A.  <u>Plaintiffs Repeatedly Seek to Compel Congress to Enact Their Preferred Legislation, but That Relief Is Barred for Several Reasons.</u>**

Plaintiffs' summary judgment brief repeatedly indicates that Plaintiffs believe that, by virtue of its authority under the District Clause, Congress should be compelled to enact legislation to provide representation in the Senate and House to District Residents.

Indeed, Plaintiffs' proposed order reads: "it is further **ORDERED** that Congress shall fashion a constitutional remedy that will vindicate the constitutional rights of the citizens of the District of Columbia to vote for members of the United States Senate."  Proposed Order, ECF No. 24-2.  Similarly, Plaintiffs' briefing is replete with references to the need for Congress to use

its authority under the District Clause to enact legislation.  *See, e.g.*, Pls.' Mem. Law Opp'n

Defs.' Mot. Dismiss & Supp. Pls.' Mot. Summ. J (Pls.' MSJ) at 7 ("Congress's Failure to

Exercise its Authority . . . Violates Equal Protection Principles."); Pls.' MSJ at 9 ("Plaintiffs

maintain that that there is no need for additional 'political remedies,' because Congress already

has the necessary authority under the District Clause, and the Equal Protection Clause requires

Congress to use it to provide equal protection under the law."); Pls.' MSJ at 18 ("[T]here is no

justifiable basis for Congress to provide voting representation to, for example, residents of

Alaska but not to District residents."); Pls.' MSJ at 21 ("Congress has acted by legislation to

ensure that Americans who reside entirely outside of the United States . . . can exercise their

right to vote for representation in Congress. Congress can do the same for District residents.").[3]

Yet at the same time, Plaintiffs appear to acknowledge the impossibility of this theory.

*See* Pls.' MSJ at 41 (arguing that Speech or Debate Clause issues do not apply because

"Plaintiffs do not ask for that relief [mandating specific legislative activities.]").  First, Plaintiffs

have not sued Congress, or either the entirety of the House or the Senate.  Second, for a court to

compel Congress to enact legislation would raise serious separation of powers concerns and

---

[3] *See also* Pls.' MSJ at 2 ("Because Congress has the power to provide voting representation to District residents but has not done so, Plaintiffs' equal protection argument is straightforward: Congress cannot lawfully extend voting representation in Congress to some taxpaying citizens of the United States subject to the federal laws that Congress enacts, while denying such representation to District residents."); Pls.' MSJ at 7-8 ("Given that it has authority to provide such representation, Congress may not confer it on some groups but withhold it from District residents . . . ."); Pls.' MSJ at 8 ("Plaintiffs further argue that Congress's failure to exercise its authority to extend the franchise here—as it has done on behalf of other groups that were not residents of States —violates Equal Protection principles."); Pls.' MSJ at 8-9 ("[T]he Plaintiffs here complain that Congress has failed to use its authority under the District Clause to provide voting representation to District residents.").

implicate the Speech or Debate clause, with its separation-of-powers purpose of protecting

legislators from interference in their legislative functions.

Plaintiffs also argue that, because *Adams* was not dismissed on threshold reasons, their

claims should not be, either.  Pls.' MSJ at 34-36.  But the analogy is inapt.  The three-judge panel

did not understand the *Adams* plaintiffs to be seeking to compel Congress to enact legislation.

*See Adams v. Clinton* (*Adams I*), 90 F. Supp. 2d 35, 43 (D.D.C. 2000) (analogizing the case to

*Franklin*, because in both the court might be able to issue "a judgment directing the Secretary of

Commerce to report the population of the states in a specified way"), *aff'd*, 531 U.S. 941 (2000).

Thus, contrary to Plaintiffs' contention, *Adams*'s justiciability holding does not control here.

### 1.    Plaintiffs Have Not Sued the Appropriate Defendants for the Relief They Seek.

Although Plaintiffs' briefing is replete with criticisms of Congress's exercise (or alleged

lack thereof) of its asserted legislative powers, *see, e.g.*, Pls.' MSJ at 8-9 ("[T]he Plaintiffs here

complain that Congress has failed to use its authority under the District Clause to provide voting

representation to District residents."), Plaintiffs did not sue Congress, but only a handful of

officers of the House and Senate.  Nor do Plaintiffs dispute the argument presented by Executive

and Senate Defendants in their motion to dismiss that Congress would be shielded by sovereign

immunity.  Exec. & Senate Defs.' Mot. Dismiss (Defs.' MTD) at 10 & n.10.  Plaintiffs have

since voluntarily dismissed the House defendants, leaving only the Executive and Senate

defendants.  Clearly the remaining defendants have no ability to enact legislation, whether under

the District Clause (as Plaintiffs would prefer) or any other theory, and, thus, Plaintiffs' claims

are not likely to be redressed by a favorable judgment against the defendants, as is required for

Article III standing.  Just as the D.C. Circuit in *Common Cause v. Biden*, 748 F.3d 1280, 1283-85

4

(D.C. Cir. 2014), held that the plaintiffs' naming of Senate officers as defendants was insufficient to give it jurisdiction to review a challenge to the Senate cloture rule, which had been enacted by the Senate as a whole, so here the Court lacks jurisdiction to hear Plaintiffs' claims where they sue Senate officers but seek relief against Congress as a whole.

