# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGELICA CASTAÑON, *et al.*,

      *Plaintiffs,*

  v.

UNITED STATES, *et al.*,

      *Defendants.*

Civil Action No. 18-2545
Three-Judge Court
(RDM, RLW, TNM)

Before: WILKINS, *Circuit Judge*, and MOSS and MCFADDEN, *District Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

## MEMORANDUM OPINION

WILKINS, *Circuit Judge*: This suit is brought by registered voters residing in the District of Columbia (the "District") in an effort to secure for themselves, and others similarly situated, the ability to elect voting representatives to the United States Congress. Plaintiffs challenge their lack of the congressional franchise as unconstitutional because violative of their rights to equal protection, due process, and association and representation. This case is a close cousin of a suit litigated a generation ago, *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000) (mem.), and *aff'd*, 531 U.S. 941 (2000) (mem.), whose reasoning necessarily informs ours and whose outcome, in the end, we echo.

Beyond the gravity of its substance, perhaps this suit's most notable attribute is its bifurcation – the gap between Plaintiffs' central theory of the case and those tertiary aspects of Plaintiffs' claims whose merits we are empowered to address. We recognize that District residents' lack of the congressional franchise is viewed by many, even most, as deeply unjust, and we have given each aspect of Plaintiffs' claims most serious consideration, but our ruling today is compelled by precedent and by the Constitution itself.

## I.      Procedural History

Plaintiffs – who are U.S. citizens, registered voters, and residents of the various Wards of the District of Columbia, Am. Compl. ¶ 21, ECF No. 9 – filed their Complaint on November 5, 2018, and amended it on November 26, 2018, *see generally id.* The Amended Complaint "seeks to secure the right to full voting representation in the United States Congress for American citizens living in the District of Columbia," *id.* ¶ 1, and alleges three counts: denial of equal protection, denial of due process, and infringement of the right to association and representation, *id.* ¶¶ 135-42. Originally named as defendants were: the Speaker, the Clerk, and the Sergeant at Arms of the

U.S. House of Representatives (collectively, "the House Defendants"); the President *Pro Tempore*, the Secretary, and the Sergeant at Arms and Doorkeeper of the U.S. Senate, as well as the Vice President in his capacity as President of the Senate ("the Senate Defendants"); and the President and the Secretary of Commerce of the United States ("the Executive Defendants"). *Id.* ¶¶ 59-67. But on March 27, 2019, Plaintiffs voluntarily dismissed the House Defendants, and the House later filed an *amicus* brief in support of Plaintiffs' cause.

On the day Plaintiffs filed the Amended Complaint, they brought a motion for the convening of a three-judge panel, pursuant to 28 U.S.C. § 2284(a), which provides that "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts[.]" District Judge Randolph D. Moss, to whom the case was originally assigned, found it appropriate to convene a three-judge District Court; he therefore requested that then-Chief Judge Merrick B. Garland of the U.S. Court of Appeals for the District of Columbia Circuit designate two other judges to serve on this panel. *See* 28 U.S.C. § 2284(b)(1) (authorizing the chief judge of the circuit to designate a three-judge court).

Before us are a motion to dismiss ("MTD") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), filed jointly by the Executive and Senate Defendants, ECF No. 21, and Plaintiffs' motion for summary judgment ("MSJ") pursuant to Federal Rule of Civil Procedure 56, ECF No. 23. *Amici* have filed a total of eight briefs.[1]

Having benefitted from oral argument, the parties' filings, and the submissions of *amici*, we now consider, in turn, the applicable standards of review, relevant legal history, this panel's subject-matter jurisdiction, the justiciability of the claims over which we assert jurisdiction, and the merits of the justiciable claims.

## II.    Standards of Review

"[T]he scope of Rule 12(b)(1) is flexible," comprehending standing as well as most justiciability issues. *See* 5B FED. PRAC. & PROC. CIV. § 1350 (Wright & Miller 3d ed.). Jurisdictional issues are to be considered and resolved at the threshold, and the party invoking federal jurisdiction – here, Plaintiffs – bears the burden of establishing that the plaintiffs have standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998). The Court may look beyond the complaint in resolving questions of jurisdiction. *See Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016). On a Rule 12(b)(1) motion, "it is well-settled that the complaint will be construed broadly and liberally, in conformity with the general principle set forth

---

[1]    *Amici* are: (1) Concerned District of Columbia Legal Organizations and Concerned District of Columbia Legal Professionals, in support of Plaintiffs, ECF No. 43; (2) the District of Columbia, in support of Plaintiffs, ECF No. 42; (3) Historians Kenneth R. Bowling, William C. diGiacomantonio, and George Derek Musgrove, in support of Plaintiffs, ECF No. 39 ("Historians' Br."); (4) David C. Krucoff, Executive Director and Founder of the non-profit organization "Douglass County, Maryland," in support of Plaintiffs, ECF No. 45-1; (5) constitutional law scholars Alan B. Morrison, Peter B. Edelman, Lawrence Lessig, Peter M. Shane, Peter J. Smith, and Kathleen M. Sullivan, in support of Plaintiffs, ECF No. 40 ("Scholars' Br."); (6) U.S. House of Representatives, in support of Plaintiffs, ECF No. 38 ("House's Br."); (7) John H. Page, in support of Plaintiffs in part and of Defendants in part, ECF No. 46; and (8) Washington Lawyers' Committee for Civil Rights and Urban Affairs, Neighbors United for DC Statehood, the League of Women Voters of the United States, the League of Women Voters of the District of Columbia, DC Vote, and American Civil Liberties Union of the District of Columbia, in support of Plaintiffs, ECF No. 41 ("Orgs.' Br.").

in Rule 8(e)[.]"  5B FED. PRAC. & PROC. CIV. § 1350 (Wright & Miller 3d ed.); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), *abrogated on other grounds as recognized in Davis v. Scherer*, 468 U.S. 183, 191 (1984).

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assesses whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Here, too, the Amended Complaint is construed in Plaintiffs' favor, *Scheuer*, 416 U.S. at 236, and its material allegations are accepted as true, *Iqbal*, 556 U.S. at 678.  In considering a Rule 12(b)(6) motion, we "consider the complaint in its entirety," and may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007) (citing 5B FED. PRAC. & PROC. CIV. § 1357 (Wright & Miller 3d ed. 2004 and Supp. 2007)).

Summary judgment, meanwhile, is appropriate where the movant can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At the summary-judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  There are no disputes of material fact here.

### III.    Background

The Seventeenth Amendment to the U.S. Constitution provides that "[t]he Senate of the United States shall be composed of two Senators from each state, elected by the people thereof[.]"  U.S. CONST. amend. XVII.  Article I of the Constitution, meanwhile, provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States[.]"  *Id.* art. I, § 2, cl. 1.  The Fourteenth Amendment dictates that "Representatives shall be apportioned among the several States according to their respective numbers," *id.* amend. XIV, and Article I provides that an "actual Enumeration" shall be conducted every ten years, *id.* art. I, § 2, cl. 3.  The provisions of the Constitution relating to the apportionment of House representation are effectuated by statute.  The Secretary of Commerce is charged, by 13 U.S.C. § 141, with the conduct of the decennial census; that statute also mandates that the Secretary tabulate the total population "by States" and report the same to the President within nine months of the census date, *id.* § 141(b).  The President must then "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled[.]"  2 U.S.C. § 2a(a).  "Each State shall be entitled . . . to the number of Representatives shown" in the President's statement, and within fifteen days of receiving that statement, the Clerk of the House must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled[.]"  *Id.* § 2a(b).  It is undisputed, and the Court takes judicial notice of the fact, *see* FED. R. EVID. 201, that District residents are unrepresented in Congress by anyone but the Delegate, who by statute has a seat in the House and may debate, but may not vote, 2 U.S.C. § 25a(a).

## IV.   *Adams*

Neither we nor the parties write on a blank slate.  Twenty years ago, another three-judge panel of this Court had occasion to pass on claims very similar to those now before us, issuing a well-reasoned opinion we are inclined to follow to the extent we are not bound to do so.  The holdings of the *Adams* court, together with the Supreme Court's summary affirmances of the *Adams* panel's judgment, serve as the background against which we rule.

*Adams* represented the consolidation of two cases: *Adams v. Clinton* and *Alexander v. Daley*.  90 F. Supp. 2d at 37-38.  In both cases, the plaintiffs alleged that the failure to apportion House representatives to the District, and to permit District residents to vote in House and Senate elections, was unconstitutional because violative of District residents' rights to equal protection and to a republican form of government.  *Id.* at 37.  Additionally, some plaintiffs brought claims that the defendants, among them the Secretary of Commerce and the President, violated Article I, the Seventeenth Amendment, and their due-process rights, and abridged their privileges and immunities as U.S. citizens, via their exclusion from the congressional franchise.  *Id.* at 38.  The plaintiffs in the consolidated suit "d[id] not dispute that to succeed they must be able to characterize themselves as residents of a 'state.'"  *Id.* at 46 (citations omitted).  Among the relief sought from the *Adams* panel was an injunction against the Secretary of Commerce, compelling him to include the District in his population report to the President.  *See id.* at 43; *see also Alexander* Compl. 59, ECF No. 21-2.

Considering those defendants' motions to dismiss and plaintiffs' motions for summary judgment, the *Adams* panel – in a thorough opinion accompanied by a similarly thoughtful partial dissent – remanded for consideration by a single-judge District Court those claims that did not concern apportionment, 90 F. Supp. 2d at 39-40, and then ruled in favor of the defendants and dismissed the remaining claims, *id.* at 72.  The *Adams* panel concluded that, while the plaintiffs had standing to pursue their apportionment claims, *id.* at 45, dismissal of those claims was appropriate because Article I restricted the House franchise to "citizens of states," and the District could not "be considered a state for purposes of congressional representation under Article I."  *Id.* at 56.