Nor does that fact that Plaintiffs seek declaratory relief relieve them of the obligation to sue the appropriate defendants.  Like other forms of judgment, a declaratory judgment is only binding on the parties.  *See, e.g.*, *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 48 (1st Cir. 2012) ("The Act does not contain any provisions indicating that declaratory judgments are authoritative vis-à-vis nonparties to the litigation."); *State Farm Mut. Auto. Ins. Co. v. Mid-Continent Cas. Co.*, 518 F.2d 292, 295 (10th Cir. 1975) ("The declaratory judgment is not res judicata as to Garton, a non-party."); *Diamond Shamrock Corp. v. Lumbermens Mut. Cas. Co.*, 416 F.2d 707, 709 (7th Cir. 1969) (noting that "the net result of a declaratory judgment in that case would have been the equivalent of a mere advisory opinion" because "neither the insured nor the damaged plaintiff was a party"); *City of Cincinnati v. Ky. Transportation Cabinet*, No. 1:16-CV-488, 2017 WL 4386379, at *3 (S.D. Ohio Sept. 29, 2017) ("There is no controversy between the parties here, and the Court is troubled by the attempts to prod this Court to issue a declaratory judgment against a nonparty, particularly in light of the fact that the claims have no merit."); *Spencer v. Eversource Energy Serv. Co.*, No. 16-CV-353-JL, 2017 WL 4326481, at *4 (D.N.H. Sept. 28, 2017) (holding that "a decision in this case will not accord complete relief among the parties" because the declaratory relief the plaintiffs sought would not bind required non-parties); *Amco Ins. Co. v. Drs Realty Co., Inc.*, No. 15-10725, 2016 WL 627889, at *3 (E.D. Mich. Feb. 17, 2016) ("The Court declines to issue a declaratory judgment primarily directed at non-parties.").

Plaintiffs appear to accept that they must show that a declaratory judgment in their favor "will significantly increase the likelihood that Plaintiffs will obtain that relief [of voting representation in Congress.]"  Pls.' MSJ at 6.  But they do not explain why a declaratory judgment against Secretary Ross and the other defendants would make it at all likely that Congress would initiate and pass Plaintiffs' preferred legislation, and that the President would sign it into law.

### 2. Separation of Powers and the Speech or Debate Clause Prohibit the Courts from Requiring Congress to Pass Legislation.

Plaintiffs are further barred from compelling Congress to act because such an action would violate separation of powers principles and the Speech or Debate Clause, which Plaintiffs do not dispute.  Defs.' MTD at 12-13, *see generally* Pls.' MSJ.  Although Plaintiffs note that *Adams* did not so hold, that is because the *Adams* court was not considering a request to compel Congress to pass legislation.  There is a difference between a court reviewing an act of Congress for constitutionality, which the courts are undoubtedly empowered to do, and the courts affirmatively mandating that Congress take a specific action, which the courts may not do. *Adams* fell into the first category, as the court was considering how to interpret the apportionment provisions that applied to the Secretary of Commerce.  *Adams I*, 90 F. Supp. 2d at 43.  The court's threshold conclusions were based on the belief that the President and House officials would follow that interpretation of existing law.  *Id.*

Here, Plaintiffs' own description of their claims makes clear that the relief they seek far exceeds that sought in *Adams*.  *See* Pls.' MSJ at 8-9 ("[W]hile the *Adams* plaintiffs argued that the Constitution should be construed such that 'State' includes the District in the relevant provisions, the Plaintiffs here complain that Congress has failed to use its authority under the

District Clause to provide voting representation to District residents.").  However, it is beyond dispute that courts lack power to require Congress to affirmatively enact new legislation.  *See, e.g.*, *McChord v. Cincinnati, N.O. & T.P. Ry. Co.*, 183 U.S. 483, 497 (1902) ("It is legislative discretion which is exercised, and that discretion, whether rightfully or wrongfully exercised, is not subject to interference by the judiciary."); *Associated Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 415 (6th Cir. 1999) ("[T]he role of the court is to intervene, if at all, only after a legislative enactment has been passed."); *Frison v. United States*, No. 95-5062, 1995 WL 686224, at *1 (D.C. Cir. Oct. 4, 1995) ("The district court appropriately declined to interfere prospectively with the exercise of legislative power by the United States Congress."); *Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936) ("[T]he universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, *whether rightfully or wrongfully exercised*, is not a subject for judicial interference." (emphasis added)).

Because the Speech or Debate Clause is an "absolute bar to interference," and "reinforc[es] the separation of powers" and "insure[s] that the legislative function the Constitution allocates to Congress may be performed independently," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975) (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)), this Court cannot command Congress to perform specific legislative functions.

### 3.    Plaintiffs' Request Also Heightens Nonjusticiability Concerns.

As Executive and Senate Defendants noted in their motion to dismiss, Plaintiffs' claims should be dismissed as nonjusticiable.  Defs.' MTD at 19-20.  Plaintiffs' motion for summary judgment makes even clearer that Plaintiffs' claims here are nonjusticiable and not disposed of by *Adams*.