The plaintiffs proceeded to the Supreme Court by right of direct appeal, which 28 U.S.C. § 1253 makes available to "any party . . . in any civil action, suit or proceeding required by an Act of Congress to be heard and determined by a district court of three judges" where such appeal is from "an order granting or denying . . . an interlocutory or permanent injunction."  The Supreme Court, in twin issuances, summarily affirmed the *Adams* panel's judgment.  *Alexander v. Mineta*, 531 U.S. 940 (2000) (mem.); *Adams v. Clinton*, 531 U.S. 941 (2000) (mem.).

The import of the Supreme Court's treatment of *Adams* – and thus the extent to which this Court is bound – is not immediately clear.  Lower courts have been admonished that, while a summary affirmance is a disposition on the merits and thus may not be disregarded, *see Hicks v. Miranda*, 422 U.S. 332, 344 (1975) ("[T]he lower courts are bound by summary decisions by this Court until such time as the Court informs them that they are not."  (alterations, citation, and internal quotation marks omitted)), a summary affirmance has "considerably less precedential value than an opinion on the merits," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180-81 (1979).  Moreover, "a summary affirmance is an affirmance of the judgment only," *Comptroller of the Treasury v. Wynne*, 135 S. Ct. 1787, 1801 (2015) (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)), rather than an affirmance of the reasoning of the lower court,

*id.* That said, the Supreme Court has several times treated a lower court's reasoning as relevant to a summary affirmance's import. *See, e.g.*, *Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1310 (2016) (citing summary affirmance in *Cox v. Larios*, 542 U.S. 947 (2004), and approvingly discussing the *Cox* District Court's reasoning); *Morse v. Republican Party of Va.*, 517 U.S. 186, 202 (1996) (citing "the logic of" a prior summary affirmance as something that should have been instructive to the *Morse* lower court, and quoting the prior District Court's reasoning).

Two relevant questions emerge from this amalgam: those of substance and weight. As to substance (and despite some jurisprudential inconsistency on this score), the Court is guided by the Supreme Court's statements in *Illinois State Board of Elections*: A summary affirmance's "precedential effect . . . can extend no farther than 'the precise issues presented and necessarily decided by those actions.'" 440 U.S. at 182 (quoting *Mandel*, 432 U.S. at 176). "A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." *Id.* (citations omitted). Divining what was necessarily decided by a summary affirmance necessitates an examination of the jurisdictional statements submitted to the Supreme Court pursuant to the prior direct appeals. *See* William J. Schneier, *The Do's and Don'ts of Determining the Precedential Value of Supreme Court Summary Dispositions*, 51 BROOK. L. REV. 945, 960-61 & n.101 (1985) (citing *Ill. State Bd. of Elections*, 440 U.S. at 182; *see also Anderson v. Celebrezze*, 460 U.S. 780, 784-85 n.5 (1983); *Washington v. Confederate Band & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 477 n.20 (1979); *Mandel*, 432 U.S. at 176; *Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976)). A lower court must also discern whether there are any legally significant differences between the case before it and the cases that were the subject of summary affirmances, *see* Schneier, *Do's and Don'ts*, *supra*, 960 & n.100 (citing *Ill. State Bd. of Elections*, 440 U.S. at 181-82; *Mandel*, 432 U.S. at 176-77; *Celebrezze*, 460 U.S. at 784-85 n.5; *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 499 (1981) (plurality)), and whether there have been superseding doctrinal developments since the summary affirmance, *id.* at 961 & n.104 (citing *Hicks*, 422 U.S. at 344-45; *Mandel*, 432 U.S. at 180 (Brennan, J., concurring)).

On weight, in addition to understanding that a summary affirmance's precedential value is "considerably less" than that of a full opinion, *Ill. State Bd. of Elections*, 440 U.S. at 180-81, we are informed by the Supreme Court's endorsement of a "do-it-yourself" approach. In *Anderson v. Celebrezze*, the Supreme Court noted with approval that the Sixth Circuit had "correctly recogniz[ed] the limited precedential effect to be accorded summary dispositions," and had undertaken an "independent[]" analysis. 460 U.S. at 784-85; *see also id.* at 784 n.5 ("The Court of Appeals quite properly concluded that our summary affirmances . . . were a 'rather slender reed' on which to rest its decision." (citation omitted)).

Against this backdrop, we proceed to the case now before us, beginning, as we must, with an analysis of whether we have jurisdiction to review each of the claims in this case. *Steel Co.*, 523 U.S. at 94.

## V.      Jurisdiction over Plaintiffs' House Claims

In the first of several threshold issues, Defendants contend that this case ought not to have been referred to a three-judge panel "because Plaintiffs' [Amended C]omplaint challenges the District's lack of representation in the House, not any particular apportionment of congressional districts." Mem. in Supp. of MTD at 9 n.9 (citing *City of Philadelphia v. Klutznick*, 503 F. Supp. 657, 658 (E.D. Pa. 1980)). This argument is foreclosed, however, by the Supreme Court's summary affirmances of the *Adams* panel's decision on the merits of those plaintiffs' House-

related claims. Like these Plaintiffs, the plaintiffs in *Adams* challenged the District's lack of representation in the House, there arguing that the District should be treated as a State, that District residents should be able to vote as Maryland residents, and that the District's lack of House representation violated the Equal Protection, Privileges or Immunities, Due Process, and Republican Guarantee Clauses of the Constitution. 90 F. Supp. 2d at 46, 56, 65. The *Adams* panel's jurisdiction to hear those plaintiffs' claims was essential to the Supreme Court's direct review under 28 U.S.C. § 1253; had such jurisdiction been lacking, the Supreme Court would have found itself to lack jurisdiction to consider the matter on direct appeal. *See, e.g.*, *Moody v. Flowers*, 387 U.S. 97, 104 (1967) ("[A] three-judge court was improperly convened. Appeals should, therefore, have been taken to the respective Courts of Appeals, not to this Court."); *Adams v. Clinton*, 531 U.S. at 941 (mem.) ("Justice Stevens would dismiss the appeal."). We therefore hold that those of Plaintiffs' claims that challenge the District's lack of representation in the House are properly before us as a three-judge District Court.

## VI.    Jurisdiction over Plaintiffs' Senate Claims

An important threshold issue – though one neither the parties nor *amici* address in their filings – is the question of this panel's jurisdiction over the claims aimed at senatorial representation. The statute giving rise to this three-judge District Court provides for the convening of such a court "when an action is filed challenging the constitutionality of the apportionment of congressional districts[.]" 28 U.S.C. § 2284(a). But Plaintiffs' suit extends beyond their lack of representation in the House – the chamber that "the apportionment of congressional districts" concerns. Each of Plaintiffs' three causes of action decries their lack of voting representation not just in the House, but in Congress writ large, *see* Am. Compl. ¶¶ 135, 137, 141; they have named as defendants the President *Pro Tempore* of the Senate, the Vice President in his capacity as president of the Senate, and both the Clerk and the Sergeant at Arms of the Senate, *see id.* ¶¶ 62-65; and among the relief sought are injunctions compelling each of the Senate Defendants to take action to the end of securing for District residents representation in the Senate, *see id.* Prayer for Relief ¶ 5. We are thus confronted with the question of the propriety of our considering Plaintiffs' senatorial claims.[2] *Cf. Perez v. Ledesma*, 401 U.S. 82, 87 (1971) ("Even where a three-judge court is properly convened to consider one controversy between two parties, the parties are not necessarily entitled to a three-judge court and a direct appeal on other controversies that may exist between them." (citation omitted)).

The Supreme Court has made clear that a properly convened three-judge district court has some ability to exercise a brand of supplemental jurisdiction over claims beyond those that form the core of its statutory jurisdictional grant. Claims that have been found to be proper subjects for the exercise of such supplemental jurisdiction have generally borne an intimate relation to those that impelled the formation of a three-judge district court in the first instance. For example, while interpreting now-repealed 28 U.S.C. § 2281 (which provided that any injunction "restraining the enforcement, operation or execution of a State statute" due to unconstitutionality could only be granted by a three-judge district court), the Supreme Court held in *Allee v. Medrano* that a three-judge district court may properly assert jurisdiction over "every question pertaining to the prayer

---

[2] In considering this question, we are mindful of, but not bound by, the *Adams* panel's discussion of the same question. The *Adams* panel's decision not to accept jurisdiction of the Senate claims presented there was in no way "essential to sustain that judgment," as would be necessary to give that holding in *Adams* binding force through the operation of the Supreme Court's summary affirmances. *See Ill. State Bd. of Elections*, 440 U.S. at 182.

for the injunction" that was the original basis for its convening. *See* 416 U.S. 802, 812 n.8 (1974) (citing *Pub. Serv. Comm'n v. Brashear Freight Lines*, 312 U.S. 621, 625 n.5 (1941)); *see also Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 504 n.5 (1972) (indicating that "a three-judge court is the proper forum for all claims against" (there) a challenged statute). As the *Adams* panel observed, a three-judge court may also decide ancillary claims where their resolution is "necessary . . . to provide a 'final and authoritative decision of the controversy' among the parties" to the claims that gave rise to the three-judge court. *See* 90 F. Supp. 2d at 39 (citing *Brashear Freight Lines*, 312 U.S. at 625 n.5, and *Allee*, 416 U.S. at 812 n.8). And it is permissible for a three-judge district court to consider ancillary claims where resolution of those claims would dispose of the entire case, including those claims over which the panel has original jurisdiction. *See United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 287-88 (1963) ("Once convened the case can be disposed of below or here on any ground, whether or not it would have justified the calling of a three-judge court." (citations omitted)).