In *Adams*, the court rejected the contention that the political question doctrine barred it from considering the "purely legal issue" of whether "District residents are among those qualified to vote for congressional representatives under Article I." *Adams I*, 90 F. Supp. 2d at 40; *see also id.* ("[T]he interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary." (quoting *Dep't of Commerce v. Montana*, 503 U.S. 442, 458-59 (1992)). Here, however, Plaintiffs seek relief that extends far beyond the determination of a purely legal issue of constitutional interpretation. As noted above, Plaintiffs expressly ask this Court to order "that Congress shall fashion a constitutional remedy that will vindicate the constitutional rights of the citizens of the District of Columbia to vote for members of the United States Senate." Proposed Order; *see also* Am. Compl., Prayer for Relief, ECF No. 9 (requesting that Court order "the Defendants to present plans setting forth their recommended best means for assuring the right of District of Columbia citizens to participate in the election of voting members of Congress," and "After full consideration of the parties' proposed plans, ORDERING Defendants to pursue the steps that will most appropriately assure the rights of District of Columbia citizens to participate in the election of voting members of Congress").

The fact that Plaintiffs seek relief compelling Congress affirmatively to enact legislation demonstrates well that this issue is clearly committed to a coordinate branch of government—the legislative branch. Indeed, plentiful cases stand for the proposition that decisions relating to statehood and membership in the Union are classic political questions. *See Igartúa de la Rosa v. United States*, 842 F. Supp. 607, 609-10 (D.P.R. 1994) (deferring plaintiffs' arguments that Puerto Rico should be a state to Congress), *aff'd*, 32 F.3d 8 (1st Cir. 1994), *cert. denied*, 514 U.S. 1049 (1995); *see also Downes v. Bidwell*, 182 U.S. 244, 312 (1901) (White, J., concurring) (holding that admission into statehood is a political question); *Phillips v. Payne*, 92 U.S. 130,

133-34 (1875) (declining to question Congress's decision to retrocede part of the District to Virginia).

## B.  <u>If Plaintiffs Intend to Request Other Relief, It Is Still Subject to the Same Problems.</u>

In light of the myriad flaws in Plaintiffs' plan to compel Congress to enact legislation under the District Clause by suing, *inter alia*, Secretary Ross and the Sergeant at Arms of the Senate, it is perhaps unsurprising that Plaintiffs at times back away from compelling Congress to pass legislation.  *See* Pls.' MSJ at 41 ("Plaintiffs do not ask for that relief [mandating specific legislative activities.]").  Although Plaintiffs' other requests for relief are difficult to understand, similar flaws apply.

In addition to requesting that the Court order Congress to craft a constitutional remedy, Plaintiffs' proposed order seeks a declaration "that the Delegate to the House of Representatives for the District of Columbia, as the duly elected representative of the United States citizens residing in the District of Columbia, has the full powers and privileges afforded to Members of the House of Representatives, including without limitation the power to vote on all legislation considered by the House."  Proposed Order.  Plaintiffs have, of course, voluntarily dismissed the House defendants from this litigation.  It does not appear that declaratory judgment directed at the Executive and Senate Defendants would have any effect, even under Plaintiffs' theory.  *See* Am. Compl. ¶¶ 59-61 (Plaintiffs' characterization of the House defendants).

Finally, Plaintiffs' proposed order seeks a declaration that:

> Plaintiffs, in common with all adult citizens of the District of Columbia, possess a constitutional right to vote in elections for voting members of the United States House of Representatives and the United States Senate; that they have been deprived of this right without warrant or justification; that Defendants have violated this right; that the continuing deprivation of this right violates one of the most precious attributes of United States citizenship; and that 2 U.S.C. § 2a and 13 U.S.C. § 141 are unconstitutional insofar as they require or have been applied

to effect the exclusion of citizens of the District of Columbia from the Congressional apportionment process[.]

Proposed Order.  This request for declaratory judgment suffers from the same flaws just explained above—Plaintiffs have sued the wrong defendants.  Although their theory relies on Congress's authority, Congress is not a party.  *See, e.g.*, Pls.' MSJ at 7-8 ("Given that it has authority to provide such representation, Congress may not confer it on some groups but withhold it from District residents . . . .").[4]  The defendants that Plaintiffs *have* sued are not responsible for the alleged failure of Congress to pass the legislation which Plaintiffs favor.

As to the Senate Defendants, Plaintiffs do not dispute that they have no role in recognizing Senators, Defs.' MTD at 13-15.  Even if these defendants played such a role, or if they were individually capable of enacting legislation, constraining them in that duty would violate the Speech or Debate clause and raise separation of powers concerns.  Defs.' MTD at 10-13.

Plaintiffs adopt an extremely cramped reading of the Speech or Debate Clause, suggesting that it would only apply to direct limitations on speech in either house of Congress.  Pls.' MSJ at 39-40.  Yet, such a narrow reading contradicts the Supreme Court, which has "read the Speech or Debate Clause broadly to effectuate its purposes," *Eastland*, 421 U.S. at 501, and has interpreted the Speech or Debate Clause to extend "to matters beyond pure speech or debate" to also encompass "the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters

---

[4] In addition, although Plaintiffs' proposed order seeks a declaration that 2 U.S.C. § 2a and 13 U.S.C. § 141 are unconstitutional, these are the provisions analyzed in *Adams* that  deal with the Secretary of Commerce's transmission to the President, and the President's transmission to Congress, of the number of representatives to which each state is required.  This claim has thus clearly been rejected in *Adams*.

which the Constitution places within the jurisdiction of either House" as "necessary to prevent indirect impairment of such deliberations," *Gravel v. United States*, 408 U.S. 606, 625 (1972) (citation omitted). Here, a declaration aimed at coercing the Senate Defendants to somehow advance legislation to cure the lack of representation for the District would certainly impair the Senate's deliberations. Likewise, to the extent that Plaintiffs seek to require the Senate Defendants to recognize particular individuals as Senators, that duty has been constitutionally placed within the jurisdiction of the Senate itself. U.S. Const. art. I, § 5, cl. 1.