Only on the margins might any of these factors be said to be present here. It certainly cannot be declared that disposition of Plaintiffs' Senate claims is necessary to settle the controversy between Plaintiffs and the Executive Defendants, against whom the apportionment claims are asserted, *see Brashear Freight Lines*, 312 U.S. at 625 n.5, or that resolution of the apportionment claims would obviate the need to decide the Senate claims, *see Ga. Pub. Serv. Comm'n*, 371 U.S. at 287-88. And while the Senate claims do of course "pertain" to Plaintiffs' quest for representation in Congress as a whole, it is Plaintiffs' challenge to apportionment – not any challenge to their exclusion from Congress writ large – that is the basis on which this Court convened. *See Allee*, 416 U.S. at 812 n.8.

Moreover, even if there is some framing of Plaintiffs' Senate claims that would lend propriety to this panel's consideration of them, the Supreme Court has made clear that even the proper exercise of jurisdiction over such non-core claims is discretionary. *See, e.g.*, *Hagans v. Lavine*, 415 U.S. 528, 544 (1974) (noting that, when a three-judge district court was presented with a claim that fell outside its core statutory purview, "the most appropriate course may well have been to remand to the single district judge for findings and the determination of [that] claim" (quoting *Rosado v. Wyman*, 397 U.S. 397, 403 (1970))). We are cognizant of the fact that our resolution of the Senate claims would "deprive the Court of Appeals of the opportunity to review our work." *Adams*, 90 F. Supp. 2d at 39 (citing 28 U.S.C. § 1253). Moreover, a misstep in this sphere could result in the Supreme Court finding that it may not consider on direct appeal our judgment on the Senate claims. *See, e.g.*, *Perez*, 401 U.S. at 85-88 ("Under 28 U.S.C. § 1253, we have jurisdiction to consider on direct appeal only those civil actions 'required . . . to be heard and determined' by a three-judge court. Since the constitutionality of this parish ordinance was not 'required . . . to be heard and determined' by a three-judge panel, there is no jurisdiction in this Court to review that question." (alterations in original)). These considerations lead us to decline to consider those of Plaintiffs' claims that concern Senate representation. We remand those claims for Judge Moss's sole consideration.

### VII.    Justiciability of Plaintiffs' Principal House Claims

We now turn to what we perceive to be the heart of the matter: Plaintiffs' supposition that Congress is under a constitutional obligation to act affirmatively in a way it has not yet done, and that this Court may (and should) use its power to the end of compelling such action. *See, e.g.*, Am. Compl. ¶¶ 11-13, 114, 141; *id.* Prayer for Relief ¶¶ 1, 5; Mem. in Supp. of MSJ at 40-41. To the

extent Plaintiffs' claims are premised on this notion – that is, insofar as they seek to litigate or redress Congress's allegedly wrongful *in*action – we find such claims not to be justiciable, and accordingly dismiss them.

To set the stage, Plaintiffs contend that Congress is empowered by the District Clause of Article I of the U.S. Constitution to provide by legislation for the congressional enfranchisement of District residents. *E.g.*, Am. Compl. ¶¶ 4, 11, 13, 92-104; *see* U.S. CONST. art. 1, § 8, cl. 17 ("The Congress shall have Power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States[.]"). Plaintiffs further assert that Congress's failure to use its District Clause power to this end, Am. Compl. ¶¶ 112-14 (noting this failure), is violative of their rights of equal protection, *id.* ¶ 125, due process, *see id.* ¶ 5, and association and representation, *id.* ¶¶ 118-19. They seek, as relevant here: (1) a declaration to the effect that they (and all others similarly situated) have a constitutional right to the congressional franchise, that the Defendants have violated this right, and that "the continuing deprivation of this right violates one of the most precious attributes of United States citizenship," *id.* Prayer for Relief ¶ 1; and (2) after the Court defers "further relief for a reasonable period of time to provide Congress an opportunity, on the basis of the Court's declaratory judgment, to fashion a constitutional remedy that will vindicate the constitutional rights" of District residents to the congressional franchise, *id.* ¶ 3, an "order [of] injunctive relief," which "could include . . . ordering the Defendants to present plans" for how they will enfranchise District residents and then "ordering Defendants to pursue the steps that will most appropriately assure" that District residents will secure the congressional franchise*, id.* ¶ 5.

We are troubled by the import of Plaintiffs' central premise: that it is both feasible and proper for this Court to order (or otherwise seek to compel) Congress to enact particular legislation. The concerns raised by such a premise include Article I's Speech or Debate Clause, U.S. CONST. art. I, § 6, cl. 1; *see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) ("The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently."), general separation-of-powers principles, and Article III standing. We explicate and rely on the last of these, the analysis of which necessarily implicates them all.

We first pause, however, to note that the justiciability of these claims is not among those issues on which our hand is guided by *Adams* and its summary affirmances, in binding or even persuasive fashion. As Plaintiffs themselves acknowledge, their focus on the District Clause sets their central claims apart from those asserted in *Adams*. *E.g.*, Am. Compl. ¶¶ 10 ("[U]nlike the equal protection challenge in *Adams*, Plaintiffs' claims here are . . . . based on Congress's refusal to exercise its authority to protect the voting rights of District residents in the face of its recognition, post-*Adams*, that it has the power to do so."), 124 ("[U]nlike the *Adams* plaintiffs, the plaintiffs here contend that they are constitutionally entitled to voting representation notwithstanding that they are not residents of a State and that legislative and legal developments after *Adams* entitle them to that representation."); Mem. in Supp. of MSJ at 8 ("The argument that Congress has the authority under the District Clause to grant voting rights to District residents was neither made nor addressed in *Adams*."). The *Adams* panel expressed no opinion on the particular issues now before us; although the *Alexander* complaint prayed for items of relief virtually identical to those here at issue, *see Alexander* Compl. 57-60, the *Adams* panel construed the thrust of those plaintiffs' House-related claims to be concerned largely with apportionment, and in any

case did not pass on any theory analogous to the one Plaintiffs now press. *See generally* 90 F. Supp. 2d 35. Nor – in case there were any remaining doubt – does either of the jurisdictional statements submitted to the Supreme Court by the *Adams* and *Alexander* plaintiffs, respectively, squarely present the theory Plaintiffs assert here: that it is unconstitutional for Congress to have neglected to use its District Clause powers to give District residents the House franchise. *See generally* Jurisdictional Statement, *Alexander v. Mineta*, 531 U.S. 940 (2000) (No. 99-2062); Jurisdictional Statement, *Adams v. Clinton*, 531 U.S. 941 (2000) (No. 00-97), 2000 WL 33999989. Because this argument "was neither made nor addressed in *Adams*," Mem. in Supp. of MSJ at 8, neither that decision nor its twin summary affirmances marks or illuminates our path.

In order to meet "the 'irreducible constitutional minimum' of standing," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *id.* (citing *Lujan*, 504 U.S. at 560-61). The "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

In performing the standing analysis, the Court "accept[s] as true all material allegations of the complaint," *Warth v. Seldin*, 422 U.S. 490, 501 (1975), construes the complaint in the plaintiffs' favor, *id.*, and assumes the plaintiffs' success on the merits of their claims, *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam). We therefore accept, for the moment, the validity of Plaintiffs' premises concerning the import of the District Clause, and generally assume for present purposes that Plaintiffs will prevail.

Defendants do not contend that Plaintiffs have not suffered an injury in fact, but of course that does not end our inquiry. *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The question of standing is not subject to waiver[.]"). Plaintiffs' asserted injury is the denial of the right to voting representation in Congress. *See, e.g.*, Am. Compl. ¶ 1. Assuming the merits of Plaintiffs' claims – in particular, that they have a constitutional right to the House franchise – they have suffered an injury in fact as a result of that denial. "[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Baker v. Carr*, 369 U.S. 186, 206 (1962) (finding an injury in fact where plaintiffs asserted that an apportionment impaired their right to vote for county representatives). We also reject any notion that the asserted injury is a generalized one. "[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998) (citation omitted); *see also Baker*, 369 U.S. at 207-08 ("The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution . . . . If such impairment does produce a legally cognizable injury, they are among those who have sustained it."). Plaintiffs have, we conclude, suffered an injury in fact.

But having cleared the first of the three hurdles, Plaintiffs are confronted with the difficult obstacles of causation and redressability. Unpacking causation requires consideration of the actions of the Executive Defendants and those Senate Defendants who might be fairly said to remain before us even after our remand of Plaintiff's Senate claims: the President *Pro Tempore* of

the Senate and the Vice President in his capacity as President of the Senate, both of whom could be required to vote on any legislation granting District residents the House franchise.[3]  Our discussion of redressability brings us back to the issue of our own power, and in particular its limitations.

Again, the causation analysis requires us to consider whether the alleged injury in fact is fairly traceable to the challenged conduct of the defendants. *Spokeo*, 136 S. Ct. at 1547. Moreover, "it does not suffice if the injury complained of is 'the result of the independent action of some third party not before the court[.]'" *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quoting *Lujan*, 504 U.S. at 560-61 (brackets and emphasis omitted)). In other words, "[t]he causation element requires that a proper defendant be sued." *Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014) (citations omitted).  It is abundantly clear that insofar as Plaintiffs are pressing the theory that Congress should have acted in a particular way but has wrongfully not bestirred itself to do so, neither of the Executive Defendants can be held responsible for Plaintiffs' lack of the House franchise.  Nor can those Senate Defendants whose duties comprehend voting on legislation be charged with "causing" Plaintiffs' injury.  The nonexistence of any statutes granting Plaintiffs the House franchise is not fairly traceable to individual legislators, who themselves have no power to pass legislation, but rather is caused by the inaction of the chambers of Congress writ large.[4]  "In short, [Plaintiffs'] alleged injury was not caused by any of the defendants, but by [] 'absent third part[ies]'" – the House and the Senate.  *See Common Cause*, 748 F.3d at 1285 (quoting *Fla. Audobon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).