In addition, for all of the reasons identified in *Adams v. Clinton* (*Adams II*), 90 F. Supp. 2d 27 (D.D.C. 2000), the Senate Defendants do not cause and could not redress Plaintiffs' claimed harms, and thus declaratory relief against them is inappropriate. Defs.' MTD at 13-17. Plaintiffs cite *Franklin*, *Utah v. Evans*, and *Adams*, Pls.' MSJ at 36-39, but those cases all rely on the purported ability of the Secretary of Commerce to adjust the apportionment figures based on the court's ruling. Plaintiffs offer no explanation of how the Senate Defendants, such as the Sergeant at Arms, could take any action that would be likely to lead to voting representation for District residents. Indeed, that Plaintiffs believe their suit could continue just as effectively in the absence of the House defendants, whom Plaintiffs voluntarily dismissed, provides a further demonstration that the comparable Senate officers comprising the Senate Defendants do not cause and cannot redress Plaintiffs' harms.

## C. **Plaintiffs Do Not Dispute that the President Should Be Dismissed as a Party to this Lawsuit Because There Is No Cause of Action Against the President and Plaintiffs Cannot Obtain Equitable Relief Against the President.**

As discussed in the Executive and Senate Defendants' motion to dismiss, Defs.' MTD at 17-19, the President should be dismissed from this lawsuit. Plaintiffs offer no specific argument in favor of maintaining the President as a defendant. *See generally* Pls.' MSJ. Although the

three-judge panel in *Adams* did not dismiss the President, Executive and Senate Defendants respectfully believe that decision was in error for the reasons stated in their prior briefing, and that holding was not a necessary part of the Supreme Court's affirmance, as the Supreme Court could have found that standing existed as to the Secretary of Commerce.

### D.  <u>Standing Is Lacking as to the President and Secretary of Commerce.</u>

Plaintiffs' explanation of their injuries and requested relief in their motion for summary judgment makes clear that Plaintiffs lack standing with respect to their claims against both the President and Secretary of Commerce.  Neither official has caused the injuries complained of by the Plaintiffs—that Congress has failed to use its purported power under the District Clause to provide representation to residents of the District.  Nor can the President or Secretary of Commerce provide the redress that Plaintiffs seek—action by Congress pursuant to its power under the District Clause.

Indeed, the *Adams* court acknowledged the argument that, as to the Secretary of Commerce, causation was lacking because the Secretary was merely carrying out the constitutional and statutory obligation to report the population for apportionment "among the several states."[5]  However, the *Adams* court did not dismiss the Secretary on those grounds because "[w]e, however, must assume here that plaintiffs will prevail, and hence that the District *is* a 'state' for apportionment purposes."  *Adams I*, 90 F. Supp. 2d at 41.  In this case, of course, in an attempt to avoid the precedential effect of *Adams*, Plaintiffs do not assert that the District is a state—instead they argue that Congress should use its purported District Clause power to

_____

[5] *See* U.S. Const. art. I, § 2, cl. 3 ("Representatives and direct [t]axes shall be apportioned among the several [s]tates . . . ."); 13 U.S.C. § 141(b) (requiring the Secretary to report "[t]he tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States" to the President).

provide representation for the District.  *See, e.g.*, Pls.' MSJ at 8-9 ("The Plaintiffs here make no

such concession [that they must characterize themselves as residents of a state]—they argue that

while the Constitution explicitly *requires* citizens of States to have voting representation in

Congress, it *also* gives Congress the authority under the District Clause, art. I, § 8, cl. 17, to

authorize voting representation in Congress for District residents. Thus, while the *Adams*

plaintiffs argued that the Constitution should be construed such that 'State' includes the District

in the relevant provisions, the Plaintiffs here complain that Congress has failed to use its

authority under the District Clause to provide voting representation to District residents.").  The

Secretary of Commerce and President should thus be dismissed on causation and redressability

grounds, as they have simply followed the statutory and constitutional commands that apply to

them, and are not granted authority under the District Clause

## II.   Even if the Court Exercised Jurisdiction, Plaintiffs' Claims Fail on the Merits.

### A.   As Recognized in *Adams*, District Residents Do Not Reside in a State, and Therefore the Constitution Precludes Their Representation in the House or Senate.