We do not wonder at Plaintiffs' failure to name the correct parties as defendants, of course, for it is well established that the Speech or Debate Clause would pose "an absolute bar to suit" where plaintiffs seek to assign liability for "any act that falls 'within the sphere of legitimate legislative activity.'" *Common Cause*, 748 F.3d at 1283 (quoting *Eastland*, 421 U.S. at 503); *see* U.S. CONST. art. I, § 6, cl. 1.  But we find Plaintiffs' attempted workaround to be fatally infirm. "Article III 'requires no more than *de facto* causality,'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)) – but it does require that much, and it is not present here.  We find, therefore, that Plaintiffs have failed to establish the "causation" prong of Article III standing with respect to those aspects of their claims that are premised on the wrongfulness of congressional inaction.

---

[3]  Because we disclaim jurisdiction over Plaintiffs' Senate claims, those Senate Defendants whose duties pertain only to Senate operations and do not comprehend legislating – the Secretary of the Senate and its Sergeant at Arms – are no longer before us.  *See* Am. Compl. ¶¶ 63 (noting that the Secretary of the Senate "serves as an administrative and financial officer"), 64 (stating that the Sergeant at Arms of the Senate "is the chief law enforcement officer of the Senate"); *id.* Prayer for Relief ¶¶ 5(d) (seeking an injunction against the Secretary of the Senate as to the transmission of Senate-election forms), (b) (seeking an injunction against the Sergeant at Arms of the Senate requiring him to seat a District-elected Senator), (e) (seeking an injunction compelling the Sergeant at Arms of the Senate to otherwise "give effect to votes cast by the citizens of the District" in a senatorial election).  But the President *Pro Tempore* of the Senate and the Vice President may be required to play a role in vindicating Plaintiffs' House claims.  *Cf.* U.S. CONST. art. I, § 3, cl. 4 (providing that the Vice President may vote in the Senate where necessary to break ties). Therefore, our remand of Plaintiffs' Senate claims to a single District Court judge does not remove the President *Pro Tempore* of the Senate or the Vice President from the picture as we consider Plaintiffs' remaining claims.

[4]  Even were we to take a different view of causation as to the Senate Defendants, the end result would not change, as the Speech or Debate Clause would preclude Plaintiffs from pursuing individual legislators for their "legitimate legislative activity." *Eastland*, 421 U.S. at 503.

We also observe that Plaintiffs cannot carry their burden to establish redressability as to these claims. Redressability is present where it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). And "standing is not dispensed in gross," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)); rather, "a plaintiff must demonstrate standing . . . for each form of relief that is sought," *id.* (quoting *Davis*, 554 U.S. at 734). Again viewing Plaintiffs' claims in the light in which they are primarily cast – as arising from congressional inaction, and thus presumably redressable only by affirmative congressional action – we find highly dubious the notion that Article III redressability could be present, given the confines of the federal judiciary's power. The Speech or Debate Clause – not to mention separation-of-powers principles more broadly – make quite impossible the injunctive relief Plaintiffs appear to contemplate. *See* Am. Compl. Prayer for Relief ¶ 5(h) (praying that the court "order[] Defendants to pursue the steps that will most appropriately assure the rights of District of Columbia citizens to participate in the election of voting members of Congress"); *see also Eastland*, 421 U.S. at 503 (noting that the Speech or Debate Clause confers immunity for any act that falls "within the sphere of legitimate legislative activity"); U.S. CONST. art I, § 1, cl. 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]").

As to the declaratory relief Plaintiffs seek, "a request for declaratory relief may be considered independently of whether other forms of relief are appropriate." *Powell v. McCormack*, 395 U.S. 486, 517-18 (1969) (finding redressability while "express[ing] no opinion about the appropriateness of coercive relief" against officers of the House). But Plaintiffs face an uphill climb to establish that ultimate redress would "likely" follow our issuance of a declaratory judgment in their favor should they prevail. *See Lujan*, 504 U.S. at 561. "Whether [Plaintiffs'] claims of [] injury would be redressed by a favorable decision in this case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

At argument and in their filings, Plaintiffs rely heavily on *Utah v. Evans*, 536 U.S. 452 (2002), and *Franklin v. Massachusetts*, 505 U.S. 788 (1992), contending that the standing principles iterated therein support their contention that redressability is present here. In *Franklin* – where the plaintiffs were challenging the allocation of overseas federal employees to States for apportionment purposes, 505 U.S. at 795 – a plurality of the Supreme Court found redressability in the potential for declaratory relief against the Secretary of Commerce, reasoning that it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination," *id.* at 803. A Court majority cited this language with approval in *Evans*, 536 U.S. at 460, 464, there considering a challenge to the methodology used in the 2000 decennial census, *id.* at 457-58. In addressing redressability, the *Evans* Court found that "a declaration leading, or an injunction requiring, the Secretary" of Commerce to issue a new census report using a different calculation method "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," *id.* at 464, as "the relevant calculations and consequent apportionment-related steps" that would follow a new report's issuance (and would redress the asserted injuries) "would be purely mechanical," *id.* at 463.

We do not find the reasoning espoused in *Franklin* or *Evans* to be controlling here. No one can be heard to say that congressional enactment of legislation – which here is the key link in the chain leading to ultimate redress – is "purely mechanical," as would bring this case within *Evans*'s scope. And while we could *posit* that members of Congress would "abide by an authoritative interpretation of the . . . [C]onstitution[]" by this Court, *Franklin*, 505 U.S. at 803, such persons acting in their capacity as legislators are not the sorts of "congressional officials" contemplated by the *Franklin* Court as likely to provide ultimate redress via dutiful, predictable adherence to a court's declaration of the law. Compounding this latter problem is the fact that Plaintiffs have dismissed the House Defendants from the suit, meaning that we could not (even in the absence of all other impediments) issue any relief running against them. *See, e.g.*, *Lujan*, 504 U.S. at 568-71 (finding an absence of redressability where remediation of plaintiffs' injuries would have required action by entities who "were not parties to the case" and were thus beyond the lower court's remedial reach).

We cannot say that the issuance of the requested declaratory judgment would make it "likely, as opposed to merely speculative," that Congress would undertake the affirmative action that, under Plaintiffs' central theory of the case, would be necessary to vindicate their asserted constitutional right to the House franchise. *See Lujan*, 504 U.S. at 561. The daylight between this case on the one hand, and *Franklin* and *Evans* on the other, shines in large part from the separation of powers. It is simply not the role of this Court to legislate, any more through declaratory action than through injunction. The bridge from our issuance of declaratory relief to Plaintiffs' receipt of ultimate redress would necessarily pass through independent congressional action, with all the political choices and policy considerations entailed therein. It is a bridge too far.

We recognize some surface tension between this case and *FEC v. Akins*, cited by the *Evans* Court as supporting its finding of redressability and thus standing. *See Evans*, 536 U.S. at 464 (citing *Akins*, 524 U.S. at 25). *Akins* concerned those plaintiffs' quest to persuade the Federal Election Commission to designate a certain group as a "political committee," in the hopes ultimately of obtaining information about the group via statutorily mandated disclosures that would likely follow from such a designation. 524 U.S. at 15-16. The *Akins* plaintiffs brought suit seeking review of FEC's dismissal of their administrative complaint. *Id.* at 18. The Supreme Court found redressability to be present, notwithstanding the fact that "the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason." *See id.* at 25. And though at least one Court of Appeals judge has read *Akins*'s redressability finding to rest on the "assur[ance] that the FEC's discretionary decision [would be] based on a correct understanding of the relevant law," *Igartúa-de la Rosa v. United States*, 417 F.3d 145, 182 (1st Cir. 2005) (en banc) (Torruella, J., dissenting), the Supreme Court itself casts *Akins*'s redressability finding as being premised on the increased likelihood of FEC ultimately requiring reporting, despite its power not to do so, *Evans*, 536 U.S. at 464; *accord Akins*, 524 U.S. at 21 (casting the injury at issue as the "inability to obtain information").

The superficial parallels are at first pass persuasive. Here, as in *Akins*, the relief requested is but an initial step toward ultimate redress, Plaintiffs' achievement of which is dependent upon choices by government actors who the Court is powerless in the first instance to control. But again we see daylight between *Akins* and our case, in that FEC, on receipt of a complaint like the one in *Akins*, is *obligated* to take some action. *See* 52 U.S.C. § 30109 (detailing how FEC must respond to such complaints). In other words, *Akins* is not a case in which the Supreme Court found redressability in the potential for an independent political actor under *absolutely no obligation* to

act to bestir itself to do so, and then to act in a way that redressed the asserted injury; rather, it was inevitable in *Akins* that *some* action would be taken on those petitioners' complaint following a favorable Court ruling. Not so here. We cannot pretend to predict the workings of Congress, and congressional issuances are not compelled as are FEC's. To posit that Congress will act, let alone act in any particular way, is to engage in the sort of speculation that *Lujan* instructs may not be the basis for Article III standing. *See* 504 U.S. at 561.

Finding an absence of both causation and redressability, we hold that insofar as Plaintiffs' House-related claims are premised on allegedly wrongful congressional inaction, those claims are nonjusticiable for want of Article III standing and accordingly are dismissed.

## VIII.   Justiciability of House Claims that Resemble Those Considered in *Adams*

The above analysis does not close the book on all of Plaintiffs' claims, however. Although the central thrust of Plaintiffs' suit is nonjusticiable, there are portions of the Amended Complaint that assert a more conventional challenge: one to Plaintiffs' exclusion from apportionment and, in the same vein, to the apportionment statutes themselves.[5] In line with the conclusion reached in *Adams*, we find that Plaintiffs' constitutional challenges to apportionment are justiciable.