Plaintiffs' claims must fail on the merits as well.  Plaintiffs argue that *Adams* did not

establish that House and Senate representation is reserved to states because the *Adams* plaintiffs

did not press the point. Pls.' MSJ at 8.  This is incorrect.  First, regardless of whether the *Adams*

plaintiffs pressed it, the holding that the Constitution reserves representation to the states was

repeatedly reiterated by the three-judge panel and necessary to its ruling.  Second, even if *Adams*

was only persuasive on this point, Plaintiffs neglect to actually substantively dispute the many

reasons, as discussed in *Adams* and in Executive and Senate Defendants' motion to dismiss, that

Article I should be interpreted to provide congressional representation only to states.

First, *Adams* resolved the issue.  *Adams* analyzed Article I, § 2, which states that the House "shall be composed of Members chosen . . . by the People of the Several States."  U.S. Const. art. I, § 2, cl. 1; *Adams I*, 90 F. Supp. 2d at 45-46.  The three-judge panel ultimately concluded that that provision allotted House members only to the States, not the District.  *See id.* ("[F]or this reason . . . residents of United States territories are not entitled to vote in federal elections, notwithstanding that they are United States citizens."); *see also id.* at 47 ("[T]he language of Article I, which makes clear just how deeply Congressional representation is tied to the structure of statehood."); *see also id.* at 47-48 (rejecting representation in the House for the District because Article I, § 2 also requires that electors of House representatives have the same qualifications as those for the largest branch of the state legislature, and the District had no such legislature); *see also id.* at 48 (holding that Article I, § 2, cl. 3 "plainly contemplates true states and not the District"); *see also id.* at 49 (holding that the District cannot be a state because Article I, § 2, cl. 4 requires that vacant House seats be filled by "the Executive Authority" of the state, and the District lacks such apparatus); *see also id.* at 66 ("[T]he voting qualification of which plaintiffs complain is one drawn by the Constitution itself.").[6]  This conclusion was necessary to the *Adams* court's holding, because it was the basis on which the *Adams* court resolved plaintiffs' claims arising out of Article I, the Equal Protection Clause, and the Due Process Clause.  *Id.* at 46, 66, 70.  Finally, the decision expressly considered the dissent's dispute of whether the *Adams* plaintiffs "must be able to characterize themselves as citizens of a state."  *Id.* at 56.  The court's conclusion was stark:

---

[6] The *Adams* court performed an analogous analysis of the constitutional provisions governing representation in the Senate and reached similar conclusions.  *Adams I*, 90 F. Supp. 2d at 49-50.

> [T]he overlapping and interconnected use of the term "state" in the relevant provisions of Article I, the historical evidence of contemporary understandings, and the opinions of our judicial forebears all reinforce how deeply Congressional representation is tied to the structure of statehood. . . . There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise.

*Id.*

Second, even if *Adams* was only persuasive, Plaintiffs do not dispute the plentiful textual and historical reasoning underlying the conclusion that the Constitution reserves representation in the House and Senate to states, as described above in *Adams* and in the Executive and Senate Defendants' motion to dismiss, Defs.' MTD at 20-25.  If a contrary interpretation was adopted, each of the discussed provisions of Article I discussed above would become an obstacle.  How would the qualifications of the electors in each state for the House be judged, if not by reference to the qualifications of electors in the District's legislature (which it lacks)?[7]  If the District's seat in the House became vacant, who would arrange for it to be filled?

Nor do Plaintiffs substantively engage with the number of courts that have reached analogous conclusions about whether the residents of territories are entitled to congressional representation, despite not being residents of states.  *See, e.g.*, *Igartúa-De La Rosa v. United*

---

[7] The court in *Adams* has already considered whether the Council of the District of Columbia would suffice as the equivalent of a state legislature for the District, and has concluded that it would not because the Council is not constitutionally required and did not exist in its elected form until 1973. *Adams I*, 90 F. Supp. 2d at 47-48 & n.20; *see also id.* at 47-48 ("A right to vote that depends upon the existence of such an occasional institutional can hardly have been what the Framers contemplated.").  The acts of the Council remain subject to Congress's disapproval, unlike those of state legislatures.  *See generally* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1–201.01 *et seq.*); *see also* D.C. Code § 1-206.02(c)(1) (providing a thirty-day period for Congress to review and potentially disapprove the acts of the Council).

*States*, 417 F.3d 147 (1st Cir. 2005); *Attorney Gen. of Territory of Guam v. United States*, 738 F.2d 1017 (9th Cir. 1984).

Although Plaintiffs suggest disposing of the current understanding of the term "state" in the Article I provisions relating to House and Senate representation, Plaintiffs articulate no alternative theory.  Presumably Plaintiffs intend for the District to be encompassed, but the bounds of their proposition are unclear.  All territorial holdings?  All lands governed by the District Clause?  Plaintiffs disclaim that the necessary result of their argument would be the enfranchisement of all the territories, Pls.' MSJ at 18, but offer no additional clarity or limiting principle.

Finally, Plaintiffs do not meaningfully dispute the Executive and Senate Defendants' argument, and the *Adams* court's conclusion that, if the Constitution's system of representation excludes the District, other constitutional provisions cannot be used to dispute this conclusion. Defs.' MTD at 25-28; *Adams I*, 90 F. Supp. 2d at 71-72.