The Amended Complaint makes evident that, though apportionment is not their primary focus, Plaintiffs do challenge their exclusion therefrom. In their discussion of each of the Executive Defendants, Plaintiffs zero in on their respective roles in apportionment. *See* Am. Compl. ¶¶ 66 (the Secretary of Commerce), 67 (the President). And among the various items of relief sought are some directed at apportionment: Plaintiffs seek a declaration that the apportionment statutes (2 U.S.C. § 2a and 13 U.S.C. § 141) "are unconstitutional insofar as they require or have been applied" to exclude District residents from apportionment, Am. Compl. Prayer for Relief ¶ 1, and also pray for injunctive relief compelling the Secretary, the President,

---

[5] We do not understand Plaintiffs to be challenging the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Pub. L. No. 99-410, 100 Stat 924 (1986) (codified at 52 U.S.C. §§ 20301-11). UOCAVA requires States (as well as U.S. territories and the District of Columbia) to permit otherwise-qualified voters residing or stationed overseas to vote in the last place they were domiciled prior to leaving the United States. 52 U.S.C. §§ 20302, 20310. Although the Amended Complaint does make repeated mention of UOCAVA with respect to Plaintiffs' equal-protection claim, *see, e.g.*, Am. Compl. ¶¶ 4, 111, 112, 114, 125, 135, it has none of the hallmarks we would expect of a complaint challenging UOCAVA's constitutionality or contending that UOCAVA should be expanded to grant some District residents the congressional franchise. For instance, the Amended Complaint's focus is evidently on securing congressional representation for District residents *qua* District residents, not as (former) residents of States. *See, e.g., id.* ¶¶ 6 (arguing for "the constitutional right of District residents to band together to further their political beliefs"), 133 ("Without voting representation in the House and the Senate, District residents are unable to rely on local champions in Congress arguing for a fairer distribution of federal funds."). None of Plaintiffs' allegations as to the Defendants sued pertains to UOCAVA. *See id.* ¶¶ 59-67. And none of the requested relief addresses UOCAVA – either striking the statute down wholesale or allowing those District residents who previously resided and voted in States to continue to vote there. *See id.* Prayer for Relief ¶¶ 1-7. Because we conclude that Plaintiffs' constitutional claims are otherwise foreclosed, we have no occasion for further discussion of UOCAVA.

"and their successors in office[] to include the District" in their apportionment calculations and transmissions, *id.* ¶ 5(f).[6]

These aspects of Plaintiffs' claims map onto *Adams*, where the panel addressed whether "the failure to apportion congressional representatives to the District . . . violate[d those plaintiffs'] constitutional rights[.]"  *See* 90 F. Supp. 2d at 37.  The *Adams* panel considered, in turn, the political-question and standing doctrines, finding the apportionment claims justiciable on both scores.  90 F. Supp. 2d. at 40-45.  In finding no political-question barrier, the panel noted that "[t]he Supreme Court has repeatedly declared that '[c]onstitutional challenges to apportionment are justiciable,'" *id.* at 40 (quoting *Franklin*, 505 U.S. at 801 (plurality)), and that the question of whether "District residents are among those qualified to vote for congressional representatives under Article I" was a "purely legal issue" that "the courts are perfectly capable of resolving," *id.* As to standing, the *Adams* panel found sufficient causation in the Secretary of Commerce's actions pursuant to the apportionment statute.  90 F. Supp. 2d at 41.  On redressability, the panel relied primarily on *Franklin*, and concluded that "the ability of the court to enjoin the Secretary establishes the necessary redressability." 90 F. Supp. 2d at 41-43; *see also Evans*, 536 U.S. at 459-64 (Court majority endorsing *Franklin's* redressability analysis).

The Supreme Court's summary affirmances in *Adams v. Clinton*, 531 U.S. 941 (2000) (mem.) and *Alexander v. Mineta*, 531 U.S. 940 (2000) (mem.), necessarily endorsed both of these justiciability holdings.  Had the Supreme Court disagreed with the *Adams* panel's justiciability findings, its action would have been in the nature of dismissal rather than affirmance.  *See, e.g.*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019) (finding a nonjusticiable political question, vacating merits decisions of two three-judge district courts, and remanding "with instructions to dismiss for lack of jurisdiction"); *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1956 (2019) (finding absence of standing and dismissing appeal "for lack of jurisdiction"); *see also Adams v. Clinton*, 531 U.S. at 941 ("Justice Stevens would dismiss the appeal.").  That both summary affirmances were issued in a post-*Steel Co.* era, *see Steel Co.*, 523 U.S. 83, moreover, lends additional credence to our conclusion that the Supreme Court considered the jurisdictional questions and accounted for them in summarily affirming the *Adams* panel's judgment.  In view of the similarity between the claims asserted before the *Adams* panel and those asserted here – claims that the District's exclusion from apportionment violates the Constitution, paired with a prayer for redress via injunctive relief against the Secretary of Commerce – we believe we are bound by *Adams* and its summary affirmances to find Plaintiffs' apportionment claims justiciable and thus assert jurisdiction over them.

Before proceeding to the merits of those claims still before us, we note that Defendants also argue for the dismissal of the President from the suit on the grounds that the Court may not order equitable relief against him for his official conduct and that there is no cause of action against him.  To the extent the first of these arguments is distinct from the second, it goes to the justiciability of Plaintiffs' claims, and we find it unnecessary to reach the issue.  Again, *Adams* anchored its redressability analysis (and thus its finding of standing) in the court's ability to enjoin the Secretary of Commerce, 90 F. Supp. 2d at 43-44, and the Supreme Court's affirmances on the

---

[6]  We construe Plaintiffs' apportionment claims as being asserted only against the Executive Defendants, as the Amended Complaint makes no apportionment-related allegations against either the Vice President or the President *Pro Tempore* of the Senate, *see generally* Am. Compl., and no other defendants remain before us.

merits, *Alexander v. Mineta*, 531 U.S. 940 (2000) (mem.); *Adams v. Clinton*, 531 U.S. 941 (2000) (mem.), dictate that we find standing here.  In the absence of any need to do so, we decline to wade into the question of the President's amenability to equitable relief.  "[T]he partial relief [Plaintiffs] can obtain against [a] subordinate executive official[] . . . . is sufficient for standing purposes when determining whether we can order more complete relief would require us to delve into complicated and exceptionally difficult questions regarding the constit[ut]ional relationship between the judiciary and the executive branch."  *Swan v. Clinton*, 100 F.3d 973, 980-81 (D.C. Cir. 1996); *accord Franklin*, 505 U.S. at 803 (plurality) ("For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone." (citations omitted)).  As to the existence of a cause of action against the President, we need not decide that issue either, because we conclude that dismissal of Plaintiffs' remaining claims on Rule 12(b)(6) grounds, including their claims against the President, is otherwise appropriate.

## IX.   The Merits of Plaintiffs' Justiciable House Claims

As explained above, insofar as Plaintiffs' claims are targeted at remediating congressional inaction, Plaintiffs lack Article III standing to pursue them.  With all claims targeting representation in the Senate remanded to the single-judge District Court from whence they came, what remains to be decided is whether the apportionment statutes, 13 U.S.C. § 141 and 2 U.S.C. § 2a, and the Secretary of Commerce's and the President's actions in conformity with the same, violate Plaintiffs' rights to equal protection, due process, or freedom of association and representation due to the resultant denial to Plaintiffs of the House franchise.  We answer these questions, ultimately, in the negative.  Our analysis begins with consideration of the effect of *Adams* on our disposition of the issues; we then elucidate and unpack the parties' central premises before proceeding, finally, to the merits.

### A.   *Adams*

Our conclusion that Plaintiffs' apportionment claims fail to state a claim upon which relief can be granted may be foreordained, in whole or in part, by *Adams* and its summary affirmances. The *Adams* panel concluded that Article I restricts representation in the House to "the residents of actual states," 90 F. Supp. 2d at 47, and on that basis denied those plaintiffs' equal-protection, privileges-and-immunities, due-process, and Republican Guarantee Clause challenges to their exclusion from apportionment, *id.* at 65-72.  The Supreme Court's summary affirmances of that panel's decision – which, again, we are counseled to treat as binding, *see Hicks*, 422 U.S. at 344 – beg the question of what was both necessarily decided there and essential to sustain the District Court's judgment, *see* Schneier, *Do's and Don'ts*, *supra*, 960-61.  An examination of the jurisdictional statements submitted to the Supreme Court is illuminating to a point; the (original) *Adams* plaintiffs presented, as relevant here,[7] only their equal-protection challenge to their exclusion from apportionment, *see* Jurisdictional Statement, *Adams*, 531 U.S. 941 (No. 00-97), 2000 WL 33999989, at *i, while the *Alexander* plaintiffs disputed the *Adams* panel's more basic conclusion that Article I, Section 2 of the Constitution divests District residents of the congressional franchise, as well as the broader holding that such a restriction did not conflict with

---

[7]  The *Adams* plaintiffs also "provisionally" presented the question of whether the *Adams* panel's handling of their case had violated their rights to due process.  Jurisdictional Statement, *Adams*, 531 U.S. 941 (No. 00-97), 2000 WL 33999989, at *i.

subsequent constitutional amendments, *see* Jurisdictional Statement, *Alexander*, 531 U.S. 940 (No. 99-2062), at i.

The jurisprudential landscape as to the precedential effect of summary affirmances is in such a state as to make the search for a firm place on which to rest a substantive holding exceedingly difficult. Pressed by necessity, however, we believe that the Supreme Court must have affirmed the *Adams* holding that was the basis for the *Adams* panel's rejection of each of those plaintiffs' specific constitutional challenges: the holding that Article I contemplates that only "residents of actual states" have and may exercise the House franchise. We reach this conclusion because this holding is the central premise, and the narrowest ground, on which we perceive *Adams* to rise or fall.