### 1.    Plaintiffs' Focus on the District Clause Is Irrelevant.

Plaintiffs conflate the questions of whether the Constitution requires representation for the District and whether Congress has discretionary authority under the District Clause to grant the District voting representation in the House and Senate.  The Constitution set up a system of representation for states.  Even assuming, *arguendo*, that the District Clause gives Congress the authority to change by statute the meaning of the term "several States" in the structural provisions of Article I, it does not follow that the Constitution *requires* Congress to take such action.  Because the Constitution must be constitutional, *see, e.g.*, *Adams I*, 90 F. Supp. 2d at 71 ("[W]e should strive to read the Constitution in a way that harmonizes its various provisions . . . ."); Defs.' MTD at 25-27, the system of representation established by the Constitution,

limiting congressional representation to states, is constitutional.  Other constitutional provisions, including equal protection, due process, and First Amendment principles, cannot compel Congress to alter the representational system set forth in the Constitution.  This Court therefore need not determine the outer bounds of Congress's power under the District Clause to resolve this case.

### 2.    Plaintiffs' Historical Evidence Does Not Indicate a Constitutional Problem with the District's Lack of Representation.

Plaintiffs devote considerable space to arguing that the Founders did not intend to "permanently" leave District residents without representation in the House or Senate.  Pls.' MSJ at 12-17; *cf. also Amici Curiae Brief of District of Columbia Historians in Support of Plaintiffs*, ECF No. 39.  This argument misses the point.  The Executive and Senate Defendants also noted in their brief, Defs.' MTD at 5-6, 24, that at the founding, different policymakers held different policy preferences concerning representation for District residents.  Indeed, plausibly some of the Founders regretted the lack of representation for the District and hoped that the issue would be revisited in the future.  But whatever any individual Founders' hopes or expectations about future enactments might have been, *see* Pls.' MSJ at 17 ("The Founders almost certainly would have expected District residents to be provided with voting representation sometime during this period, and probably closer to 1864 than 1959."), the Founders were *aware* that residents of the District would not have representatives in the House or the Senate, and the Constitution did not provide otherwise.  *See Adams I*, 90 F. Supp. 2d at 56 ("The Constitution's repeated references to states . . . are reflections of the Great Compromise forged to ensure the Constitution's ratification.").

**B.** **In Any Event, Plaintiffs' Equal Protection Claim Would Fail Because the Classification Plaintiffs Challenge Is Drawn by Article I and District Residents Are Not Similarly Situated to Residents of Federal Enclaves or Overseas Voters.**

The system of representation established by the Constitution—with seats in the House and Senate allocated to the states, but not the territories or the District—does not violate the Equal Protection Clause. The Executive and Senate Defendants' opening brief explained that *Adams* rejected an equal protection argument identical to Plaintiffs' on the ground that the challenged classification inhered in the Constitution itself. Defs.' MTD at 28-29. Because the "differing treatment is the consequence not of legislative determinations but of constitutional distinctions," the Court explained, it lacked "authority to scrutinize those distinctions to determine whether they are irrational, compelling, or anything in between." *Adams I*, 90 F. Supp. 2d at 68. Plaintiffs here fail to contend with this threshold limitation on equal protection doctrine. Moreover, even if the equal protection framework applied, Plaintiffs can identify no similarly situated groups that have voting representation in Congress—all of their examples relate to residents of *states*.

Plaintiffs make three attempts to identify a group similarly situated to residents of the District, but none succeeds because residents of the District are not similarly situated to residents of territories, federal enclaves with significant state control, or overseas voters eligible to vote in state elections.

First, Plaintiffs compare the District to territories which gained voting rights because they were admitted as States. Pls.' MSJ at 17-18. The more appropriate comparison, however, is of the District to territories which have *not* been admitted as states, as plaintiffs have provided no examples of territories that gained voting rights during the time they were still territories. Both the District and these territories lack voting representatives in Congress because they are not

states.[8]  Indeed, accepting Plaintiffs' claims here would cast into doubt the status of all non-state

territories.  Although Plaintiffs deny that their position would require Congress to admit all

territories as states, Pls.' MSJ at 18, their reasoning is unconvincing.  Plaintiffs cherry-pick

several factors to distinguish the District from the other territories that have not been admitted as

states, but never explain why these characteristics would govern the residents' entitlement to

representation in the House and Senate.  *See, e.g.*, Pls.' MSJ at 18 ("Unlike residents of the

District, residents of current United States territories do not pay federal income taxes. And,

unlike the District and many enclaves, the current U.S. territories were not carved out of land

that used to belong to a State.  And, none of their residents ever had voting representation in

Congress, while District residents did until Congress adopted the 1801 Organic Act without

providing for continued voting representation in Congress.").  Nor do Plaintiffs present any

evidence that these factors separate territories which *have* become states from territories that

*have not* become states.

Second, Plaintiffs argue that the District is similarly situated to federal enclaves.  Pls.'