But we do not rest wholly on *Adams*, for several reasons. For starters, Plaintiffs here are adamant that their claims are not foreclosed by *Adams* due, *inter alia*, to Congress's recent discovery of the applicability of (and Plaintiffs' resultant reliance on) the District Clause.[8] *See, e.g.*, Am. Compl. ¶¶ 124-27 (citing, in addition, the interposition of *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), *Vieth v. Jubelirer*, 541 U.S. 267 (2004), and *Gill v. Whitford*, 138 S. Ct. 1916 (2018)). Plaintiffs' new theories, they contend, take the instant case outside the ambit of the *Adams* decisions and warrant our fresh consideration of the issues presented. We do not pass on whether these distinctions, standing alone, would be sufficient to remove this case from *Adams*'s ambit, for they are joined by additional considerations. We are heedful of the Supreme Court's repeated statements that summary affirmances have less precedential weight than do full opinions. *See, e.g.*, *Wynne*, 135 S. Ct. at 1800; *Morse*, 517 U.S. at 203 n.21. And because the twin summary affirmances in *Adams* present "rather slender reed[s]" on which to rest our decision, *Celebrezze*, 460 U.S. at 784 n.5 (citation omitted), we conduct our own independent analysis, an approach of which the Supreme Court has previously approved, *see id.* at 784-85. For the reasons that follow, we reach the same conclusion on the question of Article I's import as did the *Adams* panel twenty years ago. As in *Adams*, the conclusion must follow that Plaintiffs' constitutional challenges to their exclusion from apportionment and from the House franchise fail.

---

[8]  As Plaintiffs and several *amici* observe, both chambers of Congress have concluded in the time since *Adams* that Congress does have the at-issue power. In 2007, the House passed H.R. 1905, which, *inter alia*, would have treated the District as a congressional district for the purposes of representation in the House. H.R. 1905, 110th Cong. (2007). In 2009, the Senate passed S.160, which would have provided the District with a voting seat in the House. S.160, 111th Cong. (2009). Plaintiffs note also that two former D.C. Circuit Judges – Kenneth Starr and Patricia Wald – testified before Congress in support of Congress's ability to use its District Clause powers in this manner. *See Hearing on S. 1257, the District of Columbia House Voting Rights Act of 2007, Before the S. Comm. on the Judiciary*, 110th Cong. (2007) (statement of Patricia M. Wald); *Common Sense Justice for the Nation's Capital: Hearing Before the H. Comm. on Gov't Reform*, 108th Cong., at 75-84 (2004) (statement of Kenneth Starr); *but see* 155 Cong. Rec. S2529 (daily ed. Feb. 26, 2009) (statement of John P. Elwood, Deputy Assistant Attorney General) (contending the 2007 bill was unconstitutional). Scholars have also weighed in on both sides of this issue. *See, e.g.*, Jonathan Turley, *Too Clever by Half: The Unconstitutionality of Partial Representation of the District of Columbia in Congress*, 76 GEO. WASH. L. REV. 305 (Feb. 2008); Mark S. Scarberry, *Historical Considerations and Congressional Representation for the District of Columbia: Constitutionality of the D.C. House Voting Rights Bill in Light of Section Two of the Fourteenth Amendment and the History of the Creation of the District*, 60 ALA. L. REV. 783 (2009); Orrin G. Hatch, *"No Right is More Precious in a Free Country": Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 HARV. J. ON LEGIS. 287 (Summer 2007); CONG. RESEARCH SERV., THE CONSTITUTIONALITY OF AWARDING THE DELEGATE FOR THE DISTRICT OF COLUMBIA A VOTE IN THE HOUSE OF REPRESENTATIVES OR THE COMMITTEE OF THE WHOLE (2009).

## B.  The Parties' Arguments

To review, Article I of the Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  U.S. CONST. art. I, § 2, cl. 1.  Section 2, Clauses 2 through 4,[9] Section 4, Clause 1,[10] Article II Section 1, Clause 2,[11] and Section 2 of the Fourteenth Amendment[12] also refer to "States" in discussing House representation.  Meanwhile, the District

---

[9]

> No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.  The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.  The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

> When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

U.S. CONST. art. I, § 2, cl. 2-4.

[10]

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1.

[11]

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

U.S. CONST. art. II, § 1, cl. 2.

[12]

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.  But when the right to vote at any election for the

Clause, contained in Article I, Section 8 of the Constitution, provides that "[t]he Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States[.]" *Id.* art I, § 8, cl. 17.

Defendants argue that the Constitution itself "reserves representation in the House and Senate to residents of a state – a group that does not include residents of the District." Mem. in Supp. of MTD at 20. As Defendants see it, because "the Constitution dictates the lack of representation for residents of the District, . . . all of Plaintiffs' claims must fail, regardless of which sections of the Constitution Plaintiffs cite." *Id.* at 25 ("Plaintiffs . . . cannot successfully establish that the Constitution itself is unconstitutional."). Plaintiffs, on the other hand, argue that "while the Constitution explicitly *requires* citizens of States to have voting representation," it also authorizes Congress, via the District Clause, to provide the congressional franchise to District residents.[13] Mem. in Supp. of MSJ at 8 (emphasis in original); *see* Pls.' Reply at 3, ECF No. 50 ("The constitutional provisions requiring voting representation for state residents set a floor, not a ceiling."); *see generally id.* at 3-11. Plaintiffs' argument is, essentially: that the District Clause empowers Congress to treat the District for apportionment purposes as if it were a State; that voting is a fundamental right that Congress must allocate to all citizens on an equal basis absent a compelling reason to do otherwise; and that such compelling reason is absent here. It is on this basis that Plaintiffs seek to establish that the apportionment statutes, 2 U.S.C. § 2a and 13 U.S.C. § 141, are unconstitutional for their exclusion from the apportionment process, and their resultant exclusion from House representation, of District residents.

In a way, the parties are asking the Court to answer different questions. Defendants would have the Court determine if the Constitution contemplated that *only* "the People of the several States" would have voting representation in Congress. If that is the constitutionally ordained system, say Defendants, Plaintiffs' claims cannot succeed, as the Constitution cannot be unconstitutional. Plaintiffs contend that the Court should instead ask if Congress *can* use its District Clause powers to allocate Representatives to the District,[14] because if it is empowered to do so, then the ability to elect House Representatives is not inherently limited to "the People of the

---

choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. CONST. amend. XIV § 2.

[13] Several *amici* join Plaintiffs in contending that Congress is empowered by the District Clause to grant District residents the congressional franchise. *See generally* Scholars' Br.; House's Br.; *see also* Historians' Br. at 3-6 (arguing that there is no historical evidence that the Framers intended to disenfranchise District residents).

[14] *See supra* note 8.

several States," and so it is not a contradiction in terms to say that District residents' lack of the House franchise is unconstitutional.[15]

One difficulty here is that the inquiry Plaintiffs would have the Court undertake is rather circular:  Plaintiffs contend that Congress's plenary power over the District is what renders those constitutional provisions that tie House representation to the States nonexclusive.  But we break through this chicken-or-egg conundrum by observing that multiple Supreme Court pronouncements undercut the notion that Congress's District Clause power has no outer limits. The Supreme Court has repeatedly recognized that the other provisions of the Constitution serve as a check on Congress's District Clause power.  *See, e.g.*, *Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 442-44 (1923) (concluding that Congress could not contravene Article III by using its District Clause powers to create jurisdiction in the Supreme Court to consider appeals from the D.C. Court of Appeals' review of utility commission proceedings).  That is, Congress's power over the District is indeed "plenary" – "save as controlled by the provisions of the Constitution." *Binns v. United States*, 194 U.S. 486, 491 (1904); *see also Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434-35 (1932) (Congress may legislate with respect to the District "so long as other provisions of the Constitution are not infringed" (citation omitted)); *Capital Traction Co.*, 174 U.S. at 5 (Congress may legislate with respect to the District "so long as it does not contravene any provision of the constitution of the United States" (citation omitted)); *see also Palmore v. United States*, 411 U.S. 389, 397 (1973) (quoting this language from *Capital Traction Co.*); *cf. Stoutenburgh v. Hennick*, 129 U.S. 141, 147 (1889) (stating that, under the District Clause, Congress "possess[es] the combined powers of a general and of a state government in all cases *where legislation is possible*" (emphasis added)).

A striking (if not immediately apparent) instance of Supreme Court recognition of this limitation can be seen in *National Mutual Insurance Co. v. Tidewater Transfer Co*., 337 U.S. 582 (1949), which Plaintiffs cite to support their broad reading of Congress's District Clause power. In *Tidewater*, a deeply divided Supreme Court upheld Congress's provision, in 28 U.S.C. § 1332, that diversity jurisdiction would be deemed to exist in a case between a citizen of a State and a citizen of the District.  *See generally* 337 U.S. 582; *cf.* U.S. CONST. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases . . .  between Citizens of different States[.]").  *Tidewater* is made up of four different opinions – a three-justice plurality, a two-justice concurrence, and two two-justice dissents – but six justices agreed that Congress could not use its District Clause power to override explicit constitutional provisions.  *Contra* Pls.' Reply at 6-7 (arguing that both the plurality opinion and the concurrence support their position, albeit through different reasoning).

---

[15]  Plaintiffs do not seriously contest the point that the Constitution cannot be unconstitutional; indeed, they "agree" with Defendants that "the constitutional provisions . . . allocating representatives and Senators to the [S]tates . . . . are constitutional."  Pls.'s Reply at 3.  This is an eminently reasonable position, and we see no need to belabor the tautology, as it is "settled beyond dispute that the Constitution is not self-destructive."  *Billings v. United States*, 232 U.S. 261, 282-83 (1914); *accord, e.g.*, *Morgan v. United States*, 801 F.2d 445, 448 (D.C. Cir. 1986) ("Unless the Constitution were unconstitutional, one would think that, on those hypotheses, further review *would certainly* be barred."  (emphasis in original)); *Igartúa v. United States*, 626 F.3d 592, 596 (1st Cir. 2010) (concluding that Article I by its terms prohibits Puerto Rico from having a House Member, and observing that "it cannot, then, be unconstitutional to conclude the residents of Puerto Rico have no right to vote for Representatives"); *Mercer v. Magnant*, 40 F.3d 893, 898 (7th Cir. 1994) ("[P]rocedures required by the Constitution are not themselves unconstitutional.").