MSJ at 18-20.  Yet Plaintiffs cannot dispute that residents of federal enclaves can vote in

congressional elections because they are citizens of a state, as required by Article I of the

Constitution.  Unlike residents of the District, residents of the NIH grounds in Maryland were

---

[8] Although Plaintiffs attribute some significance to the fact that those who lived in what is now the District had voting representation prior to 1801, Pls.' MSJ at 18, that is because Maryland and Virginia's jurisdiction in the District  did not cease until the passage of the Organic Act in 1801.  *See Adams I*, 90 F. Supp. 2d at 58 (noting federal, Maryland, and Virginia statutes providing for the continuation of  state jurisdiction and law over the District until Congress provided for the government of the District, which it did through the Organic Act in 1801).

found by the Supreme Court to still be citizens of Maryland, and thus entitled to vote in

Maryland's congressional elections.[9]  *Evans v. Cornman*, 398 U.S. 419, 421 (1970).  In reaching

this conclusion, the Supreme Court noted that NIH residents were bound to follow Maryland's

laws and pay Maryland's taxes, and were able to collect Maryland unemployment, obtain

Maryland driver's licenses, and use Maryland courts for divorce and child support payments.  *Id.*

at 424.  Residents of the District are not similarly situated because they do not pay Maryland (or

any other state) taxes, collect Maryland (or any other state) unemployment, or obtain Maryland

(or any other state) driver's licenses.  Instead they interact with the government *of the District* for

analogous functions.  *See* Pls.' MSJ at 19 ("District residents are subject to D.C. Code provisions

governing criminal laws, D.C. income tax, and D.C. sales tax. They go to the D.C. Department

of Motor Vehicles for a District driver's license, go to D.C. Superior Court to resolve family law

disputes, and send their children to the District of Columbia public school system.").  Thus, there

is no state of which District residents could plausibly be considered residents, analogous to the

NIH residents' citizenship in Maryland.

And, Plaintiffs do not respond to Executive and Senate Defendants' argument that the

Constitution gives Congress plenary authority over the District, federal enclaves, and the

territories, Defs.' MTD at 34-35 (citing U.S. Const. art. I, § 8, cl. 17; U.S. Const. art. IV, § 3, cl.

2), but that there is no reason to believe that Congress must exercise that authority identically

across the three areas.

---

[9] Plaintiffs suggest that the Supreme Court in *Evans* held that "Congress could not deny the right to vote" to the residents of the NIH grounds.  Pls.' MSJ at 19.  Plaintiffs appear to gloss over the fact that the suit in *Evans* was between plaintiffs (residents of the NIH grounds), and the members of the Maryland board of elections who sought to exclude the NIH residents from Maryland elections.  *Evans*, 398 U.S. at 419.  Congress was not a party.

Third, Plaintiffs argue that residents of the District are similarly situated to overseas voters who vote through the Overseas Voting Act. Pls.' MSJ at 21-23. But the Act does not distinguish between District residents and residents of states—all can vote in their last place of residence. A Virginia resident who moves abroad may continue to vote in Virginia, just as a District resident who moves abroad may continue to vote in the District's elections. The differences to which Plaintiffs object are purely traceable to the fact that the District is not a state. Plaintiffs argue that "[t]he Overseas Voting Act even enables overseas American citizens [who] have *never* resided in the United States, such as children born abroad, to vote in congressional elections in the State in which that person's parents reside or last resided," Pls.' MSJ at 23, but this is of no moment. Plaintiffs' own source indicates that whether a state allows such voting by "never resided" individuals is a distinction of *state* law. Pls.' MSJ at 23 (citing Federal Voting Assistance Program, Never Resided Voters: A Policy Brief 2 (Spring 2017), https://www.fvap.gov/uploads/FVAP/EO/FVAPNeverResidedPolicyBrief_20170222 _FINAL.pdf). Indeed, *the District* appears to permit voting by such "never resided" individuals. *See* Military and Overseas Voter (UOCAVA), District of Columbia Board of Elections ("A US citizen who has never resided in the US and has a parent or legal guardian that was last domiciled in the District of Columbia is eligible to vote in District of Columbia."), last visited July 16, 2019, https://www.dcboe.org/FAQS/Military-and-Overseas-Voters-(UOCAVA).

Plaintiffs are thus left without any individuals similarly situated to District residents, yet with representation in the House and Senate, and their equal protection claims must therefore fail.

**C.** **Plaintiffs' Due Process Claim Would Also Fail Because District Residents Do Not Meet the Constitutionally-Mandated Qualifications for Voting Representation in the House or Senate.**

Plaintiffs' discussion of their due process claim, Pls.' MSJ at 29-32, also does not address the dispositive fact that this claim was already heard and rejected, as affirmed by the Supreme Court, in *Adams*. As Executive and Senate Defendants noted, the holding in *Adams* was inescapably clear—"the Constitution does not grant that right [the right to vote in congressional elections] except to individuals who qualify under Article I—which District residents do not. Nor can the Due Process Clause, any more than the Equal Protection Clause, be used to change elements of the composition of Congress that are dictated by the Constitution itself." *Adams I*, 90 F. Supp. 2d at 70-71 (citing *Carliner v. Commissioner*, 412 F.2d 1090, 1090 (D.C. Cir. 1969)).