The plurality, while finding that "the District of Columbia is not a state within Article III of the Constitution," *id.* at 588, did hold that Congress could include the District in diversity jurisdiction through a combination of its District Clause and Necessary and Proper Clause powers; in a highly contextual analysis, the plurality discussed and built upon other instances in which Congress had used other plenary Article I powers to confer non-Article-III jurisdiction on Article III courts, *id.* at 592-599; *see also id.* at 603 ("Congress is reaching permissible ends by a choice of means which certainly are not expressly forbidden by the Constitution.").

The two-justice concurrence, meanwhile, reasoned that "the words of Article III . . . must mark the limits of the power Congress may confer on the district courts in the several states," and that those limits cannot be overridden "through invocation of Article I without making the Constitution a self-contradicting instrument," *id.* at 607; *see also id.* at 608 ("[I]t seems past belief that Article I was designed to enable Congress" to override Article III). The concurrence concluded, however, that § 1332 was constitutional because Article III's diversity provision should not be read as exclusive in the absence of any evidence that the Framers so intended it, *id.* at 617-25. The four justices who dissented would have held § 1332 unconstitutional for "disregard[ing] an explicit limitation of Article III." *Id.* at 653; *see id.* at 655.

Plaintiffs also rely on *Loughborough v. Blake*, 18 U.S. 317 (1820), contending that it supports their interpretation of the District Clause. In *Loughborough*, the Supreme Court considered whether the Constitution permitted Congress to impose a direct tax on residents of the District. 18 U.S. at 317-18. In finding that it did, the Supreme Court cited two grounds for Congress's power: Article I, Section 8, Clause 1 (the "Power To lay and Collect Taxes, Duties, Imposts and Excises"), *id.* at 319-24, and the District Clause, *id.* at 324-25. Plaintiffs here make much of Article I, Section 2, Clause 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective numbers" as determined by the census) and the Supreme Court's ultimate finding in *Loughborough* that direct taxation may be imposed on District residents, arguing that "it therefore follows that Congress may use its District Clause power to apportion 'Representatives' to the District as well," Pls.' Reply at 6. But the Supreme Court's invocation of the District Clause took place in the context of its discussion of Congress's Article I, Section 8, Clause 1 power to tax, a "general grant of power to lay and collect taxes," which the Supreme Court considered "incontrovertibl[y]" "made in terms which comprehend the district and territories as well as the States." *Loughborough*, 18 U.S. at 322. In light of that broad power, the Court considered the apportionment provision of Article I, Section 2, Clause 3 to "furnish a standard by which taxes are to be apportioned, not to exempt from their operation any part of our country." *Id.* at 320 ("Had the intention been to exempt from taxation those who were not represented in Congress, that intention would have been expressed in direct terms."). As we discuss below, Plaintiffs' argument that the same logic could be used to extend House representation to the District via the District Clause runs up against the other provisions of Article I. In *Loughborough*, on the other hand, no other constitutional provision was pointed to as restraining Congress's District Clause powers. *See id.* at 324-25 (discussing only the potential limitations posed by the "great principle . . . that representation is inseparable from taxation"). In order for Plaintiffs' analogy to and reliance on *Loughborough* to work, the Constitution would have to give Congress plenary power to apportion representatives – which it simply does not. *See generally* U.S. CONST. art. I, § 2, cl. 3; *id.* amend. XIV, § 2 (setting forth how House Representatives are to be apportioned).

In the same vein, the Supreme Court has previously found other power granted Congress by Article I to be limited by other portions thereof. *Powell v. McCormack* concerned a newly reelected Member of the House who, pursuant to a House resolution, was not permitted to take his seat (because the House suspected him of financial improprieties). 395 U.S. at 489. The *Powell* defendants argued that the case presented a nonjusticiable political question because Article I, Section 5, Clause 1 ("Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members") represented a textual commitment of the matter to a coordinate branch of government. 395 U.S. at 519-20. The Supreme Court undertook an historical analysis of Section 5 and determined that "Art. I, § 5, is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution." 395 U.S. at 548 (quoting *Baker*, 369 U.S. at 217); *see also* U.S. CONST. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."). In other words, the general power granted Congress by Article I, Section 5 ran up against, and yielded to, the specific provisions of Article I, Section 2.

In a way, Plaintiffs are in fact arguing for the commonsense proposition that Congress's power to legislate for the District is cabined by the other provisions of the Constitution: Plaintiffs' contention is that Congress, by providing for apportionment in a way that does not give the House franchise to District residents, is running afoul of the First, Fifth, and Fourteenth Amendments. But this argument ignores the fact that congressional legislation on apportionment does not stand on its own; rather, it follows the dictates of other portions of the Constitution to the extent the Constitution itself limits House representation to the States. Therefore, if the Constitution limits House representation to the "States," Plaintiffs – who expressly do not concede they must be able to characterize themselves as residents of a State, and do not argue the District is a State – cannot succeed on their claims. Despite their protestations to the contrary, Plaintiffs *do* seek to establish that the Constitution is unconstitutional, because they argue that the statutes by which Congress has put Article I's provisions for apportionment into action (2 U.S.C. § 2a and 13 U.S.C. § 141) violate the First, Fifth, and Fourteenth Amendments. *See* Am. Compl. Prayer for Relief ¶ 1 (seeking a declaration that the apportionment statutes "are unconstitutional insofar as they require or have been applied to effect the exclusion of citizens of the District of Columbia from the Congressional apportionment process"). Given that Congress's District Clause power is bounded by the Constitution's other provisions, Plaintiffs' claims must rise or fall on the interpretation of those provisions that address the makeup of the House electorate.

## C. The Merits

We now consider whether the Constitution contemplates that only "the People of the several States" be permitted to elect voting Representatives to the House. *See* U.S. CONST. art I, § 2, cl. 1. Our answer in the affirmative is based on the Constitution's text, judicial precedent, and, to a lesser extent, constitutional history.

### 1. Constitutional Text

The link between "States" and representation in the House is sewn throughout Article I. Members of the House are to be elected "by the People of the Several *States*," and the qualifications of "each *State*['s]" electors (voters) are tied to those of the electors of the "*State* Legislature." U.S. CONST. art I, § 2, cl. 1 (emphases added). A representative must, at the time of her election, be "an Inhabitant of that *State* in which" she is chosen. *Id.* cl. 2 (emphasis added). Article I as

unabridged dictated that both "Representatives and direct Taxes" are "apportioned among the several *States* which may be included within this Union," *id.* cl. 3 (emphasis added), and the Fourteenth Amendment provides that "Representatives shall be apportioned among the several *States* according to their respective numbers, counting the whole number of persons in each *State*," *id.* amend. XIV, § 2 (emphases added). Article I, Section 2 further dictates that "each *State* shall have at Least one Representative," and lists the number of representatives to be apportioned to the thirteen States that were then members of the Union. *Id.* art. I, § 2, cl. 3 (emphasis added). Section 2 also states that, "[w]hen vacancies happen in the Representation from any *State*, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." *Id.* cl. 4 (emphasis added). And Section 4 provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each *State* by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id.* § 4, cl. 1 (emphasis added).

As the *Adams* panel noted, 90 F. Supp. 2d at 47-49, a reading of "State" in the applicable provisions of Article I that encompassed the District would lead to results that either are impossible or cannot have been contemplated by the Framers. Voter eligibility is tied to that for the "State Legislature," U.S. CONST. art I, § 2, cl. 1, but until the 1973 passage of the Home Rule Act, Pub. L. No. 93-198, 87 Stat. 777, the District of Columbia had nothing analogous; rather, Congress itself was conceived of as the District's legislative body. *See* U.S. CONST. art. I, § 8, cl. 17; *see also, e.g.*, *Stoutenburgh*, 129 U.S. at 147 (noting that the District Clause grants Congress "the combined powers of a general and of a state government in all cases where legislation is possible"). If the "State Legislature" referred to in Article I were read to comprehend Congress as the District's legislature, "with the House as its most numerous branch, then the clause would say no more than that voters for the House must have the qualifications requisite for voters for the House—a tautology without constitutional content." *Adams*, 90 F. Supp. 2d at 48. Another example is Article I, Section 2, Clause 4's provision for the filling of vacancies "from any State [by] the Executive Authority thereof[.]" U.S. CONST. art. I, § 2, cl. 4. Although the District now has a mayor, this is again a relatively recent invention – and Congress is the District's "ultimate executive authority," *Adams*, 90 F. Supp. 2d at 49 (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982) ("Congress' power over the District of Columbia encompasses the full authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative.")), meaning that, were the District to be comprehended within the applicable passages, Congress itself would fill any vacancies in the District's seat(s). As the *Adams* panel cogently observed, "[t]he possibility that the Framers intended Congress to fill its own vacancies seems far too much of a stretch, even if the constitutional fabric were more flexible than it appears to be." *Id.*

"The framers of the constitution employed words in their natural sense; and, where they are plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged in to narrow or enlarge the text[.]" *McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *but see id.* ("[B]ut where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction is entitled to the greatest weight."). Although we perceive no ambiguity in Article I's dictates concerning the "States" whose "people" are entitled to the House franchise, we proceed to dispel any remaining doubts by considering judicial constructions of the relevant portions of Article I, and reiterating an historical issue surfaced in *Adams*.