Plaintiffs continue to pursue their *Obergefell* analysis, but, *Adams* remains good law on the precise question of whether the Due Process Clause requires representation for District residents. *Agostini v. Felton*, 521 U.S. 203, 237-38 (1997). Even if that were not the case, Plaintiffs' analogy to *Obergefell* is flawed in at least two ways. First, by its own terms it is unclear if *Obergefell* carries any weight beyond the area of marriage and intimacy. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). Plaintiffs characterize the Executive and Senate Defendants' argument as "this case is more like the Supreme Court case involving physician-assisted suicide than the same-sex marriage case," Pls.' MSJ at 29, but Executive and Senate Defendants' position is simply that *Obergefell* may be cabined to only rights involving marriage and intimacy. Defs.' MTD at 36-37. Second, Plaintiffs cannot show that voting rights is an area that has experienced a recent expansion in recognition. The rule that representation in the House and Senate is limited to the

22

residents of states has been unchanging from the founding to today.  Plaintiffs attack two

arguments that the Executive and Senate Defendants do not make—that voting rights must be

expanded by constitutional amendment, Pls.' MSJ at 30, or that all fundamental rights must be

enumerated in the constitution, Pls.' MSJ at 31.  Plaintiffs also cite to the Supreme Court's recent

analysis in *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019), Pls.' MSJ at 30-31, but that addressed a

different standard—whether the Eighth Amendment's protections against excessive fines were

sufficiently "fundamental to our scheme of ordered liberty" that they should be incorporated into

the Fourteenth Amendment's due process protections which apply against the states.  *Timbs*, 139

S. Ct. at 687.  Plaintiffs here identify no constitutional restriction which they seek to apply

against the states.

### D.  Plaintiffs Do Not State a Claim Under the First Amendment.

Plaintiffs' First Amendment theory—their only claim that does not replicate a claim from

*Adams*—fares no better.  As previously discussed, Defs.' MTD at 37-39, the general provisions

of the First Amendment cannot make unconstitutional the specific provisions of Article I.

Furthermore, Plaintiffs' entire theory rests on dubious ground.  Plaintiffs' motion for

summary judgment makes clear that Plaintiffs do not assert injuries to any of the rights

traditionally protected by the First Amendment, such as the right to freely assemble, to associate

with others of their choice, and to seek redress for their grievances.  Indeed, Plaintiffs do not

address their claims concerning the right to petition for redress of grievances at all in their

opposition to the Executive and Senate Defendants motion to dismiss, and have thus conceded

them.

Instead, Plaintiffs rely solely on a novel theory raised in several partisan gerrymandering

cases that a lack of voting representation in Congress can implicate the First Amendment rights

of association and representation.  Pls.' MSJ at 32-34.  This theory has never been accepted by the Supreme Court.  Indeed, the Supreme Court recently declined to endorse Plaintiffs' novel theory in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), and vacated one of the lower-court cases on which Plaintiffs rely, Pls.' MSJ at 33 (citing *Benisek v. Lamone*, 348 F. Supp. 3d 493 (D. Md. 2018), *vacated and remanded sub nom. Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)).  In *Rucho*, the Supreme Court held that plaintiffs' claims of partisan gerrymandering should be dismissed as non-justiciable because no judicially manageable standards existed to decide them.  The Supreme Court considered the First Amendment theory advanced here, *id.* at 2504-05, but found that it did not present judicially manageable standards.  The Supreme Court concluded that the First Amendment theory was "not a serious standard for separating constitutional from unconstitutional partisan gerrymandering" because of the difficulty in answering questions such as "How much of a decline in voter engagement is enough to constitute a First Amendment burden?  How many door knocks must go unanswered?  How many petitions unsigned? How many calls for volunteers unheeded?"  *Id.* at 2505.  These questions also bar Plaintiffs here from showing that their First Amendment rights are burdened.  Plaintiffs argue that they have less incentive to band together, Pls.' MSJ at 32-33, but by how much?  Plaintiffs do not dispute that the District nourishes a thriving civil society, and Plaintiffs have indeed banded together for this lawsuit.

The Supreme Court also called the theory into question, noting that "[t]o begin, there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue.  The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Rucho*, 139 S. Ct. at 2504.  This echoes the argument made by Executive and Senate Defendants here that "fatally, Plaintiffs do not claim any impingement on

their right to freely assemble, band together to advance their agenda, or petition existing lawmakers (or the courts, as this lawsuit demonstrates) to advance their agenda." Defs.' MTD at 38.

Even if Plaintiffs' First Amendment theory could survive *Rucho*, Plaintiffs' arguments fall short of those offered in the partisan gerrymandering cases in an important way. As Executive and Senate Defendants previously argued, the Plaintiffs do not claim that they have been penalized "because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." Defs.' MTD at 39 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring)). And Plaintiffs are not "qualified" voters for House or Senate seats, and thus in that sense their "representational rights," if such a concept survives *Rucho*, have not been altered.

## **CONCLUSION**

For the above-stated reasons and the reasons explained in Executive and Senate Defendants' motion to dismiss, this Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim, and deny Plaintiffs' motion for summary judgment.

Dated: July 18, 2019                    Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        LESLEY FARBY
                                        Assistant Branch Director

                                        */s/ Rebecca M. Kopplin*
                                        REBECCA M. KOPPLIN

Trial Attorney (California Bar No. 313970)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C.  20005
Telephone:  (202) 514-3953
Facsimile:  (202) 616-8470
Email: Rebecca.M.Kopplin@usdoj.gov

Counsel for Executive Defendants the United States of America, Secretary of Commerce Wilbur Ross, and President Donald J. Trump; and Senate Defendants President Pro Tempore Chuck Grassley, Secretary of the Senate Julie Adams, Sergeant at Arms and  Doorkeeper Michael Stenger, and Vice President Michael R. Pence