## 2. Precedent

"Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved." *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973). We are not persuaded that any of the Constitution's other uses of the word "State" address matters near enough to those here at issue that their judicial interpretations would shed light on the question before us; we therefore concern ourselves only with judicial pronouncements on the import of the word "State" in the at-issue provisions of Article I.

Given Plaintiffs' unusual position in the American constituency and the resultant scarcity of analogous cases, it is not surprising that the most on-point appellate precedent is only persuasive. The First Circuit considered in 2010 whether U.S. citizens residing in Puerto Rico had a right to elect a Representative to the House. *Igartúa v. United States*, 626 F.3d 592 (1st Cir. 2010). In holding that the Constitution foreclosed such a right, the First Circuit surveyed the constitutional text, and noted:

> The text of the Constitution defines the term "State" and affords no flexibility as to its meaning. The term is unambiguous and refers to the thirteen original states, which are specifically named in Article I, Section 2, [U.S. Const.] art. I, § 2, cl. 3, and those which have since joined the Union through the process set by the Constitution, *id.* art. IV, § 3, cl. 1 . . . . Because Puerto Rico is not a state, it may not have a member of the House of Representatives. *Id.* art. I, § 2, cl. 1. . . . The text of the Constitution does not permit plaintiffs to vote for a member of the U.S. House of Representatives.

*Igartúa*, 626 F.3d at 596; *see also id.* ("It cannot, then, be unconstitutional to conclude the residents of Puerto Rico have no right to vote for Representatives."). *Igartúa* also discusses how "central" statehood is "to the very existence of the Constitution." *Id.* at 596-98 (concluding that "[v]oting rights for the House of Representatives are limited to the citizens of the states absent constitutional amendment to the contrary."). Those few other federal appellate cases to have considered the precise issue have held similarly. *See Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018) (discussing, in a case brought by former State residents who now resided in territories, the voting rights accorded to residents of the District and the territories, and observing, "The unmistakable conclusion is that, absent a constitutional amendment, only residents of the 50 States have the right to vote in federal elections"); *Igartúa v. Trump*, 868 F.3d 24 (1st. Cir. 2017) (noting, in a four-judge statement on denial of rehearing of *Igartúa en banc*, that the plaintiff's claim "is that the United States Constitution makes it unconstitutional to apportion congressional districts as the Constitution itself says to apportion them," and that none of the judges dissenting from a denial of rehearing "even tries to explain how the Constitution itself might conceivably prohibit that which it directs 'shall be' done"). Though of course we are bound by none of these decisions, we find them persuasive – especially in the absence of any caselaw to the contrary.

Our own Court of Appeals has opined on the topic to a certain extent. The *Adams* panel, of course, concluded – after an exhaustive analysis – that "the language of Article I . . . makes clear just how deeply [c]ongressional representation is tied to the structure of statehood." 90 F. Supp. 2. at 47; *see also id.* at 68 ("[T]he inability of District residents to vote is a consequence of

Article I.").   The D.C. Circuit, citing *Adams*, has stated in dictum that "the Constitution denies District residents voting representation in Congress." *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) (per curiam) (citing *Adams*, 90 F. Supp. 2d at 72); *see also United States v. Thompson*, 452 F.2d 1333, 1340 (D.C. Cir. 1971) ("[F]or residents of the District, the right to vote in congressional elections is not merely restricted–it is totally denied."  (dictum)), *abrogation on other grounds recognized by United States v. Cohen*, 733 F.2d 128, 135 (D.C. Cir. 1984) (en banc). The D.C. Circuit has further noted, in a 1994 case concerning a House rule that permitted the District's Delegate to vote in the Committee of the Whole, that the language of Article I, Section 2 "precludes the House from bestowing the characteristics of membership" – which include the ability "to vote in the full House" – "on someone other than those 'chosen every second Year by the People of the Several States.'"  *Michel v. Anderson*, 14 F.3d 623, 630 (D.C. Cir. 1994); *see also id.* at 632 (upholding the House rule in question because "insofar as the rule change bestowed additional authority on the delegates, that additional authority is largely symbolic . . . . [W]e do not think this minor addition to the office of delegates has constitutional significance.").

Supreme Court pronouncements on the subject are a lightly mixed bag.  Historically, the Supreme Court has evinced an understanding that House representation is limited to the people of the States.  For instance, considering in 1901 whether the Constitution's revenue clauses extended to U.S. territories, the Supreme Court emphasized that "[t]he Constitution was created by the people of the *United States*, as a union of *states*, to be governed solely by representatives of the *states* . . . . In short, the Constitution deals with *states*, their people, and their representatives." *Downes v. Bidwell*, 182 U.S. 244, 251 (1901) (emphases in original); *see also Hepburn & Dundas v. Ellzey*, 6 U.S. 445, 452-53 (1805) (quoting language from Article I regarding House, Senate, and presidential elections, and concluding, "These clauses show that the word state is used in the constitution as designating a member of the union . . . . [This] term . . . [is] used plainly in this limited sense in the articles respecting the legislative and executive departments[.]").  The Supreme Court has also referred to the District as having "voluntarily relinquished the right of representation."  *Loughborough*, 18 U.S. at 324; *see also id.* at 324-25 ("[C]ertainly the [C]onstitution does not consider their want of a representative in Congress as exempting it from equal taxation.").

More recently, the Supreme Court has spoken of the right to vote for Members of Congress as rooted in the individual rather than deriving from the State – but these pronouncements are fairly general, not particularly on point, and ultimately insufficient to counteract what we read as the clear provisions of Article I.  *See, e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804 (1995) ("The [Constitution's] salary provisions reflect the view that representatives owe their allegiance to the people, and not to the States."); *id.* at 808 ("As Madison noted, allowing States to differentiate between the qualifications for state and federal electors 'would have rendered too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone.'" (quoting THE FEDERALIST NO. 52, at 326 (James Madison))); *Wesberry v. Sanders*, 376 U.S. 1, 14 (1964) ("The House of Represen[t]atives, the Convention agreed, was to represent the people as individuals, and on a basis of complete equality for each voter.").

In sum, the weight of what precedent there is on the issue supports our reading of Article I as limiting House representation to the people of the States.

### 3.  Constitutional History

We do not here rehearse constitutional history writ large.  Although Plaintiffs (and some of their *amici*) spend a fair amount of time on historical arguments, nowhere is it contended that the Framers of the Constitution intended, by their repeated reference to "States" in Article I, to refer to anything but those entities of which the Union then had thirteen and now has fifty.  *Cf. Adams*, 90 F. Supp. 2d at 56 ("There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise.").  But we linger in constitutional history long enough to reiterate and underline a critical point made in *Adams*: namely, that the process by which Congress came to be composed as it is counsels against the broad, nonexclusive reading of "State(s)" that would necessarily underpin the prevalence of Plaintiffs' claims.

The bicameral structure of Congress was the result of the Constitutional Convention's Great Compromise – a deal struck between delegates who favored election by and representation of the people, and those delegates (including those from small States) who argued that the States should instead be represented.  *Wesberry*, 376 U.S. at 9-14; *see also id.* at 10 ("The question of how the legislature should be constituted precipitated the most bitter controversy of the Convention."), 12 ("The dispute came near ending the Convention without a Constitution.").  The *Adams* panel observed that "the House provisions . . . were 'the other side of the compromise': to satisfy the larger states, the House was to be popularly elected, and 'in allocating Congressmen the number assigned to *each State* should be determined solely by the number of the State's inhabitants.'"  90 F. Supp. 2d at 50 (quoting *Wesberry,* 376 U.S. at 13) (emphasis in *Adams*).  The point we underscore is that the constitution of Congress was the considered result of extensive debate, and in the absence of any evidence that the Framers intended something other than what they wrote, it is not the place of either Congress (acting via the District Clause) or this Court to revise the results of the compromise that was so central to the formation of the country as it is.

### X.     Conclusion

Because Congress's District Clause power does not include the power to contravene the Constitution's express provisions, and because the Constitution by its terms limits House representation to "the people of the several States," we find that Plaintiffs' claims that their exclusion from apportionment is violative of their rights to equal protection, due process, and association and representation fail to state a claim upon which relief can be granted.  *See* FED. R. CIV. P. 12(b)(6).  We therefore dismiss those claims.  Having also dismissed those of Plaintiffs' claims that sought to compel affirmative congressional action, and having remanded to a single District Judge Plaintiffs' Senate claims, our work is now at an end.

But before we end, we note what gives us pause.  We have been and remain cognizant of the gravity of Plaintiffs' asserted injury, which has long been of great concern both to those similarly injured and to sympathetic others who take to heart the democratic ideals that impelled and informed the creation of the Union.  After all, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry*, 376 U.S. at 17.  But the House's makeup, though enshrined in the Constitution, is not written in stone.  The Founders provided for processes for the admission of new States, *see* U.S. CONST. art. IV, § 3, cl. 1 – which are then represented in the House under the

provisions of Article I – and for amending the Constitution, *see id.* art. V, as was done to give District residents the presidential franchise, *see id.* amend. XXIII.  In other words, Plaintiffs may continue to "plead their cause in other venues," *Adams*, 90 F. Supp. 2d at 72: those the Constitution countenances.

For the foregoing reasons, those of Plaintiffs' claims seeking Senate representation are **REMANDED** to the single District Judge to whom the case was originally assigned.  Defendants' Motion to Dismiss, ECF No. 21, is hereby **GRANTED IN PART**; all of Plaintiffs' claims except those seeking Senate representation are **DISMISSED**.  Plaintiffs' Motion for Summary Judgment, ECF No. 23, is hereby **DENIED**.

An accompanying order will follow.

/s/ Robert L. Wilkins
ROBERT L. WILKINS
United States Circuit Judge

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

/s/ Trevor N. McFadden
TREVOR N. McFADDEN
United States District Judge

Date:  March 12, 2